CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ADITHYA MANI (Bar No. 301880)
(E-Mail: Adithya_Mani@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
DERRICK PATTERSON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-155-JFW |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING POSITION; EXHIBITS** |
| DERRICK PATTERSON, | Sentencing Date: Oct. 7, 2022 |
| Defendant. | Sentencing Time: 8:00 a.m. |

Defendant Derrick Patterson, by and through his attorney of record, Deputy Federal Public Defender Adithya Mani, hereby files his sentencing position, which is based on the attached memorandum of points and authorities and exhibits.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 3, 2022     By  */s/ Adithya Mani*
ADITHYA MANI
Deputy Federal Public Defender
Attorney for DERRICK PATTERSON

# **TABLE OF CONTENTS**

Page(s)

A. Introduduction ..................................................................................................2

B. Procedural Posture and Objections to the Presentence Report ...................3

   1. Mr. Patterson Should Receive a 3-level Enhancement for Brandishing a Dangerous Weapon, Instead of a 4-level Enhancement for Using a Dangerous Weapon .................................5

      a. Mr. Patterson Brandished the Knife in Front of Victim E.M. ........................................................................................5

      b. Mr. Patterson Brandished the Stun Gun in Front of Victim D.W. .......................................................................................6

   2. Mr. Patterson's Conduct Does not Justify Imposing a 3-level Enhancement for Hate Crime Motivation ........................................7

C. 18 U.S.C. § 3553(a) Factors ............................................................................9

   1. Personal History and Characteristics ...................................................9

      a. Maternal Illness and Paternal Incarceration Infect an Early Childhood Otherwise Filled with Love and Support .....9

      b. Losing his Mother, his Everything, to Cancer ......................11

      c. No Opportunities to Grieve and No one to Teach Mr. Patterson how to Cope .............................................................12

      d. The Hurdles Mr. Patterson Faces as a gay Black Man .........12

   2. Deterrence: Mr. Patterson has Used this Wake-up Call to Accept That he Needs Help .................................................................13

      a. Moving Forward from his Biggest Mistakes .........................14

D. Conclusion ......................................................................................................15

## **TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*Masmari v. United States*, Case No. C16-0540 RSM, 2016 WL 3280381
  (W.D. Wash. Jun. 15, 2016) ................................................................................ 8

*United States v. Albritton*, 622 F.3d 1104 (9th Cir. 2010) ........................................ 5

*United States v. Booker*, 543 U.S. 220 (2005) ......................................................... 9

*United States v. Boylan*, 5 F.Supp.2d 274, 276, 283 (D.N.J. 1998) ......................... 7

*United States v. Castellanos*, 81 F.3d 108, 109 (9th Cir. 1996) ............................... 8

*United States v. Roberts*, 898 F.2d 1465, 1469-70 (10th Cir. 1990) ....................... 6

**Federal Statutes**

18 U.S.C. § 1028A ..................................................................................................... 4

18 U.S.C. § 1951(a) ................................................................................................... 4

18 U.S.C. § 3553 ........................................................................................................ 9

U.S.S.G. §1B1.1 ......................................................................................................... 5

U.S.S.G. §2B3.1 ..................................................................................................... 4, 5

U.S.S.G. §3A1.1(a) .................................................................................................... 7

**Other Authorities**

Center for American Progress, "Black LGBTQ Individuals Experience
  Heightened Levels of Discrimination," Jul. 13, 2021. ................................. 12, 13

Nat'l Research Council, The Growth of Incarceration in the United States:
  Exploring Causes and Consequences (2014), Chapter: 9 Consequences
  for Families and Children ................................................................................. 10

Am. Bar Foundation, Parental Incarceration in the United States: Bringing
  Together Research and Policy to Reduce Collateral Costs to Children ............. 10

John Hagan & Holly Foster, Mass Incarceration, Parental Imprisonment,
  and the Great Recession: Intergenerational Sources of Severe
  Deprivation in America.  Russell Sage Found. J. of the Soc. Sciences
  (Nov. 2015) ........................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

Beck, Berzofsky, Caspar, and Krebs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, U.S. Department of Justice, Bureau of Justice Statistics ................................................................................................13

# MEMORANDUM OF POINTS AND AUTHORITIES

## A. Introduction

After seeing his father, Derrick, arrested at the age of 9, Mr. Patterson saw his mother diagnosed with breast cancer when he was 13 years old. Instead of assuming the worst, Mr. Patterson and his mother maintained hope. He accompanied his mother to her treatments and helped her with chemotherapy. Mr. Patterson's mother was everything to him and so he tried his best to help her fight the cancer.

In 2016, when Mr. Patterson was 17 years old, Mr. Patterson's sister went to wake their mother and found her unresponsive. After hearing his sister scream, Mr. Patterson ran to the room and attempted CPR on his mother while his sister called 911. Mr. Patterson's mother died. Mr. Patterson did not know how to cope with his mother's death and lost his direction.

Mr. Patterson has had a history of ADHD and bipolar disorder and even received medication around the age of 12. But Mr. Patterson received that treatment with the assistance of his mother. After her death, Mr. Patterson didn't know how to ask for help to process his grief, or who to talk to, or where to go. Mr. Patterson instead kept things bottled up because he thought this might help him be a better big brother to his younger sister and brother.



Mr. Patterson (right), as a child, with his mother (left).

Lacking proper coping mechanisms, Mr. Patterson resorted to binge drinking on the weekends to try to overcome his grief. His substance abuse progressed to using marijuana, and then later cocaine and Percocet pills. Mr. Patterson's conduct, unfortunately, escalated from using some of these illegal drugs to committing the instant offense.

Mr. Patterson does not bring up his past to make any excuses for his conduct in this case. Before her death, Mr. Patterson's mother taught him better. He never envisioned engaging in the harmful actions he undertook in this case. He never imagined he would cause his victims the very real pain and hurt that they experienced.

Prior to this time in custody, Mr. Patterson had spent only a day in jail. As a result, Mr. Patterson has had an incredibly difficult 6 months at MDC. But being in custody has been a necessary wake-up call for Mr. Patterson. Reflecting on his actions and his life has helped Mr. Patterson learn that, even if he knows better, he needs help to learn how to act on what he knows. So that he never harms anyone else or breaks the law in the future.

Given 1) this is the first time Mr. Patterson has spent more than a day in jail, 2) his recent acknowledgment of the help he needs to process his mother's trauma, 3) his untreated mental illnesses, and 4) his history of substance abuse that he seeks help to address, the defense submits that a total sentence of 36 months in custody, followed by 3 years of supervised release, would be sufficient, but no greater than necessary, to achieve the goals of sentencing. Mr. Patterson, however, graciously accepts any sentence the court imposes. Regardless of the sentence he receives, Mr. Patterson knows that, as a 23-year-old, he still has much of his life remaining to make his mother proud and provide a better example to his younger brother and sister.

**B. Procedural Posture and Objections to the Presentence Report**

On July 12, 2022, Mr. Patterson pled guilty, pursuant to a plea agreement, to Counts 7 and 10 of the Indictment, charging him with Hobbs Act Robbery, in violation

of 18 U.S.C. § 1951(a), and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A, respectively. (Minutes of Change of Plea Hearing, Dkt. 34.)

Pursuant to the plea agreement, the government agreed to, among other things, 1) dismiss the remaining counts of the Indictment, and 2) recommend a two-level reduction in the applicable Sentencing Guidelines offense level for Mr. Patterson's acceptance of responsibility and, if necessary, move for an additional one-level reduction. (Plea Agreement, Dkt. 32, ¶¶ 3(c)-(d).) The parties also agreed to a base offense level of 20 under U.S.S.G. §2B3.1(a), a 3-level enhancement for a dangerous weapon being brandished under U.S.S.G. §2B3.1(b)(2)(E), a 2-level enhancement for physical restraint under §2B3.1(b)(4)(B), and a 2-level enhancement for multiple counts under §3D1.2. (*Id.*, ¶ 15.)

On August 15, 2022, the United States Probation & Pretrial Services Office ("USPO") disclosed the Presentence Investigation Report ("PSR") and its recommendation. The PSR calculates an advisory guidelines range of 70 to 87 months, pls a two-year mandatory consecutive term on Count 10, based on a total offense level of 27 and a Criminal History Category of I. (PSR, Dkt. 36, at 4.)

The defense objects to the USPO's calculation of the advisory guidelines range because, as analyzed further below, it incorrectly includes a 4-level enhancement for a dangerous weapon being "otherwise used" under U.S.S.G. §2B3.1(b)(2)(D) instead of a 3-level enhancement for a dangerous weapon being "brandished or possessed" under §2B3.1(b)(2)(D). The defense also requests the Court apply 2 additional levels under the multiple count adjustment that the parties agreed to in the plea agreement, instead of the 4 additional levels that the PSR includes.[1]

---

[1] Although it does not affect the calculation of the total offense level, Mr. Patterson also objects to the PSR's 1-level enhancement for causing victim E.G. to suffer losses exceeding $20,000 under U.S.S.G. §2B3.1(b)(7)(B). (*See* PSR, ¶ 60.) In the plea agreement, Mr. Patterson agreed that he caused victim E.G. to suffer losses of approximately $18,278.07. (Plea Agreement, at 8.) While the PSR claims total losses of $57,444.74, the defense contends that the additional losses beyond the amount agreed to in the plea agreement lack sufficient proof. (*See* PSR, ¶ 17.) As a result, the 1-level enhancement should not apply.

4

1. **Mr. Patterson Should Receive a 3-level Enhancement for Brandishing a Dangerous Weapon, Instead of a 4-level Enhancement for Using a Dangerous Weapon**

The USPO incorrectly asserts that a 4-level enhancement for "otherwise using" a dangerous weapon under U.S.S.G. §2B3.1(b)(2)(D) should apply to Mr. Patterson's conduct with respect to victims E.M. and D.W. (PSR, ¶ 45 and 67.) A 3-level enhancement for "brandishing" a dangerous weapon, however, more accurately reflects Mr. Patterson's conduct with respect to these victims.

      a.    **Mr. Patterson Brandished the Knife in Front of Victim E.M.**

The USPO cites *United States v. Albritton* to argue that Mr. Patterson "otherwise used" a knife, instead of "brandish[ing]" it when he pointed the knife at victim E.M. (PSR, ¶ 44 (citing *United States v. Albritton*, 622 F.3d 1104, 1107-08 (9th Cir. 2010)).) *Albritton* does not support the USPO's argument.

Application note 1(c) of U.S.S.G. §1B1.1 states that "brandished" with reference to a dangerous weapon "means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon as directly visible to that person." Application note 1(j) of U.S.S.G. §1B1.1 states that "otherwise used" with reference to a dangerous weapon "means the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon."

In *Albritton*, the defendant pointed a BB pistol at a bank teller and yelled "Down, Down!" and "leveled" the pistol at another bank employee "in directing her across the room." *Albritton*, 622 F.3d at 1107. In ruling that this action represented more than "brandish[ing]", the Ninth Circuit explained that the definition of brandish included "[t]o wave or flourish (a weapon, for example) menacingly" and "to display ostentatiously." *Id*.

5

Pointing a knife, as Mr. Patterson did here, constitutes "brandishing," rather than "using" the knife, as outlined by the use of the pistol in *Albritton*. By pointing a pistol at a person, with a finger ready to instantly pull the trigger, the defendant in *Albritton* caused more fear to his victims than if he had simply held the firearm up without pointing it at them. This is because people generally know that a firearm functions by pointing the firearm at an intended target and pulling the trigger to fire a projectile at the intended target.

Mr. Patterson's pointing of a knife at victim E.M. here, while concerning, does not rise to the level of fear caused by the pointing of a pistol at a person. A knife does not fire a projectile at an intended target the way a firearm does. Striking a person with a knife after pointing it at them is much more difficult than striking a person with a bullet when pointing a firearm at them. Equating the two ignores the ways in which a firearm and a knife work.

In *United States v. Roberts*, the Tenth Circuit ruled that the defendant "used" a knife rather than "brandished" it where the defendant walked up behind a victim while holding a knife in his right hand, put his right arm around the victim, and held the knife next to her face and neck while demanding money. 898 F.2d 1465, 1469-70 (10th Cir. 1990). Mr. Patterson, by contrast, after pointing the knife, would have still needed to restrain the victim and then position his knife close to the victim's neck to replicate the actions of the defendant in *Roberts*. Again, the caselaw shows that Mr. Patterson's pointing of a knife at E.M. constitutes brandishing the weapon, rather than using it.

### b. Mr. Patterson Brandished the Stun Gun in Front of Victim D.W.

The PSR's application of a 4-level enhancement for use of the stun gun with D.W. is incorrect because the facts merely show that the stun gun was brandished, instead of being used. Specifically, paragraph 18 of the PSR states that "Patterson chased D.W. with the stun gun" while paragraph 67 makes a factual leap and asserts that "Patterson pointed a stun gun at D.W. and chased D.W. with it [.]" (PSR, ¶¶ 18,

67.) The PSR reasons that "[g]iven that Patterson specifically pointed a stun gun at the victim and chased him with it, a four-level increase for otherwise using a dangerous weapon has been applied." (*Id.*, ¶ 67.) The PSR provides no explanation or justification for this factual leap. Without it, the 4-level enhancement does not apply. As explained above in Section 1-a., the Ninth Circuit has found that pointing a firearm at a person constitutes use of the weapon, rather than merely brandishing it. But chasing a person with a stun-gun, without sufficient evidence that the weapon was, at minimum, pointed at the person, does not constitute use of a weapon. Accordingly, the 3-level enhancement for brandishing the stun gun should apply here, rather than the 4-level enhancement for otherwise using the weapon.

### 2. Mr. Patterson's Conduct Does not Justify Imposing a 3-level Enhancement for Hate Crime Motivation

The defense anticipates the government will argue that a 3-level enhancement for hate crime motivation under U.S.S.G. §3A1.1(a) should apply, even though the PSR does not recommend this enhancement. The Court should reject the government's argument, however, because 1) the government is unable to prove beyond a reasonable doubt that Mr. Patterson, a gay black man, intentionally targeted victims based on their sexual orientation, and 2) the caselaw does not support the application of the enhancement here.

To apply the 3-level enhancement for hate crime motivation under U.S.S.G. § 3A1.1(a) following a guilty plea, the Court at sentencing must determine "beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived… sexual orientation of any person." Application Note 1 confirms that "special evidentiary requirements govern the application of this subsection."

In *United States v. Boylan*, a municipal judge pleaded guilty to wire fraud for, among other things, reducing traffic fines and penalties for exclusively female municipal court defendants in exchange for sexual favors. 5 F.Supp.2d 274, 276, 283

1  (D.N.J. 1998).  The district court in that case imposed a 2-level vulnerable victim
2  enhancement based on the defendant selecting poor individuals, but did not impose a 3-
3  level hate crime enhancement since it did "not appear beyond a reasonable doubt that
4  the primary motivation for the offense was a hatred of" the victims.  *Id.*, at 283.
5        In *United States v. Castellanos*, a Hispanic defendant pleaded guilty to mail
6  fraud and making a false statement to a federally insured lending institution, in part for
7  defrauding victims by primarily using extensive advertising in Spanish-language media.
8  81 F.3d 108, 109 (9th Cir. 1996).  The district court applied a vulnerable victim
9  enhancement based on the victims being "unusually susceptible" to the defendant's
10 scheme by virtue of being Spanish-speakers or Hispanic individuals, and placing their
11 trust in the defendant as "one of their own."  *Id.*, at 110.  The Ninth Circuit overturned
12 the district court's ruling, finding nothing in the record suggested that the Spanish-
13 speaking population in the area shared some unique susceptibility to fraud.  *Id.*, at 112.
14       In *Masmari v. United States*, the defendant was convicted of arson for setting a
15 fire at a crowded gay night club in Seattle.  Case No. C16-0540 RSM, 2016 WL
16 3280381, at *1 (W.D. Wash. Jun. 15, 2016).  While the presentence report considered
17 the potential of a 3-level hate crime enhancement based on one of the cooperating
18 witnesses reporting that Mr. Masmari expressed the view that homosexuals should be
19 exterminated, the report did not recommend the enhancement in part because the
20 enhancement requires proof beyond a reasonable doubt.  *Id.*, at *2.[2]
21       Here, it is not clear beyond a reasonable doubt that Mr. Patterson, a gay black
22 man, intentionally selected any alleged victims due to their sexual orientation rather
23 than who he independently would choose to go on dates with.  Similar to the defendant
24 in *Boylan*, Mr. Patterson's motivation here was not a "hatred" of other men who were
25 gay, like him.  Mr. Patterson could have used Grindr as a dating application regardless

---

[2] Undersigned counsel has not found any cases where a court has applied the hate crime enhancement to a defendant belonging to the same class of people that were allegedly the object of the defendant's alleged hate crime, as with Mr. Patterson and other gay men in this case.

8

of the conduct in the instant offense because he was a gay person interested in dating other men. Further, like the victims in *Castellanos*, there is also nothing that makes gay men uniquely susceptible to the conduct that Mr. Patterson committed.

### C. 18 U.S.C. § 3553(a) Factors

Taking into account all of the sentencing factors under 18 U.S.C. § 3553, as outlined in *United States v. Booker*, 543 U.S. 220 (2005), the defense contends that a total sentence of 36 months in custody, comprised of 12 months on Count 7, and a consecutive 24 months on Count 10, to be followed by 3 years of supervised release, is sufficient but no greater than necessary to achieve the goals of sentencing.

    **1.    Personal History and Characteristics**

        **a.    Maternal Illness and Paternal Incarceration Infect an Early Childhood Otherwise Filled with Love and Support**

Mr. Patterson was born to Derrick Malik Patterson and Treshaun Stemmons on January 16, 1999. (PSR, ¶ 122.) When Mr. Patterson was just a young boy, his mother got him into playing basketball after she played it for a long time. (*Id.*, ¶ 124.) Mr. Patterson loved playing basketball and was even on traveling teams because of how well he performed. (*Id.*)

When he was approximately 9 years old, Mr. Patterson saw his father getting arrested and often being incarcerated after that. (PSR, ¶ 125.) On August 25, 2016, Mr. Patterson's father was sentenced to 132 months in custody for sex trafficking in the District of Arizona. (Ex. A, *United States v. Patterson*, 14-CR-1395-RM-BGM-1, Docket, at 2.) Mr. Patterson's father's sentencing position in that case details that, to provide for Mr. Patterson, his father started selling quantities of marijuana shortly after he was born. (Ex. B, Patterson Sr. Sent. Pos., at 9.) This led to Mr. Patterson's father "back into associations with convicts, and refueled his own drug usage." (*Id.*) While Mr. Patterson's father still found a way to personally care for his children, his criminal activity resulted in periods of being absent from Mr. Patterson's life.

Studies show that across age groups, fathers' incarceration increases aggression in their sons. (*See* Ex. C, Nat'l Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* (2014), Chapter: 9 Consequences for Families and Children, at 271[3] (PDF pg. 15 of 27).) Professor Terry Ann Craigie of Connecticut College adds that "children of incarcerated fathers are vulnerable to future incarceration and consequently, their behavioral problems should be diagnosed and effectively addressed." (Ex. D, Am. Bar Foundation, Parental Incarceration in the United States: Bringing Together Research and Policy to Reduce Collateral Costs to Children, at 6[4].) Another study found that "[t]he *chronic* dimension of parental incarceration stems from how early in children's lives this trauma can occur and how persistent its long-term intergenerational consequences can be." (*See* Ex. E, John Hagan & Holly Foster, *Mass Incarceration, Parental Imprisonment, and the Great Recession: Intergenerational Sources of Severe Deprivation in America*. Russell Sage Found. J. of the Soc. Sciences (Nov. 2015), at 82[5].)

Shortly after seeing his father getting arrested, Mr. Patterson recalls being molested by an older child on at least one occasion. (PSR, ¶ 126.) Around this time, Mr. Patterson was also diagnosed with attention deficit hyperactivity disorder ("ADHD") and bipolar disorder. (*Id.*, ¶ 135.) Mr. Patterson recalls using effective medication for some time, but cannot recall why he and his mother decided that he would stop. (*Id.*, ¶ 136.) He also saw a therapist for some time but stopped after his mother was diagnosed with breast cancer. (*Id.*, ¶ 126.) Mr. Patterson has never received any medication or therapy since then. (*See id.*, ¶ 136.)

---

[3] Available at https://www.nap.edu/read/18613/chapter/11#270 (last visited Sept. 27, 2022).

[4] Available at http://www.americanbarfoundation.org/uploads/cms/documents/white_house_conference_summary.pdf (last visited Sept. 27, 2022).

[5] Available at https://muse.jhu.edu/article/603808/pdf (last visited Sept. 27, 2022).

10

### b. Losing his Mother, his Everything, to Cancer

Throughout his childhood and early teenage years, Mr. Patterson's mother was everything to him. Even now, his eyes light up when he speaks about the person she was and how she lived her life. Aside from introducing him to basketball, Mr. Patterson's mother also fostered children, was strict, and financially supported her children and her mother. (PSR, ¶ 123-24.) Mr. Patterson's mother took pride in supporting homeless people through food banks and often took her children along with her when doing so. (*Id.*)

When Mr. Patterson was around 13 years-old, his mother was diagnosed with metastatic breast cancer. (PSR, ¶ 127; Ex. B, Patterson Sr. Sent. Pos., at 10.) When Mr. Patterson's mother told him about her diagnosis, he was devastated. Nonetheless, Mr. Patterson, trying to emulate his mother's strength, would accompany his mother to her breast cancer treatments and help her with chemotherapy even as a young teenager. (PSR, ¶ 127.)

One morning in 2016, Mr. Patterson's sister went to their mother's room to wake her up. (PSR, ¶ 127.) When she didn't wake up, Mr. Patterson heard his sister screaming. (*Id.*) He went into his mother's room and frantically tried to do CPR to resuscitate her. It did not work. (*Id.*) Mr. Patterson and his sister called 911. Unfortunately, they also could not do anything and Mr. Patterson's mother passed away from her battle with breast cancer. (*Id.*; *see also* Ex. B, Patterson Sr. Sent. Pos., at 11.)

Losing one's mother is among the worst things that can happen to any child. But what made things worse for Mr. Patterson is that his mother's death followed a number of tragedies that had already happened just before. (PSR, ¶ 127.) Mr. Patterson lost his best friend to a shooting on a night when they were out together in 2015. (*Id.*) In 2013, Mr. Patterson's baby cousin died at the age of 2 from suffocating, and Mr. Patterson also unexpectedly lost a couple of other friends just before that. (*Id.*)

        **c.    No Opportunities to Grieve and No one to Teach Mr. Patterson how to Cope**

All of these tragedies happening within a few short years caused Mr. Patterson to become depressed and withdrawn. (PSR, ¶ 127.) Making matters worse, Mr. Patterson dealt with all of these tragedies without his father around and having to go live with his grandmother. (*Id.*) Mr. Patterson's father's sentencing position details that "[a]bove all, Derrick is frantic about the status of his children, who are now living with Treshaun's mother. For Derrick, it is unimaginable that his children were forced to face their mother's passing and funeral, and a move to their grandmother's home (a disconcerting event that Derrick intimately understands from his own childhood experience), without his support." (Ex. B, Patterson Sr. Sent. Pos., at 12.)

Mr. Patterson started missing school after his mother passed, unable to face his peers who knew about the tragedies that Mr. Patterson was dealing with. (PSR, ¶ 127.) Despite loving and being good at basketball, Mr. Patterson also stopped playing after the sport failed to bring him any relief from the traumas he was experiencing. (*Id.*)

        **d.    The Hurdles Mr. Patterson Faces as a gay Black Man**

As early as kindergarten, Mr. Patterson liked some other boys in his class, which he realized in hindsight was when he knew he was gay. (PSR, ¶ 128.) Around his freshman year in high school, Mr. Patterson's mother asked him if he liked boys and he answered yes, to which they both laughed. (*Id.*) Mr. Patterson's mother, however, passed before he could formally come out to her. Nonetheless, he appreciates that his mother and father both supported him throughout his life regardless of his sexual orientation. (*Id.*)

A 2020 study by the Center for American Progress found that 1) 25% of Black LGBTQ individuals reported experiencing discrimination from law enforcement, compared to 13% of white LGBTQ respondents; 2) 78% of Black LGBTQ individuals reported discrimination in trying to get hired, compared to 55% of white LGBTQ respondents; and 3) 36% of LGBTQ respondents of color reported receiving SNAP

benefits, compared to 20% of white LGBTQ respondents. (Ex. F, Center for American Progress, "Black LGBTQ Individuals Experience Heightened Levels of Discrimination," Jul. 13, 2021.[6]) Gay people in America face heightened discrimination, with the effects of that discrimination felt even more strongly among gay black people, like Mr. Patterson.

Mr. Patterson also experiences further difficulty in custody because he is a gay black man. At least one study has shown that non-heterosexual individuals experience significantly higher rates of sexual victimization while in federal custody than heterosexual individuals do. (Ex. G, Beck, Berzofsky, Caspar, and Krebs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, U.S. Department of Justice, Bureau of Justice Statistics, at 18 (estimated 1.2% of heterosexual inmates reported being sexually victimized by another inmate, compared to 12.2% of non-heterosexual inmates, and estimated 2.1% of heterosexual inmates reported being sexually victimized by staff, compared to 5.4% of non-heterosexual inmates.[7]) After previously only being in jail for a day, even the 6 months that Mr. Patterson has been doing at MDC is harder for him than it would be for a heterosexual person.

### 2. Deterrence: Mr. Patterson has Used this Wake-up Call to Accept That he Needs Help

Before Mr. Patterson's mother passed, he was interested in two professions as potential career options. He first wanted to become a doctor and help people after watching doctors make such a difference on television shows and in movies. He also thought he might want to be a judge someday after seeing his dad get arrested and incarcerated.

---

[6] Available at https://www.americanprogress.org/article/black-lgbtq-individuals-experience-heightened-levels-discrimination/ (last visited Sept. 27, 2022).

[7] Available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf (last visited Sept. 27, 2022).

13

After losing his mother, Mr. Patterson lost his sense of guidance and direction. While Mr. Patterson's grandmother tried to take care of him and his siblings, his mother was dead and his father was in prison. No one continually motivated him to study hard and commit to school like his mother had. Nobody taught Mr. Patterson how to apply for and get a formal job.

Since his mother's passing, Mr. Patterson has also not received any formal counseling or therapy. He has never properly processed what happened nor coped with his grief in a productive way. Instead, Mr. Patterson has often looked to illicit substances to distract him from the pain of losing his mother and never processing it. (PSR, ¶¶ 138-41.) While he is in custody and afterwards, Mr. Patterson would benefit from mental health treatment and substance abuse treatment. (*Id.*, ¶ 142.)

### a. Moving Forward from his Biggest Mistakes

As a young adult, Mr. Patterson committed the biggest mistakes of his life in committing the instant offense. Mr. Patterson, however, has already spent more time in custody than ever before. That time has impressed upon him the seriousness of his violations and that his actions have consequences. He has accepted how scary and concerning his conduct in this case was, and acknowledged the real pain that his victims experienced.

Mr. Patterson has also used this time in custody to reflect on how he can avoid ever coming into contact with the criminal justice system again. He will focus on restarting his schooling to get a college degree and commit more seriously to his hair-styling work and trying to help the homeless. (*See* PSR, ¶ 131.) Mr. Patterson also has accepted that it is ok to be vulnerable in situations like this one and ask for help. Mr. Patterson acknowledges that he needs help with processing the trauma of his father's incarceration and his mother's death. He is confident that by receiving proper mental health treatment and potential medication, he will be able to refrain from abusing substances and engaging in any future actions like the ones he committed in the instant offense.

**D. Conclusion**

For the foregoing reasons, the defense respectfully requests the Court sentence Mr. Patterson to a total term of 36 months in custody, to be followed by 3 years of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 3, 2022    By  /s/ *Adithya Mani*
ADITHYA MANI
Deputy Federal Public Defender
Attorney for DERRICK PATTERSON

15