# EXHIBIT A

**U.S. District Court**
**DISTRICT OF ARIZONA (Tucson Division)**
**CRIMINAL DOCKET FOR CASE #: 4:14-cr-01395-RM-BGM-1**

Case title: USA v. Patterson et al                              Date Filed: 08/20/2014

Date Terminated: 08/25/2016

Assigned to: Judge Rosemary Marquez
Referred to: Magistrate Judge Bruce G Macdonald

Appeals court case number: 16-10377 9th CCA

**Defendant (1)**

**Derrick Malik Patterson**                represented by   **Benjamin Westbrook Aguilera**
*TERMINATED: 08/25/2016*                                 Aguilera Law Firm PC
*also known as*                                          314 S 6th Ave.
Showtime                                                 Tucson, AZ 85701
*TERMINATED: 08/25/2016*                                 520-884-1234
*also known as*                                          Fax: 520-884-9687
Show                                                     Email: aguileralawfirm@gmail.com
*TERMINATED: 08/25/2016*                                 *LEAD ATTORNEY*
*also known as*                                          *ATTORNEY TO BE NOTICED*
Santana                                                  Designation: CJA Appointment
*TERMINATED: 08/25/2016*
                                                         **Joshua Fisher Hamilton**
                                                         Law Offices of Hernandez & Hamilton PC
                                                         455 W Paseo Redondo
                                                         Tucson, AZ 85701
                                                         520-882-8823
                                                         Fax: 520-882-8414
                                                         Email: josh@Hernandez-Hamilton.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         Designation: CJA Appointment

                                                         **Kathleen Genevieve Williamson**
                                                         Law Offices of Williamson & Young PC
                                                         P.O. Box 249
                                                         Tucson, AZ 85702-0249
                                                         520-623-8414
                                                         Fax: 212-537-6683
                                                         Email: kgw@williamsonandyoung.com
                                                         *TERMINATED: 08/28/2015*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         Designation: CJA Appointment

                                                         **Stephen G Ralls**
                                                         Ralls & Wille PC
                                                         314 S 6th Ave.
                                                         Tucson, AZ 85701
                                                         520-884-1234
                                                         Fax: 520-884-9687
                                                         Email: steve@rallslawoffice.com
                                                         *TERMINATED: 09/12/2016*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         Designation: CJA Appointment

**Pending Counts**                                       **Disposition**

18:1591(a) & 2 Sex Trafficking by Force, Fraud,        Bureau of Prisons: 132 Months; Supervised Release: 5
Coercion and Sex Trafficking of a Minor               Years; Special Assessment: $100.00; Restitution: $200
(2)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1594 (c) Conspiracy to Commit Sex Trafficking (1) | Dismissed |
| 18:1591 (a) and 2 Sex Trafficking by Force, Fraud, and Coercion (3) | Dismissed |
| 18:2423(a) & 2 Interstate Transportation of Minor for Prostitution; 18:981(a)(1)(C), 1594(d), 1594(e), 2428(a), 2428(b), 28: 2461(c), and Rule 32.2(a) Forfeiture Allegation (4) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **Karen Elizabeth Rolley - Inactive** |
|---|---|---|

US Attorneys Office - Tucson, AZ
405 W Congress St., Ste. 4800
Tucson, AZ 85701-4050
520-620-7357
Fax: 520-620-7320
Email: USAAZ.DepartedAUSAs@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Wallace Heath Kleindienst**
US Attorneys Office - Tucson, AZ
405 W Congress St., Ste. 4800
Tucson, AZ 85701-4050
520-620-7300
Fax: 520-620-7320
Email: wallace.kleindienst@usdoj.gov
*TERMINATED: 06/12/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Angela W Woolridge**
US Attorneys Office
405 W Congress St., Ste. 4800
Tucson, AZ 85701
520-620-7339
Fax: 520-620-7220
Email: angela.woolridge@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2014 | 1 | MOTION to Seal Case by USA as to Derrick Malik Patterson, Jessamy Eve Bennington. (MFR) (Entered: 08/21/2014) |

| 08/20/2014 | 2 | ORDER granting 1 Motion to Seal Case as to Derrick Malik Patterson (1), Jessamy Eve Bennington (2). Signed by Magistrate Judge Jacqueline M Rateau on 8/20/2014. (MFR) (cc: AUSA) (Entered: 08/21/2014) |
|---|---|---|
| 08/20/2014 | 3 | INDICTMENT as to Derrick Malik Patterson (1) counts 1, 2, 3, 4, Jessamy Eve Bennington (2) counts 1, 2, 3, 4. (MFR) (Entered: 08/21/2014) |
| 08/22/2014 | 9 | MINUTE ENTRY for proceedings held before Magistrate Judge Charles R Pyle: Initial Appearance/Arraignment/Detention Hearing as to Derrick Malik Patterson held on 8/22/2014. Appointing Kathleen Genevieve Williamson(CJA) for defendant. Defendant(s) state true name to be the same. Defendant enters plea of NOT guilty to all pending counts. Defendant continued detained pending trial. Jury Trial set for 9/30/2014 at 09:30 AM before Judge Jennifer G Zipps. Plea deadline 9/12/2014. (Recorded by COURTSMART.) Hearing held 3:15 pm to 3:21 pm.(BAR)cc: K. Rolley, K. Williamson, PTS (Entered: 08/25/2014) |
| 08/22/2014 | 290 | Arrest Warrant Returned Executed on 8/22/2014 as to Derrick Malik Patterson. (KEP) (Entered: 02/24/2017) |
| 08/25/2014 | 10 | ORDER OF DETENTION as to Derrick Malik Patterson. Signed by Magistrate Judge Charles R Pyle on 8/22/2014. (BAR)cc: K. Rolley, K. Williamson, PTS (Entered: 08/25/2014) |
| 09/12/2014 | 12 | MOTION to Continue Trial and Plea Deadline by Derrick Malik Patterson. (BAR) (Entered: 09/15/2014) |
| 09/18/2014 | 14 | ORDER granting 12 Motion to Continue Trial and Plea Deadline filed as to Derrick Malik Patterson (1). Jury Trial set for 12/2/2014 at 09:30 AM before Judge Jennifer G Zipps. Plea deadline is 11/14/2014. Signed by Judge Jennifer G Zipps on 9/17/2014.(BAR)cc: W. Kleindienst, K. Rolley, K. Williamson (Entered: 09/18/2014) |
| 10/03/2014 | 16 | ORDER granting 15 Motion to Prepare Preliminary U.S.S.G. Report as to Derrick Malik Patterson (1). It is Ordered that the U.S. Probation Office shall prepare a Preliminary United States Sentencing Guidelines Report (PUR) as to Defendant Derrick Malik Patterson, within thirty (30) days from the date of this Order, and notify the parties when it is completed. Signed by Magistrate Judge Bruce G Macdonald on 10/3/2014.(MFR) (cc: U.S. Probation Department; Kathleen Williamson, Attorney for Defendant; Karen Rolley and Wallace Kleindienst, Attorneys for Plaintiff) (Entered: 10/03/2014) |
| 10/16/2014 | 17 | MOTION to Unseal Case by USA as to Derrick Malik Patterson, Jessamy Eve Bennington. (Attachments: # 1 Proposed Order)(BAR) (Entered: 10/20/2014) |
| 10/29/2014 | 18 | ORDER granting 17 Motion to Unseal Case as to Derrick Malik Patterson (1), Jessamy Eve Bennington (2). It is Ordered the Clerk of the Court shall unseal the case. Signed by Magistrate Judge Bruce G Macdonald on 10/27/2014.(MFR) (Entered: 10/29/2014) |
| 10/30/2014 | 19 | ORDER as to Derrick Malik Patterson, Jessamy Eve Bennington, Judge update Judge Rosemary Marquez added. Judge Jennifer G. Zipps no longer assigned. In compliance with Rule 3.2 of the Rules of Practice, all further pleadings shall bear the following designation: CR-14-01395-TUC-RM (BGM). The trial as to Derrick Malik Patterson remains set for December 2, 2014 at 9:30 a.m.but shall be before Judge Rosemary Mrquez, Courtroom 5A, 405 West Congress, Tucson, Arizona 85701. Signed by Judge Jennifer G. Zipps on 10/30/2014. (MES) (Entered: 10/30/2014) |
| 11/14/2014 | 21 | Second MOTION to Continue Trial and Plea Deadline by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 11/14/2014) |
| 11/17/2014 | 22 | ORDER granting 21 Motion to Continue Trial and Plea Deadline filed as to Derrick Malik Patterson (1). Jury Trial set for 2/3/2015 at 09:30 AM in Courtroom 5A before Judge Rosemary Marquez. Plea deadline is 1/16/2015. Signed by Judge Rosemary Marquez on 11/17/2014. (CJS) (Entered: 11/17/2014) |
| 12/03/2014 | 33 | IT IS ORDERED the 32 Motion to Obtain Disclosure in Usable Format, is hereby set for hearing on 12/11/2014 at 10:10 a.m., in Courtroom 3C, 405 West Congress Street, Tucson, AZ 85701 before Magistrate Judge Bruce G Macdonald. Ordered by Magistrate Judge Bruce G Macdonald.(BGM, ks)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 12/03/2014) |
| 12/10/2014 | 35 | ORDER granting 34 Motion to Continue Hearing on Defendant's Benington's Motion to Obtain Disclosure in Usable Format [Doc. 32], presently set for 12/11/2014 at 10:10 a.m. The Motion hearing is hereby CONTINUED to 12/19/2014 at 11:45 a.m., in Courtroom 3C, 405 West Congress Street, Tucson, AZ 85701 before Magistrate Judge Bruce G Macdonald. IT IS FURTHER ORDERED granting defendants' presence waived for this hearing. Order to Continue applies to the following defendants: Derrick Malik Patterson and Jessamy Eve Benington. Ordered by Magistrate Judge Bruce G Macdonald. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.)(BGM, ks) (Entered: 12/10/2014) |
| 12/18/2014 | 37 | ORDER granting 36 Motion to Withdraw Document as to Jessamy Eve Benington (2). IT IS FURTHER ORDERED the hearing set for 12/19/2014 at 11:45 a.m., is hereby VACATED. Ordered by Magistrate Judge Bruce G Macdonald. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.)(BGM, ks) (Entered: 12/18/2014) |
| 12/18/2014 | 38 | ORDER finding as moot 32 Motion to Obtain Disclosure in Usable Formant, as to Jessamy Eve Benington (2). See Motion to Withdraw [Doc. 36]. Ordered by Magistrate Judge Bruce G Macdonald. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.)(BGM, ks) (Entered: 12/18/2014) |
| 01/08/2015 | 43 | ORDER granting 42 Motion to Continue Trial and Plea Deadline filed as to Jessamy Eve Benington (2). Jury Trial set for 5/5/2015 at 09:30 AM in Courtroom 5A before Judge Rosemary Marquez. Order to Continue Trial and Plea Deadline applies to the following defendants: Derrick Malik Patterson, Jessamy Eve Benington. Plea deadline is 4/17/2015. Signed by Judge Rosemary Marquez on 1/08/2015. (CJS) (Entered: 01/08/2015) |

| | | |
|---|---|---|
| 03/24/2015 | 51 | *First MOTION status conference to address trial date *Motion for Status Conference* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) *Modified motion type on 3/25/2015 (ALS). (Entered: 03/24/2015) |
| 03/27/2015 | 52 | IT IS ORDERED the 51 MOTION for Hearing as to Derrick Malik Patterson and Jessamy Eve Benington set for 4/1/2015 at 09:50AM before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, co) This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 03/27/2015) |
| 04/01/2015 | 53 | MINUTE ENTRY for status conference as to Derrick Malik Patterson(1), Jessamy Eve Benington(2) held on 4/1/2015 before Judge Rosemary Marquez. It is Ordered granting the government's 51 Motion for Status Conference to Address Trial Date. The Court and counsel confer as to setting a trial date in this case. For the reasons set forth on the record, Ms. Williamson orally moves to declare this a complex case. Mr. Ellinwood joins in the motion and the government concurs with that assessment of the case. It is Ordered this case is designated a complex case and interim payments will be authorized. A formal order will follow. In order to accommodate the calendars of all parties concerned and upon joint motion to continue the current trial date, trial set for 5/05/2015 is continued to 6/09/2015 at 9:30 a.m.., with a plea deadline of 5/22/2015. A status conference is set for 5/11/2015 at 11:00 a.m.. The defendants shall sign and file a written acknowledgment of the new trial date and waiver of speedy trial.

PRESENT: AUSA Karen Rolley appears on behalf of the government. CJA Kathleen Williamson appears on behalf of defendant Derrick Malik Patterson(1). CJA Ralph Ellinwood appears on behalf of defendant Jessamy Eve Benington(2). No interpreter needed. Excludable delay under 18 U.S.C. §3161(h)(7) is found to commence on 5/06/2015 and end on 6/09/2015. Any and all subpoenas previously issued shall remain in full force and effect through the new trial date. (Court Reporter Erica McQuillen.) Hearing held 9:55 a.m. to 10:15 a.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) (Entered: 04/02/2015) |
| 04/03/2015 | 54 | ORDER as to Derrick Malik Patterson, Jessamy Eve Benington: This matter is hereby designated a complex case. FURTHER ORDERED authorizing interim payments as set forth in the Memorandum to Counsel Appointed under the Criminal Justice Act that will be filed after Ninth Circuit review. IT IS FURTHER ORDERED a status hearing is set for May 11, 2015 at 11:00 a.m. to determine a schedule for discovery, motions and pretrial case management issues. Signed by Judge Rosemary Marquez on 4/3/2015. (ALS) (Entered: 04/03/2015) |
| 05/11/2015 | 59 | ***AMENDED BY DOC. 60**MINUTE ENTRY for status conference as to Derrick Malik Patterson(1), Jessamy Eve Benington(2) held on 5/11/2015 before Judge Rosemary Marquez. Defendant Benington is in custody and not present. Mr. Ellinwood waives the presence of defendant Benington for purposes of this hearing. Ms. Williamson advises that contrary to defendant Patterson's assertion at the prior hearing, he has decided to not waive his speedy trial rights. This case has been designated a complex case and the parties state they need additional time to prepare for trial. It is Ordered the current trial date of 6/09/2015 is CONTINUED to 8/04/2015. This is a firm trial date. The parties anticipate trial will take 2 weeks. Plea deadline is continued to 7/17/2015. Pretrial motions shall be filed by 6/22/2015; responses shall be filed by 7/06/2015. A pretrial motion hearing/pretrial conference date to be determined.

PRESENT: AUSA Karen Rolley and AUSA Wallace Kleindienst appear on behalf of the defendant. CJA Kathleen Williamson appears on behalf of defendant Patterson, who is present and in custody. CJA Ralph Ellinwood appears on behalf of defendant Benington, who is in custody and not present. Excludable delay under 18 U.S.C. §3161(h)(7) is found to commence on 6/10/2015 and end on 8/04/2015. Any and all subpoenas previously issued shall remain in full force and effect through the new trial date. (Court Reporter Chris Wallace.) Hearing held 11:05 a.m. to 11:20 a.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) Modified on 5/11/2015 (CJS). (Entered: 05/11/2015) |
| 05/11/2015 | 60 | AMENDED MINUTE ENTRY for proceedings held before Judge Rosemary Marquez: Amending Doc. 59 MINUTE ENTRY for status conference as to Derrick Malik Patterson(1), Jessamy Eve Benington(2) held on 5/11/2015 before Judge Rosemary Marquez. Defendant Benington is in custody and not present. Mr. Ellinwood waives the presence of defendant Benington for purposes of this hearing. Ms. Williamson advises that contrary to defendant Patterson's assertion at the prior hearing, he has decided to not waive his speedy trial rights. This case has been designated a complex case and the parties state they need additional time to prepare for trial. It is Ordered the current trial date of 6/09/2015 is CONTINUED to 8/04/2015. This is a firm trial date. Although the trial date is continued, pursuant to defendant Patterson's decision to not waive speedy trial, no excludable time will be entered. The parties anticipate trial will take 2 weeks. Plea deadline is continued to 7/17/2015. Pretrial motions shall be filed by 6/22/2015; responses shall be filed by 7/06/2015. A pretrial motion hearing/pretrial conference date to be determined.

PRESENT: AUSA Karen Rolley and AUSA Wallace Kleindienst appear on behalf of the defendant. CJA Kathleen Williamson appears on behalf of defendant Patterson, who is present and in custody. CJA Ralph Ellinwood appears on behalf of defendant Benington, who is in custody and not present. (Court Reporter Chris Wallace.) Hearing held 11:05 a.m. to 11:20 a.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS)

Reason for Amendment: to remove excludable start. (Entered: 05/11/2015) |
| 05/21/2015 | 61 | ORDER as to Derrick Malik Patterson, Jessamy Eve Benington, The trial in this case will begin on August 4, 2015 at 9:30 a.m.. Pretrial Conference set for 7/27/2015 at 01:50 PM before Judge Rosemary Marquez. All motions in limine are to be filed by June 22, 2015, with responses due on July 6, 2015. Jury instructions and voir dire are to be filed by noon on July 30, 2015. Signed by Judge Rosemary Marquez on 5/20/15. (KAH) (Entered: 05/21/2015) |

| Date | No. | Description |
|---|---|---|
| 06/02/2015 | 62 | NOTICE OF ATTORNEY APPEARANCE: Angela W. Woolridge appearing for USA *Co-Counsel*. (Woolridge, Angela) (Entered: 06/02/2015) |
| 06/09/2015 | 67 | ORDER: Memorandum to Counsel Appointed under the Criminal Justice Act as to Derrick Malik Patterson, Jessamy Eve Benington. Signed by Judge Rosemary Marquez on 5/8/15. (KAH) (Entered: 06/09/2015) |
| 06/10/2015 | 68 | MOTION to Preclude Statements *by Codefendant* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/10/2015) |
| 06/11/2015 | 69 | MOTION to Withdraw as Attorney as to attorney Wallace H. Kleindienst by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Kleindienst, Wallace) (Entered: 06/11/2015) |
| 06/12/2015 | 70 | ORDER granting 69 Motion to Withdraw as Attorney. Assistant United States Attorney Wallace Heath Kleindienst is hereby withdrawn from the case as to Derrick Malik Patterson (1) and Jessamy Eve Benington (2). Ordered by Magistrate Judge Bruce G Macdonald. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.)(BGM, ks) (Entered: 06/12/2015) |
| 06/18/2015 | 72 | MOTION to Dismiss Counts: Count(s) Counts One and Two by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/18/2015) |
| 06/18/2015 | 73 | NOTICE *of Service of Discovery Requests* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/18/2015) |
| 06/19/2015 | 74 | *MOTION to Dismiss 14-cr-1395 *for Lack of Jurisdiction* by Derrick Malik Patterson. (Williamson, Kathleen) *Modified to correct motion type on 6/22/2015 (KAH). (Entered: 06/19/2015) |
| 06/19/2015 | 75 | NOTICE *of Confessions and Admissions (Rule 16.1)* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/19/2015) |
| 06/19/2015 | 76 | *First MOTION to Extend Time to File Pretrial Motions by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) *Modified to reflect document filed with incorrect case number on 6/22/2015 (KAH). (Entered: 06/19/2015) |
| 06/21/2015 | 78 | First MOTION for Disclosure *of Other Acts under 404(b)* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/21/2015) |
| 06/21/2015 | 79 | MOTION in Limine *Admit Victims Other Acts and Evidence per FRE 412(b)(1)(C)* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/21/2015) |
| 06/21/2015 | 80 | NOTICE *of Intent to Call Expert - Economics* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/21/2015) |
| 06/21/2015 | 81 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 68 MOTION to Preclude Statements *by Codefendant* . (Woolridge, Angela) (Entered: 06/21/2015) |
| 06/22/2015 | 82 | *AMENDED MOTION to Extend Time to File Pretrial Motions filed by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) *Modified to reflect document filed with incorrect case number on 6/23/2015 (KAH). (Entered: 06/22/2015) |
| 06/22/2015 | 83 | MOTION in Limine *Preclude Jury Instruction* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/22/2015) |
| 06/22/2015 | 84 | MOTION in Limine *Jury Instructions* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/22/2015) |
| 06/22/2015 | 85 | MOTION to Compel *Disclosure - List* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/22/2015) |
| 06/22/2015 | 86 | *NOTICE *of Motions List* by Derrick Malik Patterson. (Williamson, Kathleen) *Modified to correct event type on 6/23/2015 (KAH). (Entered: 06/22/2015) |
| 06/22/2015 | 87 | MOTION in Limine *to Preclude Evidence of Victims' Other Acts* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 88 | MOTION in Limine *to Preclude Nullification Argument Related to Penalties Face by Defendants* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 89 | MOTION in Limine *to Preclude Use and Dissemination of Victims' Names and Identifying Information* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Attachments: # 1 Text of Proposed Order)(Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 90 | NOTICE *of Government's Expert Witness* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 91 | MOTION in Limine *Government's Request for Disclosure* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 92 | NOTICE *of Intent to Impeach Defendants with Prior Felony Conviction Pursuant to Federal Rule of Evidence 609* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 93 | First MOTION in Limine *to Preclude REference to Victims' Pre/Post Charged Offense Sexual Behavior* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |

| | | |
|---|---|---|
| 06/22/2015 | 94 | First MOTION in Limine *of Intent to Introduce 404b Material* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 06/22/2015) |
| 06/22/2015 | 95 | MOTION to Dismiss *based on Selective Prosecution* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 06/22/2015) |
| 06/23/2015 | 96 | ORDER granting 82 Amended Motion to Extend Time to File Pretrial Motions as to Derrick Malik Patterson (1), Jessamy Eve Benington (2). The Government shall file its trial motions by June 24, 2015. Signed by Judge Rosemary Marquez on 6/22/15. (KAH) (Entered: 06/23/2015) |
| 06/25/2015 | 97 | IT IS ORDERED the 72 Motion to Dismiss Counts One and Two, 74 Motion to Dismiss for Lack of Jurisdiction and 95 Motion to Dismiss for Selective Prosecution, as to Derrick Malik Patterson, is set for hearing on 7/31/2015 at 9:30 a.m., in Courtroom 5F, 405 West Congress Street, Tucson, AZ 85701 before Magistrate Judge Bruce G Macdonald. Ordered by Magistrate Judge Bruce G Macdonald.(BGM, ks)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 06/25/2015) |
| 06/25/2015 | 98 | IT IS ORDERED the Motions hearing, presently set for 7/31/2015 at 9:30 a.m., before Magistrate Judge Bruce Macdonald, on the 72 Motion to Dismiss Counts One and Two, 74 Motion to Dismiss for Lack of Jurisdiction and 95 Motion to Dismiss for Selective Prosecution, as to Derrick Malik Patterson, is hereby VACATED AND RESET to 7/27/2015 at 1:50 p.m., before District Judge Rosemary Marquez. Ordered by Magistrate Judge Bruce G Macdonald.(BGM, ks)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 06/25/2015) |
| 07/01/2015 | 101 | First MOTION to Produce *Grand Jury Transcripts* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 07/01/2015) |
| 07/01/2015 | 102 | First MOTION to Dismiss Counts: Count(s) 1, 2, 3 *or Produce Bill of Particulars* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 07/01/2015) |
| 07/02/2015 | 105 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 95 MOTION to Dismiss *based on Selective Prosecution* . (Woolridge, Angela) (Entered: 07/02/2015) |
| 07/04/2015 | 108 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 84 MOTION in Limine *Jury Instructions* . (Woolridge, Angela) (Entered: 07/04/2015) |
| 07/05/2015 | 109 | Third MOTION to Continue Trial and Plea Deadline by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 07/05/2015) |
| 07/06/2015 | 110 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 109 Third MOTION to Continue Trial and Plea Deadline . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 111 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 72 MOTION to Dismiss Counts: Count(s) Counts One and Two . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 112 | RESPONSE re: 73 Notice (Other) *of Discovery Requests* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 113 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 101 First MOTION to Produce *Grand Jury Transcripts* . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 114 | MOTION in Limine *Omnibus* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 07/06/2015) |
| 07/06/2015 | 115 | REPLY TO RESPONSE to Motion by Derrick Malik Patterson re: 109 Third MOTION to Continue Trial and Plea Deadline . (Williamson, Kathleen) (Entered: 07/06/2015) |
| 07/06/2015 | 116 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 83 MOTION in Limine *Preclude Jury Instruction* . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 117 | RESPONSE *to Defendant's Motions List (Doc.86)* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 118 | NOTICE *Of Affirmative Defense* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 07/06/2015) |
| 07/06/2015 | 119 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 102 First MOTION to Dismiss Counts: Count(s) 1, 2, 3 *or Produce Bill of Particulars* . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 120 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 79 MOTION in Limine *Admit Victims Other Acts and Evidence per FRE 412(b)(1)(C)* . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 121 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 74 MOTION to Dismiss for Lack of Jurisdiction . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 122 | MOTION in Limine *to Exclude Government Expert Stigerts* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 07/06/2015) |
| 07/06/2015 | 123 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 85 MOTION to Compel *Disclosure - List* . (Rolley, Karen) (Entered: 07/06/2015) |

| | | |
|---|---|---|
| 07/06/2015 | 124 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 122 MOTION in Limine *to Exclude Government Expert Stigerts* . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 125 | NOTICE *of Government's Opposition to Expert Witness on Economic Impact on Interstate Commerce* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 126 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 114 MOTION in Limine *Omnibus* . (Rolley, Karen) (Entered: 07/06/2015) |
| 07/06/2015 | 127 | RESPONSE to Motion by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 109 Third MOTION to Continue Trial and Plea Deadline *Government's Rebuttal to Defendant's Reply*. (Rolley, Karen) (Entered: 07/06/2015) |
| 07/07/2015 | 128 | REPLY TO RESPONSE to Motion by Derrick Malik Patterson re: 114 MOTION in Limine *Omnibus* . (Williamson, Kathleen) (Entered: 07/07/2015) |
| 07/07/2015 | 129 | IT IS ORDERED the 109 Third MOTION to Continue Trial and Plea Deadline as to Derrick Malik Patterson is set for a Motion Hearing on 7/9/2015 at 01:30 PM in Courtroom 5A, 405 West Congress Street, Tucson, AZ 85701 before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, js)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 07/07/2015) |
| 07/09/2015 | 132 | REPLY TO RESPONSE to Motion by Derrick Malik Patterson re: 95 MOTION to Dismiss *based on Selective Prosecution* . (Attachments: # 1 Exhibit Police Reports Paul Dunn, # 2 Exhibit Government Study on Characteristics of Offenders, # 3 Exhibit FBI 2013 Report, # 4 Exhibit Randomly selected report and Racial breakdown, # 5 Exhibit News Article, # 6 Exhibit News Article, # 7 Exhibit News Article, # 8 Exhibit Wikipedia Jeffrey Epstein)(Williamson, Kathleen) Modified on 7/9/2015, EXHIBIT 1 SEALED BY DOC 135 (BAR). (Entered: 07/09/2015) |
| 07/09/2015 | 135 | ORDERED that the Clerk of Court shall seal Exhibit 1 to Defendant's 132 Reply to Response to Motion to Dismiss based on Selective Prosecution filed by Derrick Malik Patterson. Signed by Judge Rosemary Marquez on 7/9/2015.(BAR) (Entered: 07/09/2015) |
| 07/09/2015 | 136 | ** AMENDED BY DOC. 141 ** MINUTE ENTRY for motion hearing as to Derrick Malik Patterson(1) held on 7/9/2015 before Judge Rosemary Marquez. Ms. Williamson has filed a motion to continue trial. The government objects to a continuance. At a previous hearing the defendant stated he did not wish to waive his speedy trial rights; however, Ms. Williamson states she has discussed the issue with the defendant and he agrees with the request for a continuance and affirmatively waives his right to speedy trial. The Court inquires of the defendant and defendant confirms that he has no objection to a continuance of the trial date, therefore, It is Ordered defendant's Motion to Continue Trial (Doc. 109) is granted over the objection by the government. Trial set for 8/4/2015 is CONTINUED to 9/22/2015 at 9:30 a.m.. Plea deadline is continued to 9/04/2015. The government states they will be forwarding a new plea offer to defendant by 7/10/2015, and will leave that plea offer open until 7/24/2015. It is Further Ordered defendant's Motion to Produce Grand Jury Transcripts (Doc. 101) is granted and the government is authorized to provide the grand jury transcripts to defense counsel. Pretrial hearings/deadlines will be set by separate order.<br><br>PRESENT: AUSA Karen Rolley appears on behalf of the government. CJA Kathleen Williamson appears on behalf of the defendant. The defendant is present and in custody.<br><br>Excludable delay under 18 U.S.C. §3161(h)(7) is found to commence on 8/05/2015 and end on 9/22/2015. Any and all subpoenas previously issued shall remain in full force and effect through the new trial date. (Court Reporter Chris Wallace.) This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) Modified on 7/13/2015 (CJS). (Entered: 07/10/2015) |

| 07/09/2015 | 141 | ** AMENDED BY DOC. 166 ** AMENDED MINUTE ENTRY for proceedings held before Judge Rosemary Marquez: Amending Doc. 136 MINUTE ENTRY for motion hearing as to Derrick Malik Patterson(1) held on 7/9/2015 before Judge Rosemary Marquez. Ms. Williamson has filed a motion to continue trial. The government objects to a continuance. At a previous hearing the defendant stated he did not wish to waive his speedy trial rights; however, Ms. Williamson states she has discussed the issue with the defendant and he agrees with the request for a continuance and affirmatively waives his right to speedy trial. The Court inquires of the defendant and defendant confirms that he has no objection to a continuance of the trial date, therefore, It is Ordered defendant's Motion to Continue Trial (Doc. 109) is granted over the objection by the government. Trial set for 8/4/2015 is CONTINUED to 9/22/2015 at 9:30 a.m.. Plea deadline is continued to 9/04/2015. The government states they will be forwarding a new plea offer to defendant by 7/10/2015, and will leave that plea offer open until 7/24/2015. It is Further Ordered defendant's Motion to Produce Grand Jury Transcripts (Doc. 101) is granted and the government is authorized to provide the grand jury transcripts to defense counsel. Pretrial hearings/deadlines will be set by separate order.<br><br>PRESENT: AUSA Karen Rolley appears on behalf of the government. CJA Kathleen Williamson appears on behalf of the defendant. The defendant is present and in custody.<br><br>Excludable delay under 18 U.S.C. §3161(h)(7) is found to commence on 8/05/2015 and end on 9/22/2015. Any and all subpoenas previously issued shall remain in full force and effect through the new trial date. (Court Reporter Chris Wallace.) Hearing held 1:40 p.m. to 2:25 p.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS)<br><br>Reason for Amendment: to add time in court. Modified on 8/4/2015 (CJS). (Entered: 07/13/2015) |
| 07/09/2015 | 166 | 2nd AMENDED MINUTE ENTRY for proceedings held before Judge Rosemary Marquez: Amending Doc. 141 and Doc. 136 : Minute Entry for motion hearing as to Derrick Malik Patterson(1) held on 7/9/2015 before Judge Rosemary Marquez. Ms. Williamson has filed a motion to continue trial. The government objects to a continuance. At a previous hearing the defendant stated he did not wish to waive his speedy trial rights; however, Ms. Williamson states she has discussed the issue with the defendant and he agrees with the request for a continuance and affirmatively waives his right to speedy trial. The Court inquires of the defendant and defendant confirms that he has no objection to a continuance of the trial date, therefore, It is Ordered defendant's Motion to Continue Trial (Doc. 109) is granted over the objection by the government. Trial set for 8/4/2015 is CONTINUED to 9/22/2015 at 9:30 a.m.. Plea deadline is continued to 9/04/2015. The government states they will be forwarding a new plea offer to defendant by 7/10/2015, and will leave that plea offer open until 7/24/2015. It is Further Ordered defendant's Motion to Produce Grand Jury Transcripts (Doc. 101) is granted and the government is authorized to provide the grand jury transcripts to defense counsel. Pretrial hearings/deadlines will be set by separate order.<br><br>PRESENT: AUSA Karen Rolley appears on behalf of the government. CJA Kathleen Williamson appears on behalf of the defendant. The defendant is present and in custody.<br><br>Excludable delay under 18 U.S.C. §3161(h)(7) is found to commence on 8/05/2015 and end on 9/22/2015. Any and all subpoenas previously issued shall remain in full force and effect through the new trial date. (Court Reporter Cindy Shearman.) Hearing held 1:40 p.m. to 2:25 p.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS)<br><br>Reason for 1st Amendment: to add time in court.<br><br>Reason for 2nd Amendment: to reflect correct court reporter. (Entered: 08/04/2015) |
| 07/13/2015 | 139 | ORDER denying without prejudice 72 Motion to Dismiss Counts 1 and 2; denying 74 Motion to Dismiss for Lack of Jurisdiction; denying 95 Motion to Dismiss based on Selective Prosecution. Signed by Judge Rosemary Marquez on 7/13/15. (See attached PDF for complete information.) (KAH) (Entered: 07/13/2015) |
| 07/13/2015 | 140 | ORDER as to Derrick Malik Patterson, The trial in this case will begin on September 22, 2015 at 9:30 a.m.. A hearing on all pending motions is scheduled for August 20, 2015 at 1:30 p.m.. All substantive motions are to be filed by August 3, 2015. Signed by Judge Rosemary Marquez on 7/10/15. (See attached PDF for complete information.) (KAH) (Entered: 07/13/2015) |
| 07/16/2015 | 142 | IT IS ORDERED vacating the pretrial conference, as to Derrick Malik Patterson(1), Jessamy Eve Benington(2) presently set for 7/27/2015 at 1:50 p.m. before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez. (CJS) (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 07/16/2015) |
| 07/17/2015 | 149 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 114 MOTION in Limine *Omnibus Supplemental Response*. (Woolridge, Angela) (Entered: 07/17/2015) |
| 07/27/2015 | 153 | MOTION FOR TRIAL SCHEDULING ORDER by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Woolridge, Angela) (Entered: 07/27/2015) |
| 08/03/2015 | 155 | ORDER as to Derrick Malik Patterson granting 153 the Motion for Trial Scheduling Order. Jury Trial set for 9/21/2015 at 09:30 AM before Judge Rosemary Marquez. Trial will continue on September 22 and 23, 2015, but trial will not be held on September 24 or 25, 2015. Trial will resume on September 28, 2015. Signed by Judge Rosemary Marquez on 8/3/15. (KAH) (Entered: 08/03/2015) |

| 08/03/2015 | 156 | Fourth MOTION to Continue Trial and Extend Time to File Pretrial Motions by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 08/03/2015) |
|---|---|---|
| 08/03/2015 | 157 | MOTION to Preclude Statements *(Defendant's Hearsay Statements)* by USA as to Derrick Malik Patterson, Jessamy Eve Benington. (Woolridge, Angela) (Entered: 08/03/2015) |
| 08/03/2015 | 158 | NOTICE *of Supplemental Notice of Intent to Use 404(b) Material* by USA as to Derrick Malik Patterson, Jessamy Eve Benington re: 94 First MOTION in Limine *of Intent to Introduce 404b Material*. (Woolridge, Angela) (Entered: 08/03/2015) |
| 08/03/2015 | 160 | First MOTION to Produce *Nontestimonial Evidence* by USA as to Derrick Malik Patterson. (Rolley, Karen) (Entered: 08/03/2015) |
| 08/03/2015 | 161 | First MOTION to Compel *Polygraph Examination of Cooperating Codefendant and Objections to Proposed Government 404(b) Evidence* by Derrick Malik Patterson. (Williamson, Kathleen) (Entered: 08/03/2015) |
| 08/04/2015 | 164 | IT IS ORDERED the 156 Fourth MOTION to Continue Trial and Extend Time to File Pretrial Motions as to Derrick Malik Patterson is set forMotion Hearing on 8/5/2015 at 10:10 AM in Courtroom 5A, 405 West Congress Street, Tucson, AZ 85701 before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, js)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 08/04/2015) |
| 08/04/2015 | 165 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 156 Fourth MOTION to Continue Trial and Extend Time to File Pretrial Motions . (Woolridge, Angela) (Entered: 08/04/2015) |
| 08/04/2015 | 167 | IT IS ORDERED vacating the motion hearing for 156 Motion to Continue Trial and Extend Time to File Pretrial Motions filed by Derrick Malik Patterson presently set for 8/5/2015 at 10:10 am as to Derrick Malik Patterson before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, js)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 08/04/2015) |
| 08/04/2015 | 168 | REPLY TO RESPONSE to Motion by Derrick Malik Patterson re: 156 Fourth MOTION to Continue Trial and Extend Time to File Pretrial Motions *Goverment Objection Dkt 165*. (Williamson, Kathleen) (Entered: 08/04/2015) |
| 08/06/2015 | 172 | ORDER denying 156 Motion to Continue Trial and Extend Time to File Pretrial Motions filed as to Derrick Malik Patterson (1). Signed by Judge Rosemary Marquez on 8/5/15. (See attached PDF for complete information.) (KAH) (Entered: 08/06/2015) |
| 08/06/2015 | 173 | ORDER granting in part and denying in part 102 Motion to Dismiss or Produce Bill of Particulars as to Derrick Malik Patterson (1). Defendant's request for a dismissal of the indictment is denied. Defendant's request for a bill of particulars is granted. The Government shall provide to the Defendant by August 19, 2015: (1) details of the specific incidents that the Government intends to allege during trial; (2) the dates of those incidents; and (3) the elements of the charges that the Government intends to allege during trial. Defendant's Motion also contains a request for a copy of the Grand Jury transcript. Defendant's instant request will be denied as moot. Signed by Judge Rosemary Marquez on 8/5/15. (KAH) (Entered: 08/06/2015) |
| 08/17/2015 | 179 | Fourth MOTION to Continue Trial and Extend Time to File Pretrial Motions */Renewed Motion and/or Motion to Reconsider/* by Derrick Malik Patterson. (Attachments: # 1 Exhibit Supporting Exhibits)(Williamson, Kathleen) (Entered: 08/17/2015) |
| 08/17/2015 | 180 | RESPONSE in Opposition by USA as to Derrick Malik Patterson re: 122 MOTION in Limine *to Exclude Government Expert Stigerts* . (Attachments: # 1 Exhibit Attachment 1-Expert CV, # 2 Exhibit Attachment 2-Fed Trials)(Rolley, Karen) (Entered: 08/17/2015) |
| 08/17/2015 | 181 | RESPONSE re: 118 Notice (Other) *Government's Opposition of Defendant's Use of Affirmative Defense* by USA as to Derrick Malik Patterson. (Rolley, Karen) (Entered: 08/17/2015) |
| 08/17/2015 | 182 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 161 First MOTION to Compel *Polygraph Examination of Cooperating Codefendant and Objections to Proposed Government 404(b) Evidence* . (Woolridge, Angela) (Entered: 08/17/2015) |
| 08/17/2015 | 183 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 179 Fourth MOTION to Continue Trial and Extend Time to File Pretrial Motions */Renewed Motion and/or Motion to Reconsider/* . (Woolridge, Angela) (Entered: 08/17/2015) |
| 08/17/2015 | 184 | NOTICE OF ERRATA re: 180 Response in Opposition by USA as to Derrick Malik Patterson.. (Rolley, Karen) (Entered: 08/17/2015) |
| 08/17/2015 | 185 | RESPONSE in Opposition by USA as to Derrick Malik Patterson re: 122 MOTION in Limine *to Exclude Government Expert Stigerts* . (Attachments: # 1 Exhibit, # 2 Exhibit)(Rolley, Karen) (Entered: 08/17/2015) |
| 08/17/2015 | 186 | *RESPONSE in Opposition by USA as to Derrick Malik Patterson re: 122 MOTION in Limine *to Exclude Government Expert Stigerts* . (Attachments: # 1 Exhibit, # 2 Exhibit)(Rolley, Karen) *Document duplicate of entry of 185 . Modified on 8/18/2015 (KAH). (Entered: 08/17/2015) |
| 08/17/2015 | 187 | NOTICE OF ERRATA *Doc. 186* by USA as to Derrick Malik Patterson.. (Rolley, Karen) (Entered: 08/17/2015) |
| 08/18/2015 | 189 | IT IS ORDERED that the motion hearing currently set for 8/20/2015 at 1:30 p.m. before Judge Rosemary Marquez is RESET as a Status Conference only as to Derrick Malik Patterson. The date and time remain as previously set; this is a |

| | | |
|---|---|---|
| | | change to status conference only. Ordered by Judge Rosemary Marquez. (CJS) (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 08/18/2015) |
| 08/19/2015 | 191 | NOTICE *of Discovery Request- Letter to Preserve Electronic Evidence* by Derrick Malik Patterson. (Attachments: # 1 Exhibit Letter to Preserve Evidence)(Williamson, Kathleen) (Entered: 08/19/2015) |
| 08/19/2015 | 192 | BILL OF PARTICULARS by USA as to Derrick Malik Patterson. (Woolridge, Angela) (Entered: 08/19/2015) |
| 08/20/2015 | 194 | ** AMENDED BY DOC. 195 ** MINUTE ENTRY for status conference as to Derrick Malik Patterson(1) held on 8/20/2015 before Judge Rosemary Marquez. Pending before the Court is defendant's Motion to Reconsider/Renew Defense Motion to Continue. Counsel argue their positions to the Court. Based on the motion practice to date by defense counsel, the Court is concerned that the defendant may be better represented by the office of the Federal Public Defender, with the staff and resources it could provide. For the reasons set forth on the record, the Court is going to grant the defendant's motion to continue; however the motion will remain pending and the trial date will remain as currently set for 9/22/2015 while the Court ascertains if the FPD can assume representation of the defendant, with the understanding of the parties that trial will NOT commence on 9/22/2015. The defendant is in agreement with a continuance and will waive his speedy trial rights. Further status conference is set for 9/01/2015 at 11:00 a.m..

PRESENT: AUSA Karen Rolley and AUSA Angela Woolridge appear on behalf of the government. CJA Kathleen Williamson appears on behalf of the defendant. The defendant is present and in custody. (Court Reporter Chris Wallace.) Hearing held 1:30 p.m. to 2:00 p.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) Modified on 8/21/2015 (CJS). (Entered: 08/21/2015) |
| 08/20/2015 | 195 | AMENDED MINUTE ENTRY for proceedings held before Judge Rosemary Marquez: Amending Doc. 194 MINUTE ENTRY for status conference as to Derrick Malik Patterson(1) held on 8/20/2015 before Judge Rosemary Marquez. Pending before the Court is defendant's Motion to Reconsider/Renew Defense Motion to Continue. Counsel argue their positions to the Court. Based on the motion practice to date by defense counsel, the Court is concerned that the defendant may be better represented by the office of the Federal Public Defender, with the staff and resources it could provide. For the reasons set forth on the record, the Court is going to grant the defendant's motion to continue; however the motion will remain pending and the trial date will remain as currently set for 9/21/2015 while the Court ascertains if the FPD can assume representation of the defendant, with the understanding of the parties that trial will NOT commence on 9/21/2015. The defendant is in agreement with a continuance and will waive his speedy trial rights. Further status conference is set for 9/01/2015 at 11:00 a.m..

PRESENT: AUSA Karen Rolley and AUSA Angela Woolridge appear on behalf of the government. CJA Kathleen Williamson appears on behalf of the defendant. The defendant is present and in custody. (Court Reporter Chris Wallace.) Hearing held 1:30 p.m. to 2:00 p.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS)

Reason for Amendment: to reflect correct current trial date. (Entered: 08/21/2015) |
| 08/28/2015 | 197 | IT IS ORDERED vacating the Status Conference, as to Derrick Malik Patterson presently set for 9/1/2015 at 11:00 a.m. before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, js)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 08/28/2015) |
| 08/28/2015 | 198 | ORDER IT IS HEREBY ORDERED that Kathleen G. Williamson is terminated as counsel of record. IT IS FURTHER ORDERED that the Law Offices of Stephen G. Ralls are appointed to represent Defendant Derrick Patterson. Signed by Judge Rosemary Marquez on 08/28/2015.(DLC) (Entered: 08/28/2015) |
| 08/28/2015 | 199 | IT IS ORDERED, as to Derrick Malik Patterson, Status Conference set for 9/14/2015 at 11:00 AM in Courtroom 5A, 405 West Congress Street, Tucson, AZ 85701 before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, js)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 08/28/2015) |
| 09/08/2015 | 201 | MOTION to Continue *Status Conference* by USA as to Derrick Malik Patterson. (Woolridge, Angela) (Entered: 09/08/2015) |
| 09/08/2015 | 202 | IT IS ORDERED the Status Conference, as to Derrick Malik Patterson, presently set for 9/14/2015 at 11:00 AM is RESET AS TO TIME ONLY!! Status Conference set for 9/14/2015 at 09:30 AM in Courtroom 5A, 405 West Congress Street, Tucson, AZ 85701 before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, co)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 09/08/2015) |
| 09/09/2015 | 203 | MOTION to Continue *Status Conference* by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 09/09/2015) |
| 09/10/2015 | 204 | There being no objection by the Government, the Motion to Continue the Status Conference (Doc. 203 ) filed by Derrick Malik Patterson is GRANTED. The Status Conference is continued to **SEPTEMBER 29, 2015 AT 10:30 AM** in Courtroom 5A, 405 West Congress Street, Tucson, AZ 85701 before this Court. Ordered by Judge Rosemary Marquez. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.) (SGF) (Entered: 09/10/2015) |
| 09/15/2015 | 205 | MOTION to Continue Trial and Plea Deadline by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 09/15/2015) |
| 09/15/2015 | 206 | ORDER granting 205 Motion to Continue Trial and Plea Deadline filed as to Derrick Malik Patterson (1). Jury Trial set for 12/22/2015 at 09:30 AM before Judge Rosemary Marquez. Plea deadline is 12/4/2015. Signed by Judge Rosemary Marquez on 9/15/2015.(TAD) (Entered: 09/15/2015) |

| | | |
|---|---|---|
| 09/29/2015 | 208 | MINUTE ENTRY for proceedings held before Judge Rosemary Marquez: Status Conference as to Derrick Malik Patterson held on 9/29/2015. Discussion held regarding the status of this case. Parties will confer on October 14th to discuss disclosure. Government states they have provided defense with a plea agreement. Court sets this matter for a status conference on 11/18/2015 at 11:00am before this Court to set a firm trial.<br><br>**Appearances**: AUSA Karen Rolley and Angela Woolridge for the Government, CJA Attorney Stephen Ralls and assisted by Benjamin Aguilera for defendant. Defendant is present and in custody. (Court Reporter Chris Wallace.) Hearing held 10:40am to 10:50am. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (TAD) (Entered: 09/29/2015) |
| 11/18/2015 | 214 | MINUTE ENTRY for status conference as to Derrick Malik Patterson(1) held on 11/18/2015 before Judge Rosemary Marquez. The parties agree the current trial date of 12/22/2015 is not a viable date. It is Ordered that jury trial in this matter is continued to 3/14/2016 and set as a firm trial date. Plea deadline is continued to 2/26/2016. Pretrial motion hearing is set for 2/22/2016 at 1:30 p.m.. All motions shall be filed by 2/1/2016. Responses are due by 2/12/2016. Proposed voir dire questions and jury instructions shall be filed by 3/9/2016. The government shall also file a 1.2 elements instruction by 3/9/2016.<br><br>PRESENT: AUSA Karen Rolley and AUSA Angela Woolridge appear on behalf of the government. CJA Steve Ralls and CJA Benjamin Aguilera appear on behalf of the defendant. The defendant is present and in custody. No interpreter needed. (Court Reporter Chris Wallace.) Hearing held 10:40 a.m. to 10:50 a.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) (Entered: 11/20/2015) |
| 11/25/2015 | 216 | ORDER as to Derrick Malik Patterson, The trial in this case will begin on March 14, 2016 at 9:30 a.m. A Pretrial Conference and hearing on all pending motions is scheduled for February 22, 2016 at 1:30 p.m.. All motions in limine are to be filed by February 1, 2016, with responses due on February 12, 2016. Proposed Jury instructions and voir dire are to be filed by noon on March 9, 2016. Counsel for the government is directed to file a 1.2 preliminary instruction listing the elements of the offense only. Signed by Judge Rosemary Marquez on 11/25/15. (KAH) (Entered: 11/25/2015) |
| 01/29/2016 | 225 | To accommodate the Court's trial calendar, IT IS ORDERED the Jury Trial set for Monday March 14, 2016, as to Derrick Malik Patterson, is RESET. Jury Trial shall begin on Tuesday March 15, 2016 at 09:30 AM in Courtroom 5A, 405 West Congress Street, Tucson, AZ 85701 before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez.(RM, js)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 01/29/2016) |
| 02/01/2016 | 226 | MOTION in Limine *re Applicability of Rule 412* by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 02/01/2016) |
| 02/01/2016 | 227 | Supplemental MOTION in Limine *Objecting to Proposed Rule 404(b) Evidence* by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 02/01/2016) |
| 02/01/2016 | 228 | NOTICE *of Motions, Responses and Notices filed by the United States* by USA as to Derrick Malik Patterson. (Rolley, Karen) (Entered: 02/01/2016) |
| 02/08/2016 | 229 | MOTION to Withdraw Document 118 Notice (Other) *of Affirmative Defense* by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 02/08/2016) |
| 02/08/2016 | 230 | MOTION to Withdraw Document 80 Notice (Other) *of Intent to Call Expert Economics* by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 02/08/2016) |
| 02/10/2016 | 231 | NOTICE OF CHANGE OF PLEA HEARING set for February 12, 2016 at 2:30 by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 02/10/2016) |
| 02/10/2016 | 232 | At the request of defense counsel, IT IS ORDERED that a Change of Plea Hearing as to Defendant Derrick Malik Patterson is scheduled before Magistrate Judge Velasco on February 12, 2016, at 2:30 p.m. Ordered by Magistrate Judge Bernardo P. Velasco.(BPV, cjm)(This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 02/10/2016) |
| 02/12/2016 | 234 | *MINUTE ENTRY for proceedings held before Magistrate Judge Bernardo P Velasco: Change of Plea Hearing as to Derrick Malik Patterson held on 2/12/2016. Defendant(s) state true name to be the same. Defendant enters a plea of guilty as to Count 2 of the Indictment. THE COURT ORDERS the trial date/pending hearings VACATED. Pending motions are rendered moot. Prior custody/release orders are AFFIRMED. The Court directs the US Probation Office to prepare a Presentence Report.<br><br>**Appearances**: AUSA Angela Woolridge for Karen Rolley for the Government, CJA Attorney Stephen Ralls for defendant. Defendant is present and in custody. Sentencing set for 5/19/2016 at 09:50 AM before Judge Rosemary Marquez. (Recorded by COURTSMART.) Hearing held 2:28 to 2:38. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (PTR) *Modified to regenerate NEF on 2/16/2016 (SCH). (Entered: 02/16/2016) |
| 02/12/2016 | 235 | CONSENT OF DEFENDANT Derrick Malik Patterson AND ORDER OF REFERRAL to Magistrate Judge Bernardo P. Velasco for entry of guilty plea. Signed by Judge Rosemary Marquez on 02/12/2016.(PTR) (Entered: 02/16/2016) |
| 02/12/2016 | 236 | PLEA AGREEMENT as to Derrick Malik Patterson. (PTR) (Entered: 02/16/2016) |
| 02/16/2016 | 237 | MAGISTRATE JUDGE FINDINGS & RECOMMENDATION UPON A PLEA OF GUILTY as to Derrick Malik Patterson. Signed by Magistrate Judge Bernardo P Velasco on 02/12/2016.(PTR) (Entered: 02/16/2016) |

| | | |
|---|---|---|
| 02/19/2016 | | NOTICE OF ASSIGNMENT: The presentence investigation has been assigned to USPO Robert Griffith as to Derrick Malik Patterson. (Griffith, Robert) (Entered: 02/19/2016) |
| 03/02/2016 | 238 | The District Court has reviewed the Findings and Recommendations of the Magistrate Judge 237 , and no objections have been filed. Therefore, IT IS ORDERED that the Findings and Recommendation of the Magistrate Judge are adopted and this Court accepts defendant's PLEA OF GUILTY as to Derrick Malik Patterson(1). Ordered by Judge Rosemary Marquez. (CJS) (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 03/02/2016) |
| 04/01/2016 | 239 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/FIRM NAME as to Stephen G Ralls by Derrick Malik Patterson (Ralls, Stephen) (Entered: 04/01/2016) |
| 04/15/2016 | 240 | At the request of U.S. Probation Office and there being no objection by counsel, IT IS ORDERED the Sentencing set for 5/19/2016 as to Derrick Malik Patterson(1) is RESET. Sentencing is CONTINUED to 6/24/2016 at 09:30 AM before Judge Rosemary Marquez. Ordered by Judge Rosemary Marquez. (CJS) (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (Entered: 04/15/2016) |
| 06/03/2016 | 244 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by Derrick Malik Patterson . (Aguilera, Benjamin) (Entered: 06/03/2016) |
| 06/09/2016 | 246 | RESPONSE re: 244 Objection to Presentence Investigation Report by USA as to Derrick Malik Patterson. (Woolridge, Angela) (Entered: 06/09/2016) |
| 06/17/2016 | 249 | SENTENCING MEMORANDUM by USA as to Derrick Malik Patterson. (Rolley, Karen) (Entered: 06/17/2016) |
| 06/17/2016 | 250 | SENTENCING MEMORANDUM by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 06/17/2016) |
| 06/17/2016 | 251 | MOTION for Leave to Exceed Page Limit *for Sentencing Memoranda* by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 06/17/2016) |
| 06/20/2016 | 252 | ORDER granting 251 Motion for Leave as to Derrick Malik Patterson (1).Ordered by Judge Rosemary Marquez. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.)(RM, js) (Entered: 06/20/2016) |
| 06/22/2016 | 253 | MOTION to Withdraw Plea of Guilty by Derrick Malik Patterson. (Ralls, Stephen) (Entered: 06/22/2016) |
| 06/22/2016 | 254 | *RESPONSE to Motion by USA as to Derrick Malik Patterson re: 253 MOTION to Withdraw Plea of Guilty . (Rolley, Karen) *Modified to correct event type on 6/23/2016 (KEP). (Entered: 06/22/2016) |
| 06/24/2016 | 255 | MINUTE ENTRY for sentencing/motion hearing as to Derrick Malik Patterson set for 6/24/2016 before Judge Rosemary Marquez. Pending before the Court is defendant's 253 Motion to Withdraw Plea of Guilty filed 6/22/2016. The government orally moves for additional time to brief defendant's motion. The government's motion is granted. The government shall file its response by 7/25/2016. Defendant shall reply by 8/3/2016. This matter is set for further hearing on 8/9/2016 at 01:30 p.m.. Sentencing set this date is vacated pending resolution of the motion to withdraw plea of guilty.<br><br>PRESENT: AUSA Karen Rolley appears on behalf of the government. Stephen Ralls (CJA) and Benjamin Aguilera (CJA) appear on behalf of the defendant. The defendant is in custody, present in the courtroom. (Court Reporter Chris Wallace.) Hearing held 9:35 a.m. to 9:50 a.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) (Entered: 06/24/2016) |
| 07/25/2016 | 258 | RESPONSE to Motion by USA as to Derrick Malik Patterson re: 253 MOTION to Withdraw Plea of Guilty . (Woolridge, Angela) (Entered: 07/25/2016) |
| 07/28/2016 | 259 | REPLY TO RESPONSE to Motion by Derrick Malik Patterson re: 253 MOTION to Withdraw Plea of Guilty . (Attachments: # 1 Exhibit A)(Ralls, Stephen) (Entered: 07/28/2016) |
| 08/09/2016 | 260 | MINUTE ENTRY for hearing as to Derrick Malik Patterson(1) held on 8/9/2016 before Judge Rosemary Marquez. Pending before the Court is defendant's Motion to Withdraw from Plea Agreement. The parties argue their positions to the Court. It is Ordered denying defendant's 253 Motion to Withdraw from Plea Agreement as to Derrick Malik Patterson (1). Sentencing in this matter is set for 8/23/2016 at 11:00 AM before Judge Rosemary Marquez.<br><br>PRESENT: AUSA Karen Rolley and AUSA Angela Woolridge appear on behalf of the government. CJA Stephen Ralls and CJA Benjamin Aguilera appear on behalf of the defendant. The defendant is in custody and present in the courtroom. (Court Reporter Cindy Shearman.) Hearing held 1:33 p.m. to 2:03 p.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) (Entered: 08/09/2016) |
| 08/23/2016 | 262 | MINUTE ENTRY for sentencing as to Derrick Malik Patterson(1) held on 8/23/2016 before Judge Rosemary Marquez. Ms. Woolridge states that the victims were notified of this hearing and they declined to attend or provide a statement. Sentence imposed. Judgment to issue.<br><br>Appearances: AUSA Angela Woolridge and AUSA Karen E. Rolley for the Government; (CJA) Stephen G. Ralls and (CJA) Benjamin Aguilera for defendant. Defendant is present and in custody. No interpreter needed. (Court Reporter Chris Wallace.) Hearing held 11:05 a.m. to 12:43 p.m.. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (CJS) (Entered: 08/23/2016) |

| 08/25/2016 | 263 | JUDGMENT AND COMMITMENT ISSUED as to Derrick Malik Patterson (1) on Count 2: Bureau of Prisons: 132 Months; Supervised Release: 5 Years; Special Assessment: $100.00; Restitution: $200. It is Ordered the remaining counts as to this defendant are Dismissed. Signed by Judge Rosemary Marquez on 8/24/2016. (CJS) (Entered: 08/25/2016) |
|---|---|---|
| 08/26/2016 | 265 | NOTICE OF APPEAL to 9th Circuit Court of Appeals as to Derrick Malik Patterson re: 263 Judgment and Commitment/of Probation Issued. (Ralls, Stephen) (Entered: 08/26/2016) |
| 08/29/2016 | 266 | USCA Case Number as to Derrick Malik Patterson re: 265 Notice of Appeal. Case number 16-10377, 9th CCA. (BAC) (Entered: 09/02/2016) |
| 08/29/2016 | 267 | TIME SCHEDULE ORDER of USCA as to Derrick Malik Patterson re: 265 Notice of Appeal. (BAC) (Entered: 09/02/2016) |
| 09/12/2016 | 268 | ORDER of USCA as to Derrick Malik Patterson re: 265 Notice of Appeal. The motion of appellant's appointed counsel, Stephen G Ralls, Esq, to be relieved as counsel of record and for appointment of new counsel (Docket EntryNo. 3) is granted; counsel will be appointed by separate order. Clerk shall electronically serve this order on appointing authority for District of Arizona, who will locate appointed counsel. The appointing authority shall send notification of name, address, and telephone number of appointed counsel to the Clerk of this court within 14 days of locating counsel. (See attached PDF for complete information).(BAC) (Entered: 09/13/2016) |
| 09/20/2016 | 269 | CJA 20: Appointment of CJA Attorney Joshua Fisher Hamilton for Derrick Malik Patterson, as of 9/15/16. Signed by Judge Rosemary Marquez on 9/19/16.(KAH) (Entered: 09/20/2016) |
| 10/11/2016 | 270 | TRANSCRIPT REQUEST by Derrick Malik Patterson for proceedings held on 8/22/14;8/23/16;4/1/15;5/11/15;7/9/15;8 /20/15;9/29/15;11/18/15;6/24/16;8/9/16;2/12/16, Judge Rosemary Marquez, Magistrate Judge Charles R Pyle, Magistrate Judge Bernardo P Velasco hearing judge(s) re: 265 Notice of Appeal. (Hamilton, Joshua) (Entered: 10/11/2016) |
| 10/14/2016 | 271 | TRANSCRIPT of STATUS HEARING as to Derrick Malik Patterson, Jessamy Eve Benington for dates of 04/01/2015 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Erica R. McQuillen. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/4/2016. Redacted Transcript Deadline set for 11/14/2016. Release of Transcript Restriction set for 1/12/2017. (CSL) (Entered: 10/14/2016) |
| 11/07/2016 | 276 | TRANSCRIPT of INITIAL APPEARANCE/ARRAIGNMENT/DETENTION HEARING as to Derrick Malik Patterson held on 08/22/2014, before Judge CHARLES R. PYLE. Transcriber Aaron H. LaDuke. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/28/2016. Redacted Transcript Deadline set for 12/8/2016. Release of Transcript Restriction set for 2/6/2017. (CSL) (Entered: 11/07/2016) |
| 11/07/2016 | 278 | TRANSCRIPT of CHANGE OF PLEA as to Derrick Malik Patterson held on 02/12/2016, before Judge BERNARDO P. VELASCO. Transcriber Aaron H. LaDuke. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/28/2016. Redacted Transcript Deadline set for 12/8/2016. Release of Transcript Restriction set for 2/6/2017. (CSL) (Entered: 11/07/2016) |
| 11/09/2016 | 279 | TRANSCRIPT of MOTION HEARING as to Derrick Malik Patterson for date of 07/09/2015 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Cindy J. Shearman. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/30/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/7/2017. (CSL) (Entered: 11/09/2016) |
| 11/09/2016 | 280 | TRANSCRIPT of MOTION HEARING as to Derrick Malik Patterson for dates of 08/09/2016 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Cindy J. Shearman. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/30/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/7/2017. (CSL) (Entered: 11/09/2016) |
| 11/10/2016 | 281 | TRANSCRIPT of STATUS CONFERENCE as to Derrick Malik Patterson for date of 05/11/2015 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Chris Wallace. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/8/2017. (CSL) (Entered: 11/10/2016) |
| 11/10/2016 | 282 | TRANSCRIPT of STATUS CONFERENCE as to Derrick Malik Patterson for date of 08/20/2015 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Chris Wallace. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased |

|  |  |  |
|---|---|---|
|  |  | through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/8/2017. (CSL) (Entered: 11/10/2016) |
| 11/10/2016 | 283 | TRANSCRIPT of SENTENCING as to Derrick Malik Patterson for date of 08/23/2016 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Chris Wallace. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/8/2017. (CSL) (Entered: 11/10/2016) |
| 11/10/2016 | 284 | TRANSCRIPT of STATUS CONFERENCE as to Derrick Malik Patterson for date of 09/29/2015 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Chris Wallace. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/8/2017. (CSL) (Entered: 11/10/2016) |
| 11/10/2016 | 285 | TRANSCRIPT of STATUS CONFERENCE as to Derrick Malik Patterson for date of 11/18/2015 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Chris Wallace. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2016. Redacted Transcript Deadline set for 12/12/2016. Release of Transcript Restriction set for 2/8/2017. (CSL) (Entered: 11/10/2016) |
| 11/18/2016 | 287 | TRANSCRIPT of MOTION HEARING/SENTENCING as to Derrick Malik Patterson for date of 06/24/2016 before Judge ROSEMARY MARQUEZ re: 265 Notice of Appeal. Court Reporter Chris Wallace. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through the Court Reporter by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/9/2016. Redacted Transcript Deadline set for 12/19/2016. Release of Transcript Restriction set for 2/16/2017. (CSL) (Entered: 11/18/2016) |
| 05/30/2017 | 294 | MANDATE of USCA as to Derrick Malik Patterson re: 265 Notice of Appeal. Appellant's motion for voluntary dismissal of this appeal (Docket Entry No. 13) is granted. This appeal is dismissed. This order served on the district court shall act as and for the mandate of this court. DISMISSED. (Attachments: # 1 NDA)(BAC) (Entered: 05/31/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/08/2022 08:35:58 | | |
| **PACER Login:** | admani301880 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:14-cr-01395-RM-BGM |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

# EXHIBIT B

1
2  **Ralls, Aguilera & Reidy, P.C.**
3       *314 South Sixth Avenue*
         *Tucson, Arizona 85701*
         *Telephone: (520) 884-1234*
4        *Facsimile: (520) 884-9687*
         *e-mail: steve@rallslawoffice.com*
5
   Attorneys for Defendant Derrick Patterson
6  By:  Stephen G. Ralls, Arizona Bar #007772
7
8                    **UNITED STATES DISTRICT COURT**
9                        **DISTRICT OF ARIZONA**
10 **United States,**                    )
                                          )
11          **Plaintiff,**                )        **14-cr-01395-RM-1**
                                          )
12      **v.**                            )
                                          )
13                                        )        **SENTENCING MEMORANDUM**
   **Derrick Malik Patterson,**           )
14                                        )
15          **Defendant.**                )
   _____       )
16

17         Defendant Derrick Malik Patterson, through undersigned counsel, hereby submits

18 the following information that he anticipates will be helpful to this Court in arriving at a

19 fair and just sentence.  Mr. Patterson is scheduled to be sentenced on June 24, 2016, at

20 9:30 a.m.

21

22                        SENTENCING MEMORANDUM

23         It is not an exaggeration to say that, from the moment Derrick took his first

24 breath, he was destined to live a life that would bring him into contact with the criminal

25 justice system.  Derrick was the second of six children born to Bernadette Gantt.

26 Unfortunately, when Derrick was born, his mother was heavily addicted to crack cocaine

27
28

and subsidized her drug habit with prostitution.[1]  Derrick's father, who was also a drug addict, disappeared when Derrick was one year old, just after the birth of Derrick's younger sister, Nicole.  Derrick's father provided no support whatsoever for Derrick or his sister.  Derrick's remaining four siblings were fathered by four men with whom his mother had casual relationships, all of whom were drug addicts, none of whom provided financial support for their children.  This meant that Derrick and his siblings were exposed to abject poverty, continuous neglect, and violent neighborhoods.

Due to the magnitude of Bernadette's drug problem, she was unable to hold a job, and supported her children with welfare.  Upon the arrival of her welfare check each month, Bernadette would fill the refrigerator with food, pay a few bills, and keep as much money as possible for drugs.  After about two weeks, however, the food would run out and the children would be faced with weeks of hunger before the next arrival of provisions.  The family's water and electricity were often disconnected, sometimes for a week at a time.  Rent and utility bills were generally in arrears and the family faced frequent eviction, occasionally sneaking away from a demanding landlord in the dead of

---

[1]  It has been well-established that, in addition to suffering from their own addiction to cocaine, infants whose mothers use cocaine during pregnancy suffer from "a higher risk of: stroke, poor growth, feeding problems, deformed limbs, brain damage, reproductive or urinary system abnormalities, [and] sudden infant death syndrome." After pregnancy, cocaine is also transmitted to the baby through breast milk. http://www.healthline.com/health/pregnancy/alcohol-drugs#DrugUseDuringPregnancy2. In addition, the long-term effects of a mother's cocaine use upon a developing child include "behavior problems (e.g., difficulties with self-regulation) and deficits in some aspects of cognitive performance, information processing, and sustained attention to tasks—abilities that are important for the realization of a child's full potential." https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-effects-maternal-cocaine-use.

2

night.

Derrick recalled times when the family was forced to camp-out in local parks, where they could gain access to running water. The lack of housing, as well as the absence of utilities when there was housing, were hardest to endure during the intense heat of the Phoenix summers, and when the winter temperature dropped below freezing. Derrick also recalled times when the children, desperate to quell the painful gurgling in their empty stomachs, foraged for food in grimy dumpsters in alleys behind restaurants.

Like most children who grow up in heavily dysfunctional homes, Derrick and his siblings were brought up with a code of silence; forbidden at an early age from speaking to anyone about what occurred in their home, and told that if they did so, they would be taken away from their family and forced to live where they would be beaten and abused. Even when they were desperately hungry, the children were not permitted to beg or to ask anyone – including well-meaning teachers, neighbors, and religious leaders – for assistance. Despite the family's code of silence, however, Derrick attributes much of his ability to survive childhood to friends and neighbors who quietly offered a helping hand. Until Derrick was ten years old, he lived in the ghetto on the east side of Phoenix. There, all of Derricks friends and neighbors were similarly situated financially, and were aware of each other's difficulties. On many occasions, neighbors, sensing the hunger in Derrick's eyes, would tactfully invite him into their homes and ask whether he would like to finish-off some left-overs. Likewise, when there was food in Derrick's home, his mother never hesitated to offer it to children whose families were "running a little short."

3

Due to her severe addiction to crack cocaine, Derrick's mother spent little time at home, and when she was at home, she was either too exhausted to interact with her children, or was engaged in the process of entertaining men in her bedroom to earn drug money. From time to time, Bernadette would disappear for days at a time, leaving the children completely unsupervised, often without food or utilities, in ramshackle neighborhoods. Unfortunately, Bernadette's extended family had largely given up on her and, during Derrick's formative years, provided no assistance to Bernadette or the children. Under these circumstances, as early as the age of four, the older children in the family became responsible for the care of their younger siblings. Derrick recalled that the first time he committed a criminal offense, he was about seven years old and stole formula and a package of pampers for his younger brother, who had cried all day from hunger and from diaper rash.

The lack of supervision in Derrick's home meant he was free to roam the often-dangerous streets of east Phoenix almost from the time he was able to walk. Not surprisingly, on the streets, Derrick met and associated with other children who were similarly neglected. Nonetheless, these largely forgotten children provided some companionship and protection for each other – sharing information regarding potential food sources, locating abandoned buildings for quick shelter, and providing each other with a brief respite from horrific homes that were often too violent to return to.

When the children in Derrick's family entered school, they encountered a mixed bag of blessings and hardship. School provided a safe haven from the streets and, at times, compassionate adult role models. It also provided free lunch and breakfast

programs, which meant the children could look forward to at least one meal per day.

Given the family's desperate financial situation, however, there was never money for

school clothes or school supplies. This meant that Derrick's meager wardrobe and ill-

fitting single pair of tennis shoes, which were acquired from church grab-bags and from

the bargain racks at second-hand stores, made him the butt of insults and abuse.

Likewise, because there was normally little money for soap or toothpaste in his home,

because the water and electricity were often disconnected, and because there was

generally no adult supervision over the children's hygiene, Derrick was often condemned

to attend school unwashed and in dirty clothes. In an attempt to hide the filth on their

clothes, Derrick and his siblings learned to wear their clothes for several days, then turn

them inside out for a cleaner look. Unfortunately, this trick did little to quell the insults

and taunts from other children.

  In addition, although Derrick always enjoyed school, he had difficulty

concentrating (undoubtedly a consequence of chronic malnutrition, as well as the

residual effects of his mother's drug use while Derrick was in utero), and had poor

attendance (a consequence of the lack of adult supervision coupled with the fact that the

family faced regular evictions and homelessness). These unfortunate circumstances

made it difficult for Derrick to earn good grades, and unfairly convinced Derrick at an

early age that he was simply not bright enough to be a good student.

  Derrick's life changed significantly when he was eleven years old, but sadly, not

entirely for the better. At approximately 11:00 p.m. one night, law enforcement officers

patrolling eastside Phoenix encountered two children walking down the street alone in a

dangerous area of east Phoenix. One of the children was Derrick's brother, Gabriel, who was five years old; the other was Derrick's sister, Sherelle, who was just one year old and barely able to walk. Sherelle was dressed in nothing but a diaper; neither of the children were wearing shoes. The officers immediately contacted Child Protective Services and located Derrick's home. There, officers found Derrick and two of his sisters sleeping in a filthy apartment. There was no running water, no food in the house, and no sign of Derrick's mother.

At that point, Child Protective Services recognized the dangerous nature of Derrick's home and sought relatives with whom Derrick and his siblings could be placed. Ultimately, Derrick's maternal grandmother and grandfather stepped forward and accepted all of Bernadette's five children into their home in westside Phoenix, where they lived for the remainder of their childhood.[2] Despite the fact that this was a positive event for Bernadette's children, it came as a shock to Derrick, who loved his mother deeply and who, at the age of eleven and as her oldest son, had developed a deep-seated need to protect Bernadette. After the move, Derrick and his siblings rarely saw their mother, who, due to chronic drug addiction, was unable to maintain a telephone or a

---

[2]      Derrick's youngest sister, Sequoia, was born two years after Bernadette's five oldest children were removed from her care. At birth, Sequoia was adopted by Bernadette's younger brother, which enabled Sequoia to grow up in an affluent neighborhood in Santa Ana, California. Derrick has always been delighted for Sequoia's good fortune, and deeply admires his uncle's family for the sacrifices they made in accepting and raising Sequoia. He has, however, had little contact with Sequoia, who is currently attending college in Newport Beach, California, because he feared he would be an embarrassment to her and to his extended family.

stable residence.[3]

In addition to losing his mother, which left Derrick angry and confused, the adjustment to his grandparents' home was challenging. Despite the abundant kindness of his grandparents, who were evangelical Christians, there existed a dramatic contrast between the virtually unlimited freedom Derrick experienced in his mother's home, and the more rigorous demands of his grandparents' lifestyle. In addition, Derrick urgently missed his friends and neighbors from the old neighborhood, with whom Derrick had, in his mother's recurrent absence, developed a close familial relationship.

Furthermore, Derrick found the move to west Phoenix to be a demoralizing experience that heavily undermined what remained of his self-confidence. In east Phoenix, all of Derrick's friends and neighbors had been persons of color, while his grandparents' westside neighborhood was populated with primarily white families. Although Derrick, as black child with dark skin, was no stranger to racism,[4] he felt

_____

[3] It was not until Derrick acquired a driver's license that he discovered a means through which to make contact with his mother. Utilizing his grandparents' car, Derrick would slowly cruise through their old east Phoenix neighborhoods, searching, with a care-package of food, personal hygiene items, and a small amount of money. Sometimes he would find Bernadette semi-conscious behind a dumpster; sometimes he located her under a tree in a park chatting amiably with other homeless drug addicts. On the worst days, Derrick could not locate Bernadette at all, leaving him with the unnerving fear that she was dead or seriously ill.

[4] Even among other persons of color, during his entire life, Derrick has been subjected to abundant racism that extended to members of his own family. Because Derrick and four of his five siblings had different fathers, they were born with widely varying skin tones. Derrick relayed that, within the African-American community, lighter skin is considered to be more desirable and more attractive. Consequently, Derrick, whose skin tone was dark, was subjected to abundant teasing and derogatory remarks from his own siblings and from people he considered to be close friends. Under

7

particularly uncomfortable in a white neighborhood where his very presence gave rise to side-long suspicious glances and persistent investigative stops by police officers.

Adrift, depressed, and lonely, Derrick became rebellious and resorted to his lifelong habits of leaving the house, sometimes in the dead of night, to wander through local parks and shopping centers. Not surprisingly, Derrick connected with other troubled youth and rapidly developed a juvenile criminal record that included drug use. By the time Derrick reached junior high school most of the adults in his life had given up on him, and no one seriously objected when he dropped out of school. Derrick turned to the streets to earn a living and commenced riding an emotional roller coaster that fluctuated between periods of drug use, criminal conduct, and incarceration, during the worst times, and attempts to control his own drug use and maintaining legitimate employment, during the best times.

Among the best things Derrick includes on his life's balance sheet is his long-term partnership with Treshaun Stemmons, as well as the birth of their two children, D.P., who is now seventeen, and A.P., age ten. Derrick and Treshaun met when Derrick was seventeen years old, and Treshaun became Derrick's first and only love. Derrick first noticed Treshaun when she was walking to high school and found himself struck by her warmth and beauty. He immediately solicited his younger sisters, who attended the same school, to inquire about Treshaun. Although Treshaun was raised by a single mother under difficult financial circumstances, she was never in trouble and did well in

---

these circumstances, at a young age, Derrick came to understand, not only was he black, he was ugly.

school.  Their first date involved dinner at Treshaun's mother's house, under close

supervision.

Although Treshaun was aware of Derrick's historical criminal conduct, and

despite concern regarding his future, Treshaun was a gentle and compassionate soul who

was quick to see the good in people and who believed people could change for the better.

The couple fell deeply in love.  Two years later, Treshaun became pregnant their son and

the couple moved into a small apartment.  Derrick and Treshaun were delighted at the

prospect of parenthood, and Derrick, who, from a young age, had enjoyed caring for his

siblings, saw fatherhood as an opportunity to do something important with his life.

When Derrick held his infant son for the first time, his heart ached, and he swore a

personal oath that his children would never face the kind of childhood Derrick endured.

At the time of Derrick's son's birth, Derrick was working as a telemarketer

earning minimum wage.  Despite employing his best efforts to find a better-paying

position, Derrick's lack of education and criminal history thwarted every attempt.  With

the expense of a new baby weighing heavy upon him, and in light of the fact that Derrick

vowed that his children would not suffer the neglect he had endured as a child, Derrick

decided that it was necessary to return to selling small quantities of marijuana.

Unfortunately, this lapse in judgment led Derrick back into associations with convicts,

and refueled his own drug usage.  In turn, when Derrick was intoxicated, he was easily

swayed by others and made poor decisions that led to additional criminal conduct.

Notwithstanding Derrick's lapses in judgment, he managed to be a devoted father

and family man by keeping the two diverse parts of his life carefully segregated.

9

Derrick, for example, spent a substantial part of each day with his family and, unwilling to entrust the care of his children to strangers, personally cared for his children when Treshaun returned to work as a secretary. Moreover, Derrick was involved in every aspect of his children's lives. When they were infants he fed, bathed and changed them; he took them to doctor's appointments; played with them; read articles on child development; and above all, made sure they were well-clothed and that the pantry was always full of food. As his children grew, Derrick did their homework with them every afternoon, walked them to and from the bus stop, attended parent conferences and performances, enrolled them in sports leagues and attended their games. On weekends, the family went to movies, the zoo, and picnics; they celebrated birthdays and went on annual vacations together. In short, Derrick was assiduous in providing his children with the kind of childhood he always wanted.

Amid Derrick's commitment to his family, however, lurked his life on the streets and an escalating addiction to drugs, which resulted in periods of incarceration. These periods placed considerably strain on his relationship with Treshaun and they began to grow apart. Even during their most tumultuous periods, however, Derrick and Treshaun cared for each other deeply and continued to live together to varying degrees. Prior to Derrick's arrest for the immediate offense, he and Treshaun lived together, Derrick was not selling drugs, and he had made significant progress toward controlling his drug use.

The pre-arrest improvements Derrick made to his life were prompted by the fact that, in 2012, Treshaun was diagnosed with metastatic breast cancer. Treshaun bravely underwent surgery, hormonal treatment, and chemotherapy. Frightened and feeling

10

1   powerless to improve Treshaun's health, Derrick did everything he could to provide

2   financial support for Treshaun and the children.  Unfortunately, given Derrick's criminal

3   history and inability to find legitimate work that paid a living wage, he turned to the sex

4   

5   trade.

6       Although this might not appear to have been a well-reasoned choice to those who

7   had a strong, stable upbringing, it is important to consider Derrick's choice in the context

8   of his personal history.  Derrick's mother, whom he dearly loved, was a prostitute and

9   

10  drug addict.  His youngest memories include a revolving door of men visiting his

11  mother.  It is extremely hard for anyone to see their parents' conduct as immoral,

12  particularly when they understand that their parents were simply victims of a  harsh

13  world, doing what was necessary to keep body and soul together.  Further, in light of the

14  

15  absence of adult role models in his young life, Derrick's moral compass was developed

16  with other neglected children in a nightmarish *Lord of the Flies* scenario in which, it is

17  not an exaggeration to say, he was forced to make choices that pitted societal morality

18  

19  against survival.

20      This is not to suggest, however, that Derrick is unaware of the mistakes he has

21  made, particularly as an adult, or of his need to make significant changes.  Sadly, just last

22  April, Derrick's beloved Treshaun succumbed to cancer.  When Derrick learned about

23  

24  her death from attorney Benjamin Aguilera, he was unquestionably devastated.

25  Although Derrick had regular contact with Treshaun and his children since he has been

26  in prison, Derrick did not know how sick Treshaun had become; a fact that Derrick

27  

28  attributes to Treshaun's unselfish awareness that he was powerless to help and would

11

have worried.

In the wake of Treshaun's death, Derrick has been consumed by grief and guilt. He deeply regrets that he was not with Treshaun and his children at the end of Treshaun's life. He feels grave sorrow that he was the source of upset and unhappiness during Treshaun's short life, and he is intensely distraught that he will never again be able to apologize or make amends. Above all, Derrick is frantic about the status of his children, who are now living with Treshaun's mother. For Derrick, it is unimaginable that his children were forced to face their mother's passing and funeral, and a move to their grandmother's home (a disconcerting event that Derrick intimately understands from his own childhood experience), without his support.

All of this has brought Derrick to the crestfallen realization that his mistakes have created too much hardship for the people he loves, and that, for them, he must live a law-abiding life. In the silence of his jail cell, Derrick has fully realized that he is no longer a young man with unlimited time to set his life straight, and the excitement that once accompanied criminal conduct is no longer appealing. At this point, a peaceful life in a minium-wage job is vastly preferable to the misery he and his family have been forced to experience when he has been incarcerated. If Derrick's life has taught him anything, it is that he is able to survive on almost nothing and his essential needs are small. Derrick's ultimate goal, however, is to do everything in his power to return to his children and to begin making amends. Although his children will be considerably older when he is released from custody, Derrick feels he will still have much to offer them in love and acquired wisdom. Informed by his own childhood, Derrick also believes he may be able

12

1  to contribute to his children's lives as a grandparent.

2      In preparation for making significant changes in his life, Derrick is looking
3  forward to post-sentencing placement in a prison where he can take advantage of
4  
5  personal development programs and education.  Derrick hopes to be able to earn a
6  general equivalency diploma (GED) and to take college courses that, upon release could
7  
8  help prepare for placement in a good job.  He will also participate in any and all
9  available drug treatment programs, as well as counseling programs that teach life skills
10  including decision-making and family dynamics.  Upon release from custody, Derrick's
11  dream is to participate-in or create a community assistance program that will help
12  
13  neglected and abused children and deter young people from the life he has led.  Inspired
14  by President Barack Obama, Derrick believes in the importance of community activism,
15  and he understands that this is one of the few endeavors in which his personal history
16  
17  and criminal record could provide an advantage rather than an impediment.

18      Under these circumstances, it is respectfully requested that this Court sentence
19  Mr. Patterson to a term of imprisonment that does not exceed 120 months.  Far less, in
20  fact, is required to impress upon him the importance of a law-abiding life.  Given the
21  
22  events that have occurred since Derrick's arrest, he has emerged a changed man with a
23  dramatically different goals and expectations for the remainder of his life.

24      RESPECTFULLY SUBMITTED this 17th day of June, 2016.

25

26          *s/Stephen G. Ralls*
27  _____
    STEPHEN G. RALLS
    Attorney for Defendant Derrick Patterson
28

13

1  <u>CERTIFICATE OF SERVICE</u>

2

3  I hereby certify that on June 17, 2016, I electronically transmitted the attached document to the Clerks' Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

4

5  AUSA Karen E. Rolley
   AUSA Angela W. Woolridge
6

7  Ralph E. Ellinwood, Attorney for Co-Defendant

8                                                    *s/Stephen G. Ralls*
                                          _____
9  _____         STEPHEN G. RALLS
                                             Attorney for Defendant Derrick Patterson
10

11  5313/patterson - sentencing memo 6-17-13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

THE NATIONAL ACADEMIES PRESS    OPENBOOK

The Growth of Incarceration in the United States: Exploring Causes and Consequences (2014)

**Chapter:** 9 Consequences for Families and Children

Visit **NAP.edu/10766** to get more information about this book, to buy it in print, or to download it as a free PDF.

# 9

# Consequences for Families and Children

The dramatic increase in incarceration rates since 1972 has stimulated widespread interest in how this trend is affecting families and children. As incarceration rates increased, more families and children had direct experience with imprisonment of a parent (see Figure 9-1). In a calculation of the number of minor children with fathers in prison or jail in the two decades from 1980 to 2000, Western and Wildeman (2009) found that the number of children with an incarcerated father increased from about 350,000 to 2.1 million, about 3 percent of all U.S. children in 2000. According to the most recent estimates from the Bureau of Justice Statistics, 53 percent of those in prison in 2007 had minor children. In that

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 33 of 221   Page ID #:292

year, an estimated 1.7 million children under age 18 had a parent in state or federal prison (Glaze and Maruschak, 2008). The racial and ethnic disparities of the prison population are reflected in the disparate rates of parental incarceration. In 2007, black and Hispanic children in the United States were 7.5 and 2.7 times more likely, respectively, than white children to have a parent in prison (Glaze and Maruschak, 2008; see also Box 9-1). While the consequences for families and children can be expected to vary by race and ethnicity, much of the research reviewed for this study does not distinguish outcomes by these characteristics. For the few studies that do, the differences and similarities are noted in the text.

This chapter reviews the empirical evidence on the consequences of incarceration for family behavior and child well-being. We focus on incarceration of men because it is more common than that of women and is the subject of the bulk of the available research. The literature on men's incarceration is large and includes ethnographic studies as well as quantitative



**FIGURE 9-1** Estimated number of parents in state and federal prisons and their minor children, by inmate's gender.
SOURCE: Data from Glaze and Maruschak (2008).

analyses of survey data and administrative records. The literature on women's incarceration is limited but growing. Most of the literature examining the consequences of maternal incarceration for families and children

is primarily qualitative or limited to specific field sites. While the risk of maternal imprisonment for children is quite small, it has grown much more rapidly in recent years than the risk of paternal imprisonment (Kruttschnitt, 2010; Wildeman, 2009). The number of children with a mother in prison increased 131 percent from 1991 to 2007 (see Figure 9-1), while the number with a father in prison increased 77 percent (Glaze and Maruschak, 2008). As discussed in Chapter 6, incarcerated mothers are more likely than incarcerated fathers to have lived with their children prior to incarceration. In a 2004 survey of inmates, 55 percent of female inmates in state prisons who were parents, compared with 36 percent of male inmates, reported living with their children in the month before arrest. Incarcerated parents in federal prisons were more likely to report living with their children before arrest (73 percent of female inmates, compared with 46 percent of male inmates). In addition, incarcerated mothers are more likely than incarcerated fathers to have come from single-parent households (42 percent versus 17 percent in state prisons, and 52 percent versus 19 percent in federal prisons) (Glaze and Maruschak, 2008).

The available literature on the consequences of incarceration for families and children focuses on incarceration per se and does not examine the

### BOX 9-1
### Racial and Ethnic Differences in the Cumulative Risk of Parental Imprisonment

Wildeman (2009) calculated the probability that a child would have experienced a parent being sent to prison by the child's teenage years. This cumulative risk of parental imprisonment was calculated for two different birth cohorts of children. For white children born in 1978, Wildeman (2009) found that 2.2 to 2.4 percent had experienced a mother or father being sent to prison by age 14. For a birth cohort born 12 years later, in 1990, the cumulative risk of parental imprisonment for white children had increased to 3.6 to 4.2 percent. Among black children, parental imprisonment in the 1978 cohort was 13.8 to 15.2 per-

Case 2:22-cr-00155-JFW　　Document 41-1　　Filed 10/03/22　　Page 35 of 221　　Page ID #:294

cent, compared with 25.1 to 28.4 percent in the 1990 cohort. Similar estimates were developed by Pettit and colleagues (2009), who found that in 2009, 15 percent of white children whose parents had not completed high school had experienced a parent being sent to prison by age 17. Among Hispanic children with similarly low-educated parents, 17 percent had experienced parental imprisonment by age 17. The comparable percentage for African American children is 62 percent (Pettit et al., 2009).

specific effects of the increasing rates of incarceration. Therefore, we cannot discuss any changes in the consequences for families and children of the incarcerated during this period. We consider what is currently known about the potential consequences for individuals, positive and negative, as a result of having a partner or parent incarcerated and believe that the numbers affected have risen. A few studies, however, discussed later, look at the effect of increasing incarceration on the marriage market and childbearing.

Most studies find that incarceration is associated with weaker family bonds and lower levels of child well-being. Men with a history of incarceration are less likely to marry or cohabit and more likely to form unstable partnerships than those who have never been incarcerated, and children of incarcerated fathers tend to exhibit more problems in childhood and adolescence. The picture is not entirely negative, however. There is evidence from at least one state, for example, that increased rates of incarceration are associated with lower rates of nonmarital childbearing. Moreover, some studies find that the negative association between incarceration and family outcomes is limited to families in which the father was living with the family prior to imprisonment. Finally, there is evidence that in cases in which a father is violent, incarceration may actually improve his family's well-being. The few studies that have examined the consequences for children of incarcerated mothers tend to focus on separation from children and housing stability. These studies often find persistent disadvantage in terms of poor

Case 2:22-cr-00155-JFW    Document 41-1    Filed 10/03/22    Page 36 of 221    Page ID #:295

education and financial circumstances, substance abuse, mental illness, domestic abuse, or a combination of these. At this time, findings on the effects of maternal incarceration on child well-being are mixed.

In this chapter, we begin by reviewing available research on the consequences of men's incarceration for families. We then examine the small but growing literature on mothers' incarceration. Next, we discuss the methodological limitations of existing studies in this area. The chapter ends with a review of knowledge gaps and concluding remarks.

## INCARCERATION OF PARTNERS AND FATHERS

For this review, we looked at both quantitative research and ethnographic studies. Our review of quantitative studies was limited to studies published within the past decade[1] that meet four criteria: (1) they are based on probability samples; (2) response rates are good, and sample attrition is low; (3) they include good measures of incarceration and family/child outcomes; and (4) the temporal ordering of incarceration and the outcome of interest is correct. We gave special attention to studies that attempt to deal with omitted variable bias. (For other reviews of the incarceration literature, see Hagan and Dinovitzer, 1999; Murray et al., 2009; Schnittker et al., 2011; Wakefield and Uggen, 2010; Wildeman and Western, 2010; and Wildeman and Muller 2012). Our review criteria would exclude most studies linking outcomes to the developmental stage of the child(ren) because these studies typically are based on small, purposive samples. As a result, our review represents a partial look at the literature on the consequences of incarceration for families and children.

Ethnographic studies generally do not allow for statements about causality; however, they describe the experiences of women with incarcerated partners and their children and reveal potential mechanisms for explaining the link between incarceration and family well-being. A key goal of our assessment is to determine whether the use of more complex statistical methods produces findings that are consistent with those from ethnographic studies and quantitative analyses using simpler statistical methods. To the extent that the findings from the various studies tell a similar story, we have greater confidence in the results.

In this section, we review the consequences of incarceration of men in four domains—(1) male-female relationships, (2) economic well-being, (3) parenting, and (4) child well-being.

————————————————

[1]Recent quantitative work does a better job than older studies of accounting or controlling for possible confounding and unmeasured variables.

## Male-Female Relationships

An extensive body of qualitative research examines relationship dynamics between incarcerated men and their female partners. These studies find that although these men view marriage as a desirable goal (Braman, 2004), incarceration (in addition to the father's criminal activity) poses difficulties for maintaining a relationship, and for those who are not yet married, it makes marriage less feasible than for those not incarcerated.

Relationship problems of the incarcerated are attributable to several factors. First, women grow weary of the time, energy, and money required to maintain a relationship with an incarcerated partner. Studies find that while family members often view their role as one of moral and emotional support, making regular visits and phone calls and sending letters and packages to prisoners can be difficult and costly (Grinstead et al., 2001), particularly when visits require long-distance travel and hours of waiting (Christian, 2005; Comfort, 2003; Braman, 2004). Second, women may undergo emotional strain from not knowing what their partner is experiencing while incarcerated (Ferraro et al., 1983) or from feeling socially excluded (some report feeling as if they themselves were incarcerated). Upon visiting their partners, for example, women often are subject to searches, removal of personal belongings, and the enforcement of strict rules (Fishman, 1990; Comfort, 2003; Braman, 2004). Similarly, following release, partners may become subject to some terms of the parolee's supervision, such as searches of their residence or car (Comfort, 2008). Third, either partner may perceive an imbalance in the relationship. Often, this is because men are unable to contribute as much financially while incarcerated. However, Braman (2004) finds that the perceived imbalance is not always material. Incarceration may diminish trust between partners and augment

the perception that individuals need to look out for themselves first, that others are selfish, and that relationships are exploitive. Moreover, Goffman (2009) finds that former prisoners and men on parole may feel the need to avoid or carefully navigate their relationships with partners who may use the criminal justice system as a way to control their behavior (e.g., a woman may threaten to call her partner's parole officer if he continues arriving home late, becomes involved with another woman, or does not contribute enough money to the household). In communities with high levels of incarcerated males, the overall gender imbalance also may shape behavior, making men more inclined to seek other partners (Braman, 2004).

Despite these findings, it is important to note that incarceration is not always harmful to relationships. Edin and colleagues (2004) find that while incarceration may strain the bonds between parents who are in a relationship prior to incarceration, it more often proves beneficial to couples whose relationship has been significantly hindered by lifestyle choices (almost

always substance abuse) prior to incarceration. For some of these men, incarceration serves as a turning point, a time to rehabilitate and rebuild ties with their child's mother—at least a cooperative friendship if not a romantic relationship. There is also evidence that marriage prevents dissolution of relationships. Indeed, Braman (2004) reports that wives of incarcerated men often say they would have left their husband had they not been married to him.

Consistent with the ethnographic literature, quantitative studies find that incarceration increases the economic costs of maintaining a relationship and imposes considerable psychological strain on the wives and partners of men in prison, especially those who were living with the man prior to his incarceration. At the same time, these studies highlight the fact that for some couples, prison is a time when men can change their lives and reestablish family relationships. A large number of quantitative studies have examined the association between incarceration and such behaviors as marriage, cohabitation, divorce, and repartnering (Apel et al., 2010; Charles and Luoh, 2010; Lewis, 2010; Lopoo and Western, 2005; Massoglia et al., 2011; Turney and Wildeman, 2012; Waller and Swisher, 2006; Western

and McLanahan, 2001; Western et al., 2004). One study examines nonmari-
tal childbearing (Mechoulan, 2011). Some of these studies focus on young
adults or men in general, while others focus on parents only. All adjust for
observed characteristics, and many employ rigorous methods.

Lewis (2010) and Waller and Swisher (2006) find evidence that fathers'
incarceration reduces subsequent marriage and cohabitation. More rigor-
ous studies, however, suggest that these effects are not causally related.
Using a lagged dependent variable (LDV) model, Lopoo and Western (2005)
find no association between men's incarceration and later marriage.
Similarly, using data from a cohort of Dutch men convicted of a crime, Apel
and colleagues (2010) find no effect of incarceration on marriage after the
first year postrelease. Both studies do, however, find a strong positive ef-
fect on divorce/separation. Married men who were incarcerated were
three times more likely to divorce than married men who were convicted
but not incarcerated. These researchers also report that the effect of in-
carceration on divorce was stronger among men without children and
those convicted of serious offenses. This study is especially noteworthy
because, by focusing exclusively on men with a criminal conviction, it can
distinguish the effects of incapacitation from those of conviction.

Two studies use state-level variables to examine how variation in mar-
riage market conditions due to increasing incarceration rates affect
women's marriage and fertility. Using state-level, race-specific incarcera-
tion rates as an indicator of marriage market conditions, Charles and Luoh
(2010) find a negative effect of incarceration on the prevalence of marriage
among women. They also find a modest and positive effect of incarceration
on

women's education and labor force participation. Using a similar approach
but more detailed information on mothers' behavior, Mechoulan (2011)
finds a weak negative effect of male incarceration on black women's proba-
bility of marriage and a strong negative effect on young black women's
nonmarital childbearing. This study also finds a positive link between men's
incarceration and women's education and employment. The Mechoulan
study is of particular interest because it highlights the possible benefits of
high rates of male incarceration: namely, more education for women and

the prevention of unintended pregnancies among young black women. The author is careful to note that his analysis does not identify the mechanisms underlying these changes in women's behavior, which could be due to the increased incapacitation of more promiscuous men or changes in women's sexual behavior. The author also notes that his findings are driven primarily by changes in incarceration rates in one state—Texas—making it difficult to generalize to other parts of the United States.

In addition to the studies described above, which focus on men rather than fathers, at least one study attempts to estimate the effect of fathers' incarceration on the stability of parents' unions. Using data from the Fragile Families Study, Turney and Wildeman (2012) find that father's incarceration increases the likelihood that the mother will end her relationship with him and form a partnership with a new man. The researchers aim to identify the effect of incarceration by employing a rich set of control variables (including couple's relationship quality); they also limit their sample to couples in which the father has a history of incarceration and compare couples who experienced a recent incarceration with those who did not. The latter results can be interpreted as the effect of a repeat incarceration for men with a history of imprisonment.

The studies described above have several limitations. First, those that use state-level incarceration rates to estimate the effect of incarceration on marriage and divorce must assume that marital status does not affect incarceration (whereas many people would argue it does) or that a third variable—such as social norms—is not causing both high rates of incarceration and high rates of union instability. A second limitation of most studies is that they ignore unions formed by cohabiting couples. Because marriage is rare among men at high risk of incarceration, at least in the United States, the failure to include cohabitating unions makes it difficult to draw strong conclusions about the effect of incarceration on union stability. A third limitation is that most studies do not compare the effect of incarceration with that of other types of forced separation. The one study that makes this comparison (Massoglia et al., 2011) finds that the destabilizing effects of incarceration are similar to those of military deployment, which suggests that the negative consequences of incarceration are due not to stigma but to the stress associated with incapacitation or possibly changes in fathers'

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 41 of 221   Page ID #:300

behavior. Both war and incarceration are likely to expose men to violence and undermine their relationship skills.

## Economic Well-Being

According to the Bureau of Justice Statistics, more than half of fathers in state prison report being the primary breadwinner in their family (Glaze and Maruschak, 2008). Thus the partners and children of these men are likely to experience a loss of economic resources while the provider is in prison. This effect also is likely to persist after the father returns home, given what is known about the link between incarceration and unemployment (see Chapter 8). Ethnographic studies generally concur that the incarceration of a partner or father can lead to increased economic hardship for members of his family. Financial circumstances are one of the most frequently cited sources of stress or strain among partners of incarcerated individuals (Carlson and Cavera, 1992; Ferraro et al., 1983). Many affected families already were living in unfavorable economic circumstances prior to the incarceration, and many were dependent on public assistance or other financial support. Even so, Arditti and colleagues (2003) find that these families become even more impoverished following the partner's or father's incarceration.

The increased economic stress among families affected by incarceration is due to several factors. One is the extra expenses (collect calls, travel costs, sending money and packages) reported by women trying to maintain a relationship with the incarcerated individual (Grinstead et al., 2001; Christian, 2005; Arditti et al., 2003). Other new expenditures include attorney or other legal fees or job loss stemming from increased work-family conflict (Arditti et al., 2003).

Consistent with the ethnographic literature, quantitative studies indicate that the families of men with an incarceration history experience a good deal of economic insecurity and hardship, resulting in greater use of public assistance among mothers and children. Three studies examine the link between fathers' incarceration and mothers' material hardship (including housing insecurity) (Geller et al., 2009; Geller and Walker, 2012; Schwartz-Soicher et al., 2011); two other studies examine the relationship between fathers' incarceration and mothers' welfare use (Sugie, 2012; Walker, 2011);

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 42 of 221   Page ID #:301

and one study examines the association between fathers' incarceration and children's homelessness (Wildeman, forthcoming). All of these studies are based on data from the Fragile Families Study.

Geller and Walker (2012) find that the partners of incarcerated fathers are at increased risk of experiencing homelessness and other types of housing insecurity. These authors use a lagged measure of housing insecurity and a rich set of early-life and contemporaneous covariates. They also

distinguish between recent and early incarceration and find that part of the effect of incarceration on housing insecurity is due to a reduction in financial resources (father's earnings or partner's financial contributions). In a third study examining housing insecurity, Wildeman (forthcoming) uses propensity score models and finds that recent paternal incarceration is associated with an increased risk of child homelessness, especially among black children. Foster and Hagan (2007) also find an association with increased homelessness among adolescent girls.

One study in this group examines the influence of fathers' incarceration on other types of material hardship besides housing. Employing several strategies for determining causality, including fixed effects models, a lagged dependent variable, and a placebo test used to examine whether future incarceration is related to current behaviors, Schwartz-Soicher and colleagues (2011) find strong evidence that paternal incarceration leads to increased material hardship for mothers and children, measured as mothers' reports of the difficulty faced by their family in meeting basic needs. Finally, two studies examine whether fathers' incarceration increases mothers' participation in public assistance programs. Using propensity score matching, Walker (2011) finds some evidence that incarceration may increase the probability of mothers' receipt of both food stamps and Temporary Assistance for Needy Families (TANF). In contrast, using fixed effects models and a more recent wave of data, Sugie (2012) finds that recent paternal incarceration is associated with mothers' receipt of food stamps and Medicaid/State Children's Health Insurance Program (SCHIP) assistance, but not TANF. Neither of these studies attempts to estimate the cost of these benefits to taxpayers. On balance, the evidence that father's incarceration increases the family's material hardship and housing insecu-

Case 2:22-cr-00155-JFW　　Document 41-1　　Filed 10/03/22　　Page 43 of 221　　Page ID #:302

rity is strong, especially when the father was living in the household prior to incarceration.

## Parenting

Ethnographic work examining the effects of incarceration on parenting focuses primarily on fathers, including their contact with the child and their financial contributions to the family. In discussing these findings, it is important to note that men do not father in a vacuum. Key concepts that influence the experiences of an incarcerated father and his children are his relationship with the child's mother and his own behavior and lifestyle before his arrest.

The father's relationship with his child's mother appears to play an important role in the father-child relationship during incarceration and after his release from prison. Fathers who lived with their child prior to incarceration are more likely than nonresident fathers to stay in contact with the child (Martin, 2001). In addition, while some mothers and families

provide encouragement for continuing contact between the child and his or her father, others promote social exclusion (Nurse, 2004). For example, some family members refuse to bring the child when making visits (Martin, 2001), and some fathers feel that mothers use the incarceration to justify limiting or prohibiting contact or painting a negative view of the father so the child does not want to interact with him (Edin et al., 2004).

The father's lifestyle prior to his incarceration and the quality of the father-child relationship also are important influences on the parenting effects of incarceration. As Edin and colleagues (2004) note, if the father's severe substance abuse or criminal activity prior to incarceration was enough to prevent him from making financial contributions to the family or developing a close relationship with his child(ren) prior to his arrest, then his incarceration may serve as a time to rebuild bonds, even allowing parents and children to communicate more frequently (Giordano, 2010). Some fathers believe their incarceration will serve as an example to their children, discouraging them from making similar mistakes (Martin, 2001). On the other hand, among fathers who previously experienced frequent con-

Case 2:22-cr-00155-JFW    Document 41-1    Filed 10/03/22    Page 44 of 221    Page ID #:303

tact with their children, incarceration almost always proves to be detrimental—breaking bonds in terms of physical closeness and financial contributions and eroding relationships that may already have been fragile. Most often, this is because the mother ends her relationship with the father or becomes involved with another man (Edin et al., 2004). Martin (2001) also finds that fathers themselves sometimes refuse to accept visits from their child(ren) to protect themselves and their child(ren) emotionally.

Four quantitative studies examine the association between fathers' incarceration and three outcomes: coparenting, engagement in activities with the child, and contact with the child (Geller and Garfinkel, 2012; Turney and Wildeman, 2012; Waller and Swisher, 2006; Woldoff and Washington, 2008). Generally, researchers find a negative association between fathers' prior or recent incarceration and each of these behaviors.

Waller and Swisher (2006) find a negative association between recent and past incarceration and father-child contact and engagement that is mediated by the father-mother relationship. Similarly, using more rigorous methods and controlling for characteristics likely to be associated with both criminal justice contact and family stability, Geller and Garfinkel (2012) find reductions in father-child contact for resident and nonresident fathers who become incarcerated and weaker coparenting relationships with the child's mother following release. Turney and Wildeman (2012) use a variety of estimation strategies, including lagged dependent variables, fixed effects, propensity score matching, and conditioning on ever-incarcerated fathers. They find that among fathers who were living with their children, the negative effects of incarceration are robust across all measures of involvement (engagement, shared responsibility in parenting, and cooperation in

parenting) and all strategies. They find further that lower levels of father involvement are due to changes in the quality of the parental relationship, changes in fathers' economic conditions, and changes in fathers' health. Effects are similar across racial/ethnic groups. These researchers also examine the effects of fathers' incarceration on mothers' parenting and find that they are much weaker. Among fathers who were not living with their children prior to incarceration, however, the effects are smaller and disap-

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 45 of 221   Page ID #:304

pear in fixed effects and other models. The latter finding is likely due to the fact that a large proportion of nonresident fathers have no contact with their children (Amato et al., 2009). Taken together, these studies indicate that incarceration reduces paternal involvement in families in which the father was living with the child prior to incarceration. A major limitation is that the analyses for incarcerated fathers are based on one source of data—the Fragile Families Study.

## Child Well-Being

Negative outcomes for children are commonly reported in open-ended interviews with fathers and their families. Mothers and some fathers believe their children perform more poorly or have more difficulties in school following their father's incarceration (Braman, 2004; Martin, 2001; Arditti et al., 2003). And many parents report negative behavioral changes in their children, including becoming more private or withdrawn (Braman, 2004), not listening to adults (Martin, 2001), becoming irritable, or showing signs of behavioral regression (Arditti et al., 2003). Some studies also provide evidence of changes in children's emotional or mental health, with children experiencing such feelings as shame or embarrassment about their father's incarceration; emotional strain, including a belief that the father did not want to live at home; a loss of trust in the father (Martin, 2001); grief or depression (Arditti et al., 2003); or even guilt (Giordano, 2010).

Despite these negative experiences, periods of incarceration are not always viewed as the most challenging circumstance these children face (Giordano, 2010). A father's severe substance addiction or violent behavior at home may lead some children to feel happier when their father is incarcerated. Imprisonment may give the father an opportunity to receive help for his problems and even communicate more with the child (Edin et al., 2004). In such cases, a father's release from prison may be emotionally complex, being both a happy and stressful life event for the child.

In summary, qualitative studies for the most part indicate that fathers' incarceration is stressful for children, increasing both depression and anxiety as well as antisocial behavior. There is also evidence that children of fathers who are violent or have serious substance abuse problems are happier when their father is removed from the household.

Case 2:22-cr-00155-JFW    Document 41-1    Filed 10/03/22    Page 46 of 221    Page ID #:305

The majority of quantitative studies focus on children's problem behaviors, which include both internalizing problems (depression and anxiety) and externalizing problems (aggression and delinquency). Early and persistent aggression and conduct problems are known to be associated with a host of negative outcomes in adulthood, including criminal behavior (Farrington, 1991; Babinski et al., 2003). A few studies investigate the influence of fathers' incarceration on physical health, cognitive ability, and grades and educational attainment.

The strongest and most consistent findings regarding effects of fathers' incarceration on child well-being are for behavior problems and delinquency (also see the meta-analysis of Murray et al., 2012a). Most studies examining behavior problems focus on young children. However, results of these studies generally are consistent with those of studies looking at older children. In both age groups, researchers find that fathers' incarceration increases externalizing behaviors, especially aggression.

Adjusting for other characteristics, Craigie (2011) finds a positive association between fathers' incarceration and children's externalizing behavior problems among blacks (see also Perry and Bright, 2012) and Hispanics, but not whites. Comparing a sample of children whose fathers were incarcerated after their birth with children whose fathers had been incarcerated before birth, Johnson (2009) finds a positive association between incarceration and externalizing behavior, but only for the former children. Walker (2011) uses propensity score matching and finds a similar association with aggressive behavior at age 5 (but not at age 3, when aggressive behavior is more common). Using similar methods, Haskins (2012) finds a positive association between fathers' incarceration and externalizing behavior and attention problems at age 5. Using a series of placebo tests, fixed effects models, and propensity score matching, Wildeman (2010) finds that paternal incarceration increases physical aggression among boys but not girls (see also Geller et al., 2009), particularly among children whose fathers were incarcerated for a nonviolent offense or were not abusive to the child's mother prior to incarceration. Using a similar set of tests, Geller and colleagues (2012) find that the effect of incarceration on young children's aggressive behaviors is nearly twice as large for boys as for girls, but significant for both genders; they find significant (though weaker) effects for fathers who were not living with their child prior to incarceration.

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 47 of 221   Page ID #:306

Aggressive behavior is much more common among boys than among girls in this age group, which may account for the gender difference in children's response to father's incarceration. Finally, Wakefield and Wildeman (2011) find that across all age groups (young children to young adults), fathers' incarceration increases aggression, especially among boys.

These researchers find no evidence that increased behavior problems and aggression resulting from paternal incarceration differ by race. However,

they do note that in cases in which there is a history of domestic abuse, paternal incarceration may actually reduce aggressive behavior in children. These findings are consistent with research of Jaffe and colleagues (2003) showing that children's response to their father's exit from the household depends on the nature of the mother-father relationship, and suggest that the association between incarceration and aggression is complex.

Another type of problem behavior examined by researchers is delinquency, specifically among older children. Using nationally representative longitudinal data, Roettger and Swisher (2011) find fathers' incarceration to be positively associated with the propensity of adolescent and young adult males for delinquency and risk of arrest. They find no interactions with race or ethnicity and note that father's incarceration both before and after birth is associated with these outcomes, although the relationships are stronger when the incarceration occurred during the child's life. Using data from the Pittsburgh Youth Study, Murray and colleagues (2012b) find that parental incarceration is not associated with boys' marijuana use but is positively associated with theft; in this study, the associations are stronger among white than among black youth. Parenting and peer processes following parental incarceration explained about half of the association. Neither of these studies examines the effect of fathers' incarceration on delinquency among adolescent girls. Using a nationally representative sample of Dutch men convicted in 1977, van de Rakt and colleagues (2012) find a moderate positive association between paternal imprisonment and child convictions (odds 1.2 times greater than for children whose fathers never went to prison). The effect was especially pronounced when the father was imprisoned before the child's twelfth birthday. Again, this study is

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 48 of 221   Page ID #:307

noteworthy because it is able to estimate the effect of incarceration net of conviction.

The evidence for children's internalizing behavior (depression and anxiety) is more mixed. Craigie (2011) and Geller and colleagues (2012) find no evidence of an effect on internalizing behavior among young children. Similarly, Murray and colleagues (2012b) find no significant influence on depression among adolescents. In contrast, Wakefield and Wildeman (2011) find that paternal incarceration increases internalizing behavior among adolescents and young adults. Part of this disparity in results may be due to the fact that internalizing of problems (depression) often does not appear until adolescence.

Two studies examine the effects of incarceration on children's physical health. Using state and year fixed effects, Wildeman (2012) finds that paternal incarceration increases the risk of early infant mortality, but only among infants whose fathers were not abusive. Similarly, Roettger and Boardman (2012) find that fathers' incarceration is positively associated with higher body mass index (BMI) in young adult women, an effect that operates primarily through depression. Foster and Hagan (2007) find evidence that

fathers' absence due to incarceration increases daughters' risk of physical and sexual abuse and neglect.

Finally, a few studies examine the effects of fathers' incarceration on children's cognitive ability and academic performance, with somewhat mixed results. Using propensity score matching, Walker (2011) finds a negative effect of incarceration on cognitive ability at age 5, whereas Haskins (2012) and Geller and colleagues (2012), using similar and more rigorous methods, find no effect at age 5. Murray and colleagues (2012b) find no relationship between parental incarceration and academic performance after adjusting for youth behavior prior to incarceration. Hagan and Foster (2012) find a negative association between fathers' incarceration (at the individual and school levels) and children's grade point average (GPA), educational attainment, and college completion. Finally, Foster and Hagan (2009), using matching techniques, find a negative effect of incarceration on years of education, even after adjusting for GPA and other characteristics, with varia

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 49 of 221   Page ID #:308

tion by race/ethnicity. On balance, the findings for education suggest that insofar as fathers' incarceration has a causal effect on educational attainment, it operates primarily through behavior problems and socioemotional adjustment rather than through cognitive ability.

## INCARCERATION OF MOTHERS

More than 200,000 women are in jails or prisons in the United States, representing nearly one-third of incarcerated females worldwide (Walmsley, 2012). The past three to four decades have seen rapid growth in women's incarceration rates—a rise of 646 percent since 1980 compared with a 419 percent rise for men (Mauer, 2013; Frost et al., 2006). Prior to 2000, most of this growth occurred among African American women. In 2000, black women were imprisoned at six times the rate of white women (Guerino et al., 2011; Mauer, 2013). Between 2000 and 2009, however, the rate declined for black women by 31 percent while continuing to increase for white and Hispanic women (by 47 and 23 percent, respectively). Mauer (2013) suggests that much of this recent shift was due to a reduction in drug-related incarcerations among black women and an increase in methamphetamine prosecutions among white women.

As the rate of women's incarceration has grown, so has the risk of maternal imprisonment (Kruttschnitt, 2010). One in 30 children born in 1990 had a mother incarcerated by age 14, compared with 1 in 60 born in 1978 (Wildeman, 2009). Scholars have been examining the experiences of incarcerated women and their children for decades, with a majority of studies using small convenience samples and qualitative methods (for reviews, see Bloom and Brown, 2011; Henriques and Manatu-Rupert, 2001; and Myers et al., 1999). These studies highlight the prevalence of economic and

educational disadvantage, substance use, mental illness, and domestic abuse among mothers with an incarceration history, with some mothers portraying jail or prison as a "safe haven" from battering and problems related to substance addiction (Richie, 1996; Greene et al., 2000; Henriques and Jones-Brown, 2000).

Nearly two-thirds of mothers in state prisons were living with their

child(ren) prior to their incarceration, many in single-parent households (Glaze and Maruschak, 2008; Mumola, 2000). Thus, a predominant theme in the literature on incarcerated mothers is mother-child separation. Using single-prison samples, Poehlmann (2005b, 2005c) describes the initial separation as one of intense distress for both mothers and children (see also Fishman, 1983). During the incarceration period, mother-child contact may be limited as a result of travel costs or mother-caregiver relationship issues (Bloom and Steinhart, 1993; Hairston, 1991). Less mother-child contact may be associated with mothers' increased depressive symptoms (Poehlmann, 2005b). Other studies find that maternal incarceration is associated with a host of negative child outcomes, including poor academic performance, classroom behavior problems, suspension, and delinquency (see the review of Myers et al., 1999). Poehlmann (2005a) examines the role of caregiver arrangements and modified home environments during mothers' incarceration and finds that among children of incarcerated mothers, cognitive outcomes may be influenced by caregiver socioeconomic characteristics and the quality of the home environment. This topic merits more attention in future research.

A few recent studies use longitudinal data and more rigorous methods to examine the effect of maternal incarceration on child academic performance, housing arrangements, and behavioral outcomes. Using data from two large samples of children in Chicago public schools and propensity score and fixed effects modeling techniques, Cho (2009a, 2009b) finds no association between maternal incarceration and children's standardized test scores, but a negative effect on grade retention in the years immediately following mother's prison entry. Another study (Cho, 2011), using administrative records and event history analysis, finds that adolescents are at higher risk of dropping out of school in the year their mother enters jail or prison.

Two studies use data from the Fragile Families Study to examine the effect of maternal incarceration on housing instability. Geller and colleagues (2009) find that incarceration is associated with an increase in the likelihood of residential mobility. Wildeman (forthcoming) finds no effect on child homelessness. This latter finding may be due to the fact that children of incarcerated mothers are more likely than children of incarcerated fathers to enter foster care (Dallaire, 2007; Mumola, 2000).

Finally, Wildeman and Turney (forthcoming) use data from the Fragile Families Study to examine the effect of maternal incarceration on child

behavior problems. Using propensity score models for both parent and teacher reports, they find no association between mothers' incarceration and children's behavior problems at age 9. Dallaire (2007), however, finds that adult children of incarcerated mothers are more likely than adult children of incarcerated fathers to be incarcerated.

Taken together, then, the small amount of evidence on the effect of maternal incarceration on overall child well-being is mixed. This subject, too, deserves more attention in future research.

## METHODOLOGICAL LIMITATIONS

To put the above discussion in proper context, it is important to note the major limitations of the studies reviewed. First, all of the ethnographies and many of the quantitative studies are based on convenience samples obtained in specific cities or communities. While these studies provide rich descriptions of the family lives of men and women with an incarceration history, and while they generate a multitude of intriguing hypotheses, their findings may not be generalizable to families in other cities or other parts of the country.

Second, although a number of more recent quantitative studies use probability samples of the national population, these studies are based on only three data sets: the Fragile Families Study, the National Longitudinal Study of Adolescent Health, and the Panel Study of Income Dynamics. At this time, these are the only large, nationally representative data sets that include information on incarceration. The field would benefit and more would be known about outcomes for families if other large national surveys did more to capture data from families with incarcerated or previously incarcerated parents.

A third limitation involves the measurement of other criminal justice contact or criminal behavior. With a few exceptions, studies do not take account of factors that precede incarceration (offending, arrests, and convictions), so the consequences of imprisonment are not sharply distin-

Case 2:22-cr-00155-JFW    Document 41-1    Filed 10/03/22    Page 52 of 221    Page ID #:311

guished from those of other factors.

A fourth, and perhaps most important, limitation of the literature is that all of the studies are based on observational rather than experimental data. Men who go to prison are different from other men in ways that are likely to affect their family relationships as well as their chances of incarceration. As noted elsewhere in this report (see Chapters 2 and 7), men and women with an incarceration history are less educated and more likely to have mental health problems and alcohol and drug addictions than the general population. In turn, their families are likely to be unstable and to experience economic hardships and their children to be at risk of doing less well in school regardless of whether the father or mother spends time in jail;

**BOX 9-2**
**Techniques for Dealing with Omitted Variable Bias**

Researchers use a variety of statistical techniques to deal with the problem of omitted variable bias. The oldest and most widely used is to control for all of the characteristics that might affect both incarceration and family well-being. Unfortunately, this technique is limited because the data sets available for examining the effects of incarceration do not measure all the relevant characteristics.

A second technique is to measure the outcome variable of interest before and after fathers' incarceration to see whether spending time in prison is associated with a change in the outcome. This approach—the lagged dependent variable (LDV) model—requires longitudinal data and allows the researcher to estimate the effect of incarceration net of the factors that affect the preincarceration outcome. In one of the studies we examined (Geller et al., 2012), for example, the researchers controlled for children's behavior problems at age 3 and looked at whether those whose fathers went to jail or prison when the children were between ages 3 and 5 were more likely to exhibit behavior problems at age 5 than those whose fathers did not go to jail or prison. Longitudinal data also allow the researcher to conduct a placebo test to see whether

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 53 of 221   Page ID #:312

fathers' future incarceration predicts current family problems. In the example given above, the researchers looked at whether children whose fathers were incarcerated when the children were between ages 3 and 5 showed higher levels of behavior problems at age 3. A positive outcome would indicate that something other than incarceration was causing the behavior problems.

Other researchers use longitudinal data to estimate a fixed effects model, which examines the association between a change in incarceration and a change in behavior. While this model does a better job than the LDV model of controlling for omitted variable bias, it does not eliminate the possibility that a change in an omitted variable might have led to the incarceration as well as the change in behavior. Continuing with the previous example, a father might have become

that is, the correlation between incarceration and family hardship may be due to conditions other than incarceration. The failure to take account of characteristics that affect incarceration as well as social and economic hardships leads to what researchers call "omitted variable bias." This problem is endemic in the literature on incarceration effects.

The best way to deal with omitted variable bias is to run an experiment in which people are randomly assigned to incarceration status. Because people cannot be randomly assigned to prison,[2] researchers have used a

––––––––––––––––––

[2]Note, however, that some studies have tested an overnight stay in jail as treatment (Sherman and Berk, 1984). In their study of police interventions for family violence, Sherman and Berk (1984), for example, found that a night in jail was not strongly associated with reduced offending. In addition, researchers have considered differing practices as natural experiments. In a recent study, Loeffler (2013) used randomization to judges, which led to variation in time

unemployed during the 2-year period after the child reached age 3 and before age 5 and responded by engaging in criminal activity that ulti-

Case 2:22-cr-00155-JFW    Document 41-1    Filed 10/03/22    Page 54 of 221    Page ID #:313

mately led to incarceration. In this case, the father's unemployment and criminal behavior may also have a role in the child's increasing behavior problems, or may be the primary causes rather than incarceration.

A fifth technique is to use a state policy, or natural experiment, to estimate the effect of incarceration on family well-being. For example, several researchers have used state differences in race-specific incarceration rates to determine whether these policies and practices affect family formation behaviors, such as marriage, divorce, and nonmarital childbearing. By using a state-level measure of incarceration, the researcher avoids the problem of omitted variable bias at the individual level. But the problem still exists at the aggregate level unless the researcher can find a policy or practice that affects an individual's chances of incarceration but is unrelated to the outcome of interest except via this pathway.

Finally, some researchers use a propensity score matching approach, which entails calculating a probability of incarceration for each man (or father) in the study, and then comparing the family outcomes of men with the same probability (or propensity) but different incarceration experiences to see whether they differ. Although this approach does not deal with omitted variable bias—propensity scores are based on observed variables only—it has certain advantages over standard regression analyses and may yield more accurate estimates of the association between incarceration and outcomes of interest. One of the more convincing studies is one that starts with a sample of convicted men, constructs a matched sample of men with the same propensity for incarceration, and then looks at whether those who were incarcerated had different outcomes than those who did not go to jail or prison (Apel et al., 2010). This study found that men who were incarcerated were more likely to divorce than their counterparts who were not incarcerated.

variety of statistical techniques to deal with the problem of omitted variable bias (see Box 9-2).

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 55 of 221   Page ID #:314

## KNOWLEDGE GAPS

As discussed above, the studies reviewed in this chapter have several limitations. A more robust research program is needed to answer the questions considered here with greater confidence. We offer the following observations on how to address some of the knowledge gaps in this area.

———————————————————————————————————————·
served, to assess the effects of incarceration on crime and unemployment. While this approach has limitations, it would provide additional information to be considered along with findings based on the other approaches to dealing with omitted variable bias.

## Understanding Variations

More work is needed to understand how the effects of fathers' incarceration on families and children vary depending on living arrangements prior to incarceration, the quality of relationships, and the ages and developmental stages of affected children. Information on the level of involvement and quality of the parental relationship prior to conviction could be incorporated into an experiment, as well as longitudinal data collection. Note, however, that measuring fathers' residence would be a challenge because men who are likely to spend time in prison and jail also are likely to be involved in multiple households before and after release.

Still missing is important descriptive information that bears on the causal questions at hand. The field would benefit from tackling the problem of omitted variables by observing them. How dangerous, violent, drug involved, and/or mentally unstable are the individuals who go to prison? What do their personal histories (as children) of family instability and family violence look like? How does incarceration contribute to family complexity—multiple partners, attachments, and households?

The collection of longitudinal data tracking individuals before and after their contact with the criminal justice system is needed. Partnering with existing longitudinal studies would be a useful avenue to explore to this end. Indicators of the quality of family life need to be tracked to better understand the influences on spousal and/or parental behaviors.

Case 2:22-cr-00155-JFW    Document 41-1    Filed 10/03/22    Page 56 of 221    Page ID #:315

## Aggregate Effects

Little attention has to date been paid to estimating the aggregate effects of high rates of incarceration on family stability, poverty and economic well-being, and child well-being. Given that incarceration is concentrated among men with low education, one might expect that recent trends in incarceration have affected aggregate poverty rates as well as trends in family structure and intergenerational mobility. To address aggregate effects, better estimates are needed of the proportion of families and children exposed to incarceration and the differential effects of incarceration depending on living arrangements and the quality of preincarceration relationships. Estimates also are needed of the proportion of families likely to benefit from a family member's incarceration.

## CONCLUSION

This chapter has reviewed the literature on the consequences of parental incarceration for the children and families of those incarcerated,

a question of importance at any level of incarceration but particularly in the current era of high U.S. incarceration rates. Our literature review has included both recent ethnographic studies and quantitative analyses and studies using convenience samples as well as population-based samples. Such a review represents a partial look at the literature on the consequences of incarceration for families and children; a more thorough review would be beyond the scope of this study. Nonetheless, our review suffices to provide a sense of the consequences. Although the evidence from individual studies is limited and findings across some studies are mixed, our review leads to the conclusion that parental incarceration, on balance, is associated with poorer outcomes for families and children. Whether these associations reflect causality is much less certain.

We find consistent evidence, in both the ethnographic and quantitative studies, of a link between men's incarceration and instability in male-female unions. We find a strong and consistent link between fathers' incarceration and family economic hardship, including housing insecurity, diffi-

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 57 of 221   Page ID #:316

culty meeting basic needs, and use of public assistance. Incarceration tends to reduce fathers' involvement in the lives of their children after re-lease, in large part because it undermines the coparenting relationship with the child's mother. Finally, both ethnographic and quantitative studies indicate that fathers' incarceration increases children's behavior problems, notably aggression and delinquency. The consequences are especially pro-nounced among boys and among children who were living with and posi-tively involved with their father at the time of his incarceration. Recent surveys indicate that roughly 4 of 10 incarcerated fathers report living with their children prior to incarceration. Of interest, although father's incar-ceration is associated with poorer grades and lower educational attain-ment, it is not associated with lower cognitive ability. Rather, school failure appears to arise from social-emotional problems rather than a lack of in-tellectual capacity.

In reviewing the literature on the consequences of parental incarcera-tion for the families and children of those incarcerated, we have been mindful of the broad charge to this committee. Ideally, the research evi-dence would help in determining whether the dramatic increase in incar-ceration rates over the past four decades, viewed as a distinct phenome-non, has affected, for better or worse, the families and children of those in-carcerated. There are, however, no studies explicitly examining the effect of the prison buildup on the families and children of incarcerated parents. As a statistical matter, the number of children with a parent in prison con-tinued to grow with increasing incarceration, reaching an estimated 1.7 million in 2007. Thus we might hypothesize that greater numbers of indi-viduals and families have experienced the predominantly negative conse-quences of a partner's or

parent's incarceration as the extent of incarceration has expanded, but that hypothesis has not been tested. There remain unanswered questions about the aggregate effects of the incarceration buildup. Nonetheless, the close correlation between having a partner or parent who has been incarcerated and poor outcomes among families and children is unmistakable.

Case 2:22-cr-00155-JFW   Document 41-1   Filed 10/03/22   Page 58 of 221   Page ID #:317

*The National Academies of Sciences, Engineering, and Medicine*
*500 Fifth St., NW | Washington, DC 20001*
© 2021 National Academy of Sciences. All rights reserved.

# EXHIBIT D

# Parental Incarceration in the United States:

## Bringing Together Research and Policy
## to Reduce Collateral Costs to Children

## American Bar Foundation's Workshop at the White House

**August 20, 2013, at the White House Eisenhower Executive Office Building, Indian Treaty Room**



**Co-sponsored by the American Bar Foundation, The National Science Foundation Law and Social Sciences Program, with help from the White House Office of National Drug Control Policy**





**Parental Incarceration in the United States:**
**Bringing Together Research and Policy to Reduce Collateral Costs to Children**

**CONFERENCE SUMMARY**

Over the past 40 years, the incarceration rate in the United States has increased exponentially; currently the US incarcerates more people per capita than any other country in the world. According to American Bar Foundation Research Professor, John Hagan, "about half of America's prison inmates are now parents." On August 20th, 2013 Hagan, and collaborator Holly Foster (Texas A&M University), convened a workshop at the White House Eisenhower Executive Office Building in Washington DC. In attendance were a select group of 23 national experts in the field, comprised of scholars, practitioners and policymakers. This working group spent an intensive day looking at the number of ways in which children are affected by the incarceration of their parents, and what can be done to lessen the collateral consequences for these children and their families. The goals set forth at the outset of the conference were to 1) review current knowledge about parental imprisonment and child well-being; 2) document programs designed to reduce negative effects of parental incarceration on children; 3) address problems stemming from parental involvement with the justice system and; 4) identify best practices for improving the lives of children of incarcerated parents.

Five major themes emerged from the presentations, identified by Chris Uggen (University of Minnesota) at the closing session:  1) parental incarceration disproportionately affects communities of color; 2) many incarcerated parents played roles in their children's lives prior to their incarceration; 3) parental incarceration is linked to a number of negative outcomes for children, including poor school performance, physical and mental health problems, housing instability, and economic strain, both during and after the period of incarceration occurs; 4) parental incarceration is strongly associated with delinquency in both adolescence and in the transition to adulthood and; 5) there are actions that can be taken to improve the situation, starting with greater cooperation between researchers, advocates, policy-makers and practitioners to help achieve shared goals.

The following individuals participated as presenters or discussants at the workshop:

John Hagan, American Bar Foundation & Northwestern University
Holly Foster, Texas A & M University
Bruce Western, Harvard University
Christopher Wildeman, Yale University
Joyce Arditti, Virginia Tech University
Senator Mark Leno, D-CA
Christopher Uggen, University of Minnesota
Jane Siegel, Rutgers University
Philip Genty, Columbia Law School
Judge Bernice Donald, US Court of Appeals, Sixth Circuit, Memphis, TN
Sara Wakefield, Rutgers University

Nancy Rodriguez, Arizona State University
Amanda Geller, Columbia University
Rucker C. Johnson, UC Berkeley
Raymond Swisher, Bowling Green State University
Rosalyn D. Lee, Centers for Disease Control and Prevention
Emily Bever Nichols, University of Virginia
Terry-Ann Craigie, Connecticut College
Myrna Raeder, Southwestern University School of Law
Becky Pettit, University of Washington
Lorie Smith Goshin, Hunter College
Dee Ann Newell, Arkansas Voices for the Children Left Behind
Gail Smith, Chicago Legal Advocacy for Incarcerated Mothers

Chairs:
Giordano Palloni, University of Maryland
Joshua Kaiser, Northwestern University, American Bar Foundation
CJ Murphy, Texas A&M University
Shaun Ossei-Owusu, UC Berkeley, American Bar Foundation
Spencer Headworth, Northwestern University, American Bar Foundation

Scribes:
Carlton Mathis, Kent State University
Tony Love, Texas A & M University

Student Observers:
Heather Washington, SUNY Albany
Armando Lara-Millan, Northwestern University

There were also nine student aides in attendance: five chairs, two note takers, two student observers. There were 35 other federal and state-level policymakers in attendance as observers, who were able to ask questions throughout the day.  The discussions and presentations held at the workshop were divided by session; question and answer sessions followed each presentation, and each session was punctuated by a discussant moderating questions and bringing together the important points made during each presentation. Each session will be summarized in the sections that follow. The conference was jointly sponsored by the American Bar Foundation and the National Science Foundation, with help from the US Office of National Drug Control Policy and the Executive Office of the President in planning and coordinating the event.

**Introduction: Overview of the Issues**

What is apparent from the existing literature and research on the effects of parental incarceration on families, and more specifically children, is that children are often the innocent victims of the criminal justice system. Having a parent incarcerated leads to a lower overall household income, possible decline in both mental and physical health, as well as the stigmatization that children suffer within their peer group. As Bruce Western (Harvard University) said in the opening remarks of the day, "parental incarceration leads to the creation of a disadvantaged outcast group among children." Having a parent

incarcerated can affect children's performance in school, as well as alienate them from their peers, which can cause a host of other related problems.

Western also highlighted that, at present, 11% of African American children have a parent that is incarcerated; this statistic alone gives us a glimpse into how demographics of incarcerated populations may contribute to other issues related to racial disparity and privilege.  Essential to setting the context for the day's presentations was the understanding issue of demographics on incarceration and the dynamic incarceration creates within families.

**Session 1: Demographic & Family Dynamics**

The incarceration rate in the US has soared since the mid-to-late 1970s. In his research, Chris Wildeman (Yale) found:

- For white men born between 1970-1974, their risk of imprisonment had doubled from their parents' generation (1.2% to 2.8%), although the overall risk of imprisonment remained relatively low.
- For all black men born of the same era (1970-74) the risk had more than doubled (9.0% to 22.8%).
  - For black men who had dropped out of high school, the risk had more than tripled (14.7% to 62.5%).

This rapid increase of incarceration means that today "paternal imprisonment is common for black children, 1 in 4 of whom experience this event. Fully 1 in 2 black children of high school dropout fathers experience this event," said Wildeman.

- Despite the fact that overall imprisonment rates have increased, the risks of paternal incarceration for white children has remained relatively small (1 in 30).
- There is a notable increase if the father dropped out of high school (1 in 13). It is also important to note at this juncture, that this surge of imprisonment is not necessarily due to a rise in violent crime. According to Joyce Arditti (Virginia Tech University), "Since 1970, the proportion of nonviolent offenders rose from one in two, to two in three [and the] proportion of drug offenders has increased from one in ten to one in three of prisoners." As of 2005, 52% of state- and 63% of federally-incarcerated men and women are parents.

The impact of this rapid increase in the incarceration nonviolent offenders has been hard-felt by the families it affects. According Arditti's research, the "overreliance on criminal sanctions and incarceration not only incapacitates offender parents, but has enhanced the 'collateral consequences' [on] children." This impact manifests in a multitude of ways:

- At the outset of an incarceration term, the non-incarcerated parent or caregiver may be distressed and unprepared for changing parenting roles and the additional responsibilities they must now undertake.

- Other harms that result from parental incarceration may include:
  - incapacitation of offender parent, traumatic separation for children and spouses
  - family dissolution estranged parent-child relationships
  - strained marriages
  - economic and health decline for families
  - difficulty for ex-offenders who reenter family life post-incarceration

This strain felt by families is difficult to mitigate; even visitation can "help and hurt" as, while it is a context for connection between the incarcerated parent and child, it may also serve as a "traumatic reminder" for the family, as well as "compound the depletion of family resources, and intensify parental distress," if the incarcerated parent is imprisoned far from home or in an otherwise remote area, and the family must allocate financial resources to travel.

> **"Paternal imprisonment is common for black children, 1 in 4 of whom experience this event.** Fully 1 in 2 black children of high school dropout fathers experience this event."
>
> -Christopher Wildeman

According to Amanda Geller (Columbia University), these "disruptions associated with parental incarceration are of serious concern for public policy," since incarceration is so widespread and puts families at "increased risk of compromised parent-child contact, economic hardship, and housing instability, among other challenges." Economic assistance programs may be enough to help secure, at least, reliable housing and help mitigate financial hardships for families, as "most incarcerated parents had been their children's primary source of financial support, and had either lived with their children prior to incarceration or had contact with their children through visitation." This finding dispels the myth that parents who are incarcerated have not been contributors to their families. On the contrary, many parents play a role in their children's lives prior to incarceration (e.g., 46% of incarcerated fathers lived with at least one of their children; more than 60% of incarcerated mothers lived with at least one of their children). Therefore, the popular narrative that removing parents from their children when they are incarcerated helps create stability inside the family by removing a negative force, is not necessarily true.

Post-incarceration, families are more likely to struggle financially as well, due to the stigma of incarceration. Geller's research indicates that the "stigma of incarceration may suggest dishonesty, undermine family reputation, or raise concerns about illegal activity," making it difficult for parents who have been incarcerated to find and/or keep work. These family members end up contributing less to their families financially. Mothers who have been incarcerated face the same issues and, ultimately, end up relying more heavily on public programs, such as food stamps and Medicaid. Geller reports that "whether incarceration causes these challenges or identifies pre-existing disadvantage, there are numerous opportunities for public policy to help families mitigate the risks they face."

**Session II: Behavioral and Health Problems**

Building on the information from the first session, those who presented in Session II delved into the types of problems that children face when a parent is incarcerated. According to Terry Ann Craigie (Connecticut College), who has researched the effects of incarceration on young children, the effects are apparent earlier than previously thought and there is an inextricable link between paternal incarceration and early externalizing behaviors. These figures are also roughly the same for both boys and girls. In her study, children as young as five who have experience parental incarceration begin exhibiting behavioral problems.  Her study found that "paternal incarceration exacerbates early externalizing behaviors in general, and especially for black and Hispanic children." These externalizing behaviors may include, though are not limited to, aggression, violence, hostility, destructive acts, etc.  Therefore Craigie suggests that "children of incarcerated fathers are vulnerable to future incarceration and consequently, their behavioral problems should be diagnosed and effectively addressed."



Left to right: Holly Foster, John Hagan, and Emily Bever Nichols weigh in on a panel that Judge Bernice Donald moderates.

These findings are echoed in the research of Sarah Wakefield (UC Irvine), who found that both internalizing and externalizing behavioral issues for children who have experienced parental incarceration are:

- strong and global for fathers
- less consistent for mothers and
- [has] major impacts for social inequality in childhood wellbeing

According Wakefield, these sorts of findings are apparent across a number of datasets. In her own work she has found that vast racial disparities in the likelihood of experiencing incarceration of a father (Session I; Wildeman) mean that parental incarceration is a significant factor driving the black-white gaps in childhood wellbeing. However, her research also found that "black and white children respond in much the same way to paternal incarceration and the effects are similar in size and magnitude. In other words, black children are no more (or less) harmed by the incarceration of their father."

Furthermore, the behavioral problems (both internalizing and externalizing) exhibited in childhood due to parental incarceration are "strongly associated with delinquency in both adolescence and the transition to adulthood," according to Raymond Swisher (Bowling Green State University). He argues that "this relationship is observed across both boys and girls, and across racial and ethnic subgroups of the population." In his review of the literature, he shows that as far back as the 1960s, prior to the surge in incarceration rate (Session I; Wildeman), that incarceration of the father predicted delinquency in

adolescence and young adulthood. Echoing this finding, the National Longitudinal Study of Adolescent Health (Add Health) data show that a father's incarceration predicts serious delinquency, marijuana use, hard drug use, and arrests in adolescence and young adulthood, regardless of gender, race, etc. Swisher's research also indicates that girls are more likely to develop internalizing behaviors (such as depression) than boys are, though this relationship is nuanced and is affected by other factors as well.

Rosalyn Lee (Centers for Disease Control and Prevention), has studied behavioral problems and mental health, and their link to parental incarceration history.  She highlighted the two narratives of parental incarceration (Session I; Geller)[1] and conducted a study on what factors actually affected people within the National Longitudinal Study of Adolescent Health (Add Health) dataset.  In her study, Lee and her collaborators "found associations between parental incarceration history and 8 of 16 health outcomes in young adults (five physical health problems (migraines, asthma, high cholesterol, HIV/AIDs and fair/poor health) and three mental health problems (anxiety, depression, and PTSD)], distinguished by parent gender)." Maternal incarceration was associated only with depression, a finding which was echoed in research presented within this session (Craigie and Swisher). In light of these results, future research should strive to investigate health impacts of exposure to parental incarceration across developmental stages and health outcomes, as well as investigate potential risk factors.

> "The U.S. College graduation rate of 40% **drops to 1-2%** among children of mothers who are imprisoned and to about 15% for children of imprisoned fathers."
>
> -John Hagan

**Session III: Educational and Exclusionary Outcomes**

In her research, Emily Bever Nichols (University of Virginia) looked at household member incarceration (HMI), as she argues, HMI is a more culturally relevant definition of family, and that in such arrangements, extended family members play an essential role in the development of youth, and the resulting removal of such support has very similar effects. Sampling 3,338 children from the National Longitudinal Survey on Child and Young Adults (NLSY79), she found that "HMI during childhood significantly increases the likelihood of extended school absences and school dropout, beyond the influence of heightened economic strain." However, Bever Nichols also found that while extended family member incarceration (e.g., cousin, uncle) increased the likelihood of school absences and dropout, parent and sibling incarceration *did not* increase the likelihood. Therefore, she concluded that more research is required beyond focusing solely on parental incarceration, and that "policy and

---

[1] One narrative portrays the parent being removed as detrimental (e.g., creates stress in the absence of the support system, restrictions and harsh environment due to housing instability, child placement concerns) and the other narrative portrays removal of that parent as positive (e.g., provides new shelter, routine, protection from violence victimization, and can provide prenatal care to expectant mothers who become incarcerated, when applicable and necessary). Philip Genty references these narratives later in Session IV and his article in Family Court Review:
Philip Genty, "Moving Beyond Generalizations and Stereotypes to Develop Individualized Approaches for Working with Families Affected by Parental Incarceration," *Family Court Review*, 50, no. 1 (2012): 36-47.

programming should focus on expanding school-based services and dropout prevention to youth with household member incarceration."

Similarly, John Hagan (American Bar Foundation and Northwestern University) has researched education in regards to college graduation. His study found that having a parent imprisoned has a dramatic effect on college completion rates.



Children whose fathers are incarcerated have a 15% chance of graduating college; this percentage drops even lower, to 2%, if the mother is imprisoned. Even more alarmingly, his study found that if a child attends a school where 10-20% of other parents are imprisoned, college graduation level rates drop by half overall. This shocking statistic sheds light on the collateral costs that children face when a parent is incarcerated. "Mass incarceration has radiating effects that extend far beyond those who are incarcerated," said Hagan. "Children do not choose their parents and they are innocent of their parents' crimes. […] World-high US parental incarceration rates [are jeopardizing] innocent children's rights to educational opportunities."

John Hagan reports on his research, which finds that incarceration has radiating effects that extend far beyond those that are incarcerated.

Expanding upon this theme, Hagan's collaborator, Holly Foster (Texas A&M University), argued that both maternal and paternal imprisonment are associated with the social exclusion in early adulthood. Hagan and Foster's findings indicate that college completion is "part of a pathway" through which the effects of parental imprisonment and social exclusion, can be lessened or shed, which suggests a point of intervention. These data are therefore particularly significant and salient for policymakers attempting to affect change through intervention and assistance programs, perhaps at the high school or early collegiate levels.

**Session IV: Law Enforcement**

Consistent with the suggested policy changes outlined above, the research of Myrna Raeder (Southwestern University School of Law) has focused on recommendations that can improve the plight children of incarcerated parents. Specifically, her recommendations focus on law enforcement and sentencing for those convicted. "Protocols should be adopted throughout the United States concerning how the police should handle arrests witnessed by children or where the arrest will have an immediate impact on children," said Raeder. Furthermore, she recommends that judges should be better trained concerning the impact of parental incarceration, and should take better advantage of their discretion in sentencing, particularly when the defendant has committed a nonviolent crime and/or has sole or primary parenting responsibility; Raeder argued that "Judges should have the power to take distance from home into account in sentencing, as well as the power to decide where a prisoner should be

housed [and that] more sentencing alternatives should be available where parents can reside with their young children." Her research also recommends that "smart on crime" initiatives should be supported by evidence-based research concerning any intergenerational implications of current sentencing practices that are in place.

Echoing Raeder's research and concerns about current policy, Philip Genty (Columbia Law School) indicated that prison sentences are too long and incarceration frequently occurs too far from home and family. Even within state prisons, 50% of incarcerated parents are imprisoned 100-500 miles from home, while at the federal level 43% of parents are imprisoned 500 miles (or less) from home. Genty suggests decreased sentence lengths and incarcerating offenders closer to their families.

However, Genty also made the argument that "descriptions of children who have experienced parental incarceration assume that the children's experiences are uniform.  This overlooks important differences in the families' histories as well as the variety of custodial settings in which these children live." Therefore, the consequences which children suffer when a parent is incarcerated are indeed complex, and scholars as well as policymakers should not take a "one- size approach."  In fact, researchers should be working to "discard preconceptions and simplistic approaches," which include the "two narratives" regarding children of incarcerated parents (Session II; Geller; Session III; Bever Nichols).

Stepping back even farther in the research design process, Becky Pettit (University of Washington) argues against the one-size approach. Her research shows that estimates of children's exposure to parental incarceration differs greatly depending on how data are collected, meaning that different techniques (survey, population-based, ethnographies) can produce different narratives about the effects of incarceration on children. Even differences in the wording of questions must be taken into account when examining research. Said Pettit, "there are a number of possible explanations for discrepancies in estimates of children's exposure to parental incarceration including differences in sampling (coverage) and differences in question wording.  Children of incarcerated parents are



Rucker Johnson, a discussant from an earlier session, asks a question during a panel.

very likely to be missed by surveys that draw their samples from people living in households, omnibus questions that include low-level forms of criminal justice contact generate higher rates of exposure than methods that focus on more severe sanctions like jail or prison time" (Session III; Bever Nichols). Therefore, scholars and policymakers need to be conscious about differences in research models and applying data to overarching policy decisions. The session closed with Senator Mark Leno (D-CA) sharing his experiences as a politician dealing with the hot-button issue of incarceration and the effects he has seen in his district.

**Session V: Caring for Children**

With respect to supporting the children of incarcerated parents, Lorie Smith Goshin (CUNY), presented her research on mothers who are involved in the criminal justice system, and in particular, prison nurseries and their effect on children. She argues that prison nurseries, which are special units in where eligible imprisoned women can care for their infants, and are staffed by a mix of civilian and correctional

> "The community's role needs to be emphasized in the care and support of these children, and action research needs to be connected to these efforts."
> -Dee Ann Newell

professionals, help to foster "stable, responsive relationships [which] lay the foundation for physical and mental health across the lifespan" (Session IV; Raeder). These nurseries integrate education on parenting and supportive programming as well. In her sample (within New York state) Goshin found that after mothers and their children were released, from birth to two years, they had clinically normal cognitive and motor development during their nursery stay and first reentry year, and from three to five years the children had significantly lower anxious/depressed scores than other children who had been separated due to maternal incarceration.  While these sorts of results from programming seem very promising, Goshin also reports that presently, systematic research on a wide-scale is unavailable. Furthermore, from the corrections perspective, many policymakers argue that budgets are too tight for these types of programs, that children within the corrections system are a liability, and that these children are not the "problem" of their department; they also assert that programs such as these could be implemented and improved by community-based collaborations through the use of other (non-corrections allocated) funding. Currently, only a handful states have similar programs in place, and the eligibility criteria are often somewhat limited.

For example, eligibility in New York State requires that women interested in the program must:

- be pregnant upon admission to prison
- have an expected release date that is 12-18 months after the expected date of conception
- must be serving for a non-violent crime
- have no history of crimes against children, and
- must apply (on behalf of herself) to the program

Currently, other community alternatives to incarceration (such as place-based residential drug treatment centers) and home-based (e.g., the JusticeHome project initiated by the Brooklyn, NY District Attorney's office) are being explored, though Goshin argues, more sustainable and long-term co-residence solutions for incarcerated mothers and children "must provide more than just living together."

However, in cases where women inmates are not eligible to apply to a prison nursery programs, as is often the case, childcare responsibilities often fall to another caregiver. The research of Nancy Rodriguez (Arizona State University) focuses on aspects of changes in caregiving. In her interviews with caregivers of children with incarcerated parent(s) regarding the changes within their own lives, as well as within those of the child, she found that the results have been "varied and complex." Rodriguez argues that her results suggest that more research "requiring systematic, long-term data collection from prisoners,

caregivers, and children" is necessary.  She also argues that in light of these results, "coordination and data sharing between relevant stakeholders are key [to] better understanding and addressing the needs of families affected by incarceration."

> "Coordination and data sharing between relevant stakeholders are key in better understanding and addressing the needs of families affected by incarceration."
>
> -Nancy Rodriguez

Echoing the need for collaborative efforts, Dee Ann Newell (Arkansas Voices for the Children Left Behind), a Senior Justice Fellow of the Soros Open Society Foundations, argued that there is an "urgency for researchers, practitioners, and policy-makers to share in real time in order to change outcomes for children of incarcerated parents, to include prevention, targeted sets, and/or if the children already have problems, identifying ways to help to fix the problems." Her project with Open Society was "the first and only initiative to attempt a multi-site, national effort to improve the care of children with incarcerated parents." The project's goal was to identify a practice or policy change to implement for improved safety and security of children of incarcerated parents. However, owing to variations in state and local systems, as well as variations in correctional policies, regional demographics, etc., not a single entity involved with the project implemented its mandate in the same manner.  As a result, while much was learned from the process of operationalizing rights for children, it became evident that the process is hardly as straightforward as a "one size" approach (Session IV; Genty). Newell reported that in an effort to streamline policy, "the centrality of the children often got lost in the efforts to make overall criminal justice reforms that did not necessarily translate into child wellbeing." Due to the apparent regional differences in policies, Newell argues that "the community's role needs to be emphasized in the care and support of these children, and action research needs to be connected to these efforts" in order to reform criminal justice policies effectively.

**Conclusion**

It is evident that the issue of parental incarceration and the problems surrounding it are complex, and research and policy changes will require careful, methodological approaches to help effect positive change within the criminal justice system. Varied though the current systems in place and research methodologies and outcomes may be, as mentioned, Chris Uggen (University of Minnesota) suggested that five primary themes surfaced as tangible information that most could agree upon:

1) Parental incarceration disproportionately affects communities of color.

2) Many incarcerated parents played roles in their children's lives prior to their incarceration.

3) Parental incarceration is linked to a number of negative outcomes for children, including poor school performance, physical and mental health problems, housing instability, and economic strain, both during and after incarceration occurs.

4) Parental incarceration is strongly associated with delinquency in both adolescence and the transition to adulthood.

5) There are things that can be done to improve the situation, beginning with greater cooperation between researchers, advocates, policymakers and practitioners to help achieve shared goals.

Specific recommendations emerging from the workshop/conference:

- Call for greater cooperation between researchers, advocates, policymakers, and practitioners.
- Policy and programming should focus on expanding school-based services and drop-out prevention for youth with household member incarceration.
- Judges should be better trained concerning the impact of parental incarceration on children to take better advantage of their discretion in sentencing, particularly when the defendant has committed a nonviolent crime and has sole or primary parenting responsibility.
- Courts should have the power to take distance from home into account in sentencing, as well as the power to decide where a prisoner should be housed.

Hagan and Foster, organizers of this workshop, hope to use the output of this conference in their on-going work, "Punishment Regimes and the Multi-Level Effects of Parental Imprisonment: Inter-Institutional, Inter-Generational, and Inter-Sectional Models of Inequality and Exclusion," from which this conference stemmed.

Presenters, discussants, and observers commented that the conference was fruitful and of tremendous value; many of the presenters and discussants remarked that the information presented by other scholars may help shape future courses of research and collaboration, and that the recommendations and questions posed by the observers were insightful and will aid in future research design. Policymaking observers commented that the information was enlightening and informative, and may be of use in future policy writing.

The American Bar Foundation thanks the National Science Foundation for its sponsorship of the event, as well as the US Office of National Drug Control Policy, for its help planning and coordinating the event.

# EXHIBIT E



Mass Incarceration, Parental Imprisonment, and the Great Recession: Intergenerational Sources of Severe Deprivation in America

John Hagan, Holly Foster



RSF: The Russell Sage Foundation Journal of the Social Sciences, Volume 1, Number 2, November 2015, pp. 80-107 (Article)

Published by Russell Sage Foundation

For additional information about this article
https://muse.jhu.edu/article/603808

[ Access provided at 5 Aug 2021 22:17 GMT with no institutional affiliation ]

# Mass Incarceration, Parental Imprisonment, and the Great Recession: Intergenerational Sources of Severe Deprivation in America



JOHN HAGAN AND HOLLY FOSTER

*What were the socioeconomic consequences for American youth of having a parent incarcerated during the 2008 Great Recession? We analyze a nationally representative panel study of adolescents who, when interviewed during this recession, were transitioning to and through early adulthood. Young adult children who have had a father or mother imprisoned are at increased risk of experiencing socioeconomic deprivation, including inadequate access to food. We build in this article on recent research showing that postsecondary education has become especially important in determining adult outcomes, and we demonstrate that higher educational attainment reduces intergenerational effects of parental imprisonment. The salient policy implication of this article may be the important protective role of education in reducing unprecedented risks and vulnerabilities imposed by mass parental incarceration.*

**Keywords:** mass incarceration, parental incarceration, economic insecurity, food insecurity, Great Recession

American youth transitioning through early adulthood in the first decade of the new millennium were exposed to unprecedented social and economic risks resulting from world-leading levels of parental imprisonment and the most severe economic downturn since the Great Depression. Some of the risks were foreseen and predicted when Sheldon Danziger, Sandra Danziger, and Jonathan Stern (1997, 183) wrote at the end of the last century that "America's high child poverty rate and its negative consequences for children are likely to persist into the next century." Of course, this prediction was made without foreknowledge of the extent of the following decade's expansion in mass incarceration and the severity of the forthcoming Great Recession. Rather, this prediction was mainly informed by the aware-

**John Hagan** is John D. MacArthur Professor of Sociology and Law at Northwestern University and the American Bar Foundation. **Holly Foster** is associate professor of sociology at Texas A&M University.

We thank the National Science Foundation for research support of our research on parental imprisonment (grant SES-1228345). This research uses data from the National Longitudinal Study of Adolescent Health (Add Health), a program project directed by Kathleen Mullan Harris, designed by J. Richard Udry, Peter S. Bearman, and Kathleen Mullan Harris at the University of North Carolina at Chapel Hill, and funded by grant P01-HD31921 from the Eunice Kennedy Shriver National Institute of Child Health and Human Development, with cooperative funding from twenty-three other federal agencies and foundations. Special acknowledgment is due Ronald R. Rindfuss and Barbara Entwisle for assistance in the original design. Information on how to obtain the Add Health data files is available at the Add Health website (http://www.cpc.unc.edu/addhealth). No direct support was received from grant P01-HD31921 for this analysis. The authors contributed equally to this article. Direct correspondence to: John Hagan at j-hagan@northwestern .edu, Department of Sociology, Northwestern University, 1810 Chicago Ave., Evanston, IL 60208; and Holly Foster at hfoster@tamu.edu, Department of Sociology, Texas A&M University, MS4351, College Station, TX 77843.

ness that the previous century's expansion of the welfare state had been derailed by the "Reagan revolution" and a further understanding that "starve the beast" politics was likely to follow. What was not as easily anticipated was that such politics would fail to hold back the oncoming explosive spending on prison construction and the ensuing massive growth in American imprisonment.

The children we consider in this article were born during the onset of the prison boom in the 1980s. Not only were they at elevated risk of their fathers and mothers being incarcerated, but they were also subject to the perils of entering early adulthood during the 2008 recession. The risks presented by mass incarceration before and during this recessionary era are not fully understood. Matthew Desmond and Nicol Valdez (2013) point out that in recent decades we actually have witnessed a "double movement" within the crime control field: a prison boom accompanied by greatly intensified policing, which has contributed to the population and eventual overcrowding of prisons. The recent research of Desmond (2012) and Alice Goffman (2014) identifies and explains the myriad ramifications of these crime control strategies in a new economy where human insecurity takes many forms, including the severe deprivation that is the subject of this volume.

We focus in this article on the destabilizing life circumstances and severe deprivation affecting the children of incarcerated parents in a nationally representative panel study of adolescents who were transitioning through early adulthood when interviewed before and during the 2008 recession. The damaged prospects for the young children of fathers incarcerated during the prison boom are only recently and increasingly revealed in a relatively new (Bloom 1995; Hagan and Dinovitzer 1999) and rapidly expanding research literature on parental incarceration (for example, Arditti 2012; Foster and Hagan 2007; Murray and Farrington 2008; Wakefield and Wildeman 2014).

As in many new research literatures, from the medical science of cardiovascular disease to the American sociology of socioeconomic status (Kalmijn 1994), the accumulation of findings can increase knowledge while also exposing gaps. For example, the literatures just noted both initially focused nearly exclusively on men. The new literature on parental imprisonment similarly has tended to focus on fathers. This is consequential because imprisoned women are more often parents than are imprisoned men (Chesney-Lind and Pollock 1995), and because the rate of female incarceration, though still much lower than for men, markedly increased during the prison boom (Kruttschnitt 2010; Snell and Morton 1994). As yet, we have less understanding of the developing consequences of maternal incarceration than we do for paternal incarceration.

The parental incarceration research literature has also concentrated on *young children* and their early lives *before* the Great Recession (see, for example, Wakefield and Wildeman 2014). This is pathbreaking work, but the continuing vulnerability of these youth as they moved into early adulthood during the recent recessionary period is not yet well understood. The children of the prison boom are now increasingly represented among the young adults affected by the Great Recession. The National Longitudinal Study of Adolescent Health (Add Health) that we analyze in this article provides a unique opportunity to examine the cumulative effects of maternal and paternal incarceration on young adults who came of age during the 2008 recession.

## IMPRISONED PARENTS, SEVERE DEPRIVATION, AND THE SYSTEMIC EXCLUSION OF CHILDREN

Americans are now imprisoned about seven times more often than in the early 1970s, with two to three million Americans now serving sentences in jails and prisons. About half of these prisoners are the parents of several million children (National Research Council 2014). Susan Phillips and Barbara Bloom (1998, 539) summarize the severity of the consequences when they observe that "by getting tough on crime, the United States has gotten tough on children." The second-generation children of the first-generation fathers and mothers incarcerated in the 1970s and 1980s are now moving into and through early adulthood. These are the children of the prison generation, and many of these children in their childhood, as well as now in their early adulthood, have experienced severe forms of deprivation that involve exclusion from a range of societal insti-

tutions essential to meeting basic human needs—including schools, housing, and medical coverage (Foster and Hagan 2007).

This is the exclusionary toll for children that Jeremy Travis and Michelle Waul (2003) thematize in their aptly titled book *Prisoners Once Removed* and that Megan Comfort (2007) details in her ethnography *Doing Time Together.* We use the severe deprivation framework to analyze the acute, chronic, and compounding ways in which state and school regimes shape and structure parental incarceration effects across the life course, while leading to the systemic social exclusion of children from formative institutions and essential services (Foster and Hagan 2015b).

In the introduction to this volume, Matthew Desmond identifies three aspects of severe deprivation that are also part of the parental incarceration effects on children. First, the *acute* nature of parental incarceration effects on children is signaled by the sheer massiveness of American incarceration: today more than one million American parents are imprisoned. The *compounding* impact of parental incarceration is expressed at two levels: at the individual level, as children directly experience multidimensional forms of insecurity resulting from the imprisonment of a parent, and at the contextual level, where spillover effects radiate to include surrounding children, families, schools, and communities (Hagan and Foster 2012a, 2012b; Perkins and Sampson, this volume). The *chronic* dimension of parental incarceration stems from how early in children's lives this trauma can occur and how persistent its long-term intergenerational consequences can be. Thus, the acute, compounding, and chronic features of severe deprivation importantly identify the endangered conditions of the everyday lived experiences of the children of incarcerated parents.

Still, something more is required in conceptualizing and analyzing this form of severe deprivation as it relates to "prison-generation children." Imprisonment is one of the most exclusionary forms of removal or banishment practiced in developed societies. For policy purposes, it is important to identify the societal agency and political responsibility involved in the imposition of this form of exclusionary deprivation. Severe deprivation may often be

the unintended consequence of public policies and practices, but the severe deprivation resulting from mass incarceration is *intended*: it is the product of *deliberate policy choices* such as determinate and mandatory minimum sentencing, prison without parole, and three-strikes laws. Identifying the collective agents and agencies responsible for systemic exclusionary deprivation can give essential policy direction to the identification of leverage points for removing its deliberately enacted origins.

A systemic social exclusion perspective recognizes and emphasizes the multiple deliberately chosen and overlapping institutional policy domains by and from which the children of incarcerated parents are excluded (Foster and Hagan 2015b). Thus, we purposefully combine the terms "systemic" and "exclusion" with "severe deprivation" to make two points: the disadvantaging outcomes found in studies of the children of incarcerated parents are products of deliberate policy choices, and these outcomes are socially reproduced in intergenerational, inter-institutional (across multiple realms such as housing, schools, and labor markets), and intersectional ways (that is, they are contingent on racial-ethnic and gender domains). Unlike a focus on poverty per se, a focus on systemic exclusion resulting in severe deprivation is explicitly multidimensional and reveals disconnection from multiple societal institutions.

A systemic social exclusion framework locates state punishment and policy regimes (Beckett and Western 2001; Esping-Anderson 1990) as formative contexts for linked lives that shape an array of social inequalities in lived experiences—from childhood through adulthood—across realms of social, cultural, political, and economic development. Succinctly said, systemic social exclusion is the structural condition of being "shut out" from conventional society (Micklewright 2002). Recent work on systemic exclusion has examined parental incarceration effects on powerlessness, earnings, perceived socioeconomic standing, and financial, housing, and food insecurity (Foster and Hagan 2015a). Indicators of systemic social exclusion widen our focus to broadly include institutional disconnections from the civic, cultural, social, and economic realms, as well as the subjectively perceived so-

cial exclusion (for example, feelings of being "left out of society") explored in new European research (Bohnke 2006; Silver 2007).

Social exclusion has been used to conceptualize groundbreaking research on the disconnection of adult prisoners from society (Travis 2002, 19). Research on the collateral consequences of imprisonment reveals social exclusion from occupational, familial, and political life (Manza and Uggen 2006; Pager 2007; Pettit and Western 2004; Western 2006). Becky Pettit (2012) emphasizes the unique systemic exclusion of incarcerated African American males from data collection, including important government databases. Young African American males are in this way often invisible to social science and public policy. As a result, spillover effects of imprisonment have spread across the lives of their families (Comfort 2007; Kamerman and Kahn 2002) in a range of exclusionary ways that we are only beginning to understand (Foster and Hagan 2007, 2015a, 2015b; Murray 2007).

Ajit Bhalla and Frederic Lapeyre (1997, 417) use social exclusion to conceptually broaden attention to the social relational as well as economic distributional aspects of severe deprivation. They do this by emphasizing how the distributional dimension of poverty drives the opportunities to achieve what Amartya Sen (1992, 110) calls the "functionings" made up of "beings and doings," such as "taking part in the life of the community, being able to appear in public without shame, and so on." The point is that adequate levels of inclusionary access to social and economic institutions and resources are a necessary though not sufficient means of meeting basic human needs. From this perspective, exclusion is a denial of fundamental rights and liberties granted and therefore presumably protected by the state. A developed state fails to fulfill its responsibilities when instead of protecting vulnerable groups—such as the innocent children of incarcerated parents—it discriminates between insiders and outsiders and excludes some disadvantaged groups of citizens while advantaging others who are included.

We hypothesize in this article that education plays a pivotal mediating role in the socioeconomic process that connects the incarceration of parents to the social exclusion of their emerging adult children. Patrick Wightman and Sheldon Danziger (2014) point out that access to public education is like other civil rights in American society in that it has expanded only fitfully across the social spectrum. They note that in the recent history of American education, the funding of public schools with local property taxes has greatly advantaged children living in prosperous communities as contrasted with poor communities. Perhaps the most notable effort to compensate for the resulting community-level disparities were the War on Poverty programs initiated in the 1960s and 1970s, including Head Start and other federal subsidies for primary, secondary, and postsecondary education.

Yet disparities in accessing and completing college persist, and the negative impact of the prison boom on schools in poorer neighborhoods and communities (Hagan and Foster 2012a, 2012b) counteracts the compensatory efforts that continue in these settings. President Obama in his 2015 State of the Union Address called for vastly increasing access to postsecondary education in America. Wightman and Danziger (2014, 23) explain that disparities in educational outcomes are especially likely at the college level, because going to college requires tuition payments, while going to high school is publicly funded. They observe that disparities in college outcomes are especially likely in an era of declining inflation-adjusted earnings among low-income parents, with the result that "the ratio of college costs to parental income has increased much more for young adults from low-SES than from high-SES families. Many poor young adults may perceive (rightly or wrongly) that college is not a financially feasible option. In addition, government spending on college subsidies for children from low-SES families has not risen as fast as college costs." We hypothesize that, as a result, restricted postsecondary educational attainment is an important mediating mechanism through which maternal and paternal incarceration leads to severe deprivation and the social exclusion of children in ways that will almost certainly have effects throughout their adult lives.

The ultimate focus of this article is on the loss of rights of access among these older children of incarcerated parents to the most basic requirements for systemic inclusion in conventional society, such as rent or mortgage money, phone service, utilities, and even food—the essential economic resources required to be free of housing and hunger insecurity in America. Recent national estimates (Houseman 2003) of severely deprived and disconnected youth ages sixteen to twenty-four in American society range from 8 to 15 percent. The purpose of this article is to examine the likely role of the mass incarceration of parents during the recent economic recession in explaining the deprivation, disconnection, and broader social exclusion of these children as they transition into and through early adulthood.

## SELECTION AND SELF-CONTROL

It is important in assessing severe deprivation and systemic exclusion to also consider related and alternative perspectives on selection and self-control. These perspectives emphasize that exogenous selection processes render imprisoned parents and their children different from parents and children who are not imprisoned. Thus, Daniel Nagin and Raymond Paternoster (1991, 167) juxtapose a state dependency theory with this kind of population heterogeneity perspective. They observe that individuals selected for imprisonment would be characterized by Michael Gottfredson and Travis Hirschi (1990) as having low self-control, by James Wilson and Richard Hernstein (1985) as having high impulsivity and low conscience, and by some criminologists as having a propensity for criminal offending resulting from low conditionability (Fishbein 1990). As Robert Sampson and John Laub (1997) remind us, and as we reemphasize later, these individual differences may derive from and lead to a mixture of factors. Regardless, these perspectives speak to the traditional American concern about failures of personal responsibility in accounting for social exclusion.

The most comprehensive explanation of a self-control theory of selection is Gottfredson and Hirschi's *A General Theory of Crime* (1990). Their point is that a stable and versatile range of exclusionary outcomes, which in their view would include economic deprivation and human insecurity, are the product of a common cause—namely, low self-control—and resulting processes of self-selection. Their selection hypothesis is simply that "people with low self-control sort themselves and are sorted in a variety of circumstances" (Gottfredson and Hirschi 1990, 119).

Past work (for example, Hagan and Palloni 1990; Nagin and Paternoster 1991) has sought to take this kind of "characterological" theory of selection into account by statistically modeling selection processes using specific assumptions about distributions in the unmeasured heterogeneity of individual background conditions and the structural forms of state dependence. Gottfredson and Hirschi (1990) propose a more direct measurement approach that, when applied to the study of crime, seems to risk circularity by positing crime as its own best explanation. They assert that "the fact that crime is by all odds the major predictor of crime is central to our theory. It tells us that criminality (low self-control) is a unitary phenomenon that absorbs its causes such that it becomes for all intents and purposes, *the* individual-level cause of crime" (Gottfredson and Hirschi 1990, 232, emphasis in the original).

Since in contrast with Gottfredson and Hirschi our concern is with noncriminal forms of social exclusion (economic deprivation and human insecurity), it does not pose a problem of circularity for us to use repeated measures of arrests as indicators of weak self-control and as one part of a methodologically conservative consideration of self-selection. We are further able to take advantage of Gottfredson and Hirschi's assertion that many other events and behaviors are unitary expressions of weak self-control. In particular, we include as further measures of low self-control and population heterogeneity indications of parents' alcoholism, parents' weak social bonds to their children, and parents' low educational achievement. Holding these influences constant allows us to more narrowly assess the independent effects of mothers' and fathers' imprisonment and the cumulative mechanisms—especially their children's educational achievement—that transmit the effects of pa-

rental imprisonment on the deprivation, insecurity, and broader social exclusion of their emerging adult children.

## DATA AND METHODS FOR STUDYING THE MASS INCARCERATION AND GREAT RECESSION GENERATIONS
### Parameters of the Study
Assessment of the historic impact on the deprivation and insecurity of children transitioning into and through early adulthood of the explosion in parental incarceration during the prison boom and the Great Recession requires knowledge of when these events occurred and, ideally, longitudinal data on child cohorts that appropriately coincide with the unfolding of these events. The prison boom started in the 1970s, began its steep ascent in the 1980s, and reached its approximate peak by the end of the first decade of the new millennium. The Great Recession was sparked by the U.S. subprime mortgage crisis and the ensuing financial crisis that began in 2007. International Monetary Fund (IMF) gross domestic product (GDP) figures place the onset of the Great Recession at the middle of 2008.

### The National Longitudinal Study of Adolescent Health
Pettit (2010, 90) observes that the inadequate enumeration of and explanation for the effects of mass incarceration policies by social scientists and policy analysts has contributed to our "collective blindness" about the effects of high U.S. rates of imprisonment. This may be simultaneously true of the Great Recession. However, Pettit (2010, 87) also notes that an important exception to this generalization is the data collected in the ongoing National Longitudinal Study of Adolescent Health (Add Health). The Add Health panel study has not only tracked respondents over time and inquired about parent incarceration but also measured important intergenerational family, school, and work experiences that prior research on educational attainment and economic deprivation has identified as important.

Add Health thus provides a well-timed and nationally representative sample of the incarceration and recession generations who were born in the early 1980s, entered adulthood (at

average age twenty-one) about the turn of the millennium, and were transitioning through early adulthood (ranging in age from twenty-four to thirty-two, with an average age of twenty-eight) when the Great Recession began in mid-2008. Add Health began in 1995 by sampling grades seven to twelve in 132 U.S. schools (Chantala and Tabor 2010 [1999]; Udry and Bearman 1998; see also Resnick et al. 1997).

The inception of the Add Health survey in 1995 is propitious for our purposes in that Katherine Beckett and Bruce Western (2001, 52) have demonstrated the emergence of a strong negative relationship between welfare support and penal punitiveness at approximately this time. Add Health parents participated in one wave of data collection, and students participated in four waves. The fourth-wave interviews occurred between 2007 and 2009, with about 1 percent of the interviews completed in 2007 and over 99 percent before the end of 2008. We consider the effects of the onset and unfolding of the recession in 2008 with a count measure of days from January 1, 1960, until the fourth-wave Add Health interview.

### Key Independent and Dependent Add Health Variables
Add Health respondents were asked in waves 3 (2002, 77.3 percent response rate) and 4 (2008, 80.3 percent response rate) to report retrospectively on parental imprisonment. As we note later, the four waves of Add Health provide a valuable moving window on incarcerated parents and their backgrounds, adolescents' backgrounds, their educational attainments, their familial and legal circumstances, and their experiences of economic deprivation and human insecurity. These moving measures are summarized in table 1 and described more fully in the appendix, including individual-level indicators of deprivation and insecurity (the key outcomes analyzed in this article): the wave 3 and 4 scale measures of not being able to pay phone, rent/mortgage, or utility bills and, in the final wave, being unable to buy food (alpha = 0.64–0.72). As indicated in figure 1, from 20 to 40 percent of young adult children of incarcerated mothers or fathers had experienced one or more of these sources of deprivation and insecurity. Figure 2 indicates that 10 to 20

**Table 1.** Descriptive Statistics for Young Adults with an Incarcerated Parent During the Great Recession

| | Mean | Standard Deviation | Range | N | Means Produced with Multiple Imputation (n = 9,401) |
|---|---|---|---|---|---|
| **Young adult income insecurity** | | | | | |
| Economic insecurity, wave 4 | 0.36 | 0.83 | 0–4 | 9,401 | 0.36 |
| Economic insecurity, wave 3 | 0.40 | 0.83 | 0–4 | 9,305 | 0.40 |
| Food insecurity, wave 4 | 0.11 | — | 0–1 | 9,415 | 0.11 |
| Any economic insecurity[a] (5), wave 4 | 0.24 | — | 0–1 | 9,401 | 0.24 |
| Any economic insecurity, wave 4 | 0.20 | — | 0–1 | 9,401 | 0.21 |
| Any economic insecurity, wave 3 | 0.24 | — | 0–1 | 9,305 | 0.25 |
| **Parental imprisonment** | | | | | |
| Paternal imprisonment, wave 4 | 0.15 | — | 0–1 | 8,885 | 0.16 |
| Paternal imprisonment, wave 3 | 0.14 | — | 0–1 | 8,831 | — |
| Maternal imprisonment, wave 4 | 0.03 | — | 0–1 | 9,328 | 0.03 |
| **Young adult sociodemographics** | | | | | |
| Hispanic | 0.11 | — | 0–1 | 9,406 | 0.12 |
| African American | 0.16 | — | 0–1 | 9,406 | 0.16 |
| White (reference) | 0.66 | — | 0–1 | 9,406 | — |
| Asian American | 0.04 | — | 0–1 | 9,406 | 0.04 |
| Other | 0.03 | — | 0–1 | 9,406 | 0.03 |
| Gender (female = 1) | 0.50 | — | 0–1 | 9,421 | 0.50 |
| Age, wave 4 | 27.89 | 1.67 | 24–34 | 9,416 | 27.88 |
| Parent welfare receipt, wave 1 | 0.09 | — | 0–1 | 8,353 | 0.09 |
| Lived in single-parent family, wave 1 | 0.23 | — | 0–1 | 9,421 | 0.23 |
| Interview date, wave 4 (number of days since January 1, 1960) | 17,660.68 | 93.98 | 17,259–17,929 (April 3, 2007, to February 1, 2009) | 9,421 | 17,660.65 |
| Log personal income, wave 3 | 8.57 | 2.14 | 0–12.43 | 8,601 | 8.57 |
| Number of moves 1995 to 2001–2002 | 1.96 | 2.08 | 0–10 | 9,354 | 1.96 |
| **Young adult life circumstances** | | | | | |
| College degree, wave 4 | 0.31 | — | 0–1 | 9,419 | 0.31 |
| Bachelor's degree, wave 3 | 0.08 | — | 0–1 | 9,417 | 0.08 |
| Ever fired or laid off, 2001 to wave 4 | 0.51 | 1.43 | 0–50 | 9,152 | 0.55 |
| Ever married, wave 4 | 0.47 | — | 0–1 | 9,410 | 0.47 |
| Ever married, wave 3 | 0.16 | — | 0–1 | 9,410 | 0.16 |
| Ever arrested, wave 4 | 0.29 | — | 0–1 | 9,363 | 0.29 |
| Ever arrested, wave 3 | 0.12 | — | 0–1 | 9,366 | 0.12 |

**Table 1.** *(continued)*

| | Mean | Standard Deviation | Range | N | Means Produced with Multiple Imputation (*n* = 9,401) |
|---|---|---|---|---|---|
| Number of children, wave 4 | 0.87 | 1.12 | 0–7 | 9,378 | 0.87 |
| Live alone, wave 3 | 0.08 | — | 0–1 | 8,905 | — |
| Live alone, wave 4 | 0.11 | — | 0–1 | 9,339 | — |
| Resident children, wave 3 | 0.30 | 0.66 | 0–5 | 8,852 | — |
| Resident children, wave 4 | 0.84 | 1.11 | 0–7 | 9,330 | — |
| Any resident parenting, wave 3 | 0.22 | — | 0–1 | 8,852 | — |
| Any resident parenting, wave 4 | 0.45 | — | 0–1 | 9,330 | — |
| **Differences in life circumstances** | | | | | |
| Differences in paternal imprisonment | 0.05 | — | 0–1 | 8,122 | — |
| Differences in paternal imprisonment[a] | 0.003 | 0.31 | −1–1 | 8,508 | — |
| Differences in bachelor's degree | 0.24 | — | 0–1 | 9,399 | — |
| Differences in bachelor's degree[a] | 0.24 | 0.43 | −1–1 | 9,415 | — |
| Differences in having been married | 0.31 | — | 0–1 | 9,321 | — |
| Differences in having been married[a] | 0.31 | 0.47 | −1–1 | 9,399 | — |
| Differences in having been arrested | 0.18 | — | 0–1 | 9,144 | — |
| Differences in having been arrested[a] | 0.16 | 0.14 | −1–1 | 9,338 | — |
| Differences in living alone | 0.09 | — | 0–1 | 8,279 | — |
| Differences in living alone[a] | 0.03 | 0.39 | −1–1 | 8,832 | — |
| Differences in residential parenting | 0.28 | — | 0–1 | 8,598 | — |
| Differences in residential parenting[a] | 0.25 | 0.48 | −1–1 | 8,772 | — |
| Differences in residential parenting[b] | 0.57 | 0.92 | −4–6 | 8,772 | — |
| **Other parental characteristics** | | | | | |
| Biological father's alcoholism, wave 1 | 0.16 | — | 0–1 | 7,746 | 0.16 |
| Biological father's education | 5.38 | 2.40 | 1–9 | 8,348 | 5.27 |
| Closeness to biological father | 4.21 | 1.26 | 1–5 | 7,318 | 4.15 |
| Biological father smokes | 0.64 | — | 0–1 | 7,513 | 0.64 |
| Biological mother's alcoholism, wave 1 | 0.03 | — | 0–1 | 8,240 | 0.03 |

*(continued)*

**Table 1.** *(continued)*

|  | Mean | Standard Deviation | Range | N | Means Produced with Multiple Imputation ($n$ = 9,401) |
|---|---|---|---|---|---|
| Biological mother's education | 5.32 | 2.31 | 1–9 | 8,109 | 5.30 |
| Closeness to biological mother | 4.49 | — | 0–1 | 8,362 | 4.49 |
| Biological mother smokes | 0.52 | — | 0–1 | 8,323 | 0.52 |

*Source:* National Longitudinal Study of Adolescent Health (Add Health), 1994/1995–2007/2008.
[a] Indicates alternate form of measure used (for example, any economic insecurity at wave 4 with the superscript is a dichotomized version of the five-item economic insecurity measure inclusive of food insecurity at wave 4).
[b] There are three forms of the measure of resident parenthood used. The form of the measure with superscript b is the second alternative operationalization.

**Figure 1.**  Percentage of Young Adults Experiencing Any of Four Types of Income Insecurity in 2007–2008



*Source:* Add Health, 2007–2008.
*Note:* The four types of economic insecurity include being unable to pay utility bills, being without a phone, being unable to pay the rent or mortgage, and being without utilities.

percent of these young adults had been unable to buy food.

The key independent variables in our analysis are father's and mother's incarceration. From 14 to 15 percent of the sampled youth reported that their biological father "had served time in jail or prison" in waves 3 and 4, while 3 percent reported that their mother, as measured in wave 4, had been incarcerated. In wave 4, nearly 3,000 members ($n$ = 2,926) of the cohort retrospectively reported having mothers and fathers who had been incarcerated.

**Figure 2.** Percentage of Young Adults Experiencing Food Insecurity in 2007–2008



*Source:* Add Health, 2007–2008.

Retrospective survey items have been effectively used to re-create cohorts' experiences of fertility, social mobility, and other salient behavioral events such as parental incarceration (Hagan and Palloni 1988; Palloni and Sørensen 1990). Add Health youth reported paternal incarceration reliably in waves 3 and 4: the correlation across waves in reported incarceration is 0.82 ($p < 0.001$, with new onset cases excluded in wave 4).

### Theoretical and Control Variables

The additional theoretical and standard young adult sociodemographic control variables are detailed in the appendix. The latter control variables include self-reported and dummy-coded respondent race-ethnicity (Hispanic, African American, white, Asian American, "other" as omitted comparison), gender (female = 1), and age (in years). Family status is measured at wave 1 as receiving welfare (yes = 1) and living in a single-parent family (yes = 1). As noted earlier, exposure to the 2008 recession is measured as the date of the interview minus January 1960. Personal total income is logged for 2000–2001 in late adolescence. Residential mobility is a reported count from 1995 to 2001–2002.

We have argued that a key mediating variable determining economic deprivation and human insecurity outcomes is educational attainment by early adulthood, which is measured in waves 3 and 4 as attaining a bachelor's degree or higher. However, drawing from the literature on the importance of local life circumstances (Horney, Osgood, and Marshall 1995), we include a number of additional young adult self-reported indices at waves 3 and 4, including having ever been married (yes = 1), having ever been arrested (yes = 1), and number of children at wave 4 (count). Given the salience of early research on family structure for food insecurity, followed by the mixed effects of family structure (Miller et al. 2014), we further attend to adulthood family circumstances as part of the foreground of potential influences.

Five measures of the biological father's and mother's backgrounds are also controlled: mother's and father's alcoholism, mother's and father's education, mother's and father's smoking, the parent-child social bond, and mother's or father's absence from the home. The controls for father's and mother's education, family structure in adolescence, and welfare receipt in adolescence are especially important to our focus on young adult children's educational attainment and family circum-

stances as potential mediating variables in our analysis of their early adult economic deprivation and insecurity.

## Methods

We use multiple imputation (MI) techniques for missing data (MI procedures in Stata using twenty multiply imputed data sets) to work with all cases with nonmissing information on our focal dependent variables ($n = 9,401$) that also have valid wave 4 sampling weights. The multivariate analyses initially presented in this article use survey-adjusted logistic and negative binomial regression equations to estimate direct and indirect effects of mothers' and fathers' imprisonment on economic outcomes. We believe this multivariate approach is persuasive because of the range of co-occurring factors and prior-wave economic outcomes that may be spuriously conflated with parental incarceration. Of course, one can never be certain that all relevant variables have been considered, but a comprehensive range of alternative causal factors are included and available for analysis in the relevant waves of the Add Health survey.

In addition, we take special advantage of the cross-wave repeated measurement of a number of key variables in the third and fourth waves of the Add Health survey, most notably father's imprisonment. These measures can be used to estimate a final set of fixed-effects models, or within-person difference models, as contrasted with the previous cross-person models. We use fixed-effects logistic regression models for the two-period case (Allison 2009). These models allow us to compare child economic outcomes and life circumstances between entry into adulthood in the third wave of the Add Health survey and six years later during early adulthood in the fourth wave.

We modeled differences within person across waves in obtaining a bachelor's degree, in having been married, in having been arrested, in residential parenthood, and in living alone. The unique advantage of these final fixed-effects models is that they control for time-invariant unobservable factors that may be related to selection into paternal imprisonment (Allison 2009). Thus, the fixed-effects models help to address competing explanations of the relationship between the father's incarceration and the child's adult economic insecurity by ruling out time-invariant sources of unobserved heterogeneity.

The findings of our final fixed-effects models parallel our findings in the earlier regression models and therefore boost our confidence in our results. In the two period-case fixed-effects regression models, we regress economic insecurity at wave 4 on difference scores in the time-varying independent variables between waves 3 and 4. Sample sizes are restricted in fixed-effects logistic regression models, with cases excluded if they have the same value of the outcome variable in both waves 3 and 4, indicating no change in status (Allison 2009, 29).

## MULTIVARIATE RESULTS

The first logistic regression equation estimated in table 2 indicates that both father's and mother's imprisonment are strongly and significantly related to one or more of the five measures of early adult economic deprivation (inability to pay for phone, rent, mortgage, utilities, or food). This continues to be the case in the second equation, which, since food insecurity was measured at wave 4 only, introduces a four-item economic deprivation measure from the prior wave. When the eight father and mother controls (for alcoholism, smoking, education, and parent-child bond) are added in the third equation of table 2, the effects of father's and mother's imprisonment are reduced by about one-third, but both parental imprisonment effects remain highly significant.

The fourth equation further includes the duration of the recession (indicated by the interview date) and sociodemographic characteristics. The results indicate the significant impact of the recession and of having a single parent, being a woman, and having African American or "other" (non-Hispanic) minority status on forms of economic insecurity, as well as the significant mitigating effect of being Asian American. Still, the effects of maternal and paternal imprisonment remain statically significant.

Finally, the fifth equation incorporates second-generation child attainment of a bachelor's degree as well as ever having been married, ever having been arrested, number of children, and having been fired, laid off, or let go. The last column in table 2 presents the ex-

**Table 2.** Survey-Adjusted Logistic Regression of Any Economic Insecurity[a] at Wave 4 on Paternal and Maternal Imprisonment and Predictors

| | 1 | 2 | 3 | 4 | 5 | 6 (Odds Ratio) |
|---|---|---|---|---|---|---|
| **Parental imprisonment** | | | | | | |
| Biological father's imprisonment | 0.86*** (0.07) | 0.78*** (0.08) | 0.49*** (0.09) | 0.44*** (0.09) | 0.35*** (0.10) | 1.42*** |
| Biological mother's imprisonment | 0.93*** (0.16) | 0.86*** (0.17) | 0.59*** (0.17) | 0.53*** (0.17) | 0.47** (0.17) | 1.59** |
| **Controls** | | | | | | |
| Binary economic insecurity, wave 3 | | 0.97*** (0.07) | 0.87*** (0.07) | 0.81*** (0.07) | 0.69*** (0.07) | 2.00*** |
| Biological father's alcoholism | | | 0.14 (0.12) | 0.12 (0.12) | 0.05 (0.13) | 1.05 |
| Biological father's education | | | −0.07*** (0.02) | −0.07*** (0.02) | −0.03 (0.02) | 0.97 |
| Bond to biological father | | | −0.09** (0.03) | −0.03 (0.03) | 0.00 (0.03) | 1.00 |
| Biological father smokes | | | 0.20* (0.09) | 0.20* (0.09) | 0.16+ (0.09) | 1.17* |
| Biological mother's alcoholism | | | 0.21 (0.21) | 0.14 (0.20) | 0.07 (0.20) | 1.07 |
| Biological mother's education | | | −0.03 (0.02) | −0.03 (0.02) | 0.02 (0.02) | 1.02 |
| Bond to biological mother | | | −0.09* (0.04) | −0.11* (0.05) | −0.08+ (0.05) | 0.92+ |
| Biological mother smokes | | | 0.25** (0.08) | 0.24** (0.08) | 0.16+ (0.08) | 1.17+ |
| Interview date, wave 4 | | | | 0.0009* (0.0004) | 0.0006+ (0.0004) | 1.0001+ |
| Gender (female = 1) | | | | 0.23*** (0.06) | 0.39*** (0.07) | 1.48*** |
| Hispanic | | | | −0.12 (0.13) | −0.14 (0.12) | 0.87 |
| African American | | | | 0.33*** (0.09) | 0.10 (0.09) | 1.10 |
| Asian American | | | | −0.70** (0.22) | −0.59* (0.24) | 0.55* |
| Other | | | | 0.38* (0.19) | 0.27 (0.18) | 1.37 |
| Age | | | | −0.02 (0.03) | −0.03 (0.03) | 0.97 |
| Lived in single-parent family, wave 1 | | | | 0.30** (0.09) | 0.27** (0.09) | 1.32** |
| Parent received welfare, wave 1 | | | | 0.14 (0.11) | 0.03 (0.12) | 1.03 |
| Personal income, wave 3 | | | | −0.03+ (0.02) | −0.04* (0.02) | 0.96* |
| Number of residential moves 1995 to 2001–2002 | | | | 0.04* (0.02) | 0.04* (0.02) | 1.04* |

*(continued)*

**Table 2.** *(continued)*

| | 1 | 2 | 3 | 4 | 5 | 6 (Odds Ratio) |
|---|---|---|---|---|---|---|
| **Young adult life circumstances** | | | | | | |
| Bachelor's degree, wave 4 | | | | | −0.95*** | 0.39*** |
| | | | | | (0.10) | |
| Ever married, wave 4 | | | | | −0.31*** | 0.72*** |
| | | | | | (0.08) | |
| Ever arrested, wave 4 | | | | | 0.35*** | 1.42*** |
| | | | | | (0.08) | |
| Number of children, wave 4 | | | | | 0.27*** | 1.32*** |
| | | | | | (0.03) | |
| Ever fired or laid off, before wave 4 | | | | | 0.13*** | 1.14*** |
| | | | | | (0.04) | |
| Constant | −1.34*** | −1.61*** | −.53* | −16.06** | −11.44+ | |
| | (0.04) | (0.05) | (0.26) | (6.14) | (6.28) | |
| Adjusted Wald statistic | 88.50*** | 102.64*** | 34.56*** | 24.56*** | 39.93*** | |

*Source:* Add Health, 1994/1995–2007/2008.

*Note: N* = 9,401 Coefficient (b)/ Standard Error (sb).

[a]Outcome measure is the dichotomized version of the five item version of economic insecurity measure (includes food insecurity).

+*p* < 0.1; *p* < .05; **p* < .01; ***p* < .001 (two-tailed tests)

ponentiated logistic regression coefficients, or odds ratios, for the fifth equation and confirms that child attainment of a bachelor's degree has among the strongest and most significant of the effects mediating the influence of parental imprisonment. Attaining a bachelor's degree reduces the probability of experiencing any of the measured economic deprivations by nearly two-thirds. However, in support of a local life circumstances perspective, marriage reduces the odds of economic insecurity in adulthood, while having more children and having been arrested increases these odds. Having been fired or laid off increases the odds of experiencing any economic insecurity at wave 4. Thus, family, legal, and labor market status matter in adulthood for changes in economic insecurity. Yet even with the full range of independent variables taken into account, the early adult children in the Add Health sample with a father imprisoned are estimated to be 42 percent more likely to experience one or more of the measured economic deprivations—and 59 percent more likely to experience economic insecurity with a mother imprisoned.

The same pattern of results is revealed in table 3 when a negative binomial regression is used to estimate effects with a five-item additive scale. Thus, whether a binary or additive scale of economic early adult deprivation is used, and notwithstanding comprehensive inclusion of control measures, the effects of maternal and paternal imprisonment remain highly significant. Furthermore, child educational attainment in the form of the absence of a bachelor's degree is also clearly shown to be an important mediator of these parental imprisonment effects. Additionally, we see the salience of overall local life circumstances in mediating the effects of parental imprisonment: having been married reduces economic insecurity, ever having been arrested increases economic insecurity, having more children increases economic insecurity, and having been fired or laid off increases economic insecurity.

We next examine food insecurity, which was uniquely measured in wave 4 of the Add Health study. The inability to pay for food is an especially telling form of economic deprivation in a developed society. Again there is evidence that notwithstanding the comprehensive inclusion of control measures, both maternal and paternal imprisonment make it more likely that children will be less likely in early adulthood to be

**Table 3.** Survey-Adjusted Negative Binomial Regression of Economic Insecurity[a] at Wave 4 on Paternal and Maternal Imprisonment and Predictors

|  | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Parental imprisonment** | | | | | |
| Biological father's imprisonment | 0.65*** | 0.57*** | 0.35*** | 0.34*** | 0.29*** |
|  | (0.06) | (0.06) | (0.06) | (0.07) | (0.07) |
| Biological mother's imprisonment | 0.76*** | 0.68*** | 0.47*** | 0.43*** | 0.37** |
|  | (0.13) | (0.12) | (0.12) | (0.12) | (0.12) |
| **Controls** | | | | | |
| Economic insecurity, wave 3 |  | 0.44*** | 0.39*** | 0.36*** | 0.28*** |
|  |  | (0.03) | (0.03) | (0.03) | (0.03) |
| Biological father's alcoholism |  |  | 0.07 | 0.06 | 0.03 |
|  |  |  | (0.10) | (0.10) | (0.10) |
| Biological father's education |  |  | −0.07*** | −0.07*** | −0.04* |
|  |  |  | (0.02) | (0.02) | (0.02) |
| Bond to biological father |  |  | −0.07** | −0.04 | −0.02 |
|  |  |  | (0.02) | (0.03) | (0.03) |
| Biological father smokes |  |  | 0.12 | 0.11 | 0.09 |
|  |  |  | (0.08) | (0.08) | (0.08) |
| Biological mother's alcoholism |  |  | 0.15 | 0.09 | 0.01 |
|  |  |  | (0.14) | (0.14) | (0.13) |
| Biological mother's education |  |  | −0.03 | −0.03 | 0.02 |
|  |  |  | (0.02) | (0.02) | (0.02) |
| Bond to biological mother |  |  | −0.05 | −0.06 | −0.04 |
|  |  |  | (0.04) | (0.04) | (0.04) |
| Biological mother smokes |  |  | 0.24*** | 0.23** | 0.14* |
|  |  |  | (0.07) | (0.07) | (0.07) |
| **Young adult sociodemographics** | | | | | |
| Interview date, wave 4 |  |  |  | 0.001** | 0.0008* |
|  |  |  |  | (0.0003) | (0.0003) |
| Gender (female = 1) |  |  |  | 0.17** | 0.31*** |
|  |  |  |  | (0.06) | (0.06) |
| Hispanic |  |  |  | −0.18 | −0.21+ |
|  |  |  |  | (0.11) | (0.11) |
| African American |  |  |  | 0.28*** | 0.11 |
|  |  |  |  | (0.07) | (0.08) |
| Asian American |  |  |  | −0.40 | −0.25 |
|  |  |  |  | (0.24) | (0.27) |
| Other |  |  |  | 0.27+ | 0.10 |
|  |  |  |  | (0.15) | (0.15) |
| Age |  |  |  | 0.01 | −0.00 |
|  |  |  |  | (0.02) | (0.02) |
| Lived in single-parent family, wave 1 |  |  |  | 0.08 | 0.09 |
|  |  |  |  | (0.07) | (0.07) |
| Parent received welfare, wave 1 |  |  |  | 0.11 | 0.02 |
|  |  |  |  | (0.08) | (0.08) |
| Personal income, wave 3 |  |  |  | −0.03+ | −0.03* |
|  |  |  |  | (0.02) | (0.01) |
| Number of residential moves 1995 to 2001–2002 |  |  |  | 0.02 | 0.02 |
|  |  |  |  | (0.01) | (0.01) |

*(continued)*

**Table 3.** *(continued)*

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Young adult life circumstances** | | | | | |
| College degree, wave 4 | | | | | −0.84*** |
| | | | | | (0.10) |
| Ever married, wave 4 | | | | | −0.19* |
| | | | | | (0.08) |
| Ever arrested, wave 4 | | | | | 0.25*** |
| | | | | | (0.07) |
| Number of children, wave 4 | | | | | 0.20*** |
| | | | | | (0.02) |
| Ever fired or laid off, before wave 4 | | | | | 0.13*** |
| | | | | | (0.03) |
| Constant | −0.93*** | −1.16*** | −0.31 | −17.57** | −15.21** |
| | (0.04) | (0.04) | (0.22) | (5.42) | (5.60) |
| Log of alpha | 1.13 | 0.97 | 0.89 | 0.84 | 0.63 |
| | (0.06) | (0.07) | (0.07) | (0.07) | (0.07) |
| Alpha | 3.11 | 2.63 | 2.42 | 2.31 | 1.88 |
| | (0.19) | (0.18) | (0.17) | (0.17) | (0.13) |
| Adjusted Wald statistic | 81.91*** | 110.00*** | 39.60*** | 27.98*** | 33.37*** |

*Source:* Add Health, 1994/1995–2007/2008.

*Note:* N = 9,401 Coefficient (b)/ Standard Error (sb).

[a]Five-item economic insecurity measure.

[+]$p < 0.1$; *$p < .05$; **$p < .01$; ***$p < .001$ (two-tailed tests)

able to afford to pay for food. However, while the effect of paternal imprisonment on the ability to afford food is statistically significant at the 0.10 level, the effect of maternal imprisonment on food insecurity is stronger and statistically significant at the 0.01 level (see table 4). Exponentiation of the logistic regression coefficient indicates that when a mother is imprisoned, the likelihood of experiencing the inability to pay for food is increased by 81 percent. Again, these background effects are partly working through foreground local life circumstances to influence food insecurity experiences.

The equations estimated in the survey-adjusted logistic regression analyses of experiencing any of five forms of income insecurity and experiencing food insecurity are used to generate exponentiated odds ratios and adjusted odds ratios in figure 3. Thus, the odds presented in the bars on the left-hand side of figure 3 estimate without controls for other independent variables the likelihood of the child of an incarcerated father or mother experiencing any income insecurity or food insecurity,

while the odds presented in the bars on the right-hand side estimate these maternal and paternal effects, net of all other independent variables in the equation. The bars in figure 3 thus indicate that without taking other variables into account, the likelihoods of income insecurity and food insecurity are elevated from about 100 to 150 percent among children with incarcerated fathers or mothers. When the range of potentially confounding variables, such as father, mother, or child attainment of a bachelor's degree, are taken into account, the effect of parental incarceration remains large—from 25 to 75 percent. The last more pronounced effect is the estimated impact of maternal incarceration on food insecurity.

Finally, table 5 presents the more stringent fixed-effects assessment of the effects of maternal and paternal imprisonment on economic insecurity. Economic insecurity at both waves 3 and 4 in these analyses is measured with four items included at both waves, while a dichotomous indicator is used to measure any economic insecurity at each wave.

**Table 4.** Survey-Adjusted Logistic Regression of Food Insecurity at Wave 4 on Paternal and Maternal Imprisonment and Predictors

| | 1 | 2 | 3 | 4 | 5 | 6 (Odds Ratio) |
|---|---|---|---|---|---|---|
| **Parental imprisonment** | | | | | | |
| Biological father's imprisonment | 0.69*** | 0.58*** | 0.31* | 0.31* | 0.23+ | 1.26+ |
| | (0.10) | (0.11) | (0.12) | (0.12) | (0.12) | |
| Biological mother's imprisonment | 0.96*** | 0.89*** | 0.68** | 0.65** | 0.59** | 1.81** |
| | (0.20) | (0.20) | (0.21) | (0.21) | (0.22) | |
| **Controls** | | | | | | |
| Economic insecurity, wave 3 | | 0.48*** | 0.43*** | 0.41*** | 0.34*** | 1.40*** |
| | | (0.04) | (0.04) | (0.05) | (0.04) | |
| Biological father's alcoholism | | | 0.19 | 0.17 | 0.10 | 1.10 |
| | | | (0.15) | (0.14) | (0.15) | |
| Biological father's education | | | −0.04+ | −0.04 | −0.01 | 0.99 |
| | | | (0.02) | (0.03) | (0.03) | |
| Bond to biological father | | | −0.08+ | −0.05 | −0.03 | 0.97 |
| | | | (0.04) | (0.05) | (0.05) | |
| Biological father smokes | | | 0.19 | 0.18 | 0.14 | 1.15 |
| | | | (0.13) | (0.13) | (0.13) | |
| Biological mother's alcoholism | | | 0.07 | −0.00 | −0.08 | 0.93 |
| | | | (0.25) | (0.24) | (0.24) | |
| Biological mother's education | | | −0.07** | −0.07** | −0.03 | 0.97 |
| | | | (0.02) | (0.03) | (0.03) | |
| Bond to biological mother | | | −0.00 | −0.05 | −0.03 | 0.97 |
| | | | (0.05) | (0.05) | (0.05) | |
| Biological mother smokes | | | 0.17 | 0.17 | 0.08 | 1.09 |
| | | | (0.11) | (0.11) | (0.11) | |
| Interview date, wave 4 | | | | 0.0007 | 0.0004 | 1.00 |
| | | | | (0.0006) | (0.0006) | |
| Gender (female = 1) | | | | 0.34*** | 0.49*** | 1.63*** |
| | | | | (0.09) | (0.11) | |
| Hispanic | | | | −0.11 | −0.13 | 0.87 |
| | | | | (0.17) | (0.16) | |
| African American | | | | 0.23+ | −0.01 | 0.99 |
| | | | | (0.13) | (0.14) | |
| Asian American | | | | −0.44 | −0.34 | 0.71 |
| | | | | (0.36) | (0.37) | |
| Other | | | | 0.45 | 0.30 | 1.35 |
| | | | | (0.24) | (0.25) | |
| Age | | | | 0.07 | 0.07 | 1.07 |
| | | | | (0.11) | (0.11) | |
| Lived in single-parent family, wave 1 | | | | 0.16 | 0.13 | 1.14 |
| | | | | (0.12) | (0.12) | |
| Parent received welfare, wave 1 | | | | 0.02 | −0.06 | 0.94 |
| | | | | (0.15) | (0.15) | |
| Personal income, wave 3 | | | | −0.05** | −0.05** | 0.95** |
| | | | | (0.02) | (0.02) | |
| Number of residential moves 1995 to 2001–2002 | | | | 0.03 | 0.03 | 1.03 |
| | | | | (0.02) | (0.02) | |

*(continued)*

**Table 4.** *(continued)*

|  | 1 | 2 | 3 | 4 | 5 | 6 (Odds Ratio) |
|---|---|---|---|---|---|---|
| **Young adult life circumstances** | | | | | | |
| Bachelor's degree, wave 4 | | | | | −0.75*** | 0.47*** |
| | | | | | (0.15) | |
| Ever married, wave 4 | | | | | −0.26*** | 0.77* |
| | | | | | (0.12) | |
| Ever arrested, wave 4 | | | | | 0.32** | 1.38** |
| | | | | | (0.12) | |
| Number of children, wave 4 | | | | | 0.26*** | 1.29*** |
| | | | | | (0.04) | |
| Ever fired or laid off, before wave 4 | | | | | 0.12*** | 1.13*** |
| | | | | | (0.04) | |
| Constant | −2.28*** | −2.52*** | −1.57*** | −14.67 | −9.69 | |
| | (0.05) | (0.06) | (0.31) | (10.65) | (10.58) | |
| Adjusted Wald statistic | 38.41*** | 55.66*** | 17.91*** | 13.90*** | 20.90*** | |

*Source:* Add Health, 1994/1995–2007/2008.
*Note: N* = 9,401 Coefficient (b)/ Standard Error (sb).
⁺*p* < 0.1; \**p* < .05; \*\**p* < .01; \*\*\**p* < .001 (two-tailed tests)

**Figure 3.** Odds Ratios and Adjusted Odds Ratios from Multivariate Survey Adjusted Logistic Regression Analyses



*Source:* Add Health, 1994/1995–2007/2008.

The results of the models shown across the columns in table 5 indicate consistently that experiencing paternal imprisonment between waves 3 and 4 increase the odds of economic insecurity from waves 3 to 4. In column 1, having a father incarcerated between waves 3 and 4 increases the odds of experiencing economic insecurity by 2.17 (*p* < 0.01). The measure of paternal imprisonment used is a lifetime mea-

sure (ever imprisoned) that respondents reported at waves 3 and 4. However, respondents who indicated that their father was imprisoned at wave 3 but not at wave 4 may have wrongly reported this, introducing measurement error. Accordingly, in model 1 we set the cases where this happened to missing.

Also in model 1, differences in residential parenthood that involve having an additional

**Table 5.** Survey-Adjusted Fixed-Effects Regressions (Two-Period Case) of Differences in Any Economic Insecurity on Changes in Paternal Imprisonment and Time-Varying Young Adult Life Circumstances Between Waves 3 and 4

| | 1 Coefficient (b)/ Standard Error (sb) | 2 Odds Ratio | 3 Coefficient (b)/ Standard Error (sb) | 4 Odds Ratio | 5 Coefficient (b)/ Standard Error (sb) | 6 Odds Ratio | 7 Coefficient (b)/ Standard Error (sb) | 8 Odds Ratio |
|---|---|---|---|---|---|---|---|---|
| Differences in paternal imprisonment | 0.77** (0.27) | 2.17** | 0.80*** (0.23) | 2.22*** | 0.79*** (0.23) | 2.21*** | | |
| Differences in paternal imprisonment[a] | | | | | | | 0.59*** (0.17) | 1.81*** |
| Differences in bachelor's degree | −0.96*** (0.17) | 0.38*** | −0.98*** (0.16) | 0.37*** | −0.96*** (0.16) | 0.38*** | | |
| Differences in bachelor's degree[a] | | | | | | | −0.88*** (0.16) | 0.42*** |
| Differences in having been married | −0.01 (0.15) | 0.99 | −0.02 (0.14) | 0.98 | −0.02 (0.13) | 0.98 | | |
| Differences in having been married[a] | | | | | | | −0.06 (0.14) | 0.95 |
| Differences in having been arrested | −0.01 (0.15) | 0.99 | 0.03 (0.14) | 1.03 | 0.03 (0.14) | 1.03 | | |
| Differences in having been arrested[a] | | | | | | | 0.10 (0.14) | 1.10 |
| Differences in residential parenthood | 0.26* (0.14) | 1.30* | | | | | | |
| Differences in residential parenthood[a] | | | 0.22⁺ (0.12) | 1.24⁺ | | | 0.26* (0.11) | 1.30* |
| Differences in living alone | 0.50* (0.21) | 1.65* | | | | | | |
| Differences in living alone[a] | | | 0.71*** (0.15) | 2.03*** | 0.70*** (0.15) | 2.02*** | 0.64*** (0.15) | 1.90*** |
| Differences in residential parenthood[b] | | | | | 0.12* (0.06) | 1.13* | | |
| Constant | −0.25** (0.09) | | 0.77** (0.07) | | 0.75*** (0.07) | | −0.27** (0.09) | |
| Adjusted Wald statistic | 7.99*** | | 11.43*** | | 11.10*** | | 9.65*** | |
| N[c] | 1,821 | | 2,023 | | 2,023 | | 2,141 | |

*Source:* Add Health, 1994/1995–2007/2008.

[a]Alternative measure used, see Appendix. [b]Alternative measure used, see Appendix. [c]Sample sizes are restricted in fixed-effects logistic regression models, with cases excluded if they had the same value on the outcome variable at both time points, indicating no change in status (Allison 2009, 29).

⁺*p* < .1; *p* < .05; **p* < .01; ***p* < .001 (two-tailed tests)

child in the home or living alone increase the odds of economic insecurity. The living alone variable is unfortunately somewhat ambiguous in its meaning: it included at least some cases in which respondents chose and could afford to live alone. However, even choosing to live alone is found in the research literature to carry risks, and the risk we are concerned with is not having someone else in the household to fall back on when problems emerge. We find very clear evidence of hardship outcomes associated with living alone. Leaving these out of the article would be misleading. Unfortunately, we cannot do more with this variable, as it is a household composition measure in the survey and does not permit more nuanced assessment.

In model 2 in column 3, we next use an alternative measure of living alone between waves, because this is a wave-specific rather than a lifetime indicator. The results for the effect of paternal imprisonment on increasing economic insecurity are robust to this change in the measurement of living alone. In model 3 in column 5, we additionally use an alternative measure of differences in residential parenthood involving a count score of the number of children living in the respondent's household at waves 3 and 4. We find again that those who experienced paternal imprisonment between waves, net of other time-varying covariates, experienced heightened economic insecurity.

Finally, in model 4 in column 7, we use an alternative measure of paternal imprisonment, with respondents reporting a father in prison at wave 3 but not at wave 4 kept in the analyses (coded as −1) in the difference score rather than set to missing. This final model is consistent with those that came before. That is, after testing sensitivity to the measurement of the difference scores, we obtain the same substantive result: respondents experiencing paternal imprisonment between waves encounter more economic insecurity at wave 4, net of other time-varying covariates.

Furthermore, as seen in column 7 of table 5, obtaining a bachelor's degree between waves 3 and 4 decreases the likelihood of moving into economic insecurity, while becoming a residential parent increases these odds, and a transition to living alone also increases the odds of economic insecurity. However, differ-ences in being arrested do not have short-term effects on differences in economic insecurity. These results are consistent with prior studies in showing that college incompletion and family status are significant sources of severe deprivation, while the results of the present analysis are unique in revealing the importance of changes in paternal imprisonment during the recent period.

## HUMAN RIGHTS AND SEVERE DEPRIVATION IN TRANSITIONS TO ADULTHOOD

Glen Elder's (1999 [1974]) seminal life-course study of the *Children of the Great Depression* highlighted the vulnerability of children in perilous economic circumstances. We too have found that the children of the 2008 Great Recession experienced economic insecurity, but in a notably new way involving the massive and unprecedented rise in parental incarceration in the late twentieth and early twenty-first centuries. Even with a wide range of variables taken into account, the early adult children in the Add Health sample with a father or mother imprisoned were uniquely likely to experience economic insecurity, including problems of access to food. We have built in this article on recent research showing that postsecondary education has become especially important in determining economic outcomes in modern American society, and we have demonstrated that achieving higher education is similarly important in reducing the effects of parental imprisonment on the economic insecurity of children. The salient policy implication of this article may be the essential role of education in reducing the unprecedented risks and vulnerabilities imposed by mass parental incarceration in twenty-first-century American society.

President Franklin D. Roosevelt (1941) responded to the vulnerability to severe deprivation created by the Great Depression by highlighting the *right* to a "freedom from want" in his famous "Four Freedoms" speech. Social scientists today recognize the significance of "freedom from want" with concepts such as economic insecurity and severe deprivation. Desmond emphasizes in the introduction to this volume that "the severe deprivation approach engages in an empirically driven values conversation about poverty in America, one

that is transparent about the moral principles undergirding research and policy, that specifies and reimagines desirable ends, and that rigorously assesses whether we are living up to our professed values." The rights that Roosevelt enshrined in his Four Freedoms speech embodied the value commitment to eliminating severe deprivation in this richest nation on the planet.

The tools of social science can be especially important in documenting and explaining the widespread, disproportionate, and systematic vulnerabilities to human want in contemporary society. Life-course research increasingly focuses on the cumulative nature of these vulnerabilities across the transitions and trajectories of human lives, with recent scholarship focusing on transitions from childhood through adolescence to adulthood, or what is now called early and emerging adulthood (Arnett 2000; Furstenberg, Rumbaut, and Settersten 2005, 18). The challenge is to link the imperatives of a human rights framework with scientific understandings of severe deprivation and with identification of effective mechanisms for its remediation and elimination.

The United Nations Convention on the Rights of the Child (1989) has universalized the protection of children in the language of human rights and with a focus on childhood vulnerability to various forms of want and insecurity. Interdisciplinary scholars (for example, Duncan and Brooks-Gunn 1997) have advanced children's rights by studying how parenting and childhood experiences affect the basic needs of children protected in the UN Convention. The ways in which societal institutions such as the justice system and educational institutions respond to parents and children in meeting these challenges can facilitate turning points and trajectories of development that extend through adolescence and into adulthood.

Article 28 of the 1989 United Nations Convention on the Rights of the Child mandates the provision of educational opportunities to children. Life-course studies have proven especially important in focusing on disparities and vulnerabilities in transitions from childhood to adulthood—for example, in access to and completion of higher education. The children of incarcerated parents are in special need of educational opportunities to reduce the heightened vulnerabilities they experience.

Duncan Gallie and Serge Paugam (2000, 370) provide a perspective that effectively summarizes the systemic exclusionary risks of the kinds of food and housing deprivations we have found among children of incarcerated mothers and fathers during the recent economic recession. They write that "social exclusion refers to a situation where people suffer from . . . cumulative disadvantages" and that "the different aspects of deprivation become mutually reinforcing over time, leading to a downward spiral in which the individual comes to have neither the economic nor the social resources needed to participate in their society." These restricted resources among children of incarcerated parents may especially involve problems of access to, and support for sustaining, postsecondary education.

We believe it is also important to emphasize that the risks of this kind of social exclusion among the children of incarcerated parents are largely the result of deliberate policy choices enacted through determinate and mandatory minimum sentencing laws and related policies and practices such as prison without parole and "three strikes." Kathleen Daly's (1987a, 1987b, 1989a, 1989b) findings on the period before the passage of these laws and the adoption of these guidelines reflects the background of this consequential policy development.

Daly found that pre-guideline judges expressed concerns in interviews and at sentencing that by incarcerating "familied offenders" they would "break up families" and "punish innocent family members" (see Daly and Bordt 1995, 163). Pre-guideline research by Daly found evidence that judges more leniently sentenced women who were also mothers, and further evidence that some judges also leniently sentenced fathers who provided reliable support to mothers and children (Daly 1989a). These leniency effects based on family care responsibilities conflicted with the subsequent policies demanded by federal and state commissions for equal treatment based on conviction records and charges, regardless of parenting expectations or responsibilities (Stith and Koh 1993). These were deliberate policy choices with far-reaching consequences of the kind empha-

sized in the concept of systemic social exclusion and in the findings reported in this article.

Daly argued that "equal treatment of defendants whose responsibilities for others not only varied but differed by gender may be unjust" (see Daly and Bordt 1995, 163). She further reasoned that a source of this problem was the policy choice that made "unfamilied" males rather than "familied" females the standard of comparison. Daly (1995) argued instead for a reversal in this policy, maintaining that provisions allowing consideration of parenting as a factor in sentencing for both men and women could have spared many fathers as well as mothers from prison, and thus reduced rising imprisonment. However, federal and state sentencing commissions adopted guidelines that reduced judicial discretion, which had been the norm since the founding of the republic, and directed judges to punish mothers equally based on the statutory seriousness of the offense and prior convictions, while disregarding gender-linked family responsibilities.

This policy experiment had profound implications for mothers and fathers of children. It meant treating as equal accused men and women whose family-connected vulnerabilities were actually quite different. Since judges previously incarcerated many fewer women than men, the new guidelines especially increased rates of female imprisonment. Meanwhile, of course, elevated and determinate sentences more broadly increased rates of confinement, and increasing numbers of these men as well as women were parents. The number of young people whose lives as a result were disrupted by separation from their imprisoned parents grew dramatically (Patillo, Weiman, and Western 2004).

Social exclusion is the result of a mixture of private- and public-sector sources of deprivation. An important body of research has focused on the combined roles of family socioeconomic status and welfare provisions in determining educational attainment and economic deprivation and security. Beckett and Western's (2001) finding that by 1995 the relationship between welfare support and penal punitiveness had turned strongly negative in the United States

suggests that criminal sentencing policy is an important factor for consideration in studies of severe deprivation. American life-course research increasingly informs us that social inequality and exclusion is the result of interactions across human lives between private- and public-sector institutional arrangements and individual biographies (O'Rand 1996a, 1996b) and family backgrounds (Warren, Sheridan, and Hauser 2002, 433). There may be no more consequential shift over the last half-century in public-sector treatment of already disadvantaged Americans than the exclusionary use of incarceration.

### APPENDIX
### Young Adult Income Insecurity
*Economic insecurity at wave 4* [a][†]
*In the past twelve months, was there a time when (you/your household) . . .*

(1) *. . . (were/was) without phone service because you didn't have enough money?*

(2) *. . . didn't pay the full amount of the rent or mortgage because you didn't have enough money?*

(3) *. . . didn't pay the full amount of a gas, electricity, or oil bill because you didn't have enough money?*

(4) *. . . had the service turned off by the gas or electric company, or the oil company wouldn't deliver, because payments were not made?*

(5) *. . . worried whether food would run out before you would get money to buy more?*

   Alpha = 0.75

*Economic insecurity at wave 4*
*In the past twelve months, was there a time when (you/your household) . . .*

(1) *. . . (were/was) without phone service because you didn't have enough money?*

(2) *. . . didn't pay the full amount of the rent or mortgage because you didn't have enough money?*

(3) *. . . didn't pay the full amount of a gas, electricity, or oil bill because you didn't have enough money?*

[†] See table 1 notes.

(4)  *. . . had the service turned off by the gas or electric company, or the oil company wouldn't deliver, because payments were not made?*

Alpha = 0.72

### *Economic insecurity at wave 3*
*In the past twelve months, was there a time when (you were/your household was) . . .*

(1)  *. . . without telephone service for any reason?*

(2)  *. . . didn't pay the full amount of the rent or mortgage because you didn't have enough money?*

(3)  *. . . didn't pay the full amount of a gas, electricity, or oil bill because you didn't have enough money?*

(4)  *. . . had the service turned off by the gas or electric company, or the oil company wouldn't deliver, because payments were not made?*

Alpha = 0.64

### *Any economic insecurity at wave 4*[a]
We used a five-item measure dichotomized to indicate any economic insecurity at wave 4.

### *Any economic insecurity at wave 4*
We used a four-item measure dichotomized to indicate any economic insecurity at wave 4.

### *Any economic insecurity at wave 3*
We used a four-item measure dichotomized to indicate any economic insecurity at wave 4.

### *Food insecurity at wave 4*
*In the past twelve months, was there a time when (you were/your household was) worried whether food would run out before you would get money to buy more?*

### Parental Imprisonment
### *Paternal imprisonment at wave 4*
*(Has/did) your biological father ever (spent/spend) time in jail or prison?* 1 = yes, 0 = no.

### *Paternal imprisonment at wave 3*
*Has your biological father ever served time in jail or prison?* 1 = yes, 0 = no.

### *Maternal imprisonment at wave 4*
*(Has/did) your biological mother ever (spent/spend) time in jail or prison?* 1 = yes, 0 = no.

### Young Adult Sociodemographics
### *Hispanic, African American, white (reference), Asian American, and other*
We used adolescent self-reported racial and ethnic identification data at wave 1 to construct the race-ethnicity dummy variables. Incidences of Hispanic status were used to first categorize respondents, followed by other group designations. The reference group in the analyses was the white non-Hispanic group.

### *Gender*
1 = female, 0 = male.

### *Age at wave 4*
We calculated age at wave 4 using birth date and interview date.

### *Parent welfare receipt at wave 1*
A parent was asked at wave 1: *Are you receiving public assistance, such as welfare?* 1 = yes, 0 = no.

### *Lived in single-parent family at wave 1*
We used the measure created by Kathleen Mullan Harris (1999) to operationalize family status using adolescent household roster zinformation to index living in a single-parent household compared to all other family types.

### *Interview date at wave 4 (number of days since January 1, 1960)*
The interview date at wave 4 ranged between 2007 and 2009. We conducted the interviews primarily over the twelve months of 2008, completing 1.23 percent of the interviews in 2007 and 99.15 percent of them before 2009.

### *Log personal income at wave 3*
Personal income responses were combined from two questions.

Including all the income sources you reported above, what was your total personal income before taxes in 2000–2001? Please include all of the income sources you identified in the previous question. $0–509,909.

Those who responded that they did not know were asked: *What is your best guess of*

*your total personal income before taxes?* Categories were: (1) less than $10,000, (2), $10,000 to $14,999, (3) $15,000 to $19,999 (4) $20,000 to $29,999, (5) $30,000 to $39,999, (6) $40,000 to $49,999, (7) $50,000 to $74,999, (8) $75,000 or more.

"Don't know" responses to the first question were set to the midpoint of the selected income category.

### Number of moves 1995 to 2001–2002
*Since the beginning of June 1995, at how many (other) addresses have you lived?* Answers ranged from zero to ten other addresses lived at during this period. If respondents indicated that they had always lived at their current address or had moved there before 1995, they were set to 0 on this measure.

## Young Adult Life Circumstances
### College degree, wave 4
*What is the highest level of education that you have achieved to date?* (1) eighth grade or less; (2) some high school; (3) high school graduate; (4) some vocational/technical training (after high school); (5) completed vocational/ technical training (after high school); (6) some college; (7) completed college (bachelor's degree); (8) some graduate school; (9) completed a master's degree; (10) some graduate training beyond a master's degree; (11) completed a doctoral degree; (12) some postbaccalaureate professional education (for example, law school, medical school, nursing school); (13) completed postbaccalaureate professional education (for example, law school, medical school, nursing school). 1 = completed college (bachelor's degree or higher), 0 = else.

### Bachelor degree, wave 3
*What degrees or diplomas have you received? Indicate all that apply.* Bachelor's degree—a BA, AB, or BS. 1 = received a degree, 0 = else.

### Ever fired or laid off, wave 4 (2001)
*Thinking back over the period from 2001 to [the previous year], how many times have you been fired, let go, or laid off from a job?* Answers ranged from zero to fifty.

### Ever married, wave 4
*How many persons have you ever married? Be sure to include your current spouse if you are married now.* 1 = any person married, 0 = else.

### Ever married, wave 3
*How many times have you been married?* 1 = any marriage, 0 = else.

### Ever arrested, wave 4
We used combined responses from three questions for this preconstructed variable: (1) *Have you ever been arrested?* 1 = yes, 0 = else; (2) a preconstructed indicator of whether the interview was conducted in prison; 1 = yes, 0 = else; and (3) *How many times have you been arrested?* 1 = one or more, 0 = else.

### Ever arrested, wave 3
*Have you ever been arrested or taken into custody by the police?* 1 = yes, 0 = no.

### Number of children, wave 4
We used a number-of-children indicator based on the number of children reported as still living (*How many of these children are still living?*). This composite variable also used information from (1) *Thinking about all the relationships and sexual encounters you have ever had, (how many times have you ever been pregnant/how many times have you ever made a partner pregnant)? Include all pregnancies, whether they resulted in a baby born alive, stillbirth, abortion, miscarriage, or ectopic or tubal pregnancy,* and (2) *How many live births resulted from (this pregnancy/ these pregnancies)?*

### Resident parenthood, wave 3
Using information from the household roster on nineteen relationships, we coded instances of living with a son or daughter as 1 and other relationships as 0. A count of sons and daughters across these relationships indicated respondent resident parenthood. This measure was then dichotomized to indicate any resident parenthood.

### Resident parenthood, wave 4
Using information from the household roster on sixteen relationships, we coded instances of living with a son or daughter as 1 and other relationships as 0. A count of sons and daugh-

ters across these relationships indicated respondent resident parenthood. This measure was then dichotomized to indicate any resident parenthood.

*Living alone, wave 3*
Do you live (here/there) alone or with others? 1 = alone, 0 = else.

*Living alone, wave 4*
Do you live alone or with others? 1 = alone, 0 = else.

## Differences in Life Circumstances
*Differences in paternal imprisonment*
Paternal imprisonment at wave 4 minus paternal imprisonment at wave 3: We coded responses 1 where the respondent did not report their father being imprisoned at wave 3 but did report their father being incarcerated at wave 4. 0 = respondent indicated that their father was not incarcerated at wave 3 or 4.

*Differences in paternal imprisonment*[a]
Paternal imprisonment at wave 4 minus paternal imprisonment at wave 3: We coded responses 1 where respondent did not report their father being imprisoned at wave 3 but did report their father being incarcerated at wave 4. 0 = respondent indicated that their father was not incarcerated at wave 3 or 4; −1 = respondent indicated that their father was incarcerated at wave 3 but not at wave 4.

*Differences in bachelor's degree*
Bachelor's degree at wave 4 minus bachelor's degree at wave 3: 1 = respondent reported having a bachelor's degree at wave 4 but not at wave 3; 0 = respondent did not report having a bachelor's degree at wave 3 or 4.

*Differences in having been married*
Respondent married at wave 4 minus respondent married at wave 3: 1 = respondent was married at wave 4; 0 = respondent was not married at wave 3 or 4.

*Differences in having been arrested*
Ever arrested at wave 4 minus ever arrested at wave 3: 1 = respondent was arrested at wave 4; 0 = respondent was not arrested at wave 3 or 4.

*Differences in living alone*
Living alone at wave 4 minus living alone at wave 3: 1 = respondent was living alone at wave 4; 0 = respondent was not living alone at wave 3 or 4.

*Differences in living alone*[a]
Living alone at wave 4 minus living alone at wave 3: 1 = respondent was living alone at wave 4; 0 = respondent was not living alone at wave 3 or 4; −1 = respondent was living alone at wave 4 but not living alone at wave 3.

*Differences in resident parenthood*
Resident parenthood at wave 4 minus resident parenthood at wave 3: 1 = respondent was a resident parent at wave 4; 0 = respondent was not a resident parent at wave 3 or 4.

*Differences in resident parenthood*[a]
Resident parenthood at wave 4 minus resident parenthood at wave 3: 1 = respondent was a resident parent at wave 4; 0 = respondent was not a resident parent at wave 3 or 4; −1 = respondent was not a resident parent at wave 4 but was at wave 3.

*Differences in resident parenthood*[b]
Differences in the count score of the number of resident children between waves 3 and 4.

## Controls
*Biological father's alcoholism, wave 1*
We created a dummy variable where a positive response indicated that the child's biological father was alcoholic, as indicated in a question posed in the parent questionnaire at wave 1.

*Biological father's education*
This variable combined information from adolescent reports at wave 1 on biological fathers from the nonresident biological father section of the questionnaire and the resident father section. It used responses to the question that reported the father's level of education: *How far in school did your biological father go?* The same response scale was used for a question on the education level of the resident father that was used if the person filling out the parent questionnaire was the child's biological father or if it was indicated

that the biological father lived in the household.

### Bond to biological father
This variable combined information from adolescent reports on biological fathers from the nonresident biological father section of the questionnaire and the resident father section. Youth with nonresident biological fathers were asked: *How close do you feel to your biological father?* 1 = not close at all, 2 = not very close, 3 = somewhat close, 4 = quite close, and 5 = extremely close. Information was also used on relations with the father figure if the parent interview indicated that the person filling out the parent questionnaire was the child's biological father or that the biological father lived in the household, using the item: *How close do you feel to your (father figure)?* 1 = not at all, 2 = very little, 3 = somewhat, 4 = quite a bit, and 5 = very much. The two questions were combined to take a nonmissing response as the indicator of the respondent's closeness to the biological father.

### Other Parental Characteristics
#### Biological father smokes
This variable combined information from adolescent reports on biological fathers from the nonresident biological father section of the questionnaire and the resident father section. Adolescents responded to the question on nonresident fathers: *Has your biological father ever smoked cigarettes?* 1 = yes. If the parent interview indicated that the person filling out the parent questionnaire was the child's biological father or that the biological father lived in the household, this measure also used information on the resident father from the question: *Has he ever smoked?* 1 = yes. A positive response to either of these two questions indicated that the biological father smoked.

#### Biological mother's alcoholism, wave 1
We created a dummy variable where a positive response indicated that the child's biological mother was alcoholic, as indicated in a question posed in the parent questionnaire at wave 1.

#### Biological mother's education
This variable combined information from adolescent reports at wave 1 on biological mothers from the nonresident biological mother section of the questionnaire and the resident mother section. It used responses to the question that reported the mother's level of education: *How far in school did your biological mother go?* The same response scale was used for a question on the education level of the resident mother that was used if the person filling out the parent questionnaire was the child's biological mother or if it was indicated that the biological mother lived in the household.

#### Bond to biological mother
This variable combined information from adolescent reports on biological mothers from the nonresident biological mother section of the questionnaire and the resident mother section. Youth with nonresident biological mothers were asked: *How close do you feel to your biological mother?* 1 = not close at all, 2 = not very close, 3 = somewhat close, 4 = quite close, and 5 = extremely close. Information was also used on relations with the mother figure if the parent interview indicated that the person filling out the parent questionnaire was the child's biological mother or that the biological mother lived in the household, using the item: *How close do you feel to your (mother figure)?* 1 = not at all, 2 = very little, 3 = somewhat, 4 = quite a bit, and 5 = very much. The two questions were combined to take a nonmissing response as the indicator of the respondent's closeness to the biological mother.

#### Biological mother smokes
This variable combined information from adolescent reports on biological mothers from the nonresident biological mother section of the questionnaire and the resident mother section. Adolescents responded to the question on nonresident mothers: *Has your biological mother ever smoked cigarettes?* 1 = yes. If the parent interview indicated that the person filling out the parent questionnaire was the child's biological mother or that the biological mother lived in the household, this measure also used information on the resident mother from the question: *Has she ever smoked?* 1 = yes. A positive response to either of these two questions indicated that the biological mother smoked.

## REFERENCES

Allison, Paul D. 2009. *Fixed Effects Regression Models.* Thousand Oaks, Calif.: Sage Publications.

Arditti, Joyce A. 2012. *Parental Incarceration and the Family: Psychological and Social Effects of Imprisonment on Children, Parents, and Caregivers.* New York: New York University Press.

Arnett, Jeffrey J. 2000. "Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties." *American Psychologist* 55(5): 469–80.

Beckett, Katherine, and Bruce Western. 2001. "Governing Social Marginality: Welfare, Incarceration, and the Transformation of State Policy." In *Mass Imprisonment: Social Causes and Consequences,* edited by David Garland. Thousand Oaks, Calif.: Sage Publications.

Bhalla, Ajit, and Frederic Lapeyre. 1997. "Social Exclusion: Towards an Analytical and Operational Framework." *Development and Change* 28(3): 413–33.

Bloom, Barbara. 1995. "Imprisoned Mothers." In *Children of Incarcerated Parents,* edited by Katherine Gabel and Denise Johnston. San Francisco: Jossey-Bass.

Bohnke, Klans. 2006. *Am Rande der Gesellschaft: Risiken Sozialer Ausgrenzung.* Verlag Barbara Budrich, Opladen.

Chantala, Kim, and Joyce Tabor. 2010 [1999]. "Strategies to Perform a Design-Based Analysis Using the Add Health Data." Chapel Hill: University of North Carolina, Carolina Population Center.

Chesney-Lind, Meda, and Joycelyn M. Pollock. 1995. "Women's Prisons: Equality with a Vengeance." In *Women, Law, and Social Control,* edited by Alida V. Merlo and Joycelyn M. Pollock. Boston: Allyn and Bacon.

Comfort, Megan. 2007. *Doing Time Together: Love and Family in the Shadow of the Prison.* Chicago: University of Chicago Press.

Daly, Kathleen. 1987a. "Structure and Practice of Familial-Based Justice in a Criminal Court." *Law and Society Review* 21(2): 267–90.

——. 1987b. "Discrimination in the Criminal Courts: Family, Gender, and the Problem of Equal Treatment." *Social Forces* 66(1): 152–75.

——. 1989a. "Rethinking Judicial Paternalism: Gender, Work-Family Relations, and Sentencing." *Gender and Society* 3(1): 9–36.

——. 1989b. "Neither Conflict nor Labeling nor Paternalism Will Suffice: Intersections of Race, Ethnicity, Gender, and Family in Criminal Court

Decisions." *Crime and Delinquency* 35(1): 136–68.

——. 1995. "Gender and Sentencing: What We Know and Don't Know from Empirical Research." *Federal Sentencing Reporter* 8(3): 163–68.

Daly, Kathleen, and Rebecca Bordt. 1995. "Sex Effects and Sentencing: An Analysis of the Statistical Literature." *Justice Quarterly* 12(1): 143–77.

Danziger, Sheldon, Sandra Danziger, and Jonathan Stern. 1997. "The American Paradox: High Income and High Child Poverty." In *Child Poverty and Deprivation in the Industrialized Countries, 1945–1995,* edited by Giovanni Andrea Cornia and Sheldon H. Danziger. Oxford: Clarendon Press.

Desmond, Matthew. 2012. "Eviction and the Reproduction of Urban Poverty." *American Journal of Sociology* 118(1): 88–133.

Desmond, Matthew, and Nicol Valdez. 2013. "Unpolicing the Urban Poor: Consequences of Third-Party Policing for Inner-City Women." *American Sociological Review* 78(1): 117–41.

Duncan, Greg J., and Jeanne Brooks-Gunn. 1997. *Consequences of Growing Up Poor.* New York: Russell Sage Foundation.

Elder, Glen. 1999 [1974]. *Children of the Great Depression: Social Change in Life Experience.* 25th Anniversary Edition. Boulder, Colo.: Westview Press.

Esping-Anderson, Gosta. 1990. *The Three Worlds of Welfare Capitalism.* Princeton, NJ: Princeton University Press.

Fishbein, Diana H. 1990. "Biological Perspectives in Criminology." *Criminology* 28(1): 27–72.

Foster, Holly, and John Hagan. 2007. "Incarceration and Intergenerational Social Exclusion." *Social Problems* 54(4): 399–433.

——. 2015a. "Maternal and Paternal Imprisonment and Children's Social Exclusion in Young Adulthood." *Journal of Criminal Law and Criminology.* In press.

——. 2015b. "Punishment Regimes and the Multi-Level Effects of Parental Imprisonment: Intergenerational, Intersectional, and Interinstitutional Modes of Social Inequality and Systemic Exclusion." *Annual Review of Sociology* 41: 135–58.

Furstenberg, Frank F., Jr., Rubén G. Rumbaut, and Richard Settersten, Jr. 2005. "On the Frontier of Adulthood: Emerging Themes and New Directions." In *On the Frontier of Adulthood: Theory, Research, and Public Policy,* edited by Richard A. Settersten Jr., Frank F. Furstenberg Jr., and Rubén

G. Rumbaut. Chicago: University of Chicago Press.

Gallie, Duncan, and Serge Paugam. eds. 2000. *Welfare Regimes and the Experience of Unemployment in Europe.* New York: Oxford University Press.

Goffman, Alice. 2014. *On the Run: Fugitive Life in an American City.* Chicago: University of Chicago Press.

Gottfredson, Michael R., and Travis Hirschi. 1990. *A General Theory of Crime.* Stanford, Calif.: Stanford University Press.

Hagan, John, and Ronit Dinovitzer. 1999. "Collateral Consequences of Imprisonment for Children, Communities, and Prisoners." *Crime and Justice* 26: 121–62.

Hagan, John, and Holly Foster. 2012a. "Intergenerational School Effects of Mass Imprisonment in America." *Sociology of Education* 85(3): 259–86.

———. 2012b. "Children of the American Prison Generation: The Paradoxical 'Spillover' School Effects of Incarcerating Mothers." *Law and Society Review* 46(1): 37–69.

Hagan, John, and Alberto Palloni. 1988. "Crimes as Social Events in the Life Course: Reconceiving a Criminological Controversy." *Criminology* 26(1): 87–100.

———. 1990. "The Social Reproduction of a Criminal Class in Working-Class London, Circa 1950–1980." *American Journal of Sociology* 96(2): 265–99.

Harris, Kathleen Mullan. 1999. "The Health Status and Risk Behavior of Adolescents in Immigrant Families." In *Children of Immigrants: Health, Adjustment, and Public Assistance,* edited by Donald J. Hernandez. Washington, D.C.: National Academy Press.

Horney, Julie, D. Wayne Osgood, and Ineke Haen Marshall. 1995. "Criminal Careers in the Short Term: Intra-individual Variability in Crime and Its Relation to Local Life Circumstances." *American Sociological Review* 60(5): 655–73.

Houseman, Alan. 2003. "Introduction." In *Leave No Youth Behind: Opportunities for Congress to Reach Disconnected Youth,* edited by Jodie Levin-Epstein and Mark H. Greenberg. Washington, D.C.: Center for Law and Social Policy.

Kalmijn, Matthijs. 1994. "Mother's Occupational Status and Children's Schooling." *American Sociological Review* 59(2): 257–75.

Kamerman, Sheila B., and Alfred J. Kahn. 2002. *Beyond Child Poverty: The Social Exclusion of*

*Children.* New York: Institute for Child and Family Policy at Columbia University.

Kruttschnitt, Candace. 2010. "The Paradox of Women's Imprisonment." *Daedalus* (Summer): 32–42.

Manza, Jeff, and Christopher Uggen. 2006. *Locked Out: Felon Disenfranchisement and American Democracy.* New York: Oxford University Press.

Micklewright, John. 2002. "Social Exclusion and Children: A European View for a U.S. Debate." In *Beyond Child Poverty: The Social Exclusion of Children*, edited by Alfred Kahn and Sheila Kamerman. New York: Institute for Child and Family Policy at Columbia University.

Miller, Daniel P., Lenna Nepomnyaschy, Gabriel Lara Ibarra, and Steven Garasky. 2014. "Family Structure and Child Food Insecurity." *American Journal of Public Health* 104(7): e70–76.

Murray, Joseph. 2007. "The Cycle of Punishment: Social Exclusion of Prisoners and Their Children." *Criminology and Criminal Justice* 7: 55–81.

Murray, Joseph, and David P. Farrington. 2008. "The Effects of Parental Imprisonment on Children." *Crime and Justice* 37: 133–206.

National Research Council. 2014. *The Growth of Incarceration in the United States: Exploring Causes and Consequences.* Washington, D.C.: National Academies Press.

Nagin, Daniel, and Raymond Paternoster. 1991. "On the Relationship Between Past and Future Participation in Delinquency." *Criminology* 29(2): 163–90.

O'Rand, Angela. 1996a. "The Cumulative Stratification of the Life Course." In *Handbook of Aging and the Social Sciences,* 4th ed., edited by Robert H. Binstock and Linda K. George. New York: Academic.

———. 1996b. "The Precious and the Precocious: Understanding Cumulative Disadvantage and Cumulative Advantage over the Life Course." *The Gerontologist* 36(2): 230–38.

Pager, Devah. 2007. *Marked: Race, Crime and Finding Work in an Era of Mass Incarceration*. Chicago: University of Chicago Press.

Palloni, Alberto, and Aäge Sørensen. 1990. "Methods for the Analysis of Event History Analysis." In *Life-Span Development and Behavior,* vol. 10, edited by Paul B. Baltes, David L. Featherman, and Richard M. Lerner. Hillsdale, N.J.: Lawrence Erlbaum.

Patillo, Mary, David Weiman, and Bruce Western. 2004. *Imprisoning America: The Social Effects of*

*Mass Incarceration.* New York: Russell Sage Foundation.

Pettit, Becky. 2012. *Invisible Men: Mass Incarceration and the Myth of Black Progress.* New York: Russell Sage Foundation.

Pettit, Becky, and Bruce Western. 2004. "Mass Imprisonment and the Life Course: Race and Class Inequaltiy in U.S. Incarceration." *American Sociological Review* 69: 151–69.

Phillips, Susan, and Barbara Bloom. 1998. "In Whose Best Interest? The Impact of Changing Public Policy on Relatives Caring for Children with Incarcerated Parents." *Child Welfare* 77(5): 531–41.

Resnick, Michael D., Peter S. Bearman, Robert W. Blum, Karl E. Bauman, Kathleen M. Harris, Jo Jones, Joyce Tabor, Trish Beuhring, Renee Sieving, Marcia Shew, Marjorie Ireland, Linda Bearinger, and J. Richard Udry. 1997. "Protecting Adolescents from Harm: Findings from the National Longitudinal Study of Adolescent Health." *Journal of the American Medical Association* 278(10): 823–32.

Roosevelt, Franklin D. 1941. "The 'Four Freedoms' Speech: Annual Message to Congress on the State of the Union." Delivered January 6. Available at: http://www.fdrlibrary.marist.edu/pdfs/fftext.pdf (accessed October 1, 2015).

Sampson, Robert J., and John H. Laub. 1997. "A Life-Course Theory of Cumulative Disadvantage and the Stability of Delinquency." In *Developmental Theories of Crime and Delinquency,* edited by Terence P. Thornberry. New Brunswick, N.J.: Transaction Publishers.

Sen, Amartya K. 1992. *Inequality Reexamined.* Oxford: Clarendon Press.

Silver, Hilary. 2007. "The Process of Social Exclusion: The Dynamics of an Evolving Concept." Working Paper 95. Providence, R.I.: Brown University, Chronic Poverty Research Center.

Snell, Tracy L., and Danielle C. Morton. 1994. "Women in Prison: Survey of State Prison Inmates, 1991." Special Report (NCJ 145321). Washington: U.S. Department of Justice, Bureau of Justice Statistics.

Stith, Kate, and Steve Koh. 1993. "The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines." *Wake Forest Law Review* 28(2): 223.

Travis, Jeremy. 2002. "Invisible Punishment: An Instrument of Social Exclusion." In *Invisible Punishment: The Collateral Consequences of Mass Imprisonment*, edited by Marc Mauer and Meda Chesney-Lind. New York: The New Press.

Travis, Jeremy, and Michelle Waul. 2003. *Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities.* Washington, D.C.: Urban Institute.

Udry, J. Richard, and Peter S. Bearman. 1998. "New Methods for New Research on Adolescent Sexual Behavior." In *New Perspectives on Adolescent Risk Behavior,* edited by Richard Jessor. Cambridge: Cambridge University Press.

United Nations. Office of the High Commissioner for Human Rights (OHCHR). 1989. "Convention on the Rights of the Child." Resolution 44/25, adopted November 20. Available at: http://www.ohchr.org/en/professionalinterest/pages/crc.aspx (accessed October 1, 2015).

Wakefield, Sara, and Christopher Wildeman. 2014. *Children of the Prison Boom: Mass Incarceration and the Future of American Inequality.* New York: Oxford University Press.

Warren, John Robert, Jennifer T. Sheridan, and Robert M. Hauser. 2002. "Occupational Stratification Across the Life Course: Evidence from the Wisconsin Longitudinal Study." *American Sociological Review* 67(3): 432–55.

Western, Bruce. 2006. *Punishment and Inequality in America.* New York: Russell Sage Foundation.

Wilson, James Q., and Richard J. Herrnstein. 1985. *Crime and Human Nature: The Definitive Study of the Causes of Crime.* New York: Simon & Schuster.

Wightman, Patrick, and Sheldon H. Danziger. 2014. "Multi-generational Income Disadvantage and the Educational Attainment of Young Adults." *Research in Social Stratification and Mobility* 35: 53–69.

# EXHIBIT F



CAP

Supreme Court  Gun Violence  Criminal Justice Reform  COVID-19  Education

Issues   Experts   Events   Press   Take Action   About Us        Donate

ARTICLE   JUL 13, 2021

# Black LGBTQ Individuals Experience Heightened Levels of Discrimination

## 2020 Survey Results Highlight Disparities in the Workplace, in Police Interactions, and in Mental and Physical Health

The compounding effects of discrimination for Black LGBTQ Americans are evident in the workplace, health care systems, and police interactions, leading to gaps in economic advancement and mental and physical health outcomes.

AUTHORS

Lindsay Mahowald

Advancing Racial Equity and Justice, Strengthening Health and Ending the Pandemic, Juneteenth, LGBTQ Communities of Color, LGBTQ Health, LGBTQ Rights, Racial Equity and Justice



People holding signs supporting Black transgender people gather during a candlelight vigil in West Reading, Pennsylvania, on September 14, 2020. (Getty/Ben Hasty/MediaNews Group/Reading Eagle)

This year will likely be remembered for important and positive moments for the United States, including passage of the Equality Act in the U.S. House of Representatives and the widespread distribution of COVID-19 vaccines that have provided nearly half of the population with full immunity. However, it also comes with a sobering statistic: 2021 is on track to become the deadliest year in history for violence against Black transgender individuals, at least 16 of whom have been killed in hate incidents as of this April. Broadly, Black LGBTQ individuals find themselves at the intersection of multiple forms of discrimination, as anti-Blackness and anti-LGBTQ sentiment compound to result in a higher incidence of police interactions, toxic workplace discrimination, and large-scale economic difficulties.

A recent analysis* of data from a 2020 Center for American Progress survey shows that 33 percent of Black LGBTQ individuals reported experiencing discrimination in the last year and that this had a significant impact on their lives and everyday experiences. Black

LGBTQ individuals regularly alter their behavior to avoid potentially harmful experiences: Nearly 1 in 3 report avoiding public spaces such as stores or restaurants to avoid experiencing discrimination; 2 in 5 have moved away from family to prevent discriminatory experiences; and 1 in 5 avoid travel. They are also more likely than their white counterparts to experience discrimination within LGBTQ spaces. This column outlines areas with the most evident disparities between Black and white survey respondents.

## Police interactions

Black people have always faced systemic and pervasive discrimination at the hands of police; due to racial profiling, Black individuals are pulled over for traffic stops at significantly higher rates than white individuals—a phenomenon known as "driving while Black." They are also disproportionately targeted by stop-and-frisk policies and overpoliced in predominantly Black neighborhoods. Soberingly, Black men are roughly 2 1/2 times as likely as their white counterparts to be killed by police. Meanwhile, LGBTQ individuals—particularly transgender individuals—are more likely to be targeted by police for stops and arrests than non-LGBTQ individuals and are overrepresented in prison populations as a result.

- 25 percent of Black LGBTQ individuals reported experiencing discrimination when interacting with law enforcement; 13 percent of white LGBTQ respondents reported the same.

- 40 percent of Black LGBTQ individuals reported avoiding law enforcement to avoid experiencing discrimination; 28 percent of white LGBTQ respondents reported the same.

## Workplace mistreatment

LGBTQ individuals experience high rates of discrimination and harassment in hiring practices and in the workplace. For example, studies have shown that employers are less likely to reach out to perceived LGBTQ job candidates for interviews, and other research indicates that LGBTQ STEM professionals are more likely to face career limitations and harassment. These concerns are compounded for Black individuals, who are paid less for doing the same job as white workers and are given fewer job opportunities in the face of occupational segregation.

- 78 percent of Black LGBTQ individuals report that discrimination has affected their ability to be hired to some degree; 55 percent of white LGBTQ respondents reported the same.

- 56 percent of Black LGBTQ individuals report that discrimination has affected their ability to retain employment to some degree; 46 percent of white LGBTQ respondents reported the same.

- 40 percent of Black LGBTQ individuals made specific decisions about where to work in order to avoid discrimination; 33 percent of white respondents reported the same.

## Economic difficulties

Black individuals face higher rates of discrimination from banks and lenders, are less likely to receive a quality education, and are less likely to own homes than their white counterparts. Centuries of discrimination have resulted in a significant wealth gap between Black and white Americans, as the latter have been able to build and store income, assets, and credit over multiple generations. LGBTQ individuals—who are also less likely to own a home and face high levels of discrimination from financial institutions—report higher rates of food insecurity and homelessness than non-LGBTQ individuals. As a result of such discrimination, Black LGBTQ people are more likely to experience poverty than both their white LGBTQ and non-LGBTQ counterparts.

- 53 percent of Black LGBTQ individuals reported a household income of less than $40,000 a year; 41 percent of white LGBTQ respondents reported the same.

- 69 percent of Black LGBTQ individuals reported that discrimination has negatively affected their financial well-being to some degree; 50 percent of white LGBTQ respondents reported the same.

- 55 percent of Black LGBTQ individuals reported that discrimination has negatively affected their ability to rent or buy a home to some degree; 32 percent of white LGBTQ respondents reported the same.

- 36 percent of Black LGBTQ individuals reported receiving assistance from the Supplemental Nutrition Assistance Program (SNAP) in the past year; 20 percent of white LGBTQ respondents reported the same.

- 28 percent of Black LGBTQ people reported experiencing discrimination in an apartment community; 14 percent of white LGBTQ respondents reported the same.

- 24 percent of Black LGBTQ people reported that they avoided getting necessary services for themselves or their family to avoid discrimination; 17 percent of white LGBTQ respondents reported the same.

- 23 percent of Black LGBTQ people reported avoiding travel to avoid experiencing discrimination; 16 percent of white LGBTQ respondents reported the same.

- 16 percent of Black LGBTQ people reported postponing adding children to their family to avoid experiencing discrimination; 8 percent of white LGBTQ respondents reported the same.

## Mental and physical health

Consistent discrimination takes a significant toll on individuals' mental and physical health. Physiologically, harassment and mistreatment have been shown to lead to cortisol dysregulation, which affects a wide range of bodily functions. As a result, Black LGBTQ individuals often experience mental and physical health challenges.

- 83 percent of Black LGBTQ individuals reported that discrimination has negatively affected their physical well-being to some degree; 61 percent of white respondents reported the same.

- 95 percent of Black LGBTQ individuals reported that discrimination has negatively affected their psychological well-being to some degree; 88 percent of white respondents reported the same.

- 86 percent of Black LGBTQ individuals reported that discrimination has negatively affected their spiritual well-being to some degree; 69 percent of white respondents reported the same.

Black individuals also face high rates of mistreatment from doctors, stemming from both a long history of medical racism and misconceptions about Black people's bodies that are perpetuated in many medical schools. These inequalities lead to structural disparities in medical outcomes.

- 15 percent of Black LGBTQ people reported some form of negative or discriminatory treatment from a doctor or health care provider in the year prior.

- 14 percent of Black LGBTQ people reported that they had to teach their doctor about their sexual orientation to get appropriate care.

- 7 percent of Black LGBTQ people reported that a doctor refused to see them because of their sexual orientation, and 11 percent said they had a doctor who was visibly uncomfortable due to their sexual orientation.

## Conclusion

Black LGBTQ individuals face disproportionate levels of discrimination, from more frequent police interactions to mistreatment in the workplace to discriminatory treatment from health care providers. This pervasive discrimination has led to large-scale economic disparities as well as significant mental and physical health concerns. Data from CAP's 2020 survey support literature that shows the compounded harm of experiencing multiple forms of discrimination. These findings underscore that policymakers must consider the specific needs of the Black LGBTQ community when pursuing efforts to combat discrimination and promote equality.

*Lindsay Mahowald is a research assistant with the LGBTQ Research and Communications Project at the Center for American Progress.*

*\* Data are from a nationally representative survey of 1,528 LGBTQ+-identifying individuals, jointly conducted in June 2020 by the Center for American Progress and NORC at the University of Chicago. Unless otherwise indicated, all comparisons between white respondents and Black respondents are significant at the 0.05 level.*

The positions of American Progress, and our policy experts, are independent, and the findings and conclusions presented are those of American Progress alone. A full list of supporters is available here. American Progress would like to acknowledge the many generous supporters who make our work possible.

AUTHORS

**Lindsay Mahowald**
Research Assistant

## YOU MIGHT ALSO LIKE

ARTICLE
**The State of Gay and Transgender Communities of Color in 2012**
Apr 13, 2012
Melissa Dunn, Aisha C. Moodie-Mills

ARTICLE
**Repealing Progress**
Jan 26, 2011
Aisha C. Moodie-Mills, Danielle Moodie-Mills

REPORT
**Flavored Disease and Death for Minorities**
May 12, 2011
Aisha C. Moodie-Mills

REPORT
**Justice in Reentry for Formerly Incarcerated LGBTQ People and People Living With HIV**
Apr 23, 2021
Thee Santos

## ALSO FROM CAP

ARTICLE
**Urgent Congressional Action Is Needed To Stave Off Hunger for Millions of Students**
Jun 6, 2022
Anona Neal

ARTICLE
**Why K-12 Teachers and Their Students Need Investments in Child Care**
Jun 8, 2022
Emily Katz

FACT SHEET
**Gun Violence Is Having a Devastating Impact on Young People**
Jun 10, 2022
Eugenio Weigend Vargas, Allison Jordan

REPORT
**The Federal Reserve Must Be Careful Not To Jeopardize the Strong Economic Recovery**
Jun 13, 2022
Christian E. Weller, Rose Khattar



The Center for American Progress is an independent nonpartisan policy institute that is dedicated to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. Our aim is not just to change the conversation, but to change the country.

   



Learn about our sister organization, the Center for American Progress Action Fund, an advocacy organization dedicated to improving the lives of all Americans.

©2022 Center for American Progress

Terms of Use
Privacy Policy
CAP - En Español
Our Supporters

# EXHIBIT G

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*



# Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12

## National Inmate Survey, 2011–12



- Federal and state prisons
- Local jails

Allen J. Beck, Ph.D.
*BJS Statistician*

Marcus Berzofsky, Dr.P.H., Rachel Caspar,
and Christopher Krebs, Ph.D., *RTI International*

May 2013, NCJ 241399



**Bureau of Justice Statistics**
William J. Sabol
Acting Director

**BJS Website:**
www.bjs.gov
askbjs@usdoj.gov

The Bureau of Justice Statistics is the statistics agency of the U.S. Department of Justice. William J. Sabol is the acting director.

This report was written by Allen J. Beck, Ph.D., BJS Statistician, and Marcus Berzofsky, Dr.P.H., Rachel Caspar, and Christopher Krebs, Ph.D., RTI International.

Paige M. Harrison (former BJS statistician) was the project manager for the NIS-3. RTI International staff, under a cooperative agreement and in collaboration with BJS, designed the survey, developed the questionnaires, and monitored the data collection and processing. The staff included Rachel Caspar, Principal Investigator/Instrumentation Task Leader; Christopher Krebs, Co-principal Investigator; Ellen Stutts, Co-principal Investigator and Data Collection Task Leader; Susan Brumbaugh, Logistics Task Leader; Jamia Bachrach, Human Subjects Task Leader; David Forvendel, Research Computing Task Leader; and Marcus Berzofsky, Statistics Task Leader. Ramona Rantala, BJS statistician, and RTI staff, including Heather Meier, Barbara Alexander, and Rodney Baxter, verified the report.

Morgan Young and Jill Thomas edited the report, and Barbara Quinn designed and produced the report under the supervision of Doris J. James.

May 2013, NCJ 241399

# Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12

### National Inmate Survey, 2011–12



Federal and state prisons
Local jails

Allen J. Beck, Ph.D.
*BJS Statistician*

Marcus Berzofsky, Dr.P.H., Rachel Caspar,
and Christopher Krebs, Ph.D., *RTI International*

May 2013, NCJ 241399



## Contents

Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

National Inmate Survey-3 . . . . . . . . . . . . . . . . . . . . 8

Incidents of sexual victimization . . . . . . . . . . . . . . . . 8

Facility-level rates  . . . . . . . . . . . . . . . . . . . . . . . . .10

Demographic and other characteristics . . . . . . . . . . . .17

Special inmate populations—Inmates ages 16 to 17 . . . . . .20

Special inmate populations— Inmates with mental health
problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

Special inmate populations—Inmates with a non-heterosexual
sexual orientation. . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Appendix 1. Survey items related to inmate-on-inmate sexual
victimization, National Inmate Survey, 2011–12  . . . . . . . .41

Appendix 2. Survey items related to staff sexual misconduct,
National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . .42

Appendix 3. Follow-up questions for inmates reporting no sexual
activity, National Inmate Survey, 2011–12 . . . . . . . . . . . .42

## List of tables

Table 1.  Adult inmates reporting sexual victimization, by type of
facility and incident, National Inmate Survey, 2011–12  . . . . . . 9

Table 2.  Prevalence of sexual victimization across inmate surveys, by
type of incident, National Inmate Survey, 2007, 2008–09,
and 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Table 3.  Facilities with high rates of inmate-on-inmate sexual
victimization, by type of facility, National Inmate Survey,
2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Table 4.  Facilities with high rates of staff sexual misconduct, by type
of facility, National Inmate Survey, 2011–12. . . . . . . . . . . .13

Table 5.  Facilities with low rates of sexual victimization, by type of
facility, National Inmate Survey, 2011–12 . . . . . . . . . . . . .15

Table 6.  Rates of sexual victimization in special correctional facilities,
by type of incident and facility, National Inmate Survey,
2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

Table 7.  Prevalence of sexual victimization, by type of incident and
inmate characteristics, National Inmate Survey, 2011–12 . . . . .17

Table 8.  Prevalence of sexual victimization, by type of incident and
inmate sexual characteristics, National Inmate Survey, 2011–12  . .18

Table 9.  Prevalence of sexual victimization, by type of incident and
inmate criminal justice status and history, National Inmate Survey,
2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Table 10.  Prevalence of sexual victimization, by type of incident and
age of inmate, National Inmate Survey, 2011–12 . . . . . . . . . .21

Table 11.  Juvenile inmates reporting sexual victimization, by type of
incident, National Inmate Survey, 2011–12 . . . . . . . . . . . . .21

Table 12.  Prevalence of sexual victimization among juveniles ages
16–17 and inmates ages 18–19 and 20–24, by type of incident and
inmate characteristics, National Inmate Survey, 2011–12 . . . . .22

Table 13.  Circumstances surrounding incidents among juveniles ages
16–17 and inmates ages 18–19 and 20–24, by type of victimization,
National Inmate Survey, 2011–12  . . . . . . . . . . . . . . . . . .23

Table 14.  Prevalence of victimization by current mental health status
and history of mental health problems among inmates, by type of
facility, National Inmate Survey, 2011–12 . . . . . . . . . . . . . .24

Table 15.  Prevalence of serious psychological distress among adults
in prisons, jails, and the U.S. civilian noninstitutional population,
2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Table 16.  Prevalence of inmate-on-inmate sexual victimization,
by current mental health status and inmate characteristics, National
Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . .27

Table 17.  Prevalence of staff sexual misconduct, by current mental
health status and inmate characteristics, National Inmate Survey,
2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Table 18.  Circumstances surrounding incidents among adult inmates,
by current mental health status and type of victimization, National
Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . .29

Table 19.  Prevalence of staff sexual misconduct, by type of incident and
inmate sexual orientation, National Inmate Survey, 2011–12 . . . .30

Table 20.  Circumstances surrounding incidents of sexual victimization
among heterosexual and non-heterosexual inmates, National Inmate
Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

## List of figures

**Figure 1.**   Confidence intervals at the 95% level for prisons with high rates of inmate-on-inmate sexual victimization, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

**Figure 2.**   Confidence intervals at the 95% level for jails with high rates of inmate-on-inmate sexual victimization, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

**Figure 3.**   Confidence intervals at the 95% level for prisons with high rates of staff sexual misconduct, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

**Figure 4.**   Confidence intervals at the 95% level for jails with high rates of staff sexual misconduct, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

## List of appendix tables

**Appendix table 1.**   Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

**Appendix table 2.**   Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49

**Appendix table 3.**   Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

**Appendix table 4.**   Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . .61

**Appendix table 5.**   Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12 . . . . .67

**Appendix table 6.**   Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12 . . .75

**Appendix table 7.**   Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

**Appendix table 8.**   Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . .91

**Appendix table 9.**   Characteristics of special correctional facilities and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .99

**Appendix table 10.**   Standard errors for table 2: Prevalence of sexual victimization across inmate surveys, by type of incident, National Inmate Survey, 2007, 2008–09, and 2011–12. . . . . . . . . . . .99

**Appendix table 11.**   Standard errors for table 7: Prevalence of sexual victimization, by type of incident and inmate characteristics, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . .100

**Appendix table 12.**   Standard errors for table 8: Prevalence of sexual victimization, by type of incident and inmate sexual characteristics, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . .101

**Appendix table 13.**   Standard errors for table 9: Prevalence of sexual victimization, by type of incident and inmate criminal justice status and history, National Inmate Survey, 2011–12 . . . . . . . . . . .101

**Appendix table 14.**   Standard errors for table 10: Juvenile inmates reporting sexual victimization, by type of incident, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . .102

**Appendix table 15.**   Standard errors for table 11: Prevalence of sexual victimization, by type of incident and age of inmate, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . .102

**Appendix table 16.**   Standard errors for table 12: Prevalence of sexual victimization among juveniles ages 16–17 and inmates ages 18–19 and 20–24, by type of incident and inmate characteristics, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . .103

**Appendix table 17.**   Standard errors for table 13: Circumstances surrounding incidents among juveniles ages 16–17 and inmates ages 18–19 and 20–24, by type of victimization, National Inmate Survey, 2011–12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .103

**Appendix table 18.**   Standard errors for table 14: Prevalence of victimization by current mental health status and history of mental health problems among inmates, by type of facility, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . . . . . . . . . . .104

**Appendix table 19.**   Standard errors for table 15: Prevalence of serious psychological distress among adults in prisons, jails, and the U.S. civilian noninstitutional population, 2011–12 . . . . . . . . .104

**Appendix table 20.**   Standard errors for table 16: Prevalence of inmate-on-inmate victimization, by current mental health status and inmate characteristics, National Inmate Survey, 2011–12 . . . . .105

**Appendix table 21.**   Standard errors for table 17: Prevalence of staff sexual misconduct, by current mental health status  and inmate characteristics, National Inmate Survey, 2011–12. . . . . . . . . .105

**Appendix table 22.**   Standard errors for table 18: Circumstances surrounding incidents among adult inmates, by current mental health status and type of victimization, National Inmate Survey, 2011–12106

**Appendix table 23.**   Standard errors for table 19: Prevalence of sexual victimization, by type of incident and inmate sexual orientation, National Inmate Survey, 2011–12 . . . . . . . . . . . . . . . . . . .106

**Appendix table 24.**   Standard errors for table 20: Circumstances surrounding incidents of sexual victimization among heterosexual and non-heterosexual inmates, National Inmate Survey, 2011–12. . . .107

## Highlights

### Prevalence of sexual victimization

- In 2011-12, an estimated 4.0% of state and federal prison inmates and 3.2% of jail inmates reported experiencing one or more incidents of sexual victimization by another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

- Using the same methodology since 2007, the rate of sexual victimization among state and federal prison inmates was 4.5% in 2007 and 4.0% in 2011-12; but, the difference was not statistically significant. Among jail inmates, the rate of sexual victimization remained unchanged—3.2% in 2007 and 3.2% in 2011-12.

- Among state and federal prison inmates, 2.0% (or an estimated 29,300 prisoners) reported an incident involving another inmate, 2.4% (34,100) reported an incident involving facility staff, and 0.4% (5,500) reported both an incident by another inmate and staff.

- About 1.6% of jail inmates (11,900) reported an incident with another inmate, 1.8% (13,200) reported an incident with staff, and 0.2% (2,400) reported both an incident by another inmate and staff.

- From 2007 to 2011-12, reports of "willing" sexual activity with staff (excluding touching) declined in prisons and jails, while reports of other types of sexual victimization remained stable.

### Facility rankings

- Eleven male prisons, 1 female prison, and 9 jails were identified as high-rate facilities based on the prevalence of inmate-on-inmate sexual victimization in 2011-12. Eight male prisons, 4 female prisons, and 12 jails were identified as high rate based on the prevalence of staff sexual misconduct. Each of these facilities had a lower bound of the 95%-confidence interval that was at least 55% higher than the average rate among comparable facilities.

- Seven male prisons, 6 female prisons, and 4 jails were identified as low-rate facilities based on a small percentage of inmates reporting any sexual victimization by another inmate or staff and a low upper bound of the 95%-confidence interval around the rate.

- Among the 225 prisons and 358 jails in the survey, 13 prisons and 34 jails had no reported incidents of sexual victimization.

- Two military facilities and one Indian country jail had high rates of staff sexual misconduct in 2011-12. The Northwest Joint Regional Correctional Facility (Fort Lewis, Washington) (6.6%) and the Naval Consolidated Brig (Miramar, California) (4.9%) had high rates of staff sexual misconduct that were more than double the average of prisons (2.4%) and jails (1.8%) nationwide. The Oglala Sioux Tribal Offenders Facility (Pine Ridge, South Dakota) (10.8%) reported the highest rate of staff sexual misconduct among all tribal and nontribal jails in the survey.

### Variations in victimization rates

- Patterns of inmate-on-inmate sexual victimization in 2011-12 were consistent with patterns in past surveys. Rates reported by prison and jail inmates were higher among females than males, higher among whites than blacks, and higher among inmates with a college degree than those who had not completed high school.

- Variations in staff sexual misconduct rates were also similar across surveys. Rates reported by inmates were higher among males in jails than females in jails, higher among black inmates in prisons and jails than white inmates in prisons and jails, and lower among inmates age 35 or older than inmates ages 20 to 24 in both prisons and jails.

- Inmates held for violent sexual offenses reported higher rates of inmate-on-inmate sexual victimization (3.7% in prison and 3.9% in jails) than inmates held for other offenses.

### Special inmate populations

- In 2011-12, juveniles ages 16 to 17 held in adult prisons and jails did not have significantly higher rates of sexual victimization than adult inmates:

  - An estimated 1.8% of juveniles ages 16 to 17 held in prisons and jails reported being victimized by another inmate, compared to 2.0% of adults in prisons and 1.6% of adults in jails.

  - An estimated 3.2% of juveniles ages 16 to 17 held in prisons and jails reported experiencing staff sexual misconduct. Though higher, these rates were not statistically different from the 2.4% of adults in prisons and 1.8% of adults in jails.

  - Juveniles (ages 16 to 17) and young adults (ages 18 to 19 and 20 to 24) reported similar rates of sexual victimization for most of the key subgroups (sex, race or Hispanic origin, body mass index, sexual orientation, and offense).

## Highlights (continued)

- Inmates with serious psychological distress reported high rates of inmate-on-inmate and staff sexual victimization in 2011-12:

  - Among state and federal prison inmates, an estimated 6.3% of those identified with serious psychological distress reported that they were sexually victimized by another inmate. In comparison, among prisoners with no indication of mental illness, 0.7% reported being victimized by another inmate.

  - Similar differences were reported by jail inmates. An estimated 3.6% of those identified with serious psychological distress reported inmate-on-inmate sexual victimization, compared to 0.7% of inmates with no indication of mental illness.

  - Rates of serious psychological distress in prisons (14.7%) and jails (26.3%) were substantially higher than the rate (3.0%) in the U.S. noninstitutional population age 18 or older.

  - For each of the measured demographic subgroups, inmates with serious psychological distress reported higher rates of inmate-on-inmate sexual victimization than inmates without mental health problems.

- Inmates who reported their sexual orientation as gay, lesbian, bisexual, or other were among those with the highest rates of sexual victimization in 2011-12:

  - Among non-heterosexual inmates, 12.2% of prisoners and 8.5% of jail inmates reported being sexually victimized by another inmate; 5.4% of prisoners and 4.3% of jail inmates reported being victimized by staff.

  - In each demographic subgroup (sex, race or Hispanic origin, age, and education), non-heterosexual prison and jail inmates reported higher rates of inmate-on-inmate sexual victimization than heterosexual inmates.

  - Among inmates with serious psychological distress, non-heterosexual inmates reported the highest rates of inmate-on-inmate sexual victimization (21.0% of prison inmates and 14.7% of jail inmates).

# Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12

## National Inmate Survey-3

Between February 2011 and May 2012, BJS completed the third National Inmate Survey (NIS-3) in 233 state and federal prisons, 358 jails, and 15 special confinement facilities operated by Immigration and Customs Enforcement (ICE), the U.S. Military, and correctional authorities in Indian country. The survey, conducted by RTI International (Research Triangle Park, North Carolina), was administered to 92,449 inmates age 18 or older, including 38,251 inmates in state and federal prisons, 52,926 in jails, 573 in ICE facilities, 539 in military facilities, and 160 in Indian country jails. The survey was also administered to juveniles ages 16 to 17 held in adult prisons and jails. Based on 527 completed interviews of juveniles in state prisons and 1,211 interviews in local jails, the NIS-3 provides the first-ever national estimates of sexual victimization of juveniles held in adult facilities.

The NIS-3 is part of the National Prison Rape Statistics Program, which collects reported sexual violence from administrative records and allegations of sexual victimization directly from victims through surveys of inmates in prisons and jails and surveys of youth held in juvenile correctional facilities. Administrative records have been collected annually since 2004. Reports by victims of sexual victimization have been collected since 2007.

The NIS-3 survey consisted of an audio computer-assisted self-interview (ACASI) in which inmates used a touch-screen to interact with a computer-assisted questionnaire and followed audio instructions delivered via headphones. Some inmates (751) completed a short paper form instead of using the ACASI. Most of these inmates were housed in administrative or disciplinary segregation or were considered too violent to be interviewed.

> The Prison Rape Elimination Act of 2003 (P.L. 108-79; PREA) requires the Bureau of Justice Statistics (BJS) to carry out a comprehensive statistical review and analysis of incidents and effects of prison rape for each calendar year. This report fulfills the requirement under Sec. 4c(2)(B)(ii) of the act to provide a list of prisons and jails according to the prevalence of sexual victimization.

As in the NIS-1 (conducted 2007) and the NIS-2 (conducted 2008-09), the NIS-3 collected only allegations of sexual victimization. Since participation in the survey is anonymous and reports are confidential, the survey does not permit any follow-up investigation or substantiation of reported incidents through review. Some allegations in the NIS-3 may be untrue. At the same time, some inmates may not report sexual victimization experienced in the facility, despite efforts of survey staff to assure inmates that their responses would be kept confidential. Although the effects may be offsetting, the relative extent of under reporting and false reporting in the NIS-3 is unknown.

## Incidents of sexual victimization

### In 2011-12, 4.0% of prison inmates and 3.2% of jail inmates reported experiencing one or more incidents of sexual victimization

Among the 91,177 adult prison and jail inmates participating in the NIS-3 sexual victimization survey, 3,381 reported experiencing one or more incidents of sexual victimization in the past 12 months or since admission to the facility, if less than 12 months. Since the NIS-3 is a sample survey, weights were applied for sampled facilities and inmates within facilities to produce national-level and facility-level estimates. The estimated number of prison and jail inmates experiencing sexual victimization totaled 80,600 (or 4.0% of all prison inmates and 3.2% of jail inmates nationwide) **(table 1)**.

Among all state and federal prison inmates, 2.0% (or an estimated 29,300 prisoners) reported an incident involving another inmate, and 2.4% (34,100) reported an incident involving facility staff. Some prisoners (0.4% or 5,500) reported sexual victimization by both another inmate and facility staff.

Among all jail inmates, about 1.6% (11,900) reported an incident with another inmate, and 1.8% (13,200) reported an incident with staff. Approximately 0.2% of jail inmates (2,400) reported being sexually victimized by both another inmate and staff.

**TABLE 1**
**Adult inmates reporting sexual victimization, by type of facility and incident, National Inmate Survey, 2011–12**

| Type of incident[c] | Number of victims[a] | | Percent of inmates | | Standard errors[b] | |
|---|---|---|---|---|---|---|
| | Prisons | Jails | Prisons | Jails | Prisons | Jails |
| **Total** | 57,900 | 22,700 | 4.0% | 3.2% | 0.2% | 0.2% |
| **Inmate-on-inmate** | 29,300 | 11,900 | 2.0% | 1.6% | 0.1% | 0.1% |
| Nonconsensual sexual acts | 15,400 | 5,100 | 1.1 | 0.7 | 0.1 | 0.1 |
| Abusive sexual contacts only | 13,900 | 6,800 | 1.0 | 0.9 | 0.1 | 0.1 |
| **Staff sexual misconduct** | 34,100 | 13,200 | 2.4% | 1.8% | 0.2% | 0.1% |
| Unwilling activity | 21,500 | 10,000 | 1.5 | 1.4 | 0.1 | 0.1 |
| Excluding touching | 15,400 | 7,400 | 1.1 | 1.0 | 0.1 | 0.1 |
| Touching only | 5,600 | 2,500 | 0.4 | 0.3 | 0.1 | -- |
| Willing activity | 19,700 | 6,200 | 1.4 | 0.9 | 0.1 | 0.1 |
| Excluding touching | 17,000 | 5,200 | 1.2 | 0.7 | 0.1 | 0.1 |
| Touching only | 2,700 | 900 | 0.2 | 0.1 | -- | -- |

Note: Detail may not sum to total because inmates may report more than one type of victimization. They may also report victimization by both other inmates and staff.

--Less than 0.05%.

[a]Estimates of the number of victims nationwide are based on weighted data and rounded to the nearest 100.

[b]Standard errors may be used to construct confidence intervals around each estimate. See *Methodology* for calculations.

[c]See *Methodology* for terms and definitions.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

The NIS-3 screened for specific sexual activities in which inmates may have been involved during the past 12 months or since admission to the facility, if less than 12 months. Inmates were then asked if they were forced or pressured to engage in these activities by another inmate or staff. (See appendices 1, 2, and 3 for specific survey questions.) Reports of inmate-on-inmate sexual victimization were classified as either nonconsensual sexual acts or abusive sexual contacts. (See text box for *Terms and definitions*.)

Approximately 1.1% of prisoners and 0.7% of jail inmates said they were forced or pressured to have nonconsensual sex with another inmate, including manual stimulation and oral, anal, or vaginal penetration. An additional 1.0% of prison inmates and 0.9% of jail inmates said they had experienced one or more abusive sexual contacts only or unwanted touching of specific body parts in a sexual way by another inmate.

An estimated 1.5% of prison inmates and 1.4% of jail inmates reported that they had sex or sexual contact unwillingly with staff as a result of physical force, pressure, or offers of special favors or privileges. An estimated 1.4% of all prison inmates and 0.9% of jail inmates reported they willingly had sex or sexual contact with staff. Any sexual contact between inmates and staff is illegal, regardless of whether an inmate reported being willing or unwilling, but this difference between willing and unwilling may be informative when addressing issues of staff training, prevention, and investigation.

---

**Terms and definitions**

*Sexual victimization*—all types of sexual activity, e.g., oral, anal, or vaginal penetration; hand jobs; touching of the inmate's buttocks, thighs, penis, breasts, or vagina in a sexual way; abusive sexual contacts; and both willing and unwilling sexual activity with staff.

*Nonconsensual sexual acts*—unwanted contacts with another inmate or any contacts with staff that involved oral, anal, vaginal penetration, hand jobs, and other sexual acts.

*Abusive sexual contacts only*—unwanted contacts with another inmate or any contacts with staff that involved touching of the inmate's buttocks, thigh, penis, breasts, or vagina in a sexual way.

*Unwilling activity*—incidents of unwanted sexual contacts with another inmate or staff.

*Willing activity*—incidents of willing sexual contacts with staff. These contacts are characterized by the reporting inmates as willing; however, all sexual contacts between inmates and staff are legally nonconsensual.

*Staff sexual misconduct*—includes all incidents of willing and unwilling sexual contact with facility staff and all incidents of sexual activity that involved oral, anal, vaginal penetration, hand jobs, blow jobs, and other sexual acts with facility staff.

The NIS-3 recorded slightly lower rates of sexual victimization in prisons compared to the NIS-1 and NIS-2, which was largely driven by a decline in the reported rates of staff sexual misconduct (table 2). Overall, the rate of sexual victimization was 4.5% in 2007 and 4.0% in 2011-12, but the difference was not statistically significant. (See *Methodology* for discussion of significance testing and standard errors.) Staff sexual misconduct considered "willing" by the victims was the only rate to show a decline, from 1.8% in 2008-09 to 1.4% in 2011-12. This drop was limited to willing sexual activity, excluding touching. In addition, willing sexual activity with staff (excluding touching only) in 2011-12 was significantly different from 2007 (dropping from 1.5% to 1.2%).

Among jail inmates, the overall rates of sexual victimization remained unchanged (3.2% in 2007, 3.1% in 2008-09, and 3.2% in 2011-12). The rates of staff sexual misconduct in jails were 2.0% in 2007, 2.0% in 2008-09, and 1.8% in 2011-12, but this decline was not statistically significant. Jail inmates in 2011-12 were less likely to report experiencing willing sexual activity with staff (0.9%) than jail inmates in 2007 (1.1%) and 2008-09 (1.1%). This decline was limited to willing sexual activity, excluding touching.

### Facility-level rates

**The NIS-3 provides a basis for identifying high rate and low rate facilities**

As required under the Prison Rape Elimination Act, the NIS-3 provides facility-level estimates of inmate-on-inmate sexual victimization and staff sexual misconduct. Since these estimates are based on a sample of inmates rather than a complete enumeration, they are subject to sampling error. (See *Methodology* for description of sampling procedures.)

The precision of each of the facility-level estimates can be calculated based on the estimated standard error. Typically, a 95%-confidence interval around each survey estimate is calculated by multiplying the standard error by 1.96 and then adding and subtracting the result from the sample estimate to create an upper and lower bound. This interval expresses the range of values that could result among 95% of the different samples that could be drawn.

For small samples and estimates close to 0%, as is the case with facility-level estimates of sexual victimization by type of incident, the use of the standard error to construct the 95%-confidence interval may not be reliable. An alternative method developed by E. B. Wilson has been shown to perform better than the traditional method.[1,2]

[1]Brown, L.D., Cai, T., & DasGupta, A. (2001). "Interval Estimation for a Binomial Proportion." *Statistical Science*, 16(2), pp. 101–117.

[2]Wilson, E.B. (1927). "Probable Inference, the Law of Succession, and Statistical Inference." *Journal of the American Statistical Association*, 22(158), pp. 209–12.

## TABLE 2
**Prevalence of sexual victimization across inmate surveys, by type of incident, National Inmate Survey, 2007, 2008–09, and 2011–12**

| Type of incident | Percent of prison inmates | | | Percent of jail inmates | | |
|---|---|---|---|---|---|---|
| | NIS-1 2007 | NIS-2 2008–09 | NIS-3 2011–12* | NIS-1 2007 | NIS-2 2008–09 | NIS-3 2011–12* |
| **Total** | 4.5% | 4.4% | 4.0% | 3.2% | 3.1% | 3.2% |
| **Inmate-on-inmate** | 2.1% | 2.1% | 2.0% | 1.6% | 1.5% | 1.6% |
| Nonconsensual sexual acts | 1.3 | 1.0 | 1.1 | 0.7 | 0.8 | 0.7 |
| Abusive sexual contacts only | 0.8 | 1.0 | 1.0 | 0.9 | 0.7** | 0.9 |
| **Staff sexual misconduct** | 2.9% | 2.8% | 2.4% | 2.0% | 2.0% | 1.8% |
| Unwilling activity | 1.7 | 1.7 | 1.5 | 1.3 | 1.5 | 1.4 |
| Excluding touching | 1.3 | 1.3 | 1.1 | 1.1 | 1.1 | 1.0 |
| Touching only | 0.4 | 0.4 | 0.4 | 0.3 | 0.4 | 0.3 |
| Willing activity | 1.7 | 1.8** | 1.4 | 1.1** | 1.1** | 0.9 |
| Excluding touching | 1.5** | 1.5** | 1.2 | 0.9** | 0.9** | 0.7 |
| Touching only | 0.2 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 |

Note: Detail may not sum to total because inmates may report more than one type of victimization. They may also report victimization by both other inmates and staff. See appendix table 10 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level. (See *Methodology* for tests of significance.)

Source: Bureau of Justice Statistics, National Inmate Survey, 2007, 2008–09, and 2011–12.

This method provides asymmetrical confidence intervals for facilities in which the lower bound is constrained to be no less than 0%. It also provides confidence intervals for facilities in which the survey estimates are 0% (but other similarly conducted samples could yield non-zero estimates).

Although the NIS-3 provides facility-level estimates and measures of precision, it cannot provide an exact ranking for all facilities as required under PREA. Rates of inmate-on-inmate sexual victimization and staff sexual misconduct differ across facilities, but the observed differences are not always statistically significant. To address PREA requirements, facilities have been categorized as having high rates or low rates based on criteria applied to the lower and upper bounds of the 95%-confidence interval for each facility (**figure 1** and **figure 2**).

As with the NIS-2, the criterion that the lower bound of the confidence interval be at least 55% higher than the average rate for comparable facilities was used in the NIS-3 to identify high-rate male prisons, female prisons, and jails. The criterion that the upper bound of the confidence interval be lower than 65% of the average rate for comparable facilities was used to identify low-rate facilities.

To better identify variations among correctional facilities in rates of sexual victimization, prisons and jails are compared separately by type of sexual victimization. Though informative, an analysis of a single, overall prevalence rate of sexual victimization for each sampled facility would confound differing risk factors, circumstances, and underlying causes of victimization. For the same reasons, prisons are compared separately by the sex of inmates housed.

**FIGURE 1**

**Confidence intervals at the 95% level for prisons with high rates of inmate-on-inmate sexual victimization, National Inmate Survey, 2011–12**



*Facility housed only female inmates.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**FIGURE 2**

**Confidence intervals at the 95% level for jails with high rates of inmate-on-inmate sexual victimization, National Inmate Survey, 2011–12**



*Facility housed only female inmates.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

The NIS-3 sample was designed to ensure a sufficient number of female-only prison facilities (44 facilities participated) and a sufficient number of female respondents (7,141 completed the survey) to allow for valid comparisons among female prisons. Four of the 358 jails that participated in the NIS-3 housed females only and one other jail was majority female. As a result, rates of sexual victimization in jails could not be compared separately by sex of inmates housed.

**11 male prisons, 1 female prison, and 9 jails were identified as having high rates of inmate-on-inmate sexual victimization in 2011–12**

Among the 233 prisons and 358 jails surveyed in the NIS-3, 11 male prisons, 1 female prison, and 9 jails were designated as high-rate facilities based on reports of inmate-on-inmate sexual

victimization (table 3). Each of these facilities had a rate of inmate-on-inmate sexual victimization that was at least twice the national rate of 1.7% for male prisons, 7.2% for female prisons, and 1.6% for jails. Each had a 95%-confidence interval with a lower bound that was at least 55% higher than the average rate among comparable facilities.

Among male prisons, Northwest Florida Reception Center (Florida), Idaho Maximum Security Institution, and Montana State Prison recorded inmate-on-inmate sexual victimization rates of 9.0% or greater. Mabel Bassett Correctional Center (Oklahoma), with a rate of 15.3%, was the only female prison that could be classified as high rate.  Eleven other female-only prison facilities had rates of 10% or greater but did not meet the requirement of a lower bound that was 55% higher than the average rate for all female prisons. (See appendix table 2.)

**TABLE 3**
**Facilities with high rates of inmate-on-inmate sexual victimization, by type of facility, National Inmate Survey, 2011–12**

| Facility name | Number of respondents[b] | Response rate | Any inmate-on-inmate incident[a] | | |
|---|---|---|---|---|---|
| | | | Percent[c] | 95%-confidence interval | |
| | | | | Lower bound | Upper bound |
| **All prisons** | 38,251 | 60.0% | 2.0% | 1.8% | 2.3% |
| **Male facilities** | 31,110 | 59.0% | 1.7% | 1.5% | 2.0% |
| Northwest Florida Reception Ctr. (FL) | 131 | 49.0 | 9.8 | 5.8 | 16.1 |
| Idaho Max. Security Inst. (ID) | 78 | 39.0 | 9.4 | 3.9 | 21.0 |
| Montana State Prison (MT) | 191 | 65.0 | 9.0 | 4.6 | 16.8 |
| Montford Psychiatric Fac. (TX) | 166 | 70.0 | 8.4 | 5.2 | 13.1 |
| Stiles Unit (TX) | 151 | 49.0 | 7.8 | 4.3 | 13.8 |
| Southern State Corr. Fac. (VT) | 109 | 55.0 | 7.7 | 3.9 | 14.6 |
| Apalachee Corr. Inst./West/ East Unit/ River Junction (FL) | 161 | 57.0 | 7.3 | 4.3 | 12.1 |
| Clements Unit (TX) | 141 | 44.0 | 6.8 | 3.8 | 11.7 |
| Maine Corr. Ctr. (ME) | 192 | 80.0 | 6.1 | 3.6 | 10.2 |
| Farmington Corr. Fac. (MO) | 240 | 84.0 | 5.8 | 3.6 | 9.3 |
| Utah State Prison (UT) | 233 | 73.0 | 5.6 | 3.2 | 9.5 |
| **Female facilities** | 7,141 | 69.0% | 7.2% | 5.9% | 8.6% |
| Mabel Bassett Corr. Ctr. (OK)[d] | 192 | 70.0 | 15.3 | 11.3 | 20.6 |
| **All jails** | 52,926 | 61.0% | 1.6% | 1.4% | 1.9% |
| Ripley Co. Jail (IN) | 51 | 89.0 | 7.9 | 5.1 | 11.9 |
| Philadelphia City Riverside Corr. Fac. (PA)[d] | 194 | 58.0 | 6.7 | 4.2 | 10.7 |
| Harris Co. Jail - 1200 Baker Street Jail (TX) | 238 | 58.0 | 6.3 | 3.4 | 11.2 |
| Eastern Regional Jail (WV) | 130 | 51.0 | 6.0 | 3.3 | 10.6 |
| Cook Co. - Division 11 (IL) | 272 | 76.0 | 5.5 | 3.5 | 8.4 |
| New York City Rose M. Singer Ctr. (NY)[d] | 202 | 63.0 | 5.0 | 2.9 | 8.4 |
| Los Angeles Co. - Twin Towers Corr. Fac. (CA) | 199 | 44.0 | 4.9 | 2.6 | 9.1 |
| Western Regional Jail (WV) | 215 | 68.0 | 4.8 | 3.0 | 7.7 |
| Schenectady Co. Jail (NY) | 162 | 68.0 | 4.4 | 2.7 | 7.0 |

Note: High-rate facilities are those in which the lower bound of the 95%-confidence interval is larger than 1.55 times the average among prisons by sex of inmates housed, and 1.55 times the average among all jail facilities.

[a]Weighted percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Number of inmates who responded to the sexual victimization survey.

[c]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on selected characteristics, including age, sex, race, sentence length, and time since admission.

[d]Facility housed only female inmates.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Ripley County Jail (Indiana) recorded an inmate-on-inmate sexual victimization rate of 7.9% and Philadelphia City Riverside Correctional Facility (Pennsylvania), a female-only jail facility, recorded a rate of 6.7%, both of which were more than four times the average rate among jails nationwide. Two other jails—Harris County Jail, Baker Street (Texas) and Eastern Regional Jail (Martinsburg, West Virginia)—each had rates of 6% or greater.

**8 male prisons, 4 female prisons, and 12 jails were identified as having high rates of staff sexual misconduct**

Twelve prisons were identified as high-rate facilities based on reports of staff sexual misconduct—eight male prisons and four female prisons **(table 4)**. Twelve jails were also

identified as high-rate facilities. Each had a confidence interval with a lower bound that was at least 55% higher than the national rate for male prisons (2.4%), female prisons (2.4%), and jails (1.8%) **(figure 3 and figure 4)**.

In five state prisons, at least 9% of surveyed inmates reported being the victims of staff sexual misconduct, including 10.1% of inmates in Santa Rosa Correctional Institution (Florida), 9.9% in Montana State Prison, 9.6% in Walnut Grove Youth Correctional Facility (Mississippi), 9.5% in Clements Unit (Texas), and 10.7% in Denver Women's Correctional Facility (Colorado).

**TABLE 4**
**Facilities with high rates of staff sexual misconduct, by type of facility, National Inmate Survey, 2011–12**

| Facility name | Number of respondents[b] | Response rate | Any staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | | | | 95%-confidence interval | |
| | | | Percent[c] | Lower bound | Upper bound |
| **All prisons** | 38,251 | 60.0% | 2.4% | 2.0% | 2.8% |
| **Male facilities** | 31,110 | 59.0% | 2.4% | 2.0% | 2.9% |
| Santa Rosa Corr. Inst. (FL) | 185 | 60.0 | 10.1 | 6.5 | 15.5 |
| Montana State Prison (MT) | 191 | 65.0 | 9.9 | 5.3 | 17.7 |
| Walnut Grove Youth Corr. Fac. (MS) | 249 | 92.0 | 9.6 | 6.9 | 13.2 |
| Clements Unit (TX) | 141 | 44.0 | 9.5 | 5.7 | 15.3 |
| Apalachee Corr. Inst./West/ East Unit/ River Junction (FL) | 161 | 57.0 | 6.8 | 3.7 | 12.2 |
| Coffield Unit (TX) | 210 | 66.0 | 6.8 | 4.1 | 11.1 |
| Wilkinson Co. Corr. Ctr. - CCA (MS) | 173 | 67.0 | 6.4 | 3.8 | 10.6 |
| Louisiana State Penitentiary (LA) | 219 | 70.0 | 6.3 | 3.9 | 10.1 |
| **Female facilities** | 7,141 | 69.0% | 2.4% | 1.9% | 3.0% |
| Denver Women's Corr. Fac. (CO)[d] | 160 | 68.0 | 10.7 | 6.8 | 16.3 |
| Broward Corr. Inst. (FL)[d] | 154 | 64.0 | 7.3 | 3.9 | 13.3 |
| Delores J. Baylor Women's Corr. Inst. (DE)[d] | 165 | 83.0 | 7.0 | 4.6 | 10.3 |
| Julia Tutwiler Prison (AL)[d] | 181 | 68.0 | 6.8 | 4.1 | 10.9 |
| **All jails** | 52,926 | 61.0% | 1.8% | 1.7% | 2.0% |
| Marion Co. Jail Intake Fac. (IN) | 62 | 43.0 | 7.7 | 3.4 | 16.3 |
| Baltimore City Det. Ctr. (MD) | 261 | 66.0 | 6.7 | 4.3 | 10.2 |
| St. Louis Med. Security Inst. (MO) | 220 | 58.0 | 6.3 | 3.9 | 10.0 |
| Philadelphia City Industrial Corr. Ctr. (PA) | 207 | 69.0 | 6.3 | 3.9 | 10.0 |
| Santa Clara Co. Main Jail (CA) | 130 | 37.0 | 6.2 | 3.0 | 12.5 |
| Ulster Co. Law Enforcement Ctr. (NY) | 153 | 68.0 | 6.1 | 3.6 | 10.2 |
| Houston Co. Jail (GA) | 174 | 71.0 | 6.0 | 3.7 | 9.6 |
| Contra Costa Co. Martinez Det. Fac. (CA) | 143 | 42.0 | 5.9 | 3.2 | 10.4 |
| Oakland Co. Law Enforcement Complex (MI) | 148 | 49.0 | 5.9 | 3.0 | 11.1 |
| New York City Rose M. Singer Ctr. (NY)[d] | 202 | 63.0 | 5.9 | 3.7 | 9.4 |
| New York City Otis Bantum Corr. Ctr. (NY) | 170 | 44.0 | 5.6 | 2.9 | 10.5 |
| Robeson Co. Jail (NC) | 147 | 52.0 | 5.2 | 3.0 | 8.7 |

Note: High-rate facilities are those in which the lower bound of the 95%-confidence interval is larger than 1.55 times the average among prisons by sex of inmates housed, and 1.55 times the average among all jail facilities.

[a]Weighted percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Number of inmates who responded to the sexual victimization survey.

[c]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on selected characteristics, including age, sex, race, sentence length, and time since admission.

[d]Facility housed only female inmates.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Seven jails had staff sexual misconduct rates of at least 6%. Marion County Jail Intake Facility (Indiana) had the highest reported rate of staff sexual misconduct (7.7%), followed by Baltimore City Detention Center (Maryland) (6.7%), St. Louis Medium Security Institution (Missouri) (6.3%), and Philadelphia City Industrial Correctional Center (Pennsylvania) (6.3%).

The reported use or threat of physical force to engage in sexual activity with staff was generally low among all prison and jail inmates (0.8%); however, at least 5% of the inmates in three state prisons and one high-rate jail facility reported they had been physically forced or threatened with force. (See appendix tables 3 and 7.) The Clements Unit (Texas) had the highest percentage of inmates reporting sexual victimization involving physical force or threat of force by staff (8.1%), followed by Denver Women's Correctional Facility (Colorado) (7.3%), and Idaho Maximum Security

Institution (6.0%). Wilson County Jail (Kansas) led all surveyed jails, with 5.6% of inmates reporting that staff used physical force or threat of force to have sex or sexual contact.

While 0.8% of prison and jail inmates reported the use or threat of physical force, an estimated 1.4% of prison inmates and 1.2% of jail inmates reported being coerced by facility staff without any use or threat of force, including being pressured or made to feel they had to have sex or sexual contact. In 8 of the 24 facilities with high rates of staff sexual misconduct, at least 5% of the inmates reported such pressure by staff. Among state prisoners, the highest rates were reported by female inmates in the Denver Women's Correctional Facility (Colorado) (8.8%) and by male inmates in the Clements Unit (Texas) (8.7%). Among jail inmates, the highest rates were reported by inmates in the Rose M. Singer Center (New York) (5.6%) and the Contra Costa County Martinez Detention Facility (California) (5.2%).

**FIGURE 3**
**Confidence intervals at the 95% level for prisons with high rates of staff sexual misconduct, National Inmate Survey, 2011–12**



*Facility housed only female inmates.
Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**FIGURE 4**
**Confidence intervals at the 95% level for jails with high rates of staff sexual misconduct, National Inmate Survey, 2011–12**



*Facility housed only female inmates.
Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**7 male prisons, 6 female prisons, and 4 jails were identified as low-rate facilities for sexual victimization overall**

Thirteen prisons and 34 jails had no reported incidents of sexual victimization of any kind. (See appendix tables 1 and 5.) Estimates of the number of inmates who experienced a sexual victimization in each of these facilities are also subject to sampling error and could vary if a different group of inmates had been interviewed. Although the lower bound of the 95%-confidence interval in each of these facilities is 0%, the upper bound varies depending on the number of completed interviews in each facility.

Combining reports of inmate-on-inmate sexual victimization and staff sexual misconduct, seven male prisons and six female prisons were designated as low-rate facilities. These designations were based on their low rate of sexual victimization overall and the upper bound of their 95%-confidence interval that was less than 65% of the average rate among male and female prisons (table 5). Six of these facilities had no reported incidents of sexual victimization, while seven facilities had at least one inmate who reported sexual victimization.

Danville Correctional Center (Illinois), with a reported sexual victimization rate of 0.5%, had a confidence interval with the lowest upper bound (1.8%) among male prisons. FCI Marianna Camp (operated in Florida by the Federal Bureau of Prisons), with a reported sexual victimization rate of 0.6%, had a confidence interval with the lowest upper bound (2.1%) among female prisons.

Four jails were designated as low-rate facilities based on the upper bound of the 95%-confidence interval that was less than 65% of the average for jails nationwide. Woodford County Detention Center (Kentucky), with a 0.1% overall sexual victimization rate, had a confidence interval with the lowest upper bound (0.6%).

**TABLE 5**
**Facilities with low rates of sexual victimization, by type of facility, National Inmate Survey, 2011–12**

| Facility name | Number of respondents[b] | Response rate | Inmates reporting any sexual victimization[a] | | |
|---|---|---|---|---|---|
| | | | | 95%-confidence interval | |
| | | | Percent[c] | Lower bound | Upper bound |
| **All prisons** | 38,251 | 60.0% | 4.0% | 3.6% | 4.5% |
| **Male prisons** | 31,110 | 59.0% | 3.7% | 3.2% | 4.3% |
| Danville Corr. Ctr. (IL) | 205 | 70.0 | 0.5 | 0.2 | 1.8 |
| Lawtey Corr. Inst. (FL) | 198 | 80.0 | 0.0 | 0.0 | 1.9 |
| CI Eden (TX)[d] | 185 | 67.0 | 0.0 | 0.0 | 2.0 |
| CI Reeves III (TX) [d] | 188 | 69.0 | 0.4 | 0.1 | 2.0 |
| CI Reeves I and II (TX) [d] | 180 | 64.0 | 0.0 | 0.0 | 2.1 |
| Jackie Brannon Corr. Ctr. (OK) | 179 | 72.0 | 0.5 | 0.1 | 2.3 |
| La Palma Corr. Ctr. (AZ) [d] | 163 | 45.0 | 0.0 | 0.0 | 2.3 |
| **Female prisons** | 7,141 | 69.0% | 8.5% | 7.2% | 10.0% |
| FCI Marianna Camp (FL) | 172 | 88.0 | 0.6 | 0.2 | 2.1 |
| FMC Lexington Camp (KY) | 148 | 83.0 | 0.8 | 0.2 | 2.7 |
| Decatur Corr. Ctr. (IL) | 157 | 65.0 | 1.1 | 0.3 | 3.3 |
| Brunswick Women's Reception and Pre-Release Ctr. (VA) | 95 | 86.0 | 0.0 | 0.0 | 3.9 |
| Woodman State Jail (TX) | 139 | 57.0 | 1.3 | 0.4 | 4.3 |
| Mary Frances Ctr. (NC) | 68 | 85.0 | 0.0 | 0.0 | 5.3 |
| **All jails** | 52,926 | 61.0% | 3.2% | 2.9% | 3.5% |
| Woodford Co. Det. Ctr. (KY) | 34 | 51.0 | 0.1 | 0.0 | 0.6 |
| Cameron Co. Carrizales-Rucker Det. Ctr. (TX) | 262 | 72.0 | 0.3 | 0.1 | 1.6 |
| Jefferson Co. Jail (CO) | 205 | 62.0 | 0.0 | 0.0 | 1.8 |
| Sarasota North Co. Jail (FL) | 203 | 65.0 | 0.0 | 0.0 | 1.9 |

Note: Low-rate facilities are those in which the upper bound of the 95%-confidence interval is lower than 0.65 times the average among prisons by sex of inmates housed, and 0.65 times the average among all jail facilities.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Number of inmates who responded to the sexual victimization survey.

[c]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on selected characteristics, including age, sex, race, time since admission, and sentence length.

[d]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**In 2011-12, two military facilities and one Indian country jail had high rates of staff sexual misconduct**

The NIS-3 also surveyed 15 special confinement facilities, including 5 ICE facilities, 5 military facilities, and 5 Indian country jails. (See *Methodology* for sample description.) As a result of too few completed interviews, rates in two Indian country facilities—Hualapai Adult Detention Center (Arizona) and Standing Rock Law Enforcement and Adult Detention Center (North Dakota)—could not be provided.

Among ICE facilities, sexual victimization rates were highest in the Krome North Service Processing Center (Florida), in which 3.2% of detainees reported experiencing sexual victimization by another detainee and 3.0% reported experiencing staff sexual misconduct **(table 6)**. Overall, an estimated 3.8% of detainees in this ICE facility reported experiencing one or more incidents of sexual victimization, which was somewhat lower than the 4.0% average in prisons nationwide and slightly higher than the 3.2% average in jails nationwide. (See appendix table 9.)

The Northwest Joint Regional Correctional Facility (Washington), which is operated by the U.S. Army Corrections Command and holds pretrial offenders and short-term post-trial offenders, had a staff sexual misconduct rate (6.6%) that was more than double the average rate for prisons (2.4%) and jails (1.8%) nationwide. Inmates held at this military facility also reported a high rate of inmate-on-inmate sexual victimization (5.1%), which was also more than double the 2.0% average among prisons and 1.6% average among jails nationwide.

Inmates at the Naval Consolidated Brig Mirimar (California) reported high rates of staff sexual misconduct (4.9%) and inmate-on-inmate sexual victimization (3.0%). This facility, which is operated by the U.S. Navy, holds male inmates sentenced to terms of 10 years or less and female inmates regardless of sentence length from all military services.

Among all facilities sampled, staff sexual misconduct was highest in the Oglala Sioux Tribal Offenders Facility (South Dakota) (10.8%). Based on the 6.2% lower bound of the 95%-confidence interval, the rate of staff sexual misconduct in this Indian country facility was statistically higher than the rate reported for any jail nationwide. This facility, with a peak population of 147 in June 2011, was the most crowded facility among the 80 Indian jails in operation at midyear 2011. (See *Jails in Indian Country, 2011,* NCJ 238978.)

**TABLE 6**
**Rates of sexual victimization in special correctional facilities, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Number of completed interviews | Any inmate-on-inmate incident | | | Any staff sexual misconduct | | |
|---|---|---|---|---|---|---|---|
| | | | 95%-confidence interval | | | 95%-confidence interval | |
| | | Percent[a] | Lower bound | Upper bound | Percent[a] | Lower bound | Upper bound |
| **Immigration and Customs Enforcement facilities** | | | | | | | |
| El Centro SPC (CA) | 115 | 0.0% | 0.0% | 3.2% | 0.8% | 0.2% | 3.4% |
| Jena/LaSalle Det. Fac. (LA)[b] | 97 | 0.0 | 0.0 | 3.8 | 1.1 | 0.2 | 5.4 |
| Krome North SPC (FL) | 60 | 3.2 | 0.8 | 11.7 | 3.0 | 0.7 | 11.6 |
| Otero Co. Processing Ctr. (NM) | 140 | 1.7 | 0.6 | 4.4 | 0.5 | 0.1 | 2.4 |
| Port Isabel Processing Ctr. (TX) | 161 | 2.3 | 1.0 | 5.6 | 0.0 | 0.0 | 2.3 |
| **Military facilities** | | | | | | | |
| Midwest Joint Regional Corr. Fac., Fort Leavenworth (KS) | 82 | 1.0% | 0.3% | 3.6% | 3.0% | 1.3% | 6.7% |
| Naval Consolidated Brig, Charleston (SC) | 94 | 2.9 | 1.6 | 5.3 | 2.4 | 1.1 | 5.1 |
| Naval Consolidated Brig, Miramar (CA)[c] | 121 | 3.0 | 1.5 | 6.0 | 4.9 | 2.5 | 9.4 |
| Northwest Joint Regional Corr. Fac. (WA) | 85 | 5.1 | 1.9 | 13.0 | 6.6 | 2.9 | 14.1 |
| United States Disciplinary Barracks, Fort Leavenworth (KS) | 157 | 2.1 | 0.9 | 5.1 | 1.1 | 0.4 | 3.2 |
| **Indian country jails** | | | | | | | |
| Hualapai Adult Det. Ctr. (AZ)[b] | 7 | ^ | ^ | ^ | ^ | ^ | ^ |
| Laguna Det. Ctr. (NM)[b] | 26 | 0.0% | 0.0% | 12.9% | 0.0% | 0.0% | 12.9% |
| Oglala Sioux Tribal Offenders Fac. (SD)[b] | 56 | 1.8 | 0.5 | 6.4 | 10.8 | 6.2 | 17.9 |
| San Carlos Dept. of Corr. and Rehabilitation - Adult and Juvenile Det. (AZ)[b] | 64 | 0.0 | 0.0 | 5.7 | 1.6 | 0.6 | 4.2 |
| Standing Rock Law Enforcement and Adult Det. Ctr. (ND)[b] | 7 | ^ | ^ | ^ | ^ | ^ | ^ |

^Too few cases to provide reliable estimate.

[a]Weighted percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Facility housed both males and females; both were sampled at this facility.

[c]Facility housed both males and females; only males were sampled at this facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

## Demographic and other characteristics

**Overweight and obese prison inmates had lower rates of inmate-on-inmate sexual victimization and staff misconduct than inmates who were at or below a normal weight**

Variations in reported sexual victimization rates across inmate demographic categories in the NIS-3 were consistent with past surveys:

- Rates of inmate-on-inmate sexual victimization among prison inmates were higher among females (6.9%) than males (1.7%), higher among whites (2.9%) or inmates of two or more races (4.0%) than among blacks (1.3%), higher among inmates with a college degree (2.7%) than among inmates who had not completed high school (1.9%), and lower among currently married inmates (1.4%) than among inmates who never married (2.1%) (table 7).

**TABLE 7**
**Prevalence of sexual victimization, by type of incident and inmate characteristics, National Inmate Survey, 2011–12**

| Characteristic | Prison inmates reporting sexual victimization[a] | | | Jail inmates reporting sexual victimization[a] | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of inmates[b] | Inmate-on-inmate | Staff sexual misconduct | Number of inmates[b] | Inmate-on-inmate | Staff sexual misconduct |
| **Sex** | | | | | | |
| Male* | 1,345,200 | 1.7% | 2.4% | 628,600 | 1.4% | 1.9% |
| Female | 96,600 | 6.9%** | 2.3 | 91,600 | 3.6%** | 1.4%** |
| **Race/Hispanic origin** | | | | | | |
| White[c] | 430,000 | 2.9%** | 1.6%** | 240,500 | 2.0%** | 1.4%** |
| Black[c*] | 507,900 | 1.3 | 2.6 | 239,200 | 1.1 | 2.1 |
| Hispanic | 339,800 | 1.6 | 2.2 | 159,300 | 1.5 | 1.5** |
| Other[c,d] | 38,200 | 1.7 | 2.6 | 18,900 | 1.2 | 1.8 |
| Two or more races[c] | 108,300 | 4.0** | 3.9** | 54,300 | 3.0** | 3.2** |
| **Age** | | | | | | |
| 18–19 | 18,500 | 1.6% | 2.4% | 40,000 | 1.9% | 2.6% |
| 20–24* | 162,500 | 2.2 | 3.5 | 145,800 | 2.0 | 2.4 |
| 25–34 | 457,100 | 2.3 | 2.9 | 250,700 | 1.9 | 2.2 |
| 35–44 | 398,200 | 2.0 | 2.3** | 150,900 | 1.4** | 1.5** |
| 45–54 | 281,400 | 2.0 | 1.7** | 102,800 | 1.1** | 0.9** |
| 55 or older | 124,000 | 1.1** | 0.8** | 30,000 | 1.3 | 0.3** |
| **Education** | | | | | | |
| Less than high school* | 813,300 | 1.9% | 2.4% | 379,700 | 1.4% | 1.8% |
| High school graduate | 293,900 | 1.7 | 2.3 | 168,700 | 1.4 | 1.7 |
| Some college[e] | 231,100 | 2.7** | 1.8 | 120,700 | 2.3** | 1.9 |
| College degree or more | 98,700 | 2.7** | 2.4 | 47,200 | 3.0** | 2.7** |
| **Marital status** | | | | | | |
| Married* | 265,600 | 1.4% | 1.9% | 134,800 | 1.1% | 1.8% |
| Widowed, divorced, or separated | 390,500 | 1.9 | 1.6 | 165,800 | 1.9** | 1.7 |
| Never married | 741,200 | 2.1** | 2.5 | 410,800 | 1.7** | 1.8 |
| **Body Mass Index** | | | | | | |
| Underweight | 12,500 | 3.2% | 3.6% | 9,800 | 3.5%** | 2.0% |
| Normal* | 357,000 | 2.7 | 2.7 | 267,000 | 1.6 | 1.8 |
| Overweight | 632,200 | 1.4** | 2.0** | 272,200 | 1.5 | 1.7 |
| Obese | 348,700 | 1.8** | 1.8** | 133,000 | 1.7 | 1.9 |
| Morbidly obese | 32,700 | 2.7 | 3.7 | 14,400 | 3.0** | 2.6 |

Note: See appendix table 11 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 and yearend 2011 in prisons and jails represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

[c]Excludes persons of Hispanic or Latino origin.

[d]Includes American Indian, Alaska Native, Asian, Native Hawaiian, and other Pacific Islander.

[e]Includes persons with an associate degree.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

- Similar patterns of inmate-on-inmate sexual victimization were reported by jail inmates. Female jail inmates (3.6%), whites (2.0%), and inmates with a college degree (3.0%) reported higher rates of victimization than males (1.4%), blacks (1.1%), and inmates who had not completed high school (1.4%).

- Rates of inmate-on-inmate sexual victimization were unrelated to age among state and federal prisoners, except for slightly lower rates among inmates age 55 or older.

- Rates were lower among jail inmates in the oldest age categories (ages 35 to 44, 45 to 54, and 55 or older) than among jail inmates ages 20 to 24.

- Patterns of staff sexual misconduct were different, with higher rates among males in jails (1.9%) than among females in jails (1.4%), and higher among black inmates in prisons (2.6%) and jails (2.1%) than among white inmates in prisons (1.6%) and jails (1.4%).

- In both prisons and jails, rates of reported staff misconduct were lower among inmates in the oldest age categories (ages 35 to 44, 45 to 54, and 55 or older), compared to inmates in the 20 to 24 age category.

With a new survey question on the inmate's specific height in combination with a question on the inmate's weight, the NIS-3 provides the first opportunity to determine if rates of sexual victimization vary based on an inmate's Body Mass Index (BMI). Among state and federal prison inmates, obese inmates (with a BMI of 30 to 39) and overweight inmates (with a BMI of 25 to 30) had lower rates of inmate-on-inmate sexual victimization and staff sexual misconduct than inmates with a normal weight (with a BMI of 18.5 to 24) or who were underweight (a BMI of less than 18.5). (See *Methodology* for calculation of BMI.)

Among jail inmates, those underweight (3.5%) and those morbidly obese (BMI of 40 or greater) (3.0%) have nearly double the rate of inmate-on-inmate sexual victimization than inmates in other categories (1.6%, normal weight; 1.5%, overweight; and 1.7%, obese). There are no statistically significant variations in reported staff sexual misconduct among jail inmates across BMI categories.

### Large differences in sexual victimization were found among inmates based on their sexual orientation and past sexual experiences

Inmates who identified their sexual orientation as gay, lesbian, bisexual, or other reported high rates of inmate-on-inmate sexual victimization and staff sexual misconduct:

- Among heterosexual state and federal prisoners, an estimated 1.2% reported being sexually victimized by another inmate, and 2.1% reported being victimized by staff. In comparison, among non-heterosexual prison inmates (including gay, lesbian, bisexual, and other sexual orientations), 12.2% reported being sexually victimized by another inmate, and 5.4% reported being sexually victimized by staff **(table 8)**.

### TABLE 8
**Prevalence of sexual victimization, by type of incident and inmate sexual characteristics, National Inmate Survey, 2011–12**

| | Prison inmates reporting sexual victimization[a] | | | Jail inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| Sexual characteristic | Number of inmates[b] | Inmate-on-inmate | Staff sexual misconduct | Number of inmates[b] | Inmate-on-inmate | Staff sexual misconduct |
| **Sexual orientation** | | | | | | |
| Heterosexual* | 1,298,000 | 1.2% | 2.1% | 654,500 | 1.2% | 1.7% |
| Non-heterosexual[c] | 111,500 | 12.2%** | 5.4%** | 50,100 | 8.5%** | 4.3%** |
| **Number of sexual partners** | | | | | | |
| 0–1* | 227,500 | 1.1% | 1.2% | 106,900 | 1.5% | 1.1% |
| 2–4 | 173,300 | 2.3%** | 1.6 | 99,900 | 1.7 | 1.4 |
| 5–10 | 242,200 | 2.1%** | 1.5 | 127,800 | 1.6 | 1.2 |
| 11–20 | 218,500 | 2.5%** | 2.9%** | 117,100 | 1.8 | 1.6 |
| 21 or more | 491,700 | 1.9%** | 2.8%** | 234,600 | 1.8 | 2.9%** |
| **Prior sexual victimization** | | | | | | |
| Yes | 178,800 | 12.0%** | 6.7%** | 94,200 | 8.3%** | 5.1%** |
| No* | 1,262,500 | 0.6 | 1.8 | 625,800 | 0.6 | 1.3 |

Note: See appendix table 12 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 and yearend 2011 in prisons and jails represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

[c]Includes gay, lesbian, bisexual, and other sexual orientations.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

- Among jail inmates, heterosexual inmates reported lower rates of inmate-on-inmate sexual victimization (1.2%) and staff sexual misconduct (1.7%) than non-heterosexual inmates (8.5% for inmate-on-inmate and 4.3% for staff sexual misconduct).

- Inmates who experienced sexual victimization before coming to the facility were also more likely than inmates with no sexual victimization history to report incidents of sexual victimization involving other inmates and staff. Among inmates who experienced sexual victimization before coming to the facility, 12.0% of prisoners and 8.3% of jail inmates reported being sexually victimized

by another inmate at the current facility. An estimated 6.7% of prisoners and 5.1% of jail inmates who experienced sexual victimization before coming to the facility reported sexual victimization by staff.

**In 2011-12, inmates held for a violent sexual offense reported higher rates of inmate-on-inmate sexual victimization than inmates held for other offenses**

An estimated 3.7% of violent sex offenders in prison and 3.9% of violent sex offenders in jail reported being sexually victimized by another inmate in the last 12 months or since admission to the facility, if less than 12 months (table 9).

---

**TABLE 9**

**Prevalence of sexual victimization, by type of incident and inmate criminal justice status and history, National Inmate Survey, 2011–12**

| Criminal justice status and history | Prison inmates reporting sexual victimization[a] | | | Jail inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | Number of prison inmates[b] | Inmate-on-inmate | Staff sexual misconduct | Number of jail inmates[b] | Inmate-on-inmate | Staff sexual misconduct |
| **Most serious offense** | | | | | | |
| Violent sexual offense* | 211,300 | 3.7% | 2.1% | 34,300 | 3.9% | 2.0% |
| Other violent | 440,900 | 2.3** | 3.4** | 113,700 | 2.3** | 3.3** |
| Property | 244,100 | 2.4** | 2.6 | 165,400 | 1.9** | 1.7 |
| Drug | 310,300 | 0.7** | 1.1** | 153,900 | 1.1** | 1.4 |
| Other | 162,900 | 1.7** | 2.1 | 190,300 | 1.2** | 1.6 |
| **Sentence length** | | | | | | |
| Less than 1 year | 53,400 | 1.5% | 1.6% | : | : | : |
| 1–4 years* | 350,400 | 1.8 | 1.3 | : | : | : |
| 5–9 years | 311,100 | 1.6 | 2.2** | : | : | : |
| 10–19 years | 296,900 | 1.8 | 2.3** | : | : | : |
| 20 years or more | 239,300 | 2.2 | 2.5** | : | : | : |
| Life/death | 139,600 | 2.7** | 3.2** | : | : | : |
| **Time in a correctional facility prior to current facility** | | | | | | |
| None | 296,400 | 1.8% | 1.5% | 204,500 | 1.9% | 1.5% |
| Less than 6 months | 161,400 | 2.3 | 1.7 | 135,500 | 1.7 | 1.3 |
| 6–11 months | 131,200 | 1.7 | 2.1 | 69,200 | 1.5 | 1.9 |
| 1–4 years | 384,900 | 1.6 | 1.8 | 171,700 | 1.4** | 2.1** |
| 5 years or more | 423,500 | 2.2 | 3.0** | 129,700 | 1.6 | 2.5** |
| **Number of times arrested** | | | | | | |
| 1 time* | 217,600 | 2.0% | 1.7% | 78,800 | 2.1% | 1.3% |
| 2–3 | 427,200 | 2.0 | 2.2 | 197,800 | 1.7 | 1.6 |
| 4–10 | 495,400 | 1.8 | 2.0 | 265,900 | 1.5 | 1.9** |
| 11 or more | 253,200 | 2.0 | 2.8** | 164,400 | 1.5 | 2.3** |
| **Time since admission** | | | | | | |
| Less than 1 month* | 79,600 | 1.4% | 0.8% | 226,800 | 0.9% | 1.2% |
| 1–5 months | 367,500 | 1.6 | 1.7** | 341,100 | 1.7** | 1.8** |
| 6–11 months | 263,200 | 2.2 | 2.6** | 92,500 | 2.7** | 2.5** |
| 1–4 years | 558,100 | 2.1 | 2.5** | 58,000 | 2.6** | 3.3** |
| 5 years or more | 172,400 | 2.9** | 3.4** | 1,600 | 2.1 | 3.2 |

Note: See appendix table 13 for standard errors.

: Not calculated.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 and yearend 2011 in prisons and jails represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

These rates were higher than those reported by inmates held for other offenses. Among state and federal prisoners, rates of inmate-on-inmate sexual victimization were—

- higher among prison inmates serving a sentence of life or death (2.7%) than among inmates serving a sentence of 1 to 4 years (1.8%).

- higher among prison inmates who had been at their current facility for 5 years or more (2.9%) than among inmates who had been admitted in the last month (1.4%).

Among jail inmates, the rate of inmate-on-inmate sexual victimization increased with the length of time served in the current facility, rising from 0.9% among inmates who had been at the facility for less than a month to 1.7% among inmates in jail for 1 to 5 months, 2.7% among inmates in jail for 6 to 11 months, and 2.6% among those in jail for 1 to 4 years.

### Rates of staff sexual misconduct varied among inmates based on their criminal justice status and history

- Among state and federal prisoners, inmates with a long sentence, inmates who had served 5 years or more in prison prior to coming to the current facility, and inmates who had served 5 years or more at the current facility were more likely to report experiencing staff sexual misconduct than inmates with a sentence of 1 to 4 years, inmates who had not served any prior time, and inmates who had been admitted in the last month.

- Among jail inmates, the rate of reported staff sexual misconduct increased with time served in the current facility and was higher among inmates who had previously served time in a correctional facility for 1 year or more.

These variations in rates of sexual victimization among inmate subgroups based on demographic characteristics, sexual history and orientation, and criminal justice status are almost identical to those reported in the NIS-2. (See *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09,* NCJ 231169, BJS Web, August 2010.)

### Special inmate populations—Inmates ages 16 to 17

#### In 2011-12, juvenile inmates ages 16 to 17 held in adult facilities reported rates of sexual victimization similar to those of adult inmates

The NIS-3 was specially designed to provide estimates of sexual victimization for inmates ages 16 to 17 held in adult facilities. Previous NIS collections excluded inmates age 17 or younger due to special human subject issues (related to consent and assent, as well as risk of trauma in the survey process) and statistical issues (related to clustering of youth and the need to oversample to ensure a representative sample). To address issues of consent and risk, the NIS-3 juvenile sample was restricted to inmates ages 16 to 17 (who represented an estimated 95% of the 1,790 juveniles held in prisons at yearend 2011 and 97% of the 5,870 juveniles held in local jails at midyear 2011).

The NIS-3 was designed to oversample for facilities that house juveniles and to oversample juveniles within selected facilities. The resulting sample was structured to provide separate nationwide estimates for juveniles in prisons and jails, while providing national-level and facility-level estimates for adult inmates that were comparable to estimates in the NIS-1 and NIS-2. (See *Methodology* for the juvenile sample design.)

Juveniles ages 16 to 17 held in prisons and jails did not report significantly higher rates of sexual victimization than adult inmates. Although the overall rates for juveniles (4.5% in prisons and 4.7% in jails) were somewhat higher than those for adults (4.0% in prisons and 3.2% in jails), the differences were not statistically significant (table 10).

Rates of inmate-on-inmate sexual victimization are unrelated to age among state and federal prisoners (table 11). When compared to inmates in every other age category, inmates ages 16 to 17 reported experiencing inmate-on-inmate sexual victimization at similar rates. Among jail inmates, the rate of staff sexual misconduct was higher for inmates ages 16 to 17 than for older inmates; however, the differences were statistically significant only for inmates age 35 or older.

These data do not support the conclusion that juveniles held in adult prisons and jails are more likely to be sexually victimized than inmates in other age groups. Due to the relatively small number of juveniles held in state prisons (an estimated 1,700 inmates ages 16 to 17 at midyear 2011), BJS combined these data with reports from juveniles held in local jails (an estimated 5,700 inmates ages 16 to 17).

**TABLE 10**
**Juvenile inmates reporting sexual victimization, by type of incident, National Inmate Survey, 2011–12**

| Type of incident[b] | Percent of inmates | | |
|---|---|---|---|
| | All facilities | Prisons | Jails |
| **Total** | 4.7% | 4.5% | 4.7% |
| **Inmate-on-inmate** | 1.8% | 1.8% | 1.8% |
| Nonconsensual sexual acts | 0.7 | 1.6 | 0.4 |
| Abusive sexual contacts only | 1.1 | 0.2 | 1.4 |
| **Staff sexual misconduct** | 3.2% | 2.8% | 3.3% |
| Unwilling activity | 1.9 | 0.9 | 2.2 |
| Excluding touching | 1.6 | 0.9 | 1.9 |
| Touching only | 0.2 | 0.0 | 0.3 |
| Willing activity | 2.2 | 2.5 | 2.1 |
| Excluding touching | 2.2 | 2.5 | 2.1 |
| Touching only | 0.0 | 0.0 | 0.0 |
| **Number of inmates** | 7,400 | 1,700 | 5,700 |

Note: Detail may not sum to total because inmates may report more than one type of victimization. They may also report victimization by both other inmates and staff. See appendix table 14 for standard errors.

: Not calculated.

[a]Standard errors may be used to construct confidence intervals around each estimate. See *Methodology* for calculations.

[b]See *Methodology* for terms and definitions.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**TABLE 11**
**Prevalence of sexual victimization, by type of incident and age of inmate, National Inmate Survey, 2011–12**

| Age | Prison inmates | | | Jail inmates | | |
|---|---|---|---|---|---|---|
| | Number | Inmate-on-inmate | Staff sexual misconduct | Number | Inmate-on-inmate | Staff sexual misconduct |
| 16–17* | 1,700 | 1.8% | 2.8% | 5,700 | 1.8% | 3.3% |
| 18–19 | 18,550 | 1.6 | 2.4 | 40,000 | 1.9 | 2.6 |
| 20–24 | 162,520 | 2.2 | 3.5 | 145,770 | 2.0 | 2.4 |
| 25–34 | 457,060 | 2.3 | 2.9 | 250,690 | 1.9 | 2.2 |
| 35–44 | 398,230 | 2.0 | 2.3 | 150,890 | 1.4 | 1.5** |
| 45–54 | 281,390 | 2.0 | 1.7 | 102,820 | 1.1 | 0.9** |
| 55 or older | 124,050 | 1.1 | 0.8 | 30,010 | 1.3 | 0.3** |

Note: See appendix table 15 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Overall, the patterns of reported sexual victimization by juveniles were similar to those for adult inmates, including higher rates of staff sexual misconduct than rates of inmate-on-inmate sexual victimization:

- Of juveniles held in prisons and jails, 1.8% reported being victimized by another inmate in the past 12 months or since admission to the facility, if less than 12 months) (table 12). This rate was similar to the rate reported by adult prisoners (2.0%) and adult jail inmates (1.6%).

- Among juveniles held in prisons and jails nationwide, 3.2% reported experiencing staff sexual misconduct. Though higher, the rate was not statistically different from that of adults in prisons (2.4%) and adults in jails (1.8%).

**Among juveniles and young adult inmates in 2011-12, patterns of sexual victimization across demographic subgroups showed little variation**

Across subgroups defined by sex, race or Hispanic origin, BMI, sexual orientation, and most serious offense, juveniles and young adults reported experiencing similar rates of sexual victimization. Due to the small number of juveniles within each subgroup, few differences in sexual victimization rates across age groups were statistically significant. (Tests across age group not shown; see appendix table 14 for standard errors.)

**TABLE 12**

**Prevalence of sexual victimization among juveniles ages 16–17 and inmates ages 18–19 and 20–24, by type of incident and inmate characteristics, National Inmate Survey, 2011–12**

| | Prison and jail inmates reporting sexual victimization[a] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of inmates | | | Inmate-on-inmate | | | Staff sexual misconduct | | |
| Characteristic | Ages 16–17 | 18–19 | 20–24 | Ages 16–17 | 18–19 | 20–24 | Ages 16–17 | 18–19 | 20–24 |
| All inmates | 7,400 | 58,550 | 308,290 | 1.8% | 1.8% | 2.1% | 3.2% | 2.5% | 2.9% |
| **Sex** | | | | | | | | | |
| Male* | 6,930 | 54,220 | 280,670 | 1.6% | 1.5% | 1.8% | 3.3% | 2.6% | 3.1% |
| Female | 470 | 4,330 | 27,610 | 4.4 | 5.2** | 5.7** | 0.9** | 0.8** | 1.7** |
| **Race/Hispanic origin** | | | | | | | | | |
| White[c] | 910 | 12,080 | 76,890 | 6.6% | 3.8%** | 3.6%** | 3.4% | 2.5% | 2.0%** |
| Black[c] | 3,760 | 24,770 | 115,000 | 1.1 | 1.0 | 1.2 | 3.3 | 2.5 | 3.0 |
| Hispanic | 1,820 | 14,730 | 78,470 | 1.1 | 1.6 | 1.5 | 3.5 | 2.0 | 3.0 |
| Other[c,d] | 100 | 1,120 | 8,200 | 0.0** | 1.6 | 1.1 | 0.0** | 1.8 | 4.7 |
| Two or more races[c] | 740 | 5,430 | 25,910 | 1.5 | 2.0 | 3.8** | 1.9 | 3.8 | 3.6 |
| **Body Mass Index** | | | | | | | | | |
| Underweight | 340 | 1,260 | 3,670 | 5.9% | 1.7% | 2.5% | 6.6% | 1.8% | 4.1% |
| Normal* | 4,410 | 33,850 | 139,140 | 1.1 | 1.8 | 2.0 | 2.9 | 2.6 | 2.4 |
| Overweight | 1,540 | 15,940 | 110,360 | 2.4 | 1.9 | 1.7 | 2.7 | 2.8 | 3.0 |
| Obese | 520 | 3,970 | 36,160 | 4.8 | 2.0 | 2.9 | 4.8 | 0.9** | 3.2 |
| Morbidly obese | 70 | 310 | 3,740 | 0.0** | 5.3 | 4.3 | 0.0** | 7.3 | 5.0 |
| **Sexual orientation** | | | | | | | | | |
| Heterosexual* | 6,930 | 54,200 | 277,960 | 1.7% | 1.1% | 1.4% | 3.0% | 2.5% | 2.6% |
| Non-heterosexual[e] | 270 | 3,150 | 22,840 | 6.3 | 13.9** | 11.3** | 1.4 | 4.3 | 7.0** |
| **Most serious offense** | | | | | | | | | |
| Violent sexual offense* | 160 | 2,200 | 18,830 | 7.5% | 10.4% | 6.9% | 12.0% | 3.0% | 2.4% |
| Other violent | 3,100 | 18,580 | 94,970 | 1.7 | 1.5 | 2.1** | 4.3 | 3.6 | 4.1** |
| Property | 2,170 | 18,480 | 70,730 | 1.0 | 1.5 | 2.4** | 1.5** | 2.4 | 2.5 |
| Drug | 480 | 6,980 | 53,990 | 4.8 | 1.3 | 1.4** | 2.9 | 1.6 | 2.0 |
| Other | 870 | 8,230 | 50,900 | 2.3 | 1.8 | 1.2** | 1.9** | 1.3 | 2.1 |

Note: See appendix table 16 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 in jails and yearend 2011 in prisons represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

[c]Excludes persons of Hispanic or Latino origin.

[d]Includes American Indian, Alaska Native, Asian, Native Hawaiian, and other Pacific Islander.

[e]Includes gay, lesbian, bisexual, and other sexual orientations.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Among juvenile inmates ages 16 to 17 and young adult inmates ages 18 to 19 and 20 to 24—

- Young adult females reported higher rates of inmate-on-inmate sexual victimization than young adult males, while young adult males reported higher rates of staff sexual misconduct than young adult females.

- White non-Hispanic young adults (ages 18 to 19 and 20 to 24) reported higher rates of inmate-on-inmate sexual victimization than black non-Hispanic and Hispanic youth in the same age groups.

- Inmates ages 18 to 19 and 20 to 24 with a sexual orientation other than heterosexual experienced higher rates of sexual victimization by another inmate than heterosexual inmates in similar age groups.

- Male juvenile inmates reported higher rates of staff sexual misconduct (3.3%) than female juveniles (0.9%).

- Juvenile inmates held for violent sex offenses reported higher rates of staff sexual misconduct (12.0%) than those held for property offenses (1.5%).

## Among juveniles victimized by other inmates in 2011-12, more than three-quarters experienced force or threat of force, and a quarter were injured

Juveniles ages 16 to 17 who reported sexual victimization by other inmates revealed that—

- Two-thirds were victimized more than once (65.5%) (table 13).

- An estimated 78.6% reported experiencing physical force or threat of force, and 39.8% were pressured by the perpetrator to engage in the sexual act or other sexual contact.

- More than a quarter (27.7%) were injured in at least one of the incidents.

- Fewer than 1 in 6 (15.4%) reported an incident to someone at the facility, a family member, or a friend.

Among juvenile inmates ages 16 to 17 who reported experiencing staff sexual misconduct—

- Three-quarters (75.8%) were victimized more than once.

- An estimated 43.7% said that staff used force or threat of force.

- An estimated 10.8% were injured in at least one of the incidents.

- Fewer than 1 in 10 (9.0%) reported the staff sexual misconduct to someone at the facility, a family member, or a friend.

---

**TABLE 13**

**Circumstances surrounding incidents among juveniles ages 16–17 and inmates ages 18–19 and 20–24, by type of victimization, National Inmate Survey, 2011–12**

| | Victims in prisons and jails | | | | | |
| | Inmate-on-inmate | | | Staff sexual misconduct | | |
| Circumstance | Ages 16–17* | 18–19 | 20–24 | 16–17* | 18–19 | 20–24 |
|---|---|---|---|---|---|---|
| Number of victims | 130 | 1,070 | 6,490 | 230 | 1,470 | 9,070 |
| Number of incidents[a] | | | | | | |
| 1 | 34.5% | 26.2% | 29.9% | 24.2% | 19.7% | 27.9% |
| 2 or more | 65.5 | 73.8 | 70.1 | 75.8 | 80.3 | 72.1 |
| Type of coercion or force[b] | | | | | | |
| Without pressure or force | ~ | ~ | ~ | 68.9% | 59.9% | 67.2% |
| Pressured | 39.8% | 62.6% | 73.8%** | 51.2 | 52.6 | 49.7 |
| Force or threat of force | 78.6 | 75.5 | 62.1 | 43.7 | 36.2 | 33.0 |
| Ever injured | 27.7% | 33.2% | 15.9% | 10.8% | 12.9% | 13.5% |
| Ever report an incident | 15.4% | 29.9% | 18.1% | 9.0% | 14.3% | 16.9% |

Note: See appendix table 17 for standard errors.

~Not applicable.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Number of incidents by another inmate and number of reported willing and unwilling incidents of staff sexual misconduct.

[b]Detail sums to more than 100% because some inmates reported more than one victimization.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

## Special inmate populations— Inmates with mental health problems

The NIS-3 collected data on the mental health problems of inmates for the first time in 2011-12. Inmates were asked whether they had been told by a mental health professional that they had a mental disorder or if because of a mental health problem they had stayed overnight in a hospital or other facility, used prescription medicine, or they had received counseling or treatment from a trained professional. These items have been previously used by BJS to determine if inmates in prisons and jails had any history of mental health problems. (See *Mental Health Problems of Prison and Jail Inmates,* NCJ 213600, BJS Web, September 2006.)

### A high percentage of inmates had a history of problems with their emotions, nerves, or mental health

An estimated 36.6% of prison inmates and 43.7% of jail inmates reported being told by a mental health professional that they had a mental health disorder, as specified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) (table 14). Inmates were asked specifically if they had ever been told they had manic depression, bipolar disorder, or other depressive disorder, schizophrenia or another psychotic disorder, post-traumatic stress disorder, or an anxiety or other personality disorder. (See *Methodology* for survey items and full list of disorders.)

More than a third of prison inmates (35.8%) and jail inmates (39.2%) said they had received some counseling or therapy from a trained professional for these problems. An estimated 8.9% of prisoners and 12.8% of jail inmates reported an overnight stay in a hospital or other facility before their current admission to prison or jail. Approximately 15.4% of prisoners and 19.7% of jail inmates reported taking prescription medication for these mental health and emotional problems at the time of the offense for which they were currently being held.

### TABLE 14
**Prevalence of victimization by current mental health status and history of mental health problems among inmates, by type of facility, National Inmate Survey, 2011–12**

| Mental health status | Adult prison inmates | | | | Adult jail inmates | | | |
|---|---|---|---|---|---|---|---|---|
| | Number[b] | Percent | Inmate-on-inmate | Staff sexual misconduct | Number | Percent | Inmate-on-inmate | Staff sexual misconduct |
| Current mental health status[a] | | | | | | | | |
| No mental illness* | 926,800 | 67.1% | 0.7% | 1.1% | 360,600 | 51.4% | 0.7% | 1.0% |
| Anxiety-mood disorder | 251,700 | 18.2 | 2.8%** | 3.0%** | 155,800 | 22.2 | 1.3%** | 1.4%** |
| Serious psychological distress | 203,200 | 14.7 | 6.3%** | 5.6%** | 184,500 | 26.3 | 3.6%** | 3.6%** |
| History of mental health problems[b] | | | | | | | | |
| Ever told by mental health professional had disorder | | | | | | | | |
| Yes | 505,600 | 36.6% | 3.8%** | 3.4%** | 305,400 | 43.7% | 2.9%** | 2.5%** |
| No* | 875,500 | 63.4 | 0.8 | 1.3 | 393,500 | 56.3 | 0.6 | 1.2 |
| Had overnight stay in hospital in year before current admission | | | | | | | | |
| Yes | 122,800 | 8.9 | 5.7%** | 4.9%** | 89,700 | 12.8 | 4.4%** | 3.4%** |
| No* | 1,257,700 | 91.1 | 1.5 | 1.8 | 611,300 | 87.2 | 1.2 | 1.5 |
| Used prescription medications at time of current offense | | | | | | | | |
| Yes | 211,800 | 15.4 | 4.5%** | 3.3%** | 137,700 | 19.7% | 3.2%** | 2.7%** |
| No* | 1,165,000 | 84.6 | 1.4 | 1.8 | 561,400 | 80.3 | 1.2 | 1.5 |
| Ever received professional mental health therapy | | | | | | | | |
| Yes | 492,000 | 35.8% | 3.6%** | 3.0%** | 274,100 | 39.2% | 2.8%** | 2.3%** |
| No* | 884,000 | 64.2 | 0.9 | 1.5 | 425,200 | 60.8 | 0.8 | 1.4 |

Note: See appendix table 18 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Based on the K6 scale where a score of 1–7 indicates no mental illness, a score of 8–12 indicates anxiety mood-disorder, and a score of 13 or more indicates serious psychological distress. See *Methodology* for discussion of the K6 scale and past applications.

[b]See *Methodology* for survey items.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

### Inmates with a history of mental health problems had higher rates of sexual victimization than other inmates

Inmates who had been told by a mental health professional that they had a mental disorder were more likely than other inmates to report being sexually victimized while in prison or jail. Among inmates who had been told they had a specific DSM-IV disorder—

- During 2011-12, an estimated 3.8% of prison inmates and 2.9% of jail inmates reported that they were sexually victimized by another inmate.

- Approximately 3.4% of prison inmates and 2.5% of jail inmates reported that they were sexually victimized by staff during 2011-12.

Sexual victimization rates were also higher among inmates who had stayed overnight in a hospital or other treatment facility because of a mental health problem than among inmates who had no prior admission for mental health problems.  Among those who had stayed overnight in a hospital for mental or emotional problems, 5.7% of prison inmates and 4.4% of jail inmates said they were victimized by another inmate, and 4.9% of prison inmates and 3.4% of jail inmates said they were victimized by facility staff.

Differences in sexual victimization rates among inmates were similar across other mental health measures. Rates of inmate-on-inmate sexual victimization were—

- Two to three times higher among inmates who were taking prescription medications for their mental health or emotional problems at the time of the current offense than among inmates who were not taking such medications.

- Three to four times higher among inmates who had received mental health counseling or treatment from a trained professional in the past than among inmates who had not received such counseling or treatment.

### In 2011-12, nearly 15% of state and federal prisoners and 26% of jail inmates had symptoms of serious psychological distress

To determine whether inmates had a current mental health problem, BJS used the K6 screening scale in the NIS-3. The K6 was previously developed by Kessler and others for estimating the prevalence of serious mental illness in noninstitutional settings as a tool to identify cases of psychiatric disorder. It has been used widely in epidemiological surveys in the U.S. and internationally.[3,4]

The K6 consists of six questions that ask inmates to report how often during the past 30 days they had felt—

- nervous
- hopeless
- restless or fidgety
- so depressed that nothing could cheer them up
- everything was an effort
- worthless.

The response options were (1) all of the time, (2) most of the time, (3) some of the time, (4) a little of the time, and (5) none of the time. Following Kessler, the responses were coded from 4 to 0, with 4 assigned to "all of the time" and 0 assigned to "none of the time." A summary scale combining the responses from all six items was then produced with a range of 0 to 24. The summary score was then reduced to three categories: 0 to 7 indicated no mental illness, 8 to 12 indicated an anxiety-mood disorder, and 13 or higher indicated serious psychological distress (SPD).

Since 2008, the K6 scale has been used in federal epidemiological studies to measure symptoms of SPD rather than serious mental illness. Although the K6 has been demonstrated to be a good predictor of serious mental illness in prior studies, a technical advisory group, convened by the Center for Mental Health Services at the Substance Abuse and Mental Health Services Administration (SAMHSA), recommended that it should be supplemented with questions on functional impairment to improve statistical prediction and validity. (See *Methodology* for discussion of K6 scaling rules and current applications.)

Consistent with other measures of mental health or emotional problems, the K6 reveals that prison and jail inmates have high rates of SPD. An estimated 203,200 state and federal inmates and 185,500 jail inmates reported levels of psychological distress in the 30 days prior to the interview consistent with SPD. These estimates of current SPD represented nearly 15% of state and federal inmates and 26% of local jail inmates. These may be underestimates because some inmates with serious mental illness may have been unable to participate in the NIS-3 due to cognitive limitations that precluded them from fully understanding the informed consent procedures or the survey questions.

[3]Kessler, R.C., Barker, P.R., Colpe, L.J., Epstein, J.F., Gfroerer, J.C., Hiripi, E., Howes, M.J., Normand, S.L., Manderscheid, R.W., Walters, E.E., & Zaslavsky, A.M. (2003). "Screening for serious mental illness in the general population." *Archives of General Psychiatry*, 60, 184–189.

[4]Kessler, R.C., Green, J.G., Gruber, M.J., Sampson, N.A., Bromet, E., Cuitan, M., Furukawa, T.A., et al. (2010). "Screening for serious mental illness in the general population with the K6 screening scale: results from the WHO World Mental Health (WMH) survey initiative." *International Journal of Methods in Psychiatric Research*, 19 (Spp. 1) 4–22.

An additional 251,700 state and federal prisoners (18.2%) and 155,800 jail inmates (22.2%) reported lower levels of psychological distress, indicative of anxiety-mood disorders.

Rates of SPD in prisons and jails were substantially higher than the 3.0% rate of SPD observed in the 2012 National Health Interview Survey of the noninstitutional U.S. population age 18 or older, using the same K6 screener.[5] Although inmate populations are demographically different from the general U.S. population, these differences in the prevalence of SPD remain significant when comparisons are restricted to demographic subgroups most commonly held in prisons and jails (table 15):

- Among males, 3.0% of the general U.S. population was identified with SPD, compared to 14.7% of prisoners and 26.3% of jails inmates.

- Among persons ages 18 to 44, 2.7% of the general population, 14.8% of prisoners and 26.1% of jail inmates had SPD.

- Among black non-Hispanic adults, 2.6% of the general population was classified with SPD, compared to 13.0% of prisoners and 22.1% of jail inmates.

- Among white non-Hispanic adults, 2.9% of the general population, 17.5% of prisoners and 30.8% of jail inmates had SPD.

### Inmates with SPD or anxiety-mood disorders reported high overall rates of sexual victimization in 2011-12

Inmates identified with SPD reported significantly higher rates of inmate-on-inmate sexual victimization and staff sexual misconduct than inmates without a mental health problem:

- Among state and federal inmates, an estimated 6.3% of those identified with SPD reported being sexually victimized by another inmate, and 5.6% reported being victimized by staff. In comparison, among prison inmates with no indication of mental illness or anxiety-mood disorders, 0.7% reported being sexually victimized by another inmate and 1.1% reported experiencing staff sexual misconduct.

- Similarly, jail inmates identified with SPD reported higher rates of inmate-on-inmate sexual victimization (3.6%) and staff sexual misconduct (3.6%) than inmates with no mental illness (0.7% for inmate-on-inmate and 1.0% for staff sexual misconduct).

---

**TABLE 15**
**Prevalence of serious psychological distress among adults in prisons, jails, and the U.S. civilian noninstitutional population, 2011–12**

| Demographic characteristic | Percent with symptoms of serious psychological distress[a] | | |
|---|---|---|---|
| | U.S. noninstitutional adult population[b]* | Inmates age 18 or older | |
| | | Prison | Jail |
| Total | 3.0% | 14.7%** | 26.3%** |
| **Sex** | | | |
| Male | 2.8% | 14.3%** | 25.5%** |
| Female | 3.7 | 20.8** | 32.2** |
| **Race/Hispanic origin** | | | |
| White[c] | 2.9% | 17.5%** | 30.8%** |
| Black[c] | 2.6 | 13.0** | 22.4** |
| Hispanic | 3.6 | 11.6** | 23.1** |
| **Age** | | | |
| 18–44 | 2.7% | 14.8%** | 26.1%** |
| 45–64 | 3.9 | 14.7** | 27.7** |
| 65 or older | 1.9 | 9.5** | 19.3** |

Note: See appendix table 19 for standard errors.
*Comparison group.
**Difference with comparison group is significant at the 95%-confidence level.
[a]Based on a score of 13 or more on the K-6 scale.
[b]Based on household interviews of a national sample of the civilian noninstitutional population between January and September 2012.
[c]Excludes persons of Hispanic or Latino origin.
Sources: Bureau of Justice Statistics, National Inmate Survey, 2011–12; and Centers for Disease Control and Prevention, National Health Interview Survey, 2012.

---

[5]Centers for Disease Control and Prevention, *Early Release of Selected Estimates Based on Data from* Surveillance Among Adults in the United States, Morbidity and Mortality Weekly Report, 2011;60 (Suppl.) table 7.) January-September 2012, National Health Interview Survey. Figures 13.1-13.3, March 2013.

Inmates identified as having anxiety-mood disorders reported higher rates of sexual victimization than inmates who did not report a mental health problem. Inmates with anxiety-mood disorders reported lower victimization rates than inmates with SPD. Among inmates with anxiety-mood disorders—

- An estimated 2.8% of prison inmates and 1.3% of jail inmates reported that they were sexually victimized by another inmate.

- About 3.0% of prison inmates and 1.4% of jail inmates reported that they were sexually victimized by staff.

**Inmates with mental illness reported higher rates of sexual victimization than inmates without mental health problems across subgroups**

For each of the measured subgroups (i.e., sex, race or Hispanic origin, age, sexual orientation, and most serious offense), inmates with SPD reported higher rates of inmate-on-inmate sexual victimization than inmates without mental health problems (table 16). With the exception of jail inmates age 45 or older, the differences were large and statistically significant. Among inmates with SPD, non-heterosexual inmates reported the highest rates of inmate-on-inmate sexual victimization (an estimated 21.0% of prison inmates and 14.7% of jail inmates).

## TABLE 16
**Prevalence of inmate-on-inmate sexual victimization, by current mental health status and inmate characteristics, National Inmate Survey, 2011–12**

| Characteristic | Prison inmates reporting sexual victimization[a] | | | Jail inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | No mental illness* | Anxiety-mood disorder | Serious psychological distress | No mental illness* | Anxiety-mood disorder | Serious psychological distress |
| **Sex** | | | | | | |
| Male | 0.5% | 2.2%** | 5.6%** | 0.5% | 1.1%** | 3.2%** |
| Female | 3.4 | 8.9** | 12.9** | 2.3 | 2.8 | 5.8** |
| **Race/Hispanic origin[c]** | | | | | | |
| White[d] | 1.1% | 3.9%** | 7.0%** | 0.8% | 1.4%** | 4.0%** |
| Black[d] | 0.3 | 1.5** | 5.3** | 0.5 | 0.9 | 2.7** |
| Hispanic | 0.6 | 2.2** | 5.3** | 0.6 | 1.3** | 3.8** |
| **Age** | | | | | | |
| 18–24 | 0.4% | 3.4%** | 7.4%** | 0.5% | 1.8%** | 4.8%** |
| 25–34 | 0.9 | 3.2** | 6.1** | 1.0 | 1.6** | 3.6** |
| 35–44 | 0.5 | 2.4** | 6.9** | 0.5 | 0.7 | 3.4** |
| 45 or older | 0.7 | 2.4** | 5.4** | 0.6 | 0.8 | 2.2 |
| **Sexual orientation** | | | | | | |
| Heterosexual | 0.4% | 1.6%** | 4.0%** | 0.5% | 1.0%** | 2.6%** |
| Non-heterosexual[e] | 5.9 | 13.4** | 21.0** | 5.0 | 5.1 | 14.7** |
| **Most serious offense** | | | | | | |
| Violent sexual offense | 1.5% | 4.8%** | 9.5%** | 1.4% | 4.1% | 6.7%** |
| Other violent | 0.9 | 3.1** | 6.1** | 1.2 | 1.8 | 3.9** |
| Property | 0.5 | 3.1** | 8.1** | 0.8 | 1.6** | 4.1** |
| Drug | 0.3 | 1.2** | 2.8** | 0.3 | 0.6 | 2.9** |
| Other | 0.6 | 1.3 | 4.2** | 0.5 | 0.8 | 2.9** |

Note: See appendix table 20 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 in jails and yearend 2011 in prisons represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

[c]Due to small sample size, estimates for other races, including American Indian, Alaska Native, Asian, Native Hawaiian, and other Pacific Islander, and two or more races, are not shown.

[d]Excludes persons of Hispanic or Latino origin.

[e]Includes gay, lesbian, bisexual, and other sexual orientations.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Patterns of staff sexual misconduct were similar to those of inmate-on-inmate victimization. Staff sexual misconduct was also higher among inmates with SPD than those without mental health problems (table 17). With the exception of female jail inmates, the differences within each demographic subgroup were statistically significant. Among inmates with SPD, non-heterosexual prison inmates recorded the highest rate (10.5%) of sexual victimization by staff.

**TABLE 17**

**Prevalence of staff sexual misconduct, by current mental health status and inmate characteristics, National Inmate Survey, 2011–12**

| Characteristic | Prison inmates reporting sexual victimization[a] | | | Jail inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | No mental illness* | Anxiety-mood disorder | Serious psychological distress | No mental illness* | Anxiety-mood disorder | Serious psychological distress |
| **Sex** | | | | | | |
| Male | 1.1% | 3.0%** | 5.7%** | 1.0% | 1.4%** | 4.0%** |
| Female | 1.0 | 2.4** | 5.2** | 1.1 | 1.0 | 1.7 |
| **Race/Hispanic origin[c]** | | | | | | |
| White[d] | 0.6% | 2.0%** | 3.6%** | 0.8% | 0.7% | 2.5%** |
| Black[d] | 1.2 | 4.1** | 6.1** | 1.1 | 1.7 | 4.7** |
| Hispanic | 1.1 | 1.7 | 6.8** | 0.5 | 1.2** | 3.9** |
| **Age** | | | | | | |
| 18–24 | 1.8% | 3.1% | 7.4%** | 1.2% | 1.8%** | 5.1%** |
| 25–34 | 1.6 | 3.4** | 6.1** | 1.3 | 1.6 | 3.9** |
| 35–44 | 0.9 | 3.3** | 5.6** | 0.7 | 0.9 | 3.3** |
| 45 or older | 0.6 | 2.0** | 4.3** | 0.4 | 0.7 | 1.4** |
| **Sexual orientation** | | | | | | |
| Heterosexual | 1.0% | 2.9%** | 4.8%** | 0.9% | 1.3%** | 3.4%** |
| Non-heterosexual[e] | 3.4 | 3.6 | 10.5** | 3.0 | 2.4 | 6.2** |
| **Most serious offense** | | | | | | |
| Violent sexual offense | 1.4% | 2.3% | 4.1%** | 1.2% | 1.2% | 3.3% |
| Other violent offense | 1.7 | 3.8** | 7.2** | 2.2 | 2.2 | 5.7** |
| Property | 1.1 | 3.1** | 6.7** | 0.8 | 1.6** | 3.3** |
| Drug | 0.4 | 2.9 | 2.3** | 0.7 | 1.0 | 2.8** |
| Other | 0.8 | 1.7 | 5.9** | 0.8 | 1.0 | 3.5** |

Note: See appendix table 21 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 in jails and yearend 2011 in prisons represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

[c]Due to small sample size, estimates for other races, including American Indian, Alaska Native, Asian, Native Hawaiian, and other Pacific Islander, and two or more races, are not shown.

[d]Excludes persons of Hispanic or Latino origin.

[e]Includes gay, lesbian, bisexual, and other sexual orientations.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**Reports of sexual victimization differed among inmates with SPD and other inmates**

Among prison and jail inmates who reported inmate-on-inmate sexual victimization, those with SPD were more likely than those without mental health problems to be—

- victimized more than once (80.4% compared to 62.6%)

- forced or threatened with force by the perpetrator (71.2% compared to 57.7%)

- injured (26.4% compared to 12.3%) **(table 18)**.

Among victims of staff sexual misconduct, inmates with SPD were more likely than those without mental health problems to—

- report being pressured by staff (73.4% compared to 50.2%) or forced or threatened with force (47.2% compared to 33.8%)

- be injured by staff (19.8% compared to 6.3%)

- report at least one victimization to someone at the facility, a family member, or a friend (24.9% compared to 14.1%).

---

**TABLE 18**

**Circumstances surrounding incidents among adult inmates, by current mental health status and type of victimization, National Inmate Survey, 2011–12**

| | Victims in prisons and jails | | | | | |
| | Inmate-on-inmate | | | Staff sexual misconduct | | |
| Circumstance | No mental illness* | Anxiety-mood disorder | Serious psychological distress | No mental illness* | Anxiety-mood disorder | Serious psychological distress |
|---|---|---|---|---|---|---|
| Number of victims | 8,880 | 9,040 | 19,490 | 13,910 | 9,580 | 18,130 |
| Number of incidents[a] | | | | | | |
| 1 | 37.4% | 33.5% | 19.6%** | 23.4% | 25.5% | 23.6% |
| 2 or more | 62.6 | 66.5 | 80.4** | 76.6 | 74.5 | 76.4 |
| Type of coercion or force[b] | | | | | | |
| Without pressure or force | ~ | ~ | ~ | 64.1% | 57.2% | 43.6%** |
| Pressured | 72.7% | 79.4% | 73.7% | 50.2 | 54.8 | 73.4** |
| Force or threat of force | 57.7 | 61.9 | 71.2** | 33.8 | 29.8 | 47.2** |
| Ever injured | 12.3% | 14.1% | 26.4%** | 6.3% | 6.1% | 19.8%** |
| Ever report an incident | 21.2% | 15.4% | 23.1% | 14.1% | 18.4% | 24.9%** |

Note: See appendix table 22 for standard errors.

~Not applicable.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Number of sexual acts by another inmate and number of reported willing and unwilling incidents of staff sexual misconduct.

[b]Detail sums to more than 100% because some inmates reported more than one victimization.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

## Special inmate populations—Inmates with a non-heterosexual sexual orientation

To date, all of the BJS victim self-report surveys conducted under PREA have found that inmates with the highest rates of sexual victimization are those who reported their sexual orientation as gay, lesbian, bisexual, or other. For example, among non-heterosexual inmates interviewed in the NIS-2, 11.2% of prison inmates and 7.2% of jail inmates reported being victimized by another inmate in the past 12 months or since admission to the facility, if less than 12 months. Among former state prison inmates interviewed in the National Former Prisoner Survey (NFPS, conducted in 2008), more than a third of non-heterosexual males (33% of bisexuals and 39% of gays and lesbians) reported being sexually victimized by another inmate during their most recent period of incarceration. Combined with the higher rates among non-heterosexual inmates in the NIS-3 (12.2% in prisons and 8.5% in jails), the surveys clearly identify a high-risk population. Although the NIS-2 and NFPS provide detailed multivariate models that control for other risk factors, NIS-3 provides additional detail on this population.

### Across subgroups, inmate-on-inmate victimization rates were higher for non-heterosexual inmates than heterosexual inmates

In every measured subgroup (i.e., sex, race or Hispanic origin, age, education, and mental health problems), non-heterosexual prison and jail inmates reported higher rates of inmate-on-inmate sexual victimization than heterosexual inmates (table 19). Rates of sexual victimization by other inmates against non-heterosexual inmates were at least 10 times greater than that of heterosexual inmates when the victim was also male, black, Hispanic, or had less than a high school education. These differences were smaller, but still large, among non-heterosexual female inmates (2.5 times larger), whites (more than 6 times larger), and high school graduates (8 times larger).

Within each of the other demographic subgroups, staff-on-inmate victimization rates were at least double for non-heterosexual inmates compared to heterosexual inmates. Among non-heterosexual prison and jail inmates, rates of staff sexual misconduct were the highest for inmates ages 18 to 24 (6.7%), blacks (6.2%), and males (6.1%).

### TABLE 19
**Prevalence of sexual victimization, by type of incident and inmate sexual orientation, National Inmate Survey, 2011–12**

| Characteristic | Inmate-on-inmate | | Staff sexual misconduct | |
|---|---|---|---|---|
| | Heterosexual* | Non-heterosexual[a] | Heterosexual* | Non-heterosexual[a] |
| **Sex** | | | | |
| Male | 1.0% | 11.9%** | 2.0% | 6.1%** |
| Female | 3.6 | 9.4** | 1.4 | 3.0** |
| **Race/Hispanic origin[b]** | | | | |
| White[c] | 1.7% | 11.4%** | 1.3% | 3.2%** |
| Black[c] | 0.6 | 10.6** | 2.2 | 6.2** |
| Hispanic | 1.0 | 10.1** | 1.8 | 5.9** |
| **Age** | | | | |
| 18–24 | 1.3% | 11.6%** | 2.5% | 6.7%** |
| 25–44 | 1.2 | 11.9** | 2.2 | 5.0** |
| 45 or older | 0.9 | 8.9** | 1.1 | 4.2** |
| **Education** | | | | |
| Less than high school | 1.0% | 11.0%** | 2.0% | 5.1%** |
| High school graduate | 1.1 | 9.0** | 2.0 | 4.9 |
| Some college or more | 1.7 | 12.6** | 1.8 | 4.8** |
| **Current mental health status** | | | | |
| No mental illness | 0.4% | 5.7%** | 1.0% | 3.2%** |
| Anxiety-mood disorder | 1.3 | 10.7** | 2.3 | 3.2 |
| Serious psychological distress | 3.3 | 18.6** | 4.1 | 8.8** |

Note: Prison and jail inmates have been combined to obtain a sufficient number of non-heterosexual inmates. See appendix table 23 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Includes gay, lesbian, bisexual, and other sexual orientations.

[b]Due to small sample size, estimates for other races, including American Indian, Alaska Native, Asian, Native Hawaiian, and other Pacific Islander, and persons of two or more races, are not shown.

[c]Excludes persons of Hispanic or Latino origin.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Non-heterosexual victims (82.9%) were more likely than heterosexual victims (68.0%) to report that the victimization by another inmate involved pressure, but less likely to report that it involved force or threat of force (62.0% for non-heterosexual compared to 69.7% for heterosexual victims) (table 20). In addition, non-heterosexual victims (84.2%) of staff sexual misconduct were more likely than heterosexual victims (71.4%) to report more than one incident.

**TABLE 20**
**Circumstances surrounding incidents of sexual victimization among heterosexual and non-heterosexual inmates, National Inmate Survey, 2011–12**

| | Victims in prisons and jails | | | |
| | Inmate-on-inmate | | Staff sexual misconduct | |
| Circumstance | Heterosexual* | Non-heterosexual[a] | Heterosexual * | Non-heterosexual[a] |
|---|---|---|---|---|
| **Number of victims** | 22,960 | 17,910 | 38,320 | 8,130 |
| **Number of incidents[b]** | | | | |
| 1 | 32.5% | 25.9% | 28.6% | 15.8%** |
| 2 or more | 67.5 | 74.1 | 71.4 | 84.2** |
| **Type of coercion or force[c]** | | | | |
| Without pressure or force | ~ | ~ | 53.0% | 60.6% |
| Pressured | 68.0% | 82.9%** | 60.1 | 63.8 |
| Force or threat of force | 69.7 | 62.0** | 37.8 | 41.7 |
| **Ever injured** | 22.5% | 20.9% | 11.0% | 15.6% |
| **Ever report an incident** | 27.5% | 19.4%** | 19.5% | 26.7% |

Note: Prison and jail inmates have been combined to obtain a sufficient number of non-heterosexual inmates. See appendix table 24 for standard errors.

~Not applicable.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Includes gay, lesbian, bisexual, and other sexual orientations.

[b]Number of incidents by another inmate and number of reported willing and unwilling incidents of staff sexual misconduct.

[c]Based only on victims reporting incidents involving force, threat of force, or pressure.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

## Methodology

The National Inmate Survey, 2011-12 (NIS-3) was conducted in 233 state and federal prisons, 358 jails, and 15 special facilities (military, Indian country, and Immigration and Customs Enforcement (ICE)) between February 2011 and May 2012. The data were collected by RTI International under a cooperative agreement with the Bureau of Justice Statistics (BJS).

The NIS-3 comprised two questionnaires—a survey of sexual victimization and a survey of mental and physical health, past drug and alcohol use, and treatment for substance abuse. Inmates were randomly assigned to receive one of the questionnaires so that at the time of the interview the content of the survey remained unknown to facility staff and the interviewers.

A total of 106,532 inmates participated in NIS-3, including the sexual victimization survey or the randomly assigned companion survey. Combined, the surveys included 43,721 inmates in state and federal prisons, 61,351 inmates in jails, 605 inmates in military facilities, 192 inmates in Indian country jails, and 663 inmates in facilities operated by ICE.

The interviews, which averaged 35 minutes in length, used computer-assisted personal interviewing (CAPI) and audio computer-assisted self-interviewing (ACASI) data collection methods. For approximately the first two minutes, survey interviewers conducted a personal interview using CAPI to obtain background information and date of admission to the facility. For the remainder of the interview, respondents interacted with a computer-administered questionnaire using a touchscreen and synchronized audio instructions delivered via headphones. Respondents completed the ACASI portion of the interview in private, with the interviewer either leaving the room or moving away from the computer.

A shorter paper questionnaire was made available for inmates who were unable to come to the private interviewing room or interact with the computer. The paper form was completed by 751 prison inmates (or 1.9% of all prison interviews)—733 were completed by adult prison inmates (1.9% of adult prison inmate interviews) and 18 were completed by prisoners ages 16 to 17 (3.4% of all prison inmate interviews of inmates ages 16 to 17). The paper questionnaire was also completed by 264 jail inmates (0.5% of all jail interviews)—255 were completed by adults (0.5% of adult jail inmate interviews) and 9 were completed by jail inmates ages 16 to 17 (0.7% of jail inmate interviews of inmates ages 16 to 17). In addition, five paper questionnaires were completed by military inmates (0.9%

of all military inmate interviews). Most of these inmates were housed in administrative or disciplinary segregation or were considered too violent to be interviewed.

Before the interview, inmates were informed verbally and in writing that participation was voluntary and that all information provided would be held in confidence. Interviews were conducted in either English (96% in prisons, 95% in jails, 35% in ICE facilities, and 100% in military and Indian country facilities) or Spanish (4% in prisons, 5% in jails, and 65% in ICE facilities).

### Selection of state and federal prisons

A sample of 241 state and federal prisons was drawn to produce a sample representing the 1,158 state and 194 federal adult confinement facilities identified in the 2005 Census of State and Federal Adult Correctional Facilities, supplemented with updated information from websites maintained by each state's department of corrections (DOC) and the Federal Bureau of Prisons (BOP). The 2005 census was a complete enumeration of adult state prisons, including all publicly operated and privately operated facilities under contract to state correctional authorities.

The NIS-3 was restricted to confinement facilities—institutions in which fewer than 50% of the inmates were regularly permitted to leave, unaccompanied by staff, for work, study, or treatment. Such facilities included prisons, penitentiaries, prison hospitals, prison farms, boot camps, and centers for reception, classification, or alcohol and drug treatment. The NIS-3 excluded community-based facilities, such as halfway houses, group homes, and work release centers.

Based on BJS's 2011 National Prisoner Statistics and 2005 Census of State and Federal Adult Correctional Facilities, the prisons in the study universe held an estimated 1,238,000 state and 203,800 federal inmates age 18 or older and 1,700 state inmates ages 16 to 17 at yearend 2011. Facilities that had been closed and new facilities that had opened since the 2005 census were identified via review of DOC and BOP websites. Facilities determined to be closed were removed from the NIS-3 frame and new facilities were added.

State and federal confinement facilities were sequentially sampled with probabilities of selection proportionate to size (as measured by the number of inmates held in state prisons on December 30, 2005, and in federal prisons on September 9, 2010).

Facilities on the sampling frame were stratified by sex of inmates housed, whether the facility had a mental health function, and whether the facility held five or more juveniles:

- Among facilities that housed males, the measure of size for facilities that held male inmates and participated in the NIS-1 in 2007 or NIS-2 in 2008-09 were adjusted to lower their probability of selection in the NIS-3.

- Among facilities with an inmate population that was at least 50% female, the measure of size for facilities that participated in the NIS-2 was reduced to lower their probability of selection in the NIS-3.

- The measures of size were further adjusted to increase the probability of selection of facilities with large juvenile populations.

Within each stratum, facilities in the sampling frame were first sorted by region, state, and public or private operation:

- The sample measures of size for facilities housing only female inmates were increased by a factor of 5 to ensure a sufficient number of women and allow for meaningful analyses of sexual victimization by sex. This led to an allocation of 51 female facilities (out of 233) in the sample.

- An additional 25 facilities were allocated to the stratum with facilities that have a mental health function, and another 20 facilities were allocated to the strata that housed juveniles.

- This led to the allocation of 66 facilities known to have a mental health function—49 male facilities and 17 female facilities—and 38 facilities that housed juveniles (36 facilities that housed males and 2 facilities that housed females).

Facilities were sampled ensuring that at least one facility in every state was selected. Federal facilities were grouped together and treated like a state for sampling purposes. The remaining facilities were selected from each region with probabilities proportionate to size.

Of the 241 selected prison facilities, 7 had closed prior to the start of data collection: Metro State Prison (Georgia), Hillsborough Corr. Inst. (Florida), Gates Corr. Inst. (Connecticut), Brush Corr. Fac. (Colorado), Burnet Co. Intermediate Sanction Fac. (Texas), and Diamondback Corr. Fac. (Oklahoma). One facility—Chittenden Regional Corr. Fac. (Vermont)—had transitioned from holding males to females during the data collection period and was considered a closed facility. All other selected prison facilities participated fully in NIS-3.

### Selection of inmates within prisons

A roster of inmates was obtained just prior to the start of data collection at each facility. Inmates age 15 or younger and inmates who were released prior to data collection were deleted from the roster. Eligible inmates within a facility were placed into one of two strata based on their ages. Inmates who were ages 16 to 17 (juveniles) were placed in one stratum and inmates age 18 or older (adults) were placed in the other. Inmates age 15 or younger were considered ineligible for the NIS-3.

### Selection of adult inmates within prisons

The number of adult inmates sampled in each facility varied based on six criteria—

- an expected sexual victimization prevalence rate of 4%

- a desired level of precision based on a standard error of 1.75%

- a projected 70% response rate among selected inmates

- a 10% chance among participating inmates of not receiving the sexual victimization questionnaire

- an adjustment factor of 1.9 to account for the complex survey design

- the size of the facility.

Each eligible adult inmate was assigned a random number and sorted in ascending order. Inmates were selected from the list up to the expected number of inmates determined by the sampling criteria.

### Selection of inmates ages 16 to 17 within prisons

The number of inmates ages 16 to 17 sampled in each facility varied based on the number who appeared on the roster:

- If fewer than 50 were on the roster, all inmates ages 16 to 17 were selected.

- If between 50 and 149 were on the roster, 75% were sampled (with a minimum of 50).

- If 150 or more were on the roster, 75% were sampled (with a minimum of 150).

In cases in which not all inmates ages 16 to 17 were selected, each eligible inmate ages 16 to 17 was assigned a random number and sorted in ascending order. Inmates were selected from the list up to the expected number of inmates determined by the sampling criteria.

A total of 74,655 prison inmates were selected. After selection, 2,233 ineligible inmates were excluded—1,441 (1.9%) were released or transferred to another facility before interviewing began, 657 (0.9%) were mentally or physically unable to be interviewed, 10 (0.01%) were age 15 or younger or their age could not be obtained during the interview process, 56 (0.5%) were selected in error (i.e., an inmate was incorrectly listed on the facility roster), 21 (0.03%) were only in the facility on weekends, and 47 (0.06%) were on unsupervised work release or only served time on weekends.

Of all selected eligible prison inmates, 32% refused to participate in the survey, 0.5% were not available to be interviewed (e.g., in court, in medical segregation, determined by the facility to be too violent to be interviewed, or restricted from participation by another legal jurisdiction), and 0.5% were not interviewed due to survey logistics (e.g., language barriers, releases, or transfers to another facility after interviewing began).

Overall, 43,721 prison inmates participated in the survey, yielding a response rate of 60%. Approximately 90% of the participating inmates (38,778) received the sexual assault survey. (See appendix table 1 for the number of participating inmates in each prison facility.)

## Selection of jail facilities

A sample of 393 jails was drawn to represent the 2,957 jail facilities identified in the Census of Jail Inmates, 2005, and the sample was supplemented with information obtained during the NIS-1 and NIS-2. The 2005 census was a complete enumeration of all jail jurisdictions, including all publicly operated and privately operated facilities under contract to jail authorities. The NIS-3 was restricted to jails that had six or more inmates on June 30, 2005. Jails identified as closed or ineligible during the NIS-1 and NIS-2 were removed from the NIS-3 frame. Based on estimates from the Annual Survey of Jails, 2011, the jails in the NIS-3 held an estimated 720,171 inmates age 18 or older and 5,700 inmates ages 16 to 17 on June 30, 2011.

Jail facilities were sequentially sampled with probabilities of selection proportionate to size (as measured by the number of inmates held on June 30, 2005).

- Two facilities that were unable to participate in the NIS-2 were selected with certainty in the NIS-3.

- The measures of size for facilities that participated in the NIS-1 or NIS-2 were adjusted to give them a lower probability of selection.

- Facilities with juveniles had their measures of size adjusted to increase their probability of selection.

- Facilities were stratified such that facilities in each of the 10 largest jail jurisdictions were placed into a stratum. Within the large jurisdiction stratum, three facilities were selected from the five largest jurisdictions with probabilities proportionate to size, and two facilities were selected from the next five largest jurisdictions with probabilities proportionate to size.

- All other facilities were placed in a single stratum and then sorted by region, state, and public or private operation. Facilities were sampled to ensure that at least one jail facility in every state was selected. The remaining jail facilities were selected from each region with probabilities proportionate to size.

Of the 393 selected jails in the NIS-3, 20 facilities refused to participate:

- Covington Co. Jail (Alabama)
- Mobile Co. Metro Jail (Alabama)
- Delaware Co. George W. Hill Corr. Fac. (Pennsylvania)
- Montcalm Co. Jail (Michigan)
- Will Co. Adult Det. Fac. (Illinois)
- Northumberland Co. Prison (Pennsylvania)
- Kenosha Co. Pre-Trial Det. Fac. (Wisconsin)
- Carroll Co. Jail (Tennessee)
- Brevard Co. Jail (Florida)
- Pinellas Co. North Division (Florida)
- Hillsborough Co. Falkenburg Road Jail (Florida)
- Paulding Co. Det. Ctr. (Georgia)
- Whitfield Co. Jail (Georgia)
- Marion Co. Jail (Tennessee)
- Sandoval Co. Det. Ctr. (New Mexico)
- Williamson Co. Jail (Texas)
- Montgomery Co. Jail (North Carolina)
- Catahoula Parish Corr. Ctr. (Louisiana)
- Escambia Co. Det. Ctr. (Alabama)
- Orleans Parish House of Det. (Louisiana).

Williamsburg Co. Jail (South Carolina), was excused due to construction at the facility. In Nassau Co. Corr. Ctr. (New York), data were collected only among inmates ages 16 to 17 due to lack of space to interview both adults and juveniles ages 16 to 17.

Fourteen facilities were determined to be ineligible: six had closed, two were considered part of another facility on the sampling frame, three had fewer than six eligible inmates, two were facilities containing only unsupervised work release inmates, and one had active litigation related to sexual victimization. All other selected jail facilities participated fully in NIS-3.

### Selection of inmates within jails

A roster of inmates was obtained just prior to the start of data collection at each facility. Inmates age 15 or younger and inmates who had not been arraigned were removed from the roster. Eligible inmates within a facility were placed into one of two stratum based on their age. Inmates who were ages 16 to 17 (juveniles) were placed in one stratum and inmates age 18 or older (adults) were placed in the other. Inmates age 15 or younger were considered ineligible for the NIS-3.

### Selection of adult inmates within jails

The number of adult inmates sampled in each facility varied based on six criteria:

- an expected prevalence rate of sexual victimization of 3%
- a desired level of precision based on a standard error of 1.4%
- a projected 65% response rate among selected inmates
- a 10% chance among participating inmates of not receiving the sexual victimization questionnaire
- an adjustment factor of 1.9 to account for the complex survey design
- a pre-arraignment adjustment factor equal to 1 in facilities where the status was known for all inmates and less than 1 in facilities where only the overall proportion of inmates who were pre-arraigned was known

Each eligible adult inmate was assigned a random number and sorted in ascending order. Inmates were selected from the list up to the expected number of inmates determined by the sampling criteria.

Due to the dynamic nature of jail populations, a second roster of inmates was obtained on the first day of data collection. Eligible adult inmates who appeared on the second roster but who had not appeared on the initial roster were identified. These inmates had been arraigned since the initial roster was created or were newly admitted to the facility and arraigned. A random sample of these new inmates was chosen using the same probability of selection used to sample from the first roster.

### Selection of inmates ages 16 to 17 within jails

The number of inmates ages 16 to 17 sampled in each facility varied based on the number who appeared on the roster:

- If fewer than 50 were on the roster, all inmates ages 16 to 17 were selected.
- If between 50 and 149 were on the roster, 75% were sampled (with a minimum of 50).
- If 150 or more were on the roster, 75% were sampled (with a minimum of 150).

In facilities in which not all inmates ages 16 to 17 were selected, each eligible inmate ages 16 to 17 was assigned a random number and sorted in ascending order. Inmates were selected from the list up to the expected number of inmates determined by the sampling criteria.

As with adult jail inmates, a second roster obtained on the first day of data collection was used to identify inmates that had been arraigned since the initial roster was created or newly admitted. A random sample of these new inmates was chosen using the same probability of selection used to sample from the first roster.

A total of 112,594 jail inmates was selected. After selection, 11,342 ineligible inmates were excluded—9,479 (8.4%) were released or transferred to another facility before interviewing began, 1,036 (0.8%) were mentally or physically unable to be interviewed, 25 (0.02%) were age 15 or younger or their age could not be obtained during the interview process, 296 (0.3%) were selected in error (i.e., an inmate was incorrectly listed on the facility roster), and 484 (0.4%) were on unsupervised work release or only served time on weekends.

Of all selected inmates, 22% refused to participate in the survey, 1.1% were not available to be interviewed (e.g., in court, in medical segregation, determined by the facility to be too violent to be interviewed, or restricted from participation by another legal jurisdiction), and 8% were not interviewed due to survey logistics (e.g., language barriers, releases, and transfers to another facility after interviewing began).

Overall, 61,351 jail inmates participated in the survey, yielding a response rate of 61%. Approximately 90% of the participating inmates (54,137) received the sexual victimization survey. (See appendix table 5 for the number of participating inmates in each jail facility.)

### Selection of special confinement facilities

A sample of 16 special facilities was drawn to represent the inmate populations in military, Indian country, and ICE facilities. Five military, six Indian country, and five ICE facilities were included.

The military frame came from the military correctional facilities population report on April 1, 2011. The Indian country frame came from the BJS report, *Jails in Indian Country, 2009,* NCJ 232223, BJS Web, February 2011. The ICE frame came from the ICE integrated decision support system on March 21, 2011.

Military, Indian country, and ICE facilities were sequentially selected with probability proportionate to the adjusted number of inmates in the facility. The measures of size (population) were adjusted to reduce the probability of selection among facilities included in the NIS-2.

Tohono O'odham Adult Detention Facility (Arizona) refused to participate in the NIS-3. All other selected special confinement facilities participated fully in the survey.

### Selection of inmates in special confinement facilities

For purposes of inmate selection, military facilities were treated as prisons, and Indian country and ICE facilities were treated like jails. The assumptions used to determine the sample size within a prison or jail and the corresponding selection procedures were used. However, in ICE facilities, a second sample of newly admitted inmates was not drawn due to an inability to identify new inmates on the ICE rosters. In addition, inmates in ICE facilities who did not speak English or Spanish were defined as ineligible for the study.

Overall, 2,874 inmates were selected, including 910 in military facilities, 300 in Indian country facilities, and 1,664 in ICE facilities. After selection, 163 ineligible inmates were excluded—28 (1.0%) were released or transferred to another facility before interviewing began, 46 (1.1%) were mentally or physically unable to be interviewed, 3 (0.1%) were sampled in error, 2 (0.1%) were inmates in custody only on the weekend, and 84 (3.0%) in ICE facilities did not speak English or Spanish.

Overall, 1,272 inmates participated in the survey (605 in military, 192 in Indian country, and 663 in ICE facilities), yielding a response rate of 68% in military, 68% in Indian country, and 43% in ICE facilities. Approximately 90% of the participating inmates (1,379) received the sexual victimization survey (539 in military, 160 in Indian country, and 573 in ICE facilities). (See appendix table 9 for the number of participating inmates in each special confinement facility.)

### Weighting and nonresponse adjustments

Responses from interviewed inmates were weighted to provide national-level and facility-level estimates. Each interviewed inmate was assigned an initial weight corresponding to the inverse of the probability of selection within each sampled facility. A series of adjustment factors was applied to the initial weight to minimize potential bias due to nonresponse and to provide national estimates.

Bias occurs when the estimated prevalence is different from the actual prevalence for a given facility. In each facility, bias could result if the random sample of inmates did not accurately represent the facility population. Bias could also result if the nonrespondents were different from the respondents. Post-stratification and nonresponse adjustments were made to the data to compensate for these two possibilities. These adjustments included—

- calibration of the weights of the responding inmates within each facility so that the estimates accurately reflected the facility's entire population in terms of known demographic characteristics. These characteristics included distributions by inmate age, sex, race, sentence length, and time since admission. This adjustment ensured that the estimates better reflected the entire population of the facility and not just the inmates who were randomly sampled.

- calibration of the weights so that the weight from a non-responding inmate was assigned to a responding inmate with similar demographic characteristics. This adjustment ensured that the estimates accurately reflected the full sample, rather than only the inmates who responded.

For each inmate, these adjustments were based on a generalized exponential model, developed by Folsom and Singh, and applied to the sexual victimization survey respondents.[6]

A final ratio adjustment to each inmate weight was made to provide national-level estimates for the total number of inmates age 18 or older and the total number of inmates ages 16 to 17 who were held in jails at midyear 2011 or in prison at yearend 2011. These ratios represented the estimated number of inmates by sex (from BJS's 2011 Annual Survey of Jails and 2011 National Prisoner Statistics) divided by the number of inmates by sex for adults and overall for juvenile inmates ages 16 to 17 in the NIS-3, after calibration for sampling and nonresponse. The national estimates for state prisons were 1,154,600

---

[6]Folsom, Jr., R.E., & Singh, A.C. (2002). "The Generalized Exponential Model for Sampling Weight Calibration for Extreme Values, Nonresponse, and Poststratification." *Proceedings of the American Statistical Association, Survey Research Methods Section,* pp. 598–603.

adult males, 83,400 adult females, and 1,700 juveniles ages 16 to 17; for federal prisons, 190,600 adult males and 13,200 adult females (there were no juveniles ages 16 to 17 in federal custody); and for jails (with an average daily population of six or more inmates), 628,620 adult males, 91,551 adult females, and 5,700 juveniles ages 16 to 17.

Final ratio adjustments were not applied to inmate weights in military, Indian country, and ICE facilities. Estimates for special confinement facilities were made at the facility level only.

### Standard errors and tests of significance

The NIS-3 is statistically unable to provide an exact ranking for all facilities as required under PREA. As with any survey, the NIS estimates are subject to error arising from the fact that they are based on a sample rather than a complete enumeration. Within each facility, the estimated sampling error varies by the size of the estimate, the number of completed interviews, and the size of the facility.

A common way to express this sampling variability is to construct a 95%-confidence interval around each survey estimate. Typically, multiplying the standard error by 1.96 and then adding or subtracting the result from the estimate produces the confidence interval. This interval expresses the range of values that could result among 95% of the different samples that could be drawn.

For small samples and estimates close to 0%, as is the case with sexual victimization in most prisons and jails, the use of the standard error to construct the 95%-confidence interval may not be reliable. An alternative developed by Wilson has been shown to perform better than the traditional method when constructing a confidence interval. (See footnote 1 on page 10.) This method produces an asymmetrical confidence interval around the facility estimates in which the lower bound is constrained to be greater than or equal to 0%. It also provides confidence intervals for facilities in which the survey estimates are zero (but other similarly conducted surveys could yield non-zero estimates). (See tables 3, 4, 5, and 6 and appendix tables 1, 2, 4, 5, 6, 8, and 9.)

When applied to large samples, the traditional and the Wilson confidence intervals are nearly identical. As a result, the tables that show national estimates display traditional standard errors. (See tables 1 and 2.) The traditional standard errors have also been used to compare estimates of sexual victimization among selected groups of inmates that have been defined by type of incident, demographic subgroup, sexual history, and criminal justice status. (See tables 7 through 9 and 11 through 20.) To facilitate the

analysis, rather than provide the detailed estimates for every standard error, differences in the estimates of sexual victimization for subgroups in these tables have been tested and notated for significance at the 95%-level of confidence.

For example, the difference in the rate of inmate-on-inmate sexual victimization among female prison inmates (6.9%) compared to male prison inmates (1.7%) is statistically significant at the 95%-level of confidence (table 7). In all tables providing detailed comparisons, statistically significant differences at the 95%-level of confidence or greater have been designated with two asterisks (**).

### Exposure period

To calculate comparative rates of sexual victimization, respondents were asked to provide the most recent date of admission to the current facility. If the date of admission was at least 12 months prior to the date of the interview, inmates were asked questions related to their experiences during the past 12 months. If the admission date was less than 12 months prior to the interview, inmates were asked about their experiences since they had arrived at the facility.

The average exposure period of inmates participating in the sexual victimization survey was—

- 8.8 months for federal prisoners
- 8.1 months for adult state prisoners
- 5.5 months for juveniles ages 16 to 17 in state prisons
- 3.7 months for jail inmates
- 7.6 months for inmates in military facilities
- 2.8 months for inmates in ICE facilities
- 2.0 months for inmates in Indian country facilities.

### Measurement of sexual victimization

The survey of sexual victimization relied on inmates reporting their direct experiences, rather than inmates reporting on the experiences of other inmates. Questions related to inmate-on-inmate sexual activity were asked separately from questions related to staff sexual misconduct. (For specific survey questions, see appendices 1 and 2.)

The ACASI survey began with a series of questions that screened for specific sexual activities without restriction, including both wanted and unwanted sex and sexual contacts with other inmates. To fully measure all sexual activities, questions related to the touching of body parts in a sexual way were followed by questions related to manual stimulation and questions related to acts involving oral,

anal, and vaginal sex. The nature of coercion (including use of physical force, pressure, and other forms of coercion) was measured for each type of reported sexual activity.

ACASI survey items related to staff sexual misconduct were asked in a different order. Inmates were first asked about being pressured or being made to feel they had to have sex or sexual contact with the staff and then asked about being physically forced. In addition, inmates were asked if any facility staff had offered favors or special privileges in exchange for sex. Finally, inmates were asked if they willingly had sex or sexual contact with staff. All reports of sex or sexual contact between an inmate and facility staff, regardless of the level of coercion, were classified as staff sexual misconduct.

The ACASI survey included additional questions related to both inmate-on-inmate sexual victimization and staff sexual misconduct. These questions, known as latent class measures, were included to assess the reliability of the survey questionnaire. After being asked detailed questions, all inmates were asked a series of general questions to determine if they had experienced any type of unwanted sex or sexual contact with another inmate or had any sex or sexual contact with staff. (See appendix 3.)

The entire ACASI questionnaire (listed as the National Inmate Survey-3) and the shorter paper and pencil survey form (PAPI) are available on the BJS website at www.bjs.gov.

### Interviews checked for inconsistent response patterns

Once data collection was completed, individual response patterns were assessed to identify interviewer error, interviews that had been completed in too short of time, and incomplete interviews. In 141 interviews, the interviewers administered sex-specific survey items inconsistent with the sex of the inmate. In 693 interviews, the inmate failed to complete enough questions to be considered a completed interview. These interviews were excluded from the calculations of sexual victimization.

Interviews were also examined for inconsistent response patterns. A list of 31 indicators were developed based on inmate characteristics (e.g., education, age, marital status, and time since admission) and items related to victimization (e.g., number of times, injuries, willing contact with staff, sex of staff perpetrator, and reporting of victimization). Indicators compared responses to initial questions with responses to detailed follow-up questions. The indicators were identified as unlikely, highly unlikely, or extremely unlikely.

Of the 31 indicators, 21 were deemed unlikely, 7 were deemed highly unlikely, and 3 were deemed extremely unlikely. An example of an unlikely indicator is when a respondent indicated victimization occurred, but responded no to all types of victimization. An example of a highly unlikely indicator is when a responded indicated that the first time a victimization occurred was before the inmate was admitted to the facility. An example of an extremely unlikely indicator is if the inmate responded yes to 12 or more of the sex-specific victimization items and indicated being victimized 11 or more times to both staff sexual misconduct and inmate-on-inmate victimization. If any of the extremely unlikely indicators were triggered and at least one highly unlikely indicator or four or more unlikely indicators were triggered, the inmate's data were removed.

The amount of time the interview took was also reviewed. Inmates whose average time for the sexual victimization items was less than 2 seconds per item and inmates whose total time was less than 10 minutes for English respondents and less than 12 minutes for Spanish respondents had their data removed.

Overall, the results revealed very high levels of consistency in survey responses. Of the 92,689 respondents to the sexual victimization survey, 87 triggered one extremely highly unlikely flag. Of these, 20 met the additional criteria for removal. In addition, data for 12 respondents were removed because their interviews did not meet the length of interview criteria. Among the 32 cases that were removed, 1 respondent was in a federal facility, 13 respondents were in state prisons (2 were juveniles ages 16 to 17), and 18 respondents were in jails. These 32 inmates came from separate facilities (i.e., only one inmate from each of these facilities was removed) and were excluded from the calculation of sexual victimization.

### Calculation of Body Mass Index (BMI)

BMI is a measurement of body fat, based on height and weight, that applies to both men and women ages 18 to 65. BMI can be used to determine if a person is underweight (18.5 or less), normal (18.5 to 24.9), overweight (25 to 29.9), obese (30 to 39.9), or morbidly obese (40 or greater). The calculation in the NIS-3 was based on the following formula provided by the Centers for Disease Control and Prevention:

$$BMI = weight\ (pounds)\ /\ [height\ (inches)]^2\ x\ 703.$$

**Screening for serious psychological distress (SPD) and history of mental health problems**

The NIS-3 included four items to measure the prevalence of any problems with emotions, nerves, or mental health an inmate may have had in the past:

R24. Have you ever been told by a mental health professional, such as a psychiatrist or psychologist, that you had…

    **a.** manic depression, a bipolar disorder or mania?

    **b.** a depressive disorder?

    **c.** schizophrenia or another psychotic disorder?

    **d.** post-traumatic stress disorder (PTSD)?

    **e.** another anxiety disorder, such as panic disorder or obsessive compulsive disorder (OCD)?

    **f.** a personality disorder, such as antisocial or borderline personality?

    **g.** a mental or emotional condition other than those listed above?

R27. During the 12 months before you were admitted to [this facility / any facility to serve time on your current sentence], did you stay overnight or longer in any type of hospital or other facility to receive treatment or counseling for problems you were having with your emotions, nerves, or mental health?

R30. At the time of the offense for which you are currently [being held / serving time], were you taking prescription medicine for any problem you were having with your emotions, nerves, or mental health?

R33. Have you ever received counseling or therapy from a trained professional, such as a psychiatrist, psychologist, social worker, or nurse, for any problem you were having with your emotions, nerves, or mental health?

**Development of the K6**

The K6 is a six-item scale designed to provide rapid assessment of the prevalence of serious psychological distress (SPD) in population surveys. (See page 25 for the six items and response categories.) Developed by Kessler and colleagues, the K6 has become widely used in epidemiological surveys throughout the world. It is included in three general population surveys in the U.S.—the Behavioral Risk Factor Surveillance System and the National Health Interview Survey (conducted by the Centers for Disease Control and Prevention) and the National Survey on Drug Use and Health (conducted by the U.S. Substance Abuse and Mental Health Services Administration).

The K6 has been recognized as a broad screener rather than a specific screener for any one mental disorder. Kessler and others have shown that the K6 outcomes are consistent with blinded clinical diagnoses of SPD in general population samples. Moreover, their statistical analyses of alternative scoring rules for the sex items have shown the unweighted sum (based on codes 0 to 4, with a total sum ranging from 0 to 24) to be virtually identical to sums using other weighting schemes. Although its use under PREA is to determine risk related to SPD and the incidence of sexual victimization, more specific screening scales could have been used to determine if sexual victimization was associated with particular kinds of mental disorder.

Prior to 2004, the K6 was used in the National Survey on Drug Use and Health (NSDUH) to estimate the prevalence of serious mental illness.  In 2008, following the recommendation of a technical advisory group, convened by the Center for Mental Health Services at the SAMHSA, NSDUH supplemented the K6 scale with questions on functional impairment. Functional impairment is defined as difficulties that substantially interfere with or limit role functioning in one or more major life activities, including basic living skills; instrumental living skills; and functioning in social, family, and vocational or educational contexts.[7] However, the NIS-3 did not include any items related to functional impairment, since past measures and scales are not appropriate for inmates held in prisons or jails.

The use of K6 for predicting serious mental illness has never been validated in a correctional setting. It may be expected that some inmates feel nervous, hopeless, restless or fidgety, sad or depressed, or worthless due to their confinement rather than due to an underlying mental health disorder. Consequently, the exact cut point for serious psychological distress may be higher than 13 among inmates than among persons in the general population.

However, the link between SPD and sexual victimization rates remains strong, regardless of the exact cut point in the K6 scale. For example, had the cut point for serious psychological distress in the NIS been raised to 17 (from 13), inmate-on-inmate sexual victimization rates would have increased to 7.6% among prison inmates and 4.4%

---

[7]Gfroerer, J., Hedden, S., Barker, P., Bose, J., & Aldworth, J. (2012). "Estimating Mental Illness in an Ongoing National Survey," Federal Committee on Statistical Methodology, available at www.fcsm.gov/12papers/Gfroerer_2012FCSM_VII-A.pdf

among jail inmates, and staff sexual misconduct rates would have increased to 7.2% among prison inmates and 4.4% among jail inmates.

## Imputation of missing data

SPD status was determined by the sum of the responses to the K6 items. Since some inmates did not respond to all six items, inclusion and imputation criteria were developed. Only respondents who answered at least four of the K6 items were included in the estimates of SPD status.

A missing K6 item was imputed in a nearest neighbor approach (i.e., the donor value for the imputed value was the nearest previous nonmissing K6 response). If the nearest K6 item was missing, then the value from the first nonmissing response preceding the missing item was used as the donor. For example, if item 2 was not answered, but item 1 was answered, then the value from the first K6 item was used as the value for the selected K6 item. If the first K6 item was missing, then the first nonmissing value that followed was used as the donor. Since only respondents who answered at least four of the K6 items were included in the analysis, the donor response was never more than two items away from the item with the missing response.

In prisons, among the 38,251 adult respondents, 555 (1.5%) answered fewer than four items and thus were not included in the estimates of SPD. Of the adult prison inmates who responded to four or more items, 931 (2.4%) had one or two items imputed.

In jails, among the 52,926 adult respondents, 1,106 (2.1%) answered fewer than four items and therefore were not included in the estimates of SPD status. Of the adult jail inmates who responded to four or more items, 1,840 (3.5%) had one or two items imputed.

## Terms and definitions

*Sexual victimization*—all types of sexual activity, e.g., oral, anal, or vaginal penetration; hand jobs; touching of the inmate's buttocks, thighs, penis, breasts, or vagina in a sexual way; abusive sexual contacts; and both willing and unwilling sexual activity with staff.

*Nonconsensual sexual acts*—unwanted contacts with another inmate or any contacts with staff that involved oral, anal, vaginal penetration, hand jobs, and other sexual acts.

*Abusive sexual contacts only*—unwanted contacts with another inmate or any contacts with staff that involved touching of the inmate's buttocks, thigh, penis, breasts, or vagina in a sexual way.

*Unwilling activity*—incidents of unwanted sexual contacts with another inmate or staff.

*Willing activity*—incidents of willing sexual contacts with staff. These contacts are characterized as willing by the reporting inmates; however, all sexual contacts between inmates and staff are legally nonconsensual.

*Staff sexual misconduct*—includes all incidents of willing and unwilling sexual contact with facility staff and all incidents of sexual activity that involved oral, anal, vaginal penetration, hand jobs, blow jobs, and other sexual acts with facility staff.

## Related prior publications

Eight BJS reports on sexual victimization in prisons and jails:

*Sexual Violence Reported by Correctional Authorities, 2004* (NCJ 210333)

*Sexual Violence Reported by Correctional Authorities, 2005* (NCJ 214646)

*Sexual Violence Reported by Correctional Authorities, 2006* (NCJ 218914)

*Sexual Victimization Reported by Adult Correctional Authorities, 2007-2008* (NCJ 231172)

*Sexual Victimization in State and Federal Prisons Reported by Inmates, 2007* (NCJ 219414)

*Sexual Victimization in Local Jails Reported by Inmates, 2007* (NCJ 221946)

*Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09* (NCJ 231169)

*Sexual Victimization Reported by Former State Prisoners, 2008* (NCJ 237363).

An overview of all of the BJS prison rape collections: *PREA Data Collection Activities, 2012* (NCJ 238640)

These reports are available on the BJS website at www.bjs.gov.

## Appendix 1. Survey items related to inmate-on-inmate sexual victimization, National Inmate Survey, 2011–12

### Males

E16. During the last 12 months, did another inmate use physical force to touch your butt, thighs, or penis in a sexual way?

E17. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to let them touch your butt, thighs, or penis in a sexual way?

E22. During the last 12 months, did another inmate use physical force to make you give or receive a hand job?

E23. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to give or receive a hand job?

E26. During the last 12 months, did another inmate use physical force to make you give or receive oral sex or a blow job?

E27. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to give or receive oral sex or a blow job?

E32. During the last 12 months, did another inmate use physical force to make you have anal sex?

E33. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to have anal sex?

E34. During the last 12 months, did another inmate use physical force to make you have any type of sex or sexual contact other than sexual touching, hand jobs, oral sex or blow jobs, or anal sex?

E35. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to have any type of sex or sexual contact other than sexual touching, hand jobs, oral sex or blow jobs, or anal sex?

### Females

E18. During the last 12 months, did another inmate use physical force to touch your butt, thighs, breasts, or vagina in a sexual way?

E19. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to let them touch your butt, thighs, breasts, or vagina in a sexual way?

E24. During the last 12 months, did another inmate use physical force to make you give or receive oral sex?

E25. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to give or receive oral sex?

E28. During the last 12 months, did another inmate use physical force to make you have vaginal sex?

E29. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to have vaginal sex?

E32. During the last 12 months, did another inmate use physical force to make you have anal sex?

E33. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to have anal sex?

E34. During the last 12 months, did another inmate use physical force to make you have any type of sex or sexual contact other than sexual touching, oral sex, vaginal sex, or anal sex?

E35. During the last 12 months, did another inmate, without using physical force, pressure you or make you feel that you had to have any type of sex or sexual contact other than sexual touching, oral sex, vaginal sex, or anal sex?

## Appendix 2. Survey items related to staff sexual misconduct, National Inmate Survey, 2011–12

These next questions are about the behavior of staff at this facility during the last 12 months. By staff we mean the employees of this facility and anybody who works as a volunteer in this facility.

G4. During the last 12 months, have any facility staff pressured you or made you feel that you had to let them have sex or sexual contact with you?

G5. During the last 12 months, have you been physically forced by any facility staff to have sex or sexual contact?

G7. During the last 12 months, have any facility staff offered you favors or special privileges in exchange for sex or sexual contact?

G2. During the last 12 months, have you willingly had sex or sexual contact with any facility staff?

G11. [IF G2 OR G4 OR G5 OR G7 = Yes] During the last 12 months, which of the following types of sex or sexual contact did you have with a facility staff person?

G11a. You touched a facility staff person's body or had your body touched in a sexual way.

G11b. You gave or received a hand job.

G11c. You gave or received oral sex or a blow job.

G11d. You had vaginal sex.

G11e. You had anal sex.

## Appendix 3. Follow-up questions for inmates reporting no sexual activity, National Inmate Survey, 2011–12

Follow-up questions for inmates reporting no sexual activity in the screener questions for sexual activity with inmates:

LCM1. During the last 12 months, did another inmate use physical force, pressure you, or make you feel that you had to have any type of sex or sexual contact?

LCM2. How long has it been since another inmate in this facility used physical force, pressured you, or made you feel that you had to have any type of sex or sexual contact?

1. Within the past 7 days
2. More than 7 days ago but within the past 30 days
3. More than 30 days ago but within the past 12 months
4. More than 12 months ago
5. This has not happened to me at this facility

Follow-up questions for inmates reporting no sexual activity in the screener questions for sexual activity with staff:

LCM5. During the last 12 months, have you had any sex or sexual contact with staff in this facility whether you wanted to have it or not?

LCM6. How long has it been since you had any sex or sexual contact with staff in this facility whether you wanted to or not?

1. Within the past 7 days
2. More than 7 days ago but within the past 30 days
3. More than 30 days ago but within the past 12 months
4. More than 12 months ago
5. This has not happened to me at this facility

**APPENDIX TABLE 1**
**Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | | 95%-confidence interval[b] | |
| | | | | Percent[f] | Lower bound | Upper bound |
| **Total** | 386,307 | 38,778 | 60.4% | 4.0% | 3.6% | 4.5% |
| **Alabama** | | | | | | |
| Bibb Corr. Fac. | 1,928 | 219 | 72.9% | 5.8% | 3.6% | 9.4% |
| G.K. Fountain Corr. Fac./J.O. Davis Corr. Fac. | 1,233 | 194 | 66.7 | 5.7 | 3.3 | 9.6 |
| Julia Tutwiler Prison[g] | 964 | 181 | 68.2 | 14.1 | 10.1 | 19.3 |
| St. Clair Corr. Fac. | 1,331 | 178 | 64.4 | 5.5 | 2.8 | 10.7 |
| **Alaska** | | | | | | |
| Anchorage Corr. Complex West | 472 | 119 | 57.0% | 5.9% | 3.1% | 10.7% |
| Hiland Mountain Corr. Ctr.[g] | 412 | 139 | 76.0 | 12.9 | 8.5 | 19.1 |
| **Arizona** | | | | | | |
| ASPC - Douglas | 2,512 | 163 | 55.6% | 1.2% | 0.3% | 4.5% |
| ASPC - Eyman | 4,919 | 200 | 41.2 | 4.1 | 2.0 | 8.2 |
| ASPC - Perryville[g] | 3,417 | 208 | 66.9 | 9.1 | 5.9 | 13.9 |
| ASPC - Tuscon[h] | 5,092 | 273 | 72.7 | 3.7 | 1.9 | 7.2 |
| ASPC - Yuma | 4,190 | 158 | 50.6 | 1.9 | 0.6 | 5.6 |
| Florence Corr. Ctr.[h,i] | 2,809 | 188 | 67.4 | 1.0 | 0.3 | 3.5 |
| La Palma Corr. Ctr.[i] | 3,023 | 163 | 45.1 | 0.0 | 0.0 | 2.3 |
| Red Rock Corr. Ctr.[i] | 1,525 | 62 | 18.8 | 2.9 | 0.8 | 10.0 |
| **Arkansas** | | | | | | |
| Ouachita River Corr. Unit | 2,558 | 136 | 80.2% | 4.2% | 2.1% | 8.5% |
| **California** | | | | | | |
| Avenal State Prison | 5,619 | 183 | 61.3% | 1.2% | 0.3% | 4.4% |
| California Corr. Ctr. | 3,527 | 120 | 39.0 | 2.1 | 0.7 | 6.0 |
| California Corr. Inst. | 4,939 | 161 | 38.7 | 5.4 | 2.4 | 11.5 |
| California Inst. for Women[g] | 1,952 | 146 | 51.6 | 6.7 | 3.8 | 11.3 |
| California Men's Colony | 6,273 | 168 | 51.8 | 1.5 | 0.6 | 4.2 |
| California Rehabilitation Ctr. | 4,173 | 137 | 45.2 | 2.5 | 0.8 | 7.3 |
| Calipatria State Prison | 4,408 | 92 | 30.8 | 2.3 | 0.8 | 6.4 |
| Central California Women's Fac.[g] | 3,745 | 196 | 67.6 | 10.1 | 6.5 | 15.3 |
| Chuckawalla Valley State Prison | 3,169 | 158 | 52.7 | 2.7 | 1.1 | 6.7 |
| Corcoran State Prison | 4,812 | 155 | 35.7 | 6.4 | 3.0 | 12.9 |
| Corr. Training Fac. | 6,635 | 214 | 66.4 | 3.2 | 1.6 | 6.3 |
| Sacramento State Prison | 2,827 | 93 | 29.7 | 3.3 | 1.2 | 8.7 |
| Salinas Valley State Prison | 3,589 | 143 | 45.8 | 3.8 | 1.8 | 7.6 |
| San Quentin State Prison | 3,495 | 156 | 50.3 | 3.8 | 1.6 | 8.6 |
| Sierra Conservation Ctr. | 3,451 | 187 | 59.8 | 1.4 | 0.5 | 3.9 |
| Solano State Prison | 4,649 | 202 | 64.8 | 2.0 | 0.8 | 5.0 |
| Valley State Prison for Women[g] | 3,513 | 178 | 56.3 | 11.5 | 7.5 | 17.2 |
| **Colorado** | | | | | | |
| Buena Vista Corr. Ctr. | 929 | 128 | 55.3% | 3.3% | 1.5% | 7.1% |
| Denver Women's Corr. Fac.[g] | 777 | 160 | 68.2 | 19.3 | 13.8 | 26.3 |
| Skyline Corr. Ctr. | 248 | 95 | 54.9 | 3.7 | 1.4 | 8.9 |
| **Connecticut** | | | | | | |
| Manson Youth Inst. | 446 | 242 | 84.3% | 5.2% | 3.4% | 7.9% |
| York Corr. Inst.[g] | 1,087 | 206 | 76.3 | 12.0 | 8.3 | 17.2 |
| **Delaware** | | | | | | |
| Central Violation of Probation Ctr. | 216 | 138 | 88.3% | 3.0% | 1.7% | 5.3% |
| Delores J. Baylor Women's Corr. Inst.[g] | 360 | 165 | 82.9 | 13.6 | 10.0 | 18.3 |
| James T. Vaughn Corr. Ctr. | 2,538 | 167 | 57.4 | 5.3 | 2.7 | 10.0 |

**APPENDIX TABLE 1 (continued)**
**Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | Percent[f] | 95%-confidence interval[b] | |
| | | | | | Lower bound | Upper bound |
| **Florida** | | | | | | |
| Apalachee Corr. Inst./West/East Unit/River Junction | 2,230 | 161 | 56.9% | 12.2% | 8.0% | 18.3% |
| Broward Corr. Inst.[g] | 699 | 154 | 64.4 | 12.0 | 7.6 | 18.6 |
| Calhoun Corr. Inst. and Work Camp | 1,615 | 185 | 64.2 | 4.1 | 2.2 | 7.7 |
| Central Florida Reception Ctr. East and South | 2,057 | 115 | 48.0 | 0.0 | 0.0 | 3.4 |
| Florida State Prison and Work Camp | 2,082 | 133 | 44.2 | 5.2 | 2.6 | 10.2 |
| Jackson Corr. Inst. and Work Camp | 1,522 | 129 | 46.1 | 4.0 | 1.7 | 9.1 |
| Lancaster Corr. Inst. and Work Camp | 908 | 184 | 69.0 | 5.5 | 3.2 | 9.3 |
| Lawtey Corr. Inst. | 806 | 198 | 79.7 | 0.0 | 0.0 | 1.9 |
| Levy Forestry Camp[g] | 159 | 91 | 66.0 | 6.1 | 3.1 | 11.9 |
| Marion Corr. Inst. and Work Camp | 1,455 | 238 | 83.2 | 2.2 | 1.1 | 4.6 |
| Martin Corr. Inst. and Work Camp | 1,489 | 189 | 66.4 | 5.8 | 3.4 | 9.7 |
| Northwest Florida Reception Ctr. | 2,073 | 135 | 48.9 | 13.7 | 8.8 | 20.7 |
| Santa Rosa Corr. Inst. | 2,686 | 185 | 60.0 | 14.0 | 9.5 | 20.3 |
| Taylor Corr. Inst. and Annex | 2,996 | 206 | 67.1 | 2.7 | 1.1 | 6.0 |
| Zephyrhills Corr. Inst. | 656 | 156 | 62.5 | 7.9 | 4.7 | 13.0 |
| **Georgia** | | | | | | |
| Autry State Prison | 1,662 | 132 | 46.2% | 6.1% | 3.3% | 11.1% |
| Burruss Corr. Training Ctr. | 763 | 228 | 79.7 | 0.6 | 0.1 | 2.6 |
| D. Ray James Prison[i] | 2,066 | 195 | 66.0 | 0.5 | 0.1 | 2.7 |
| Lee Arrendale State Prison[g] | 1,664 | 211 | 78.9 | 5.9 | 3.5 | 9.7 |
| Macon State Prison | 1,706 | 215 | 74.1 | 5.8 | 3.5 | 9.5 |
| Rogers State Prison | 1,479 | 235 | 80.2 | 2.2 | 1.0 | 4.8 |
| Valdosta State Prison | 1,457 | 139 | 50.6 | 10.5 | 6.5 | 16.7 |
| Ware State Prison | 1,521 | 231 | 78.0 | 4.6 | 2.7 | 7.8 |
| Washington State Prison | 1,537 | 216 | 82.3 | 2.2 | 1.0 | 4.7 |
| **Hawaii** | | | | | | |
| Waiawa Corr. Fac. | 280 | 155 | 92.0% | 6.2% | 4.2% | 8.8% |
| **Idaho** | | | | | | |
| Idaho Max. Security Inst. | 388 | 78 | 39.3% | 14.0% | 7.0% | 25.9% |
| St. Anthony Work Camp | 230 | 72 | 43.2 | 2.3 | 0.5 | 9.4 |
| **Illinois** | | | | | | |
| Danville Corr. Ctr. | 1,833 | 206 | 69.7% | 0.5% | 0.2% | 1.8% |
| Decatur Corr. Ctr.[g] | 683 | 157 | 65.0 | 1.1 | 0.3 | 3.3 |
| Dwight Corr. Ctr.[g] | 1,029 | 203 | 81.0 | 10.7 | 7.1 | 15.6 |
| Hill Corr. Ctr. | 1,843 | 248 | 84.1 | 4.9 | 2.7 | 8.7 |
| Menard Corr. Ctr. | 3,660 | 162 | 51.4 | 2.6 | 1.1 | 6.0 |
| Pittsfield Work Camp | 401 | 79 | 35.7 | 0.0 | 0.0 | 4.6 |
| Stateville Corr. Ctr. | 3,670 | 229 | 74.2 | 1.0 | 0.4 | 3.0 |
| Western Illinois Corr. Ctr. | 1,932 | 156 | 55.0 | 3.7 | 1.6 | 8.1 |
| **Indiana** | | | | | | |
| Miami Corr. Fac. | 3,168 | 203 | 65.5% | 3.2% | 1.5% | 7.0% |
| Reception-Diagnostic Ctr. | 645 | 148 | 63.2 | 2.4 | 1.1 | 5.5 |
| Rockville Corr. Fac.[g] | 1,140 | 224 | 83.1 | 7.6 | 4.3 | 12.9 |
| Wabash Valley Corr. Fac. | 2,080 | 169 | 49.1 | 3.2 | 1.3 | 7.7 |
| **Iowa** | | | | | | |
| Anamosa State Penitentiary | 1,166 | 166 | 59.0% | 4.5% | 2.3% | 8.7% |
| **Kansas** | | | | | | |
| Lansing Corr. Fac. | 2,241 | 191 | 66.3% | 6.7% | 4.0% | 11.0% |
| Norton Corr. Fac. | 808 | 128 | 61.6 | 5.1 | 2.6 | 9.9 |

**APPENDIX TABLE 1 (continued)**
**Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | Percent[f] | 95%-confidence interval[b] | |
| | | | | | Lower bound | Upper bound |
| **Kentucky** | | | | | | |
| Eastern Kentucky Corr. Complex | 1,704 | 154 | 50.3% | 6.3% | 3.6% | 10.9% |
| Kentucky State Reformatory | 2,039 | 156 | 53.3 | 6.4 | 3.6 | 11.3 |
| Otter Creek Corr. Complex[i] | 640 | 117 | 47.3 | 7.0 | 3.8 | 12.3 |
| **Louisiana** | | | | | | |
| B.B. Rayburn Corr. Ctr. | 1,157 | 187 | 70.1% | 4.1% | 2.1% | 8.0% |
| Elayn Hunt Corr. Ctr. | 2,158 | 184 | 68.9 | 6.5 | 3.7 | 11.0 |
| Louisiana State Penitentiary | 5,351 | 220 | 69.5 | 8.5 | 5.5 | 12.8 |
| **Maine** | | | | | | |
| Maine Corr. Ctr.[h] | 617 | 192 | 80.5% | 6.1% | 3.6% | 10.2% |
| **Maryland** | | | | | | |
| Maryland Corr. Inst. - Hagerstown | 2,021 | 180 | 61.4% | 3.1% | 1.5% | 6.4% |
| Maryland Corr. Inst. for Women[g] | 827 | 151 | 54.8 | 12.7 | 8.5 | 18.4 |
| Maryland Corr. Training Ctr. | 2,653 | 203 | 64.7 | 3.4 | 1.7 | 6.8 |
| Metropolitan Transition Ctr. | 635 | 106 | 43.9 | 3.2 | 1.4 | 7.6 |
| **Massachusetts** | | | | | | |
| Old Colony Corr. Ctr. | 856 | 181 | 69.3% | 5.6% | 3.4% | 9.3% |
| **Michigan** | | | | | | |
| Bellamy Creek Corr. Fac. | 1,822 | 186 | 58.1% | 4.4% | 2.2% | 8.6% |
| Central Michigan Corr. Fac. | 2,455 | 226 | 76.0 | 2.7 | 1.2 | 6.0 |
| Lakeland Corr. Fac. | 1,368 | 222 | 78.0 | 5.6 | 3.4 | 9.3 |
| Saginaw Corr. Fac. | 1,459 | 215 | 78.0 | 2.9 | 1.4 | 6.0 |
| Thumb Corr. Fac. | 955 | 181 | 58.3 | 3.2 | 1.3 | 7.4 |
| **Minnesota** | | | | | | |
| MCF - Moose Lake | 1,019 | 191 | 70.0% | 4.4% | 2.5% | 7.8% |
| MCF - Shakopee[g] | 564 | 156 | 67.8 | 13.0 | 8.4 | 19.6 |
| **Mississippi** | | | | | | |
| Pike Co. Community Work Ctr. | 46 | 29 | 79.5% | 0.0% | 0.0% | 11.7% |
| Walnut Grove Youth Corr. Fac.[i] | 976 | 281 | 92.0 | 9.9 | 7.2 | 13.6 |
| Wilkinson Co. Corr. Fac.[i] | 881 | 173 | 66.8 | 7.5 | 4.6 | 11.8 |
| **Missouri** | | | | | | |
| Algoa Corr. Ctr. | 1,485 | 152 | 53.3% | 0.0% | 0.0% | 2.5% |
| Farmington Corr. Fac. | 2,602 | 240 | 83.9 | 7.9 | 5.2 | 11.8 |
| South Central Corr. Fac. | 1,576 | 182 | 62.6 | 7.2 | 4.2 | 12.1 |
| Tipton Corr. Ctr. | 1,155 | 152 | 51.0 | 1.3 | 0.4 | 4.5 |
| Western Missouri Corr. Ctr. | 1,910 | 161 | 54.0 | 3.4 | 1.7 | 6.9 |
| Western Reception, Diagnostic and Corr. Ctr. | 1,876 | 187 | 67.1 | 1.5 | 0.5 | 4.1 |
| Women's Eastern Reception, Diagnostic and Corr. Ctr.[g] | 1,535 | 198 | 68.9 | 8.7 | 5.3 | 13.7 |
| **Montana** | | | | | | |
| Montana State Prison | 1,443 | 191 | 65.3% | 13.9% | 8.8% | 21.4% |
| **Nebraska** | | | | | | |
| Lincoln Corr. Ctr. | 491 | 141 | 64.2% | 4.5% | 2.4% | 8.1% |
| **Nevada** | | | | | | |
| Florence McClure Women's Corr. Ctr.[g] | 705 | 142 | 61.0% | 16.3% | 10.8% | 23.7% |
| High Desert State Prison | 2,713 | 192 | 59.4 | 2.5 | 1.0 | 6.4 |
| Lovelock Corr. Ctr. | 1,609 | 191 | 61.9 | 3.8 | 1.8 | 7.6 |
| **New Hampshire** | | | | | | |
| New Hampshire State Prison for Men | 1,370 | 193 | 69.2% | 5.5% | 2.9% | 10.3% |
| New Hampshire State Prison for Women[g] | 111 | 78 | 84.0 | 8.2 | 5.5 | 12.1 |
| **New Jersey** | | | | | | |
| Bayside State Prison | 2,241 | 119 | 39.6% | 3.4% | 1.3% | 8.6% |
| Mountainview Youth Corr. Fac. | 1,060 | 151 | 53.2 | 3.1 | 1.4 | 6.7 |
| South Woods State Prison | 3,398 | 131 | 44.1 | 5.2 | 2.3 | 11.3 |

**APPENDIX TABLE 1 (continued)**
**Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Percent[f] | 95%-confidence interval[b] Lower bound | Upper bound |
|---|---|---|---|---|---|---|
| **New Mexico** | | | | | | |
| Lea Co. Corr. Fac.[i] | 1,137 | 135 | 51.4% | 4.5% | 2.2% | 9.2% |
| New Mexico Women's Corr. Fac.[g,i] | 599 | 157 | 65.2 | 14.3 | 10.1 | 19.9 |
| **New York** | | | | | | |
| Auburn Corr. Fac. | 1,710 | 195 | 67.4% | 9.8% | 6.3% | 14.7% |
| Cayuga Corr. Fac. | 979 | 165 | 60.9 | 2.7 | 1.2 | 5.7 |
| Gowanda Corr. Fac. | 1,503 | 239 | 85.6 | 3.4 | 1.8 | 6.1 |
| Lakeview Shock Incarceration Corr. Fac.[h] | 950 | 233 | 85.4 | 1.9 | 0.8 | 4.3 |
| Otisville Corr. Fac. | 407 | 128 | 61.1 | 8.3 | 4.9 | 13.7 |
| Washington Corr. Fac. | 705 | 180 | 69.0 | 3.9 | 2.0 | 7.3 |
| Wyoming Corr. Fac. | 1,576 | 217 | 73.5 | 3.1 | 1.6 | 6.0 |
| **North Carolina** | | | | | | |
| Harnett Corr. Inst. | 987 | 160 | 58.9% | 3.6% | 1.8% | 7.0% |
| Lanesboro Corr. Inst. | 982 | 161 | 37.0 | 3.3 | 1.5 | 7.1 |
| Mary Frances Ctr.[g,i] | 93 | 68 | 84.6 | 0.0 | 0.0 | 5.3 |
| Maury Corr. Inst. | 961 | 102 | 29.0 | 5.6 | 2.7 | 11.3 |
| North Carolina Corr. Inst. for Women[g] | 1,138 | 150 | 57.8 | 13.0 | 8.3 | 19.6 |
| Odom Corr. Inst. | 531 | 129 | 59.0 | 3.3 | 1.5 | 7.4 |
| Western Youth Inst. | 668 | 227 | 70.6 | 1.1 | 0.4 | 3.2 |
| **North Dakota** | | | | | | |
| North Dakota State Penitentiary | 517 | 146 | 61.5% | 5.3% | 2.9% | 9.3% |
| **Ohio** | | | | | | |
| Allen Corr. Inst. | 1,340 | 116 | 41.2% | 3.2% | 1.1% | 9.0% |
| Belmont Corr. Inst. | 2,648 | 167 | 55.0 | 2.4 | 0.9 | 5.8 |
| Chillicothe Corr. Inst. | 2,944 | 197 | 59.4 | 5.1 | 2.8 | 9.0 |
| Franklin Medical Ctr.[h] | 577 | 129 | 55.9 | 0.0 | 0.0 | 2.9 |
| Madison Corr. Inst. | 2,333 | 172 | 47.0 | 7.2 | 3.5 | 14.3 |
| Noble Corr. Inst. | 2,561 | 186 | 62.1 | 4.5 | 2.4 | 8.1 |
| Northeast Pre-Release Ctr.[g] | 553 | 157 | 65.5 | 7.6 | 4.5 | 12.3 |
| Pickaway Corr. Fac. | 2,185 | 188 | 65.4 | 5.3 | 2.9 | 9.5 |
| **Oklahoma** | | | | | | |
| Dr. Eddie Warrior Corr. Ctr.[g] | 717 | 187 | 75.3% | 9.4% | 6.3% | 13.8% |
| Jackie Brannon Corr. Ctr. | 709 | 179 | 72.1 | 0.5 | 0.1 | 2.3 |
| Mabel Bassett Corr. Ctr.[g] | 1,054 | 193 | 70.1 | 17.5 | 13.1 | 22.9 |
| North Fork Corr. Fac.[i] | 2,326 | 46 | 17.2 | 1.7 | 0.3 | 8.7 |
| **Oregon** | | | | | | |
| Coffee Creek Corr. Fac.[g] | 1,107 | 207 | 69.1% | 10.8% | 7.5% | 15.3% |
| Deer Ridge Corr. Inst. | 754 | 165 | 65.7 | 3.2 | 1.5 | 6.6 |
| Oregon State Penitentiary | 1,989 | 203 | 62.3 | 2.9 | 1.4 | 6.1 |
| **Pennsylvania** | | | | | | |
| Cambridge Springs State Corr. Inst.[g] | 856 | 199 | 76.6% | 4.1% | 2.3% | 7.3% |
| Chester State Corr. Inst. | 1,237 | 195 | 70.0 | 1.5 | 0.5 | 4.1 |
| Houtzdale State Corr. Inst. | 2,268 | 175 | 55.7 | 1.8 | 0.6 | 5.4 |
| Mahanoy State Corr. Inst. | 2,323 | 202 | 68.6 | 0.9 | 0.3 | 3.2 |
| Muncy State Corr. Inst.[g] | 1,443 | 216 | 75.6 | 11.4 | 8.2 | 15.8 |
| Pine Grove State Corr. Inst. | 798 | 196 | 68.2 | 7.1 | 4.0 | 12.2 |
| Somerset State Corr. Inst. | 2,237 | 183 | 61.0 | 4.5 | 2.2 | 9.1 |
| Waymart State Corr. Inst. | 1,426 | 189 | 66.1 | 1.4 | 0.4 | 5.1 |
| **Rhode Island** | | | | | | |
| Donald Price Med. Security Fac. | 290 | 151 | 81.9% | 2.6% | 1.4% | 4.8% |

**APPENDIX TABLE 1 (continued)**
**Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| | | | | Inmates reporting sexual victimization[a] | | |
| | | | | | 95%-confidence interval[b] | |
| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Percent[f] | Lower bound | Upper bound |
|---|---|---|---|---|---|---|
| **South Carolina** | | | | | | |
| Camille Griffin Graham Corr. Inst.[g] | 495 | 129 | 67.5% | 8.7% | 5.2% | 14.1% |
| Kershaw Corr. Inst. | 1,473 | 232 | 78.9 | 5.6 | 3.2 | 9.7 |
| Kirkland Reception and Evaluation Ctr. | 1,672 | 233 | 85.3 | 2.8 | 1.4 | 5.8 |
| Turbeville Corr. Inst. | 1,163 | 214 | 74.6 | 3.2 | 1.6 | 6.2 |
| Tyger River Corr. Inst. | 1,287 | 206 | 63.7 | 1.9 | 0.7 | 4.8 |
| **South Dakota** | | | | | | |
| South Dakota Women's Prison[g] | 220 | 118 | 74.7% | 13.2% | 9.5% | 18.1% |
| **Tennessee** | | | | | | |
| Riverbend Max. Security Inst. | 698 | 87 | 16.5% | 1.2% | 0.3% | 4.1% |
| **Texas** | | | | | | |
| Byrd Unit | 1,095 | 183 | 60.9% | 1.8% | 0.8% | 4.4% |
| Carole Young Medical Fac. Complex[g] | 402 | 162 | 79.5 | 1.7 | 0.8 | 3.6 |
| Clemens Unit | 1,168 | 173 | 55.8 | 6.4 | 3.1 | 12.7 |
| Clements Unit | 3,631 | 141 | 43.6 | 11.9 | 7.6 | 18.0 |
| Coffield Unit | 4,113 | 210 | 66.1 | 7.9 | 4.9 | 12.4 |
| Dawson State Jail[h,i] | 2,202 | 188 | 63.7 | 2.4 | 1.1 | 5.1 |
| Eastham Unit | 2,439 | 207 | 68.1 | 4.7 | 2.7 | 8.2 |
| Gist State Jail | 1,997 | 213 | 72.2 | 1.5 | 0.5 | 4.1 |
| Gurney Transfer Fac. | 1,834 | 179 | 62.3 | 1.5 | 0.5 | 4.2 |
| Henley State Jail[g] | 423 | 138 | 69.0 | 2.4 | 1.0 | 5.8 |
| Hodge Unit | 928 | 154 | 21.9 | 2.1 | 0.8 | 5.3 |
| Holliday Transfer Fac. | 2,077 | 161 | 52.9 | 2.8 | 1.1 | 7.1 |
| Huntsville Unit | 1,530 | 171 | 67.1 | 0.9 | 0.2 | 2.9 |
| McConnell Unit | 2,905 | 172 | 54.2 | 5.3 | 2.8 | 10.0 |
| Michael Unit | 3,257 | 179 | 57.1 | 6.0 | 3.4 | 10.3 |
| Montford Psychiatric Fac. | 819 | 166 | 70.2 | 10.2 | 6.7 | 15.2 |
| Murray Unit[g] | 1,315 | 168 | 63.7 | 15.3 | 10.7 | 21.4 |
| Plane State Jail[g] | 2,175 | 175 | 63.0 | 4.4 | 2.2 | 8.9 |
| Powledge Unit | 1,119 | 170 | 61.3 | 2.9 | 1.0 | 8.0 |
| Stiles Unit | 2,935 | 151 | 49.4 | 11.9 | 7.5 | 18.6 |
| Willacy Co. State Jail[i] | 1,069 | 151 | 55.6 | 1.1 | 0.3 | 3.8 |
| Woodman State Jail[g] | 796 | 140 | 56.8 | 1.3 | 0.4 | 4.3 |
| **Utah** | | | | | | |
| Central Utah Corr. Fac. | 1,105 | 193 | 69.9% | 5.5% | 3.2% | 9.2% |
| Utah State Prison[h] | 3,746 | 233 | 73.1 | 6.4 | 3.8 | 10.5 |
| **Vermont** | | | | | | |
| Southeast State Corr. Fac. | 92 | 58 | 71.1% | 5.1% | 2.3% | 10.9% |
| Southern State Corr. Fac. | 359 | 109 | 55.3 | 9.9 | 5.6 | 16.9 |
| **Virginia** | | | | | | |
| Brunswick Women's Reception and Pre-Release Ctr.[g] | 131 | 95 | 85.8% | 0.0% | 0.0% | 3.9% |
| Dillwyn Corr. Ctr. | 1,061 | 163 | 60.3 | 4.5 | 2.2 | 9.0 |
| Sussex II State Prison | 1,276 | 204 | 74.1 | 5.4 | 3.0 | 9.5 |
| **Washington** | | | | | | |
| Clallam Bay Corr. Ctr. | 894 | 146 | 53.2% | 5.1% | 2.6% | 9.6% |
| Monroe Corr. Complex | 2,229 | 183 | 60.2 | 2.9 | 1.2 | 7.0 |
| Washington State Penitentiary | 2,017 | 119 | 41.2 | 5.2 | 2.2 | 11.9 |
| **West Virginia** | | | | | | |
| Huttonsville Corr. Ctr. | 1,147 | 128 | 46.6% | 8.1% | 4.4% | 14.6% |
| **Wisconsin** | | | | | | |
| Green Bay Corr. Inst. | 1,076 | 208 | 72.2% | 4.8% | 2.8% | 7.9% |
| Oshkosh Corr. Ctr. | 2,020 | 223 | 74.3 | 4.7 | 2.7 | 8.1 |

**APPENDIX TABLE 1 (continued)**
**Characteristics of state and federal prisons and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | | 95%-confidence interval[b] | |
| | | | | Percent[f] | Lower bound | Upper bound |
| **Wyoming** | | | | | | |
| Wyoming Honor Farm | 153 | 97 | 69.9% | 2.9% | 1.5% | 5.5% |
| **Federal Facilities (Bureau of Prisons)** | | | | | | |
| CI Eden[i] | 1,556 | 185 | 67.5% | 0.0% | 0.0% | 2.0% |
| CI Reeves I and II[i] | 2,395 | 180 | 63.7 | 0.0 | 0.0 | 2.1 |
| CI Reeves III[i] | 1,345 | 188 | 69.2 | 0.4 | 0.1 | 2.0 |
| CI Rivers[i] | 1,416 | 159 | 58.3 | 0.9 | 0.2 | 4.7 |
| FCI Allenwood Low | 1,398 | 149 | 52.4 | 1.9 | 0.7 | 5.2 |
| FCI Big Spring Camp | 209 | 70 | 45.7 | 1.2 | 0.3 | 5.0 |
| FCI Butner Med. I Camp | 328 | 99 | 49.1 | 0.0 | 0.0 | 3.7 |
| FCI Butner Med. II | 1,722 | 180 | 61.0 | 2.2 | 0.7 | 7.1 |
| FCI Forrest City Med. | 1,725 | 152 | 51.4 | 0.6 | 0.1 | 2.9 |
| FCI Greenville Camp[g] | 353 | 130 | 65.8 | 4.1 | 2.1 | 8.0 |
| FCI Jesup | 1,127 | 132 | 46.5 | 0.0 | 0.0 | 2.8 |
| FCI Lompoc | 1,413 | 164 | 57.5 | 0.6 | 0.1 | 2.8 |
| FCI Manchester Camp | 495 | 110 | 49.0 | 0.9 | 0.2 | 4.1 |
| FCI Marianna Camp[g] | 296 | 172 | 88.5 | 0.6 | 0.2 | 2.1 |
| FCI Milan | 1,525 | 163 | 58.6 | 2.4 | 1.0 | 6.0 |
| FCI Seagoville | 1,562 | 194 | 67.4 | 1.1 | 0.4 | 3.1 |
| FCI Tallahassee[g] | 1,250 | 157 | 60.2 | 5.8 | 3.2 | 10.3 |
| FCI Terre Haute | 1,182 | 92 | 34.6 | 2.2 | 0.5 | 8.2 |
| FDC Philadelphia[h] | 1,093 | 162 | 59.1 | 1.8 | 0.7 | 4.8 |
| FMC Carswell[g] | 1,413 | 193 | 64.6 | 4.2 | 2.3 | 7.5 |
| FMC Devens | 1,027 | 155 | 57.2 | 2.6 | 1.2 | 5.8 |
| FMC Lexington Camp[g] | 285 | 148 | 83.2 | 0.8 | 0.2 | 2.7 |
| FPC Alderson[g] | 1,130 | 237 | 83.6 | 2.7 | 1.2 | 5.9 |
| Limestone Co. Det. Ctr.[i] | 1,021 | 157 | 60.1 | 0.6 | 0.1 | 3.1 |
| MCFP Springfield | 1,163 | 80 | 33.5 | 1.8 | 0.6 | 5.2 |
| USP Hazelton - Female[g] | 487 | 111 | 49.0 | 5.2 | 2.6 | 10.2 |
| USP Lee | 1,479 | 101 | 32.3 | 1.7 | 0.5 | 5.7 |
| USP Tucson | 1,521 | 140 | 42.2 | 7.3 | 3.9 | 13.4 |

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[c]Number of inmates in custody on day when the facility provided the sample roster.

[d]Number of respondents completing the sexual victimization survey. (See *Methodology*.)

[e]Response rate is equal to the number of respondents divided by the number of eligible sampled inmates times 100 percent.

[f]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, sentence length, and time served. (See *Methodology*.)

[g]Female facility.

[h]Facility housed both males and females; both were sampled at this facility.

[i]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 2**
**Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[b] | | | 95%-confidence interval[b] | |
| | Percent victimized[c] | Lower bound | Upper bound | Percent victimized[c] | Lower bound | Upper bound |
| **Total** | 2.0% | 1.8% | 2.3% | 2.4% | 2.0% | 2.8% |
| **Alabama** | | | | | | |
| Bibb Corr. Fac. | 3.1% | 1.5% | 6.0% | 3.6% | 2.0% | 6.5% |
| G.K. Fountain Corr. Fac./J.O. Davis Corr. Fac. | 4.4 | 2.3 | 8.2 | 2.3 | 1.0 | 5.2 |
| Julia Tutwiler Prison[d] | 10.0 | 6.8 | 14.6 | 6.8 | 4.1 | 10.9 |
| St. Clair Corr. Fac. | 3.2 | 1.3 | 7.6 | 3.5 | 1.4 | 8.4 |
| **Alaska** | | | | | | |
| Anchorage Corr. Complex West | 3.7% | 1.8% | 7.5% | 2.2% | 0.7% | 6.5% |
| Hiland Mountain Corr. Ctr.[d] | 9.9 | 6.2 | 15.5 | 3.0 | 1.2 | 7.4 |
| **Arizona** | | | | | | |
| ASPC - Douglas | 0.0% | 0.0% | 2.3% | 1.2% | 0.3% | 4.5% |
| ASPC - Eyman | 1.8 | 0.7 | 4.4 | 3.2 | 1.4 | 7.2 |
| ASPC - Perryville[d] | 7.5 | 4.6 | 11.9 | 2.1 | 0.8 | 5.4 |
| ASPC - Tucson[e] | 1.3 | 0.5 | 3.9 | 2.4 | 1.0 | 5.4 |
| ASPC - Yuma | 0.5 | 0.1 | 3.0 | 1.4 | 0.4 | 5.0 |
| Florence Corr. Ctr.[e,f] | 0.5 | 0.1 | 2.7 | 0.5 | 0.1 | 2.7 |
| La Palma Corr. Ctr.[f] | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 2.3 |
| Red Rock Corr. Ctr.[f] | 0.0 | 0.0 | 5.8 | 2.9 | 0.8 | 10.0 |
| **Arkansas** | | | | | | |
| Ouachita River Corr. Unit | 3.0% | 1.2% | 7.2% | 1.3% | 0.5% | 3.6% |
| **California** | | | | | | |
| Avenal State Prison | 1.2% | 0.3% | 4.4% | 0.0% | 0.0% | 2.1% |
| California Corr. Ctr. | 1.4 | 0.4 | 5.0 | 0.7 | 0.1 | 3.9 |
| California Corr. Inst. | 3.3 | 1.1 | 9.4 | 2.0 | 0.7 | 6.0 |
| California Inst. for Women[d] | 3.6 | 1.7 | 7.4 | 4.2 | 2.1 | 8.3 |
| California Men's Colony | 1.5 | 0.6 | 4.2 | 0.0 | 0.0 | 2.2 |
| California Rehabilitation Ctr. | 1.4 | 0.3 | 5.2 | 1.1 | 0.2 | 5.9 |
| Calipatria State Prison | 0.7 | 0.1 | 3.8 | 1.6 | 0.4 | 5.5 |
| Central California Women's Fac.[d] | 9.5 | 6.1 | 14.7 | 2.1 | 0.8 | 5.1 |
| Chuckawalla Valley State Prison | 2.7 | 1.1 | 6.7 | 0.0 | 0.0 | 2.4 |
| Corcoran State Prison | 2.4 | 0.9 | 5.9 | 4.3 | 1.6 | 11.0 |
| Corr. Training Fac. | 1.6 | 0.6 | 3.9 | 2.8 | 1.3 | 5.7 |
| Sacramento State Prison | 2.4 | 0.8 | 7.6 | 2.2 | 0.6 | 7.9 |
| Salinas Valley State Prison | 2.2 | 0.8 | 5.6 | 3.0 | 1.4 | 6.3 |
| San Quentin State Prison | 1.7 | 0.4 | 5.9 | 2.7 | 1.1 | 6.8 |
| Sierra Conservation Ctr. | 0.4 | 0.1 | 2.3 | 1.0 | 0.3 | 3.4 |
| Solano State Prison | 0.5 | 0.1 | 2.5 | 2.0 | 0.8 | 5.0 |
| Valley State Prison for Women[d] | 11.5 | 7.5 | 17.2 | 3.9 | 1.8 | 8.0 |
| **Colorado** | | | | | | |
| Buena Vista Corr. Ctr. | 1.5% | 0.5% | 4.9% | 3.3% | 1.5% | 7.1% |
| Denver Women's Corr. Fac.[d] | 13.4 | 8.8 | 19.9 | 10.7 | 6.8 | 16.3 |
| Skyline Corr. Inst. | 0.0 | 0.0 | 3.9 | 3.6 | 1.4 | 8.9 |
| **Connecticut** | | | | | | |
| Manson Youth Inst. | 1.3% | 0.5% | 3.1% | 4.0% | 2.5% | 6.3% |
| York Corr. Fac.[d] | 11.0 | 7.4 | 16.0 | 2.5 | 1.0 | 6.3 |
| **Delaware** | | | | | | |
| Central Violation of Probation Ctr. | 0.7% | 0.2% | 2.0% | 2.4% | 1.2% | 4.5% |
| Delores J. Baylor Women's Corr. Inst.[d] | 10.7 | 7.4 | 15.3 | 7.0 | 4.6 | 10.3 |
| James T. Vaughn Corr. Ctr. | 3.6 | 1.7 | 7.6 | 1.7 | 0.5 | 5.7 |

**APPENDIX TABLE 2 (continued)**
**Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Florida** | | | | | | |
| Apalachee Corr. Inst./West/East Unit/River Junction | 7.3% | 4.3% | 12.1% | 6.8% | 3.7% | 12.2% |
| Broward Corr. Inst.[d] | 5.4 | 2.9 | 9.9 | 7.3 | 3.9 | 13.3 |
| Calhoun Corr. Inst. and Work Camp | 1.7 | 0.7 | 4.3 | 2.4 | 1.0 | 5.5 |
| Central Florida Reception Ctr. East and South | 0.0 | 0.0 | 3.4 | 0.0 | 0.0 | 3.4 |
| Florida State Prison and Work Camp | 2.8 | 1.0 | 7.2 | 3.3 | 1.5 | 7.1 |
| Jackson Corr. Inst. and Work Camp | 1.8 | 0.5 | 6.1 | 3.0 | 1.2 | 7.6 |
| Lancaster Corr. Inst. and Work Camp | 2.7 | 1.2 | 5.7 | 3.4 | 1.7 | 6.7 |
| Lawtey Corr. Inst. | 0.0 | 0.0 | 1.9 | 0.0 | 0.0 | 1.9 |
| Levy Forestry Camp[d] | 4.7 | 2.1 | 10.4 | 1.4 | 0.4 | 4.3 |
| Marion Corr. Inst. and Work Camp | 1.0 | 0.4 | 2.6 | 1.6 | 0.7 | 3.8 |
| Martin Corr. Inst. and Work Camp | 4.3 | 2.3 | 7.8 | 2.5 | 1.1 | 5.5 |
| Northwest Florida Reception Ctr. | 9.8 | 5.8 | 16.1 | 4.9 | 2.3 | 10.2 |
| Santa Rosa Corr. Inst. | 4.6 | 2.1 | 9.4 | 10.1 | 6.5 | 15.5 |
| Taylor Corr. Inst. and Annex | 0.4 | 0.1 | 2.2 | 2.2 | 0.9 | 5.5 |
| Zephyrhills Corr. Inst. | 2.9 | 1.3 | 6.1 | 5.5 | 2.9 | 10.3 |
| **Georgia** | | | | | | |
| Autry State Prison | 1.9% | 0.7% | 5.2% | 4.2% | 2.0% | 8.8% |
| Burruss Corr. Training Ctr. | 0.0 | 0.0 | 1.9 | 0.6 | 0.1 | 2.6 |
| D. Ray James Prison[f] | 0.5 | 0.1 | 2.7 | 0.0 | 0.0 | 1.9 |
| Lee Arrendale State Prison[d] | 5.9 | 3.5 | 9.7 | 0.0 | 0.0 | 1.8 |
| Macon State Prison | 1.3 | 0.5 | 3.6 | 5.3 | 3.1 | 8.9 |
| Rogers State Prison | 0.0 | 0.0 | 1.6 | 2.2 | 1.0 | 4.8 |
| Valdosta State Prison | 5.0 | 2.5 | 9.8 | 6.5 | 3.4 | 11.9 |
| Ware State Prison | 0.4 | 0.1 | 1.8 | 4.6 | 2.7 | 7.8 |
| Washington State Prison | 0.0 | 0.0 | 1.7 | 2.1 | 1.0 | 4.7 |
| **Hawaii** | | | | | | |
| Waiawa Corr. Fac. | 4.1% | 2.6% | 6.4% | 2.1% | 1.1% | 3.9% |
| **Idaho** | | | | | | |
| Idaho Max. Security Inst. | 9.4% | 3.9% | 21.0% | 8.2% | 3.1% | 19.7% |
| St. Anthony Work Camp | 0.0 | 0.0 | 5.1 | 2.3 | 0.5 | 9.4 |
| **Illinois** | | | | | | |
| Danville Corr. Ctr. | 0.5% | 0.2% | 1.8% | 0.3% | 0.1% | 1.4% |
| Decatur Corr. Ctr.[d] | 1.1 | 0.3 | 3.3 | 0.0 | 0.0 | 2.4 |
| Dwight Corr. Ctr.[d] | 9.2 | 6.0 | 14.0 | 4.2 | 2.2 | 7.9 |
| Hill Corr. Ctr. | 0.8 | 0.2 | 2.5 | 4.1 | 2.1 | 7.9 |
| Menard Corr. Ctr. | 0.4 | 0.1 | 2.4 | 2.6 | 1.1 | 6.0 |
| Pittsfield Work Camp | 0.0 | 0.0 | 4.6 | 0.0 | 0.0 | 4.6 |
| Stateville Corr. Ctr. | 0.0 | 0.0 | 1.7 | 1.0 | 0.4 | 3.0 |
| Western Illinois Corr. Ctr. | 2.2 | 0.8 | 6.1 | 3.0 | 1.2 | 7.4 |
| **Indiana** | | | | | | |
| Miami Corr. Fac. | 1.6% | 0.5% | 4.9% | 2.7% | 1.1% | 6.4% |
| Reception-Diagnostic Ctr. | 1.3 | 0.4 | 3.9 | 1.2 | 0.4 | 3.6 |
| Rockville Corr. Fac.[d] | 5.8 | 3.2 | 10.4 | 1.8 | 0.5 | 6.5 |
| Wabash Valley Corr. Fac. | 1.7 | 0.5 | 5.7 | 2.3 | 0.8 | 6.3 |
| **Iowa** | | | | | | |
| Anamosa State Penitentiary | 4.0% | 2.0% | 8.2% | 0.5% | 0.1% | 2.4% |
| **Kansas** | | | | | | |
| Lansing Corr. Fac. | 2.9% | 1.4% | 6.2% | 5.1% | 2.8% | 9.1% |
| Norton Corr. Fac. | 1.6 | 0.5 | 5.2 | 4.5 | 2.2 | 9.1 |
| **Kentucky** | | | | | | |
| Eastern Kentucky Corr. Complex | 2.0% | 0.7% | 5.6% | 5.7% | 3.2% | 10.1% |
| Kentucky State Reformatory | 3.4 | 1.5 | 7.7 | 4.5 | 2.2 | 8.9 |
| Otter Creek Corr. Complex[f] | 4.7 | 2.3 | 9.6 | 2.9 | 1.2 | 6.7 |

**APPENDIX TABLE 2 (continued)**
**Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Louisiana** | | | | | | |
| B.B. Rayburn Corr. Ctr. | 2.7% | 1.1% | 6.3% | 2.1% | 0.9% | 5.0% |
| Elayn Hunt Corr. Ctr. | 3.5 | 1.6 | 7.5 | 4.6 | 2.5 | 8.4 |
| Louisiana State Penitentiary | 3.5 | 1.7 | 7.0 | 6.3 | 3.9 | 10.1 |
| **Maine** | | | | | | |
| Maine Corr. Ctr.[e] | 6.1% | 3.6% | 10.2% | 1.8% | 0.6% | 5.1% |
| **Maryland** | | | | | | |
| Maryland Corr. Inst. - Hagerstown | 1.5% | 0.5% | 4.1% | 1.6% | 0.6% | 4.4% |
| Maryland Corr. Inst. for Women[d] | 8.4 | 5.2 | 13.2 | 5.6 | 3.0 | 10.3 |
| Maryland Corr. Training Ctr. | 1.6 | 0.6 | 4.5 | 2.4 | 1.0 | 5.3 |
| Metropolitan Transition Ctr. | 0.8 | 0.2 | 3.8 | 3.2 | 1.4 | 7.6 |
| **Massachusetts** | | | | | | |
| Old Colony Corr. Ctr. | 3.1% | 1.5% | 6.1% | 2.6% | 1.2% | 5.4% |
| **Michigan** | | | | | | |
| Bellamy Creek Corr. Fac. | 0.7% | 0.1% | 3.4% | 4.3% | 2.2% | 8.6% |
| Central Michigan Corr. Fac. | 1.3 | 0.5 | 3.5 | 1.8 | 0.6 | 5.1 |
| Lakeland Corr. Fac. | 1.7 | 0.7 | 3.9 | 4.0 | 2.1 | 7.4 |
| Saginaw Corr. Fac. | 0.4 | 0.1 | 2.1 | 2.9 | 1.4 | 6.0 |
| Thumb Corr. Fac. | 1.4 | 0.4 | 4.4 | 2.5 | 0.9 | 6.5 |
| **Minnesota** | | | | | | |
| MCF - Moose Lake | 2.8% | 1.4% | 5.6% | 2.6% | 1.2% | 5.5% |
| MCF - Shakopee[d] | 12.8 | 8.2 | 19.4 | 0.5 | 0.2 | 1.5 |
| **Mississippi** | | | | | | |
| Pike Co. Community Work Ctr. | 0.0% | 0.0% | 11.7% | 0.0% | 0.0% | 11.7% |
| Walnut Grove Youth Corr. Fac.[f] | 0.4 | 0.1 | 1.6 | 9.6 | 6.9 | 13.2 |
| Wilkinson Co. Corr. Fac.[f] | 1.1 | 0.3 | 3.4 | 6.4 | 3.8 | 10.6 |
| **Missouri** | | | | | | |
| Algoa Corr. Ctr. | 0.0% | 0.0% | 2.5% | 0.0% | 0.0% | 2.5% |
| Farmington Corr. Fac. | 5.8 | 3.6 | 9.3 | 3.7 | 2.0 | 6.7 |
| South Central Corr. Fac. | 1.0 | 0.3 | 3.6 | 6.1 | 3.4 | 10.9 |
| Tipton Corr. Ctr. | 0.0 | 0.0 | 2.5 | 1.3 | 0.4 | 4.5 |
| Western Missouri Corr. Ctr. | 1.1 | 0.3 | 3.9 | 2.3 | 1.0 | 5.3 |
| Western Reception, Diagnostic and Corr. Ctr. | 0.0 | 0.0 | 2.0 | 1.5 | 0.5 | 4.1 |
| Women's Eastern Reception, Diagnostic and Corr. Ctr.[d] | 7.8 | 4.6 | 12.8 | 1.3 | 0.5 | 3.6 |
| **Montana** | | | | | | |
| Montana State Prison | 9.0% | 4.6% | 16.8% | 9.9% | 5.3% | 17.7% |
| **Nebraska** | | | | | | |
| Lincoln Corr. Ctr. | 0.5% | 0.1% | 2.1% | 4.0% | 2.1% | 7.6% |
| **Nevada** | | | | | | |
| Florence McClure Women's Corr. Ctr.[d] | 16.3% | 10.8% | 23.7% | 2.1% | 0.8% | 5.3% |
| High Desert State Prison | 1.3 | 0.4 | 4.7 | 1.2 | 0.3 | 4.5 |
| Lovelock Corr. Ctr. | 2.3 | 0.9 | 5.7 | 1.5 | 0.5 | 4.4 |
| **New Hampshire** | | | | | | |
| New Hampshire State Prison for Men | 2.2% | 0.9% | 5.3% | 3.3% | 1.3% | 7.9% |
| New Hampshire State Prison for Women[d] | 5.8 | 3.5 | 9.3 | 2.4 | 1.2 | 4.8 |
| **New Jersey** | | | | | | |
| Bayside State Prison | 2.0% | 0.6% | 7.1% | 1.4% | 0.4% | 4.9% |
| Mountainview Youth Corr. Fac. | 0.8 | 0.2 | 4.2 | 3.1 | 1.4 | 6.7 |
| South Woods State Prison | 3.5 | 1.3 | 8.8 | 4.0 | 1.5 | 10.2 |
| **New Mexico** | | | | | | |
| Lea Co. Corr. Fac.[f] | 1.3% | 0.4% | 4.4% | 3.2% | 1.3% | 7.7% |
| New Mexico Women's Corr. Fac. [d,f] | 12.2 | 8.3 | 17.5 | 6.0 | 3.4 | 10.5 |

**APPENDIX TABLE 2 (continued)**
**Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] Lower bound | Upper bound | Percent victimized[c] | 95%-confidence interval[b] Lower bound | Upper bound |
| **New York** | | | | | | |
| Auburn Corr. Fac. | 3.7% | 1.9% | 7.3% | 6.0% | 3.4% | 10.4% |
| Cayuga Corr. Fac. | 0.0 | 0.0 | 2.3 | 2.7 | 1.2 | 5.7 |
| Gowanda Corr. Fac. | 1.1 | 0.4 | 3.2 | 2.6 | 1.3 | 5.1 |
| Lakeview Shock Incarceration Corr. Fac.[e] | 0.5 | 0.1 | 2.4 | 1.9 | 0.8 | 4.3 |
| Otisville Corr. Fac. | 3.7 | 1.7 | 8.1 | 5.9 | 3.2 | 10.6 |
| Washington Corr. Fac. | 1.0 | 0.3 | 3.1 | 2.9 | 1.4 | 6.1 |
| Wyoming Corr. Fac. | 1.4 | 0.5 | 3.8 | 1.7 | 0.7 | 4.0 |
| **North Carolina** | | | | | | |
| Harnett Corr. Inst. | 1.9% | 0.8% | 4.7% | 1.9% | 0.8% | 4.7% |
| Lanesboro Corr. Inst. | 0.0 | 0.0 | 2.3 | 3.3 | 1.5 | 7.1 |
| Mary Frances Ctr.[d,f] | 0.0 | 0.0 | 5.3 | 0.0 | 0.0 | 5.3 |
| Maury Corr. Inst. | 1.9 | 0.7 | 5.0 | 3.7 | 1.4 | 9.4 |
| North Carolina Corr. Inst. for Women[d] | 11.4 | 7.1 | 17.8 | 4.9 | 2.3 | 10.1 |
| Odom Corr. Inst. | 0.9 | 0.2 | 3.9 | 3.3 | 1.5 | 7.4 |
| Western Youth Inst. | 0.6 | 0.1 | 2.5 | 0.5 | 0.1 | 2.3 |
| **North Dakota** | | | | | | |
| North Dakota State Penitentiary | 2.5% | 1.1% | 5.6% | 3.3% | 1.6% | 6.9% |
| **Ohio** | | | | | | |
| Allen Corr. Inst. | 1.5% | 0.3% | 7.7% | 1.7% | 0.5% | 5.7% |
| Belmont Corr. Inst. | 1.6 | 0.6 | 4.6 | 0.7 | 0.1 | 3.8 |
| Chillicothe Corr. Inst. | 4.5 | 2.4 | 8.1 | 0.8 | 0.2 | 3.3 |
| Franklin Medical Ctr.[e] | 0.0 | 0.0 | 2.9 | 0.0 | 0.0 | 2.9 |
| Madison Corr. Inst. | 3.0 | 1.2 | 7.3 | 4.2 | 1.5 | 11.4 |
| Noble Corr. Inst. | 0.8 | 0.3 | 2.3 | 3.7 | 1.8 | 7.3 |
| Northeast Pre-Release Ctr.[d] | 5.2 | 3.0 | 8.8 | 2.4 | 0.8 | 7.0 |
| Pickaway Corr. Fac. | 3.2 | 1.5 | 6.7 | 2.1 | 0.8 | 5.3 |
| **Oklahoma** | | | | | | |
| Dr. Eddie Warrior Corr. Ctr.[d] | 8.1% | 5.3% | 12.3% | 2.4% | 1.0% | 5.5% |
| Jackie Brannon Corr. Ctr. | 0.5 | 0.1 | 2.3 | 0.0 | 0.0 | 2.1 |
| Mabel Bassett Corr. Ctr.[d] | 15.3 | 11.3 | 20.6 | 3.4 | 1.8 | 6.6 |
| North Fork Corr. Fac.[f] | 0.0 | 0.0 | 7.7 | 1.6 | 0.3 | 8.7 |
| **Oregon** | | | | | | |
| Coffee Creek Corr. Fac.[d] | 8.0% | 5.2% | 12.0% | 4.7% | 2.7% | 8.1% |
| Deer Ridge Corr. Inst. | 2.3 | 1.1 | 5.0 | 0.9 | 0.2 | 4.1 |
| Oregon State Penitentiary | 2.1 | 0.8 | 5.0 | 0.9 | 0.3 | 3.1 |
| **Pennsylvania** | | | | | | |
| Cambridge Springs State Corr. Inst.[d] | 3.7% | 1.9% | 6.7% | 0.9% | 0.3% | 2.7% |
| Chester State Corr. Inst. | 0.5 | 0.1 | 2.3 | 1.0 | 0.3 | 3.6 |
| Houtzdale State Corr. Inst. | 0.0 | 0.0 | 2.1 | 1.8 | 0.6 | 5.4 |
| Mahanoy State Corr. Inst. | 0.0 | 0.0 | 1.9 | 0.9 | 0.3 | 3.2 |
| Muncy State Corr. Inst.[d] | 8.9 | 6.0 | 12.9 | 3.6 | 2.0 | 6.4 |
| Pine Grove State Corr. Inst. | 2.0 | 0.8 | 4.6 | 6.3 | 3.4 | 11.4 |
| Somerset State Corr. Inst. | 2.9 | 1.1 | 7.4 | 3.1 | 1.3 | 7.1 |
| Waymart State Corr. Inst. | 1.0 | 0.2 | 5.0 | 0.4 | 0.1 | 2.1 |
| **Rhode Island** | | | | | | |
| Donald Price Med. Security Fac. | 0.9% | 0.4% | 2.4% | 1.7% | 0.8% | 3.6% |
| **South Carolina** | | | | | | |
| Camille Griffin Graham Corr. Inst.[d] | 6.5% | 3.6% | 11.4% | 3.0% | 1.3% | 6.7% |
| Kershaw Corr. Inst. | 3.0 | 1.3 | 6.8 | 2.6 | 1.3 | 5.3 |
| Kirkland Reception and Evaluation Ctr. | 1.5 | 0.5 | 3.9 | 1.4 | 0.5 | 3.7 |
| Turbeville Corr. Inst. | 1.5 | 0.5 | 3.9 | 2.3 | 1.0 | 5.0 |
| Tyger River Corr. Inst. | 0.9 | 0.3 | 2.9 | 1.0 | 0.3 | 3.8 |

**APPENDIX TABLE 2 (continued)**
**Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **South Dakota** | | | | | | |
| South Dakota Women's Prison[d] | 12.4% | 8.8% | 17.3% | 2.6% | 1.2% | 5.4% |
| **Tennessee** | | | | | | |
| Riverbend Max. Security Inst. | 0.4% | 0.1% | 2.0% | 1.2% | 0.3% | 4.1% |
| **Texas** | | | | | | |
| Byrd Unit | 0.9% | 0.3% | 2.8% | 1.0% | 0.3% | 3.3% |
| Carole Young Medical Fac. Complex[d] | 1.2 | 0.5 | 3.0 | 1.3 | 0.5 | 3.1 |
| Clemens Unit | 2.9 | 0.9 | 8.8 | 3.5 | 1.5 | 8.2 |
| Clements Unit | 6.8 | 3.8 | 11.7 | 9.5 | 5.7 | 15.3 |
| Coffield Unit | 1.1 | 0.3 | 3.8 | 6.8 | 4.1 | 11.1 |
| Dawson State Jail[e,f] | 1.4 | 0.5 | 3.9 | 1.6 | 0.6 | 4.1 |
| Eastham Unit | 2.3 | 1.0 | 5.1 | 2.9 | 1.4 | 5.9 |
| Gist State Jail | 0.6 | 0.1 | 2.9 | 0.9 | 0.2 | 3.1 |
| Gurney Transfer Fac. | 1.5 | 0.5 | 4.2 | 0.6 | 0.1 | 2.9 |
| Henley State Jail[d] | 1.7 | 0.6 | 4.9 | 0.8 | 0.2 | 3.2 |
| Hodge Unit | 1.9 | 0.7 | 5.2 | 0.7 | 0.2 | 2.6 |
| Holliday Transfer Fac. | 1.0 | 0.3 | 3.7 | 1.8 | 0.5 | 6.1 |
| Huntsville Unit | 0.5 | 0.1 | 2.6 | 0.3 | 0.1 | 1.7 |
| McConnell Unit | 3.4 | 1.4 | 8.0 | 2.3 | 1.1 | 4.9 |
| Michael Unit | 4.4 | 2.3 | 8.4 | 2.1 | 0.8 | 5.2 |
| Montford Psychiatric Fac. | 8.4 | 5.2 | 13.1 | 5.0 | 2.7 | 9.2 |
| Murray Unit[d] | 11.3 | 7.3 | 17.0 | 4.4 | 2.3 | 8.2 |
| Plane State Jail[d] | 2.1 | 0.9 | 5.2 | 2.3 | 0.8 | 6.5 |
| Powledge Unit | 1.8 | 0.5 | 6.5 | 1.1 | 0.2 | 5.2 |
| Stiles Unit | 7.8 | 4.3 | 13.8 | 6.2 | 3.2 | 11.4 |
| Willacy Co. State Jail[f] | 1.1 | 0.3 | 3.8 | 0.6 | 0.1 | 2.8 |
| Woodman State Jail[d] | 1.3 | 0.4 | 4.3 | 0.0 | 0.0 | 2.7 |
| **Utah** | | | | | | |
| Central Utah Corr. Fac. | 3.7% | 2.0% | 6.9% | 2.7% | 1.2% | 5.7% |
| Utah State Prison[e] | 5.6 | 3.2 | 9.5 | 1.2 | 0.4 | 3.6 |
| **Vermont** | | | | | | |
| Southeast State Corr. Fac. | 2.2% | 0.7% | 6.5% | 5.1% | 2.3% | 10.9% |
| Southern State Corr. Fac. | 7.7 | 3.9 | 14.6 | 4.8 | 2.2 | 10.3 |
| **Virginia** | | | | | | |
| Brunswick Women's Reception and Pre-Release Ctr.[d] | 0.0% | 0.0% | 3.9% | 0.0% | 0.0% | 3.9% |
| Dillwyn Corr. Ctr. | 0.8 | 0.2 | 3.9 | 3.7 | 1.7 | 8.0 |
| Sussex II State Prison | 1.3 | 0.4 | 4.6 | 4.1 | 2.2 | 7.7 |
| **Washington** | | | | | | |
| Clallam Bay Corr. Ctr. | 1.6% | 0.5% | 5.1% | 3.5% | 1.6% | 7.5% |
| Monroe Corr. Complex | 0.3 | 0.1 | 1.6 | 2.6 | 1.0 | 6.8 |
| Washington State Penitentiary | 3.3 | 1.1 | 9.4 | 1.9 | 0.5 | 6.9 |
| **West Virginia** | | | | | | |
| Huttonsville Corr. Ctr. | 2.8% | 1.0% | 7.5% | 6.5% | 3.2% | 12.8% |
| **Wisconsin** | | | | | | |
| Green Bay Corr. Inst. | 2.4% | 1.2% | 4.7% | 2.4% | 1.1% | 5.1% |
| Oshkosh Corr. Ctr. | 3.9 | 2.1 | 7.2 | 1.1 | 0.4 | 3.1 |
| **Wyoming** | | | | | | |
| Wyoming Honor Farm | 1.0% | 0.3% | 3.0% | 2.9% | 1.5% | 5.5% |

**APPENDIX TABLE 2 (continued)**
**Percent of prison inmates reporting sexual victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Federal Facilities (Bureau of Prisons)** | | | | | | |
| CI Eden[f] | 0.0% | 0.0% | 2.0% | 0.0% | 0.0% | 2.0% |
| CI Reeves I and II[f] | 0.0 | 0.0 | 2.1 | 0.0 | 0.0 | 2.1 |
| CI Reeves III[f] | 0.0 | 0.0 | 2.0 | 0.4 | 0.1 | 2.0 |
| CI Rivers[f] | 0.9 | 0.2 | 4.7 | 0.0 | 0.0 | 2.4 |
| FCI Allenwood Low | 0.5 | 0.1 | 2.8 | 1.4 | 0.4 | 4.5 |
| FCI Big Spring Camp | 0.0 | 0.0 | 5.2 | 1.2 | 0.3 | 5.0 |
| FCI Butner Med. I Camp | 0.0 | 0.0 | 3.7 | 0.0 | 0.0 | 3.7 |
| FCI Butner Med. II | 1.4 | 0.3 | 7.0 | 0.8 | 0.2 | 2.7 |
| FCI Forrest City Med. | 0.0 | 0.0 | 2.5 | 0.6 | 0.1 | 2.9 |
| FCI Greenville Camp[d] | 3.3 | 1.5 | 7.0 | 0.8 | 0.2 | 3.2 |
| FCI Jesup | 0.0 | 0.0 | 2.8 | 0.0 | 0.0 | 2.8 |
| FCI Lompoc | 0.0 | 0.0 | 2.3 | 0.6 | 0.1 | 2.8 |
| FCI Manchester Camp | 0.9 | 0.2 | 4.1 | 0.0 | 0.0 | 3.4 |
| FCI Marianna Camp[d] | 0.6 | 0.2 | 2.1 | 0.0 | 0.0 | 2.2 |
| FCI Milan | 1.2 | 0.3 | 4.0 | 1.3 | 0.4 | 4.4 |
| FCI Seagoville | 1.1 | 0.4 | 3.1 | 0.0 | 0.0 | 1.9 |
| FCI Tallahassee[d] | 4.0 | 2.1 | 7.8 | 2.3 | 0.8 | 6.1 |
| FCI Terre Haute | 0.5 | 0.1 | 2.7 | 1.6 | 0.3 | 8.3 |
| FDC Philadelphia[e] | 1.2 | 0.4 | 4.0 | 0.6 | 0.1 | 3.0 |
| FMC Carswell[d] | 4.2 | 2.3 | 7.5 | 0.4 | 0.1 | 2.2 |
| FMC Devens | 1.3 | 0.4 | 4.1 | 1.4 | 0.5 | 3.8 |
| FMC Lexington Camp[d] | 0.8 | 0.2 | 2.7 | 0.0 | 0.0 | 2.5 |
| FPC Alderson[d] | 2.3 | 1.0 | 5.5 | 0.4 | 0.1 | 1.8 |
| Limestone Co. Det. Ctr.[f] | 0.6 | 0.1 | 3.1 | 0.0 | 0.0 | 2.4 |
| MCFP Springfield | 1.2 | 0.3 | 4.2 | 0.6 | 0.1 | 3.4 |
| USP Hazelton - Female[d] | 4.4 | 2.0 | 9.2 | 0.8 | 0.2 | 3.7 |
| USP Lee | 0.9 | 0.2 | 4.8 | 0.7 | 0.1 | 3.9 |
| USP Tucson | 4.1 | 1.7 | 9.5 | 3.2 | 1.3 | 7.9 |

Note: Detail may sum to more than total victimization rate because victims may have reported both inmate-on-inmate and staff-on-inmate sexual victimization.

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months, or since admission to the facility, if shorter.

[b]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[c]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, time served, and sentence length. (See *Methodology*.)

[d]Female facility.

[e]Facility housed both males and females; both were sampled at this facility.

[f]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 3**
**Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] Physically forced[b] | Pressured[c] | Staff sexual misconduct[a] Physically forced[b] | Pressured[c] | Without force or pressure[d] |
|---|---|---|---|---|---|
| **Total** | 1.3% | 1.6% | 0.8% | 1.4% | 1.4% |
| **Alabama** | | | | | |
| Bibb Corr. Fac. | 2.0% | 1.8% | 0.3% | 1.5% | 2.9% |
| G.K. Fountain Corr. Fac./J.O. Davis Corr. Fac. | 3.5 | 3.1 | 1.0 | 1.7 | 1.3 |
| Julia Tutwiler Prison[e] | 5.0 | 7.8 | 4.0 | 5.5 | 2.4 |
| St. Clair Corr. Fac. | 2.5 | 3.2 | 1.1 | 2.9 | 1.7 |
| **Alaska** | | | | | |
| Anchorage Corr. Complex West | 3.7% | 2.3% | 1.2% | 1.2% | 1.0% |
| Hiland Mountain Corr. Ctr.[e] | 5.9 | 8.3 | 0.7 | 3.0 | 1.6 |
| **Arizona** | | | | | |
| ASPC - Douglas | 0.0% | 0.0% | 1.2% | 0.4% | 0.4% |
| ASPC - Eyman | 1.3 | 1.8 | 1.8 | 1.7 | 1.7 |
| ASPC - Perryville[e] | 4.3 | 6.5 | 1.3 | 1.8 | 1.7 |
| ASPC - Tuscon[f] | 0.6 | 0.7 | 0.6 | 1.6 | 1.2 |
| ASPC - Yuma | 0.5 | 0.0 | 0.5 | 1.4 | 0.0 |
| Florence Corr. Ctr.[f,g] | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 |
| La Palma Corr. Ctr.[g] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Red Rock Corr. Ctr.[g] | 0.0 | 0.0 | 0.0 | 0.0 | 2.9 |
| **Arkansas** | | | | | |
| Ouachita River Corr. Unit | 2.2% | 3.0% | 0.4% | 0.4% | 0.9% |
| **California** | | | | | |
| Avenal State Prison | 1.2% | 0.5% | 0.0% | 0.0% | 0.0% |
| California Corr. Ctr. | 0.8 | 1.4 | 0.0 | 0.0 | 0.7 |
| California Corr. Inst. | 0.9 | 2.9 | 0.3 | 2.0 | 0.0 |
| California Inst. for Women[e] | 1.9 | 3.0 | 0.6 | 3.7 | 1.2 |
| California Men's Colony | 1.1 | 1.5 | 0.0 | 0.0 | 0.0 |
| California Rehabilitation Ctr. | 0.4 | 1.0 | 0.0 | 1.1 | 0.0 |
| Calipatria State Prison | 0.7 | 0.7 | 0.7 | 0.7 | 0.9 |
| Central California Women's Fac.[e] | 7.5 | 5.4 | 1.5 | 2.1 | 0.0 |
| Chuckawalla Valley State Prison | 1.5 | 1.8 | 0.0 | 0.0 | 0.0 |
| Corcoran State Prison | 2.0 | 2.0 | 0.0 | 1.7 | 2.6 |
| Corr. Training Fac. | 1.2 | 0.8 | 1.8 | 1.1 | 2.2 |
| Sacramento State Prison | 1.4 | 2.4 | 0.0 | 2.2 | 0.0 |
| Salinas Valley State Prison | 2.2 | 2.2 | 1.4 | 2.0 | 1.0 |
| San Quentin State Prison | 1.7 | 1.7 | 1.4 | 1.9 | 1.9 |
| Sierra Conservation Ctr. | 0.0 | 0.4 | 0.0 | 0.4 | 0.5 |
| Solano State Prison | 0.0 | 0.5 | 0.4 | 0.9 | 1.1 |
| Valley State Prison for Women[e] | 8.8 | 10.7 | 3.1 | 3.6 | 0.7 |
| **Colorado** | | | | | |
| Buena Vista Corr. Ctr. | 1.5% | 1.5% | 1.2% | 2.8% | 0.8% |
| Denver Women's Corr. Fac.[e] | 9.7 | 11.8 | 7.3 | 8.8 | 3.2 |
| Skyline Corr. Inst. | 0.0 | 0.0 | 0.6 | 1.8 | 1.9 |
| **Connecticut** | | | | | |
| Manson Youth Inst. | 0.5% | 0.8% | 1.6% | 2.2% | 2.7% |
| York Corr. Fac.[e] | 7.2 | 9.1 | 0.4 | 2.4 | 0.3 |
| **Delaware** | | | | | |
| Central Violation of Probation Ctr. | 0.7% | 0.7% | 0.8% | 1.5% | 1.6% |
| Delores J. Baylor Women's Corr. Inst.[e] | 6.0 | 5.8 | 0.6 | 5.2 | 3.2 |
| James T. Vaughn Corr. Ctr. | 3.2 | 2.5 | 0.0 | 0.8 | 0.9 |
| **Florida** | | | | | |
| Apalachee Corr. Inst./West/East Unit/River Junction | 5.0% | 6.9% | 1.3% | 2.4% | 5.7% |
| Broward Corr. Inst.[e] | 2.3 | 3.6 | 4.7 | 3.5 | 1.3 |
| Calhoun Corr. Inst. and Work Camp | 1.4 | 1.0 | 0.7 | 1.1 | 2.4 |
| Central Florida Reception Ctr. East and South | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Florida State Prison and Work Camp | 2.3 | 1.6 | 0.9 | 1.4 | 2.9 |

**APPENDIX TABLE 3 (continued)**
**Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | Without force or pressure[d] |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | |
| Jackson Corr. Inst. and Work Camp | 0.8% | 1.8% | 1.8% | 1.9% | 0.3% |
| Lancaster Corr. Inst. and Work Camp | 1.6 | 2.0 | 1.1 | 2.2 | 2.8 |
| Lawtey Corr. Inst. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Levy Forestry Camp[e] | 4.7 | 3.6 | 1.4 | 1.4 | 0.0 |
| Marion Corr. Inst. and Work Camp | 0.6 | 1.0 | 0.7 | 1.2 | 1.6 |
| Martin Corr. Inst. and Work Camp | 1.3 | 4.3 | 1.5 | 1.5 | 1.0 |
| Northwest Florida Reception Ctr. | 6.9 | 6.9 | 1.8 | 2.9 | 3.4 |
| Santa Rosa Corr. Inst. | 2.5 | 3.5 | 2.4 | 6.4 | 3.5 |
| Taylor Corr. Inst. and Annex | 0.4 | 0.4 | 1.2 | 1.2 | 1.0 |
| Zephyrhills Corr. Inst. | 1.9 | 2.5 | 1.9 | 2.0 | 3.4 |
| **Georgia** | | | | | |
| Autry State Prison | 0.7% | 1.9% | 0.8% | 0.8% | 4.2% |
| Burruss Corr. Training Ctr. | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| D. Ray James Prison[g] | 0.0 | 0.5 | 0.0 | 0.0 | 0.0 |
| Lee Arrendale State Prison[e] | 2.5 | 4.4 | 0.0 | 0.0 | 0.0 |
| Macon State Prison | 1.3 | 1.3 | 1.5 | 2.9 | 3.8 |
| Rogers State Prison | 0.0 | 0.0 | 0.0 | 0.4 | 1.8 |
| Valdosta State Prison | 4.2 | 4.0 | 2.2 | 3.0 | 2.6 |
| Ware State Prison | 0.0 | 0.4 | 1.7 | 2.2 | 3.4 |
| Washington State Prison | 0.0 | 0.0 | 0.9 | 0.5 | 1.7 |
| **Hawaii** | | | | | |
| Waiawa Corr. Fac. | 2.6% | 3.3% | 0.7% | 1.4% | 1.4% |
| **Idaho** | | | | | |
| Idaho Max. Security Inst. | 8.3% | 4.8% | 6.0% | 6.0% | 5.9% |
| St. Anthony Work Camp | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 |
| **Illinois** | | | | | |
| Danville Corr. Ctr. | 0.5% | 0.3% | 0.0% | 0.3% | 0.0% |
| Decatur Corr. Ctr.[e] | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Dwight Corr. Ctr.[e] | 6.8 | 6.9 | 2.6 | 3.7 | 0.5 |
| Hill Corr. Ctr. | 0.3 | 0.8 | 1.2 | 3.3 | 2.2 |
| Menard Corr. Ctr. | 0.4 | 0.0 | 0.6 | 1.3 | 1.3 |
| Pittsfield Work Camp | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Stateville Corr. Ctr. | 0.0 | 0.0 | 0.0 | 0.3 | 0.8 |
| Western Illinois Corr. Ctr. | 0.8 | 2.2 | 0.8 | 2.3 | 0.9 |
| **Indiana** | | | | | |
| Miami Corr. Fac. | 0.9% | 1.6% | 0.0% | 1.5% | 1.2% |
| Reception-Diagnostic Ctr. | 1.0 | 0.3 | 0.0 | 0.0 | 1.2 |
| Rockville Corr. Fac.[e] | 2.6 | 4.0 | 0.3 | 0.0 | 1.4 |
| Wabash Valley Corr. Fac. | 0.0 | 1.7 | 0.8 | 0.8 | 1.5 |
| **Iowa** | | | | | |
| Anamosa State Penitentiary | 1.3% | 4.0% | 0.5% | 0.0% | 0.5% |
| **Kansas** | | | | | |
| Lansing Corr. Fac. | 2.4% | 1.9% | 2.8% | 3.2% | 3.1% |
| Norton Corr. Fac. | 1.6 | 1.0 | 2.6 | 2.6 | 2.8 |
| **Kentucky** | | | | | |
| Eastern Kentucky Corr. Complex | 1.2% | 2.0% | 1.6% | 2.9% | 5.0% |
| Kentucky State Reformatory | 2.1 | 2.6 | 0.5 | 3.1 | 3.6 |
| Otter Creek Corr. Complex[g] | 1.4 | 3.9 | 0.7 | 0.7 | 2.2 |
| **Louisiana** | | | | | |
| B.B. Rayburn Corr. Ctr. | 1.2% | 2.7% | 1.7% | 1.1% | 0.9% |
| Elayn Hunt Corr. Ctr. | 2.7 | 1.3 | 1.6 | 3.8 | 1.2 |
| Louisiana State Penitentiary | 1.6 | 3.5 | 2.2 | 3.3 | 4.6 |
| **Maine** | | | | | |
| Maine Corr. Ctr.[f] | 3.1% | 4.4% | 0.0% | 1.8% | 1.0% |

**APPENDIX TABLE 3 (continued)**
**Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | Without force or pressure[d] |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | |
| **Maryland** | | | | | |
| Maryland Corr. Inst. - Hagerstown | 1.0% | 1.5% | 0.6% | 0.6% | 1.6% |
| Maryland Corr. Inst. for Women[e] | 4.8 | 5.1 | 0.9 | 5.6 | 1.4 |
| Maryland Corr. Training Ctr. | 1.6 | 1.0 | 0.6 | 1.4 | 1.4 |
| Metropolitan Transition Ctr. | 0.8 | 0.8 | 1.8 | 1.8 | 2.2 |
| **Massachusetts** | | | | | |
| Old Colony Corr. Ctr. | 2.5% | 1.6% | 1.5% | 2.0% | 1.1% |
| **Michigan** | | | | | |
| Bellamy Creek Corr. Fac. | 0.7% | 0.7% | 1.1% | 2.0% | 2.7% |
| Central Michigan Corr. Fac. | 0.4 | 1.3 | 0.7 | 0.7 | 1.8 |
| Lakeland Corr. Fac. | 0.8 | 0.9 | 2.4 | 3.5 | 2.7 |
| Saginaw Corr. Fac. | 0.4 | 0.4 | 1.5 | 1.1 | 1.6 |
| Thumb Corr. Fac. | 1.4 | 0.7 | 1.5 | 2.5 | 1.0 |
| **Minnesota** | | | | | |
| MCF - Moose Lake | 0.4% | 2.4% | 1.5% | 1.6% | 2.1% |
| MCF - Shakopee[f] | 7.3 | 10.2 | 0.2 | 0.5 | 0.0 |
| **Mississippi** | | | | | |
| Pike Co. Community Work Ctr. | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Walnut Grove Youth Corr. Fac.[g] | 0.4 | 0.0 | 1.5 | 2.7 | 8.8 |
| Wilkinson Co. Corr. Fac.[g] | 1.1 | 0.6 | 0.5 | 1.9 | 5.7 |
| **Missouri** | | | | | |
| Algoa Corr. Ctr. | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Farmington Corr. Fac. | 4.7 | 4.2 | 2.4 | 3.2 | 1.7 |
| South Central Corr. Fac. | 1.0 | 1.0 | 2.2 | 1.8 | 3.0 |
| Tipton Corr. Ctr. | 0.0 | 0.0 | 0.8 | 0.8 | 1.3 |
| Western Missouri Corr. Ctr. | 0.7 | 0.4 | 0.0 | 0.6 | 2.3 |
| Western Reception, Diagnostic and Corr. Ctr. | 0.0 | 0.0 | 0.0 | 0.5 | 1.0 |
| Women's Eastern Reception, Diagnostic and Corr. Ctr.[e] | 6.2 | 4.1 | 0.4 | 1.3 | 0.4 |
| **Montana** | | | | | |
| Montana State Prison | 7.1% | 5.0% | 3.5% | 8.0% | 2.3% |
| **Nebraska** | | | | | |
| Lincoln Corr. Ctr. | 0.5% | 0.0% | 0.7% | 1.1% | 2.8% |
| **Nevada** | | | | | |
| Florence McClure Women's Corr. Ctr.[e] | 12.0% | 11.3% | 0.4% | 2.1% | 0.0% |
| High Desert State Prison | 0.0 | 1.3 | 0.8 | 0.8 | 1.2 |
| Lovelock Corr. Ctr. | 1.5 | 1.5 | 1.2 | 0.2 | 1.0 |
| **New Hampshire** | | | | | |
| New Hampshire State Prison for Men | 1.7% | 1.2% | 2.4% | 2.4% | 0.9% |
| New Hampshire State Prison for Women[e] | 4.3 | 3.3 | 2.4 | 2.4 | 1.2 |
| **New Jersey** | | | | | |
| Bayside State Prison | 1.2% | 2.0% | 0.0% | 1.4% | 0.0% |
| Mountainview Youth Corr. Fac. | 0.8 | 0.8 | 0.8 | 2.6 | 1.8 |
| South Woods State Prison | 2.9 | 3.5 | 1.0 | 2.3 | 2.8 |
| **New Mexico** | | | | | |
| Lea Co. Corr. Fac.[g] | 0.6% | 1.3% | 0.0% | 2.4% | 2.4% |
| New Mexico Women's Corr. Fac.[e,g] | 6.8 | 8.9 | 4.5 | 5.3 | 2.4 |
| **New York** | | | | | |
| Auburn Corr. Fac. | 3.1% | 2.8% | 3.0% | 2.9% | 1.8% |
| Cayuga Corr. Fac. | 0.0 | 0.0 | 1.6 | 2.1 | 1.6 |
| Gowanda Corr. Fac. | 0.4 | 1.1 | 1.8 | 1.9 | 0.3 |
| Lakeview Shock Incarceration Corr. Fac.[f] | 0.5 | 0.5 | 0.9 | 1.4 | 1.3 |
| Otisville Corr. Fac. | 0.8 | 3.7 | 3.3 | 0.8 | 3.5 |
| Washington Corr. Fac. | 0.6 | 0.4 | 1.8 | 2.5 | 0.4 |
| Wyoming Corr. Fac. | 0.4 | 1.4 | 0.4 | 1.2 | 0.5 |

**APPENDIX TABLE 3 (continued)**
**Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | Without force or pressure[d] |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | |
| **North Carolina** | | | | | |
| Harnett Corr. Inst. | 0.8% | 1.4% | 1.0% | 1.5% | 1.0% |
| Lanesboro Corr. Inst. | 0.0 | 0.0 | 1.2 | 1.2 | 3.3 |
| Mary Frances Ctr.[e,g] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Maury Corr. Inst. | 1.6 | 1.0 | 1.1 | 0.0 | 3.7 |
| North Carolina Corr. Inst. for Women[e] | 7.1 | 9.1 | 2.5 | 2.5 | 4.0 |
| Odom Corr. Inst. | 0.9 | 0.9 | 0.9 | 0.9 | 1.6 |
| Western Youth Inst. | 0.0 | 0.6 | 0.0 | 0.0 | 0.5 |
| **North Dakota** | | | | | |
| North Dakota State Penitentiary | 1.6% | 1.4% | 1.6% | 1.1% | 2.8% |
| **Ohio** | | | | | |
| Allen Corr. Inst. | 1.5% | 1.5% | 0.9% | 0.9% | 1.7% |
| Belmont Corr. Inst. | 1.0 | 1.2 | 0.7 | 0.7 | 0.7 |
| Chillicothe Corr. Inst. | 3.0 | 2.3 | 0.0 | 0.6 | 0.2 |
| Franklin Medical Ctr.[f] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Madison Corr. Inst. | 2.3 | 3.0 | 0.0 | 4.2 | 0.0 |
| Noble Corr. Inst. | 0.5 | 0.6 | 1.7 | 2.1 | 3.2 |
| Northeast Pre-Release Ctr.[e] | 2.4 | 4.7 | 0.0 | 2.4 | 0.0 |
| Pickaway Corr. Fac. | 1.9 | 2.3 | 0.3 | 1.6 | 0.5 |
| **Oklahoma** | | | | | |
| Dr. Eddie Warrior Corr. Ctr.[e] | 6.7% | 6.5% | 1.7% | 2.4% | 1.2% |
| Jackie Brannon Corr. Ctr. | 0.0 | 0.5 | 0.0 | 0.0 | 0.0 |
| Mabel Bassett Corr. Ctr.[e] | 9.5 | 13.2 | 1.4 | 2.5 | 1.5 |
| North Fork Corr. Fac.[g] | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 |
| **Oregon** | | | | | |
| Coffee Creek Corr. Fac.[e] | 5.5% | 5.5% | 1.1% | 3.9% | 1.3% |
| Deer Ridge Corr. Inst. | 1.2 | 1.7 | 0.0 | 0.9 | 0.0 |
| Oregon State Penitentiary | 1.1 | 2.1 | 0.9 | 0.5 | 0.0 |
| **Pennsylvania** | | | | | |
| Cambridge Springs State Corr. Inst.[e] | 2.8% | 3.0% | 0.0% | 0.4% | 0.5% |
| Chester State Corr. Inst. | 0.0 | 0.5 | 0.7 | 1.0 | 0.0 |
| Houtzdale State Corr. Inst. | 0.0 | 0.0 | 0.0 | 1.1 | 0.7 |
| Mahanoy State Corr. Inst. | 0.0 | 0.0 | 0.0 | 0.5 | 0.5 |
| Muncy State Corr. Inst.[e] | 5.7 | 6.0 | 1.0 | 3.2 | 0.3 |
| Pine Grove State Corr. Inst. | 1.5 | 2.0 | 1.8 | 1.8 | 5.6 |
| Somerset State Corr. Inst. | 1.9 | 1.4 | 1.5 | 2.0 | 2.1 |
| Waymart State Corr. Inst. | 0.0 | 1.0 | 0.4 | 0.4 | 0.0 |
| **Rhode Island** | | | | | |
| Donald Price Med. Security Fac. | 0.9% | 0.5% | 0.4% | 1.7% | 0.8% |
| **South Carolina** | | | | | |
| Camille Griffin Graham Corr. Inst.[e] | 3.3% | 4.4% | 0.7% | 1.1% | 1.2% |
| Kershaw Corr. Inst. | 1.9 | 2.6 | 0.4 | 1.3 | 2.2 |
| Kirkland Reception and Evaluation Ctr. | 0.5 | 1.5 | 0.5 | 1.0 | 1.4 |
| Turbeville Corr. Inst. | 0.5 | 1.0 | 1.6 | 1.9 | 1.9 |
| Tyger River Corr. Inst. | 0.5 | 0.9 | 0.3 | 0.3 | 1.0 |
| **South Dakota** | | | | | |
| South Dakota Women's Prison[e] | 7.9% | 9.9% | 0.0% | 1.9% | 0.7% |
| **Tennessee** | | | | | |
| Riverbend Max. Security Inst. | 0.4% | 0.4% | 0.4% | 0.4% | 1.2% |

**APPENDIX TABLE 3 (continued)**
**Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | Without force or pressure[d] |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | |
| **Texas** | | | | | |
| Byrd Unit | 0.9% | 0.4% | 0.4% | 0.4% | 1.0% |
| Carole Young Medical Fac. Complex[e] | 0.4 | 1.2 | 0.8 | 1.3 | 0.5 |
| Clemens Unit | 2.0 | 2.6 | 0.3 | 1.5 | 2.0 |
| Clements Unit | 4.9 | 5.7 | 8.1 | 8.7 | 2.5 |
| Coffield Unit | 0.7 | 0.4 | 2.0 | 3.5 | 3.8 |
| Dawson State Jail[f,g] | 1.4 | 1.4 | 1.6 | 1.0 | 0.6 |
| Eastham Unit | 1.4 | 2.3 | 1.9 | 1.9 | 1.8 |
| Gist State Jail | 0.6 | 0.6 | 0.0 | 0.6 | 0.3 |
| Gurney Transfer Fac. | 1.5 | 0.5 | 0.0 | 0.6 | 0.0 |
| Henley State Jail[e] | 1.7 | 0.0 | 0.0 | 0.8 | 0.0 |
| Hodge Unit | 1.9 | 1.9 | 0.5 | 0.5 | 0.2 |
| Holliday Transfer Fac. | 1.0 | 0.7 | 0.7 | 1.8 | 0.7 |
| Huntsville Unit | 0.0 | 0.5 | 0.3 | 0.3 | 0.0 |
| McConnell Unit | 3.0 | 2.9 | 1.0 | 1.6 | 1.1 |
| Michael Unit | 3.8 | 2.3 | 1.1 | 1.1 | 1.0 |
| Montford Psychiatric Fac. | 5.2 | 7.3 | 2.9 | 4.5 | 2.0 |
| Murray Unit[e] | 6.9 | 7.4 | 1.0 | 3.6 | 1.1 |
| Plane State Jail[e] | 1.7 | 1.1 | 1.0 | 2.3 | 0.0 |
| Powledge Unit | 1.3 | 0.5 | 1.1 | 1.1 | 1.1 |
| Stiles Unit | 4.5 | 6.3 | 0.9 | 2.5 | 4.9 |
| Willacy Co. State Jail[g] | 0.0 | 1.1 | 0.0 | 0.0 | 0.6 |
| Woodman State Jail[e] | 0.8 | 1.3 | 0.0 | 0.0 | 0.0 |
| **Utah** | | | | | |
| Central Utah Corr. Fac. | 3.7% | 2.8% | 2.2% | 1.5% | 1.8% |
| Utah State Prison[f] | 2.4 | 4.7 | 0.0 | 1.2 | 0.0 |
| **Vermont** | | | | | |
| Southeast State Corr. Fac. | 2.2% | 2.2% | 2.2% | 2.2% | 5.1% |
| Southern State Corr. Fac. | 3.3 | 7.7 | 2.2 | 4.1 | 1.3 |
| **Virginia** | | | | | |
| Brunswick Women's Reception and Pre-Release Ctr.[e] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Dillwyn Corr. Ctr. | 0.0 | 0.8 | 0.6 | 0.0 | 3.2 |
| Sussex II State Prison | 1.3 | 1.3 | 0.8 | 2.1 | 2.8 |
| **Washington** | | | | | |
| Clallam Bay Corr. Ctr. | 0.8% | 0.7% | 1.4% | 1.4% | 2.6% |
| Monroe Corr. Complex | 0.3 | 0.3 | 0.4 | 0.4 | 2.2 |
| Washington State Penitentiary | 3.3 | 3.3 | 0.0 | 1.3 | 0.7 |
| **West Virginia** | | | | | |
| Huttonsville Corr. Ctr. | 2.0% | 1.6% | 0.9% | 2.8% | 4.7% |
| **Wisconsin** | | | | | |
| Green Bay Corr. Inst. | 1.6% | 0.8% | 0.9% | 1.5% | 1.9% |
| Oshkosh Corr. Ctr. | 1.6 | 3.1 | 0.4 | 0.7 | 0.4 |
| **Wyoming** | | | | | |
| Wyoming Honor Farm | 1.0% | 1.0% | 0.0% | 2.0% | 0.8% |

**APPENDIX TABLE 3 (continued)**
**Percent of prison inmates reporting sexual victimization by level of coercion, by facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | Without force or pressure[d] |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | |
| **Federal Facilities (Bureau of Prisons)** | | | | | |
| CI Eden[g] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| CI Reeves I and II[g] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CI Reeves III[g] | 0.0 | 0.0 | 0.0 | 0.4 | 0.0 |
| CI Rivers[g] | 0.9 | 0.9 | 0.0 | 0.0 | 0.0 |
| FCI Allenwood Low | 0.0 | 0.5 | 0.7 | 1.4 | 0.0 |
| FCI Big Spring Camp | 0.0 | 0.0 | 1.2 | 1.2 | 0.0 |
| FCI Butner Med. I Camp | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| FCI Butner Med. II | 1.4 | 0.0 | 0.0 | 0.4 | 0.8 |
| FCI Forrest City Med. | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| FCI Greenville Camp[e] | 0.0 | 3.3 | 0.0 | 0.8 | 0.8 |
| FCI Jesup | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| FCI Lompoc | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| FCI Manchester Camp | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 |
| FCI Marianna Camp[e] | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| FCI Milan | 0.5 | 1.2 | 0.5 | 0.5 | 0.8 |
| FCI Seagoville | 0.4 | 1.1 | 0.0 | 0.0 | 0.0 |
| FCI Tallahassee[e] | 1.7 | 3.5 | 0.0 | 0.8 | 1.5 |
| FCI Terre Haute | 0.0 | 0.5 | 1.7 | 1.6 | 0.0 |
| FDC Philadelphia[f] | 0.6 | 1.2 | 0.0 | 0.6 | 0.6 |
| FMC Carswell[e] | 1.5 | 4.2 | 0.0 | 0.4 | 0.0 |
| FMC Devens | 0.7 | 1.3 | 0.0 | 1.0 | 0.4 |
| FMC Lexington Camp[e] | 0.8 | 0.0 | 0.0 | 0.0 | 0.0 |
| FPC Alderson[e] | 1.3 | 2.3 | 0.4 | 0.4 | 0.0 |
| Limestone Co. Det. Ctr.[g] | 0.6 | 0.6 | 0.0 | 0.0 | 0.0 |
| MCFP Springfield | 1.2 | 0.6 | 0.6 | 0.0 | 0.0 |
| USP Hazelton - Female[e] | 3.3 | 3.6 | 0.8 | 0.8 | 0.0 |
| USP Lee | 0.9 | 0.9 | 0.0 | 0.7 | 0.0 |
| USP Tucson | 1.2 | 4.1 | 0.6 | 3.2 | 2.5 |

Note: Detail may sum to more than total victimization rate because victims may report on more than one incident involving different levels of coercion.

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Physical force or threat of physical force reported.

[c]Includes incidents in which the perpetrator, without using force, pressured the inmate or made the inmate feel that they had to participate. (See *Methodology*.)

[d]Includes incidents in which the staff offered favors or privileges in exchange for sex or sexual contact and incidents in which the inmate reported that they willingly had sex or sexual contact with staff.

[e]Female facility.

[f]Facility housed both males and females; both were sampled at this facility.

[g]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 4**
**Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Total** | 1.3% | 1.1% | 1.6% | 2.7% | 2.4% | 3.0% |
| **Alabama** | | | | | | |
| Bibb Corr. Fac. | 0.8% | 0.2% | 2.5% | 5.1% | 3.0% | 8.5% |
| G.K. Fountain Corr. Fac./J.O. Davis Corr. Fac. | 2.3 | 0.9 | 5.5 | 3.4 | 1.7 | 6.7 |
| Julia Tutwiler Prison[e] | 6.1 | 3.6 | 10.1 | 8.0 | 5.1 | 12.2 |
| St. Clair Corr. Fac. | 0.0 | 0.0 | 2.1 | 5.5 | 2.8 | 10.7 |
| **Alaska** | | | | | | |
| Anchorage Corr. Complex West | 2.6% | 1.0% | 6.7% | 3.2% | 1.4% | 7.1% |
| Hiland Mountain Corr. Ctr.[e] | 6.2 | 3.8 | 9.9 | 6.7 | 3.4 | 12.8 |
| **Arizona** | | | | | | |
| ASPC - Douglas | 0.0% | 0.0% | 2.3% | 1.2% | 0.3% | 4.5% |
| ASPC - Eyman | 0.0 | 0.0 | 1.9 | 4.1 | 2.0 | 8.2 |
| ASPC - Perryville[e] | 4.7 | 2.6 | 8.3 | 4.5 | 2.3 | 8.5 |
| ASPC - Tucson[f] | 1.6 | 0.6 | 4.6 | 2.1 | 0.9 | 4.8 |
| ASPC - Yuma | 0.5 | 0.1 | 3.0 | 1.4 | 0.4 | 5.0 |
| Florence Corr. Ctr.[f,g] | 0.0 | 0.0 | 2.0 | 1.0 | 0.3 | 3.5 |
| La Palma Corr. Ctr.[g] | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 2.3 |
| Red Rock Corr. Ctr.[g] | 0.0 | 0.0 | 5.8 | 2.9 | 0.8 | 10.0 |
| **Arkansas** | | | | | | |
| Ouachita River Corr. Unit | 0.8% | 0.1% | 4.0% | 3.5% | 1.6% | 7.4% |
| **California** | | | | | | |
| Avenal State Prison | 1.2% | 0.3% | 4.4% | 0.0% | 0.0% | 2.1% |
| California Corr. Ctr. | 1.4 | 0.4 | 5.0 | 0.7 | 0.1 | 3.9 |
| California Corr. Inst. | 4.5 | 1.8 | 10.4 | 0.9 | 0.2 | 4.8 |
| California Inst. for Women[e] | 1.4 | 0.4 | 4.6 | 5.3 | 2.9 | 9.5 |
| California Men's Colony | 0.0 | 0.0 | 2.2 | 1.5 | 0.6 | 4.2 |
| California Rehabilitation Ctr. | 1.5 | 0.4 | 5.9 | 1.0 | 0.2 | 5.1 |
| Calipatria State Prison | 1.4 | 0.4 | 4.9 | 0.9 | 0.2 | 4.7 |
| Central California Women's Fac.[e] | 4.8 | 2.6 | 8.6 | 5.3 | 2.8 | 9.8 |
| Chuckawalla Valley State Prison | 2.2 | 0.8 | 6.2 | 0.5 | 0.1 | 2.5 |
| Corcoran State Prison | 1.6 | 0.5 | 5.3 | 4.7 | 1.9 | 11.3 |
| Corr. Training Fac. | 0.9 | 0.2 | 3.0 | 2.4 | 1.1 | 5.2 |
| Sacramento State Prison | 0.9 | 0.2 | 4.7 | 2.4 | 0.8 | 7.6 |
| Salinas Valley State Prison | 1.0 | 0.3 | 3.6 | 2.7 | 1.2 | 6.3 |
| San Quentin State Prison | 0.0 | 0.0 | 2.4 | 3.8 | 1.6 | 8.6 |
| Sierra Conservation Ctr. | 0.0 | 0.0 | 2.0 | 1.4 | 0.5 | 3.9 |
| Solano State Prison | 0.5 | 0.1 | 2.5 | 1.5 | 0.5 | 4.4 |
| Valley State Prison for Women[e] | 6.1 | 3.4 | 10.7 | 5.4 | 2.8 | 10.0 |
| **Colorado** | | | | | | |
| Buena Vista Corr. Ctr. | 1.2% | 0.4% | 4.1% | 2.1% | 0.7% | 5.5% |
| Denver Women's Corr. Fac.[e] | 7.0 | 3.8 | 12.6 | 12.2 | 8.0 | 18.3 |
| Skyline Corr. Inst. | 2.4 | 0.8 | 7.5 | 1.2 | 0.3 | 4.8 |
| **Connecticut** | | | | | | |
| Manson Youth Inst. | 1.7% | 0.8% | 3.6% | 3.5% | 2.1% | 5.8% |
| York Corr. Fac.[e] | 6.5 | 4.1 | 10.3 | 5.5 | 3.0 | 10.0 |
| **Delaware** | | | | | | |
| Central Violation of Probation Ctr. | 0.0% | 0.0% | 2.7% | 3.0% | 1.7% | 5.3% |
| Delores J. Baylor Women's Corr. Inst.[e] | 6.2 | 3.8 | 10.0 | 7.4 | 4.9 | 11.0 |
| James T. Vaughn Corr. Ctr. | 1.5 | 0.4 | 5.1 | 3.8 | 1.8 | 8.0 |

**APPENDIX TABLE 4 (continued)**
**Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **Florida** | | | | | | |
| Apalachee Corr. Inst./West/East Unit/River Junction | 4.5% | 2.3% | 8.6% | 7.7% | 4.4% | 13.3% |
| Broward Corr. Inst.[e] | 5.0 | 2.5 | 9.5 | 7.1 | 3.7 | 13.1 |
| Calhoun Corr. Inst. and Work Camp | 1.2 | 0.4 | 3.7 | 2.9 | 1.4 | 6.1 |
| Central Florida Reception Ctr. East and South | 0.0 | 0.0 | 3.4 | 0.0 | 0.0 | 3.4 |
| Florida State Prison and Work Camp | 1.9 | 0.5 | 6.7 | 3.3 | 1.5 | 7.1 |
| Jackson Corr. Inst. and Work Camp | 2.5 | 0.9 | 7.0 | 1.5 | 0.4 | 5.7 |
| Lancaster Corr. Inst. and Work Camp | 2.2 | 0.9 | 5.0 | 3.3 | 1.6 | 6.6 |
| Lawtey Corr. Inst. | 0.0 | 0.0 | 1.9 | 0.0 | 0.0 | 1.9 |
| Levy Forestry Camp[e] | 1.6 | 0.7 | 4.0 | 4.5 | 1.9 | 10.4 |
| Marion Corr. Inst. and Work Camp | 0.3 | 0.1 | 1.6 | 1.9 | 0.9 | 4.2 |
| Martin Corr. Inst. and Work Camp | 1.2 | 0.3 | 3.9 | 4.7 | 2.6 | 8.2 |
| Northwest Florida Reception Ctr. | 3.3 | 1.5 | 7.4 | 10.4 | 6.1 | 17.0 |
| Santa Rosa Corr. Inst. | 4.4 | 2.2 | 8.7 | 9.6 | 5.9 | 15.2 |
| Taylor Corr. Inst. and Annex | 1.1 | 0.3 | 3.7 | 1.6 | 0.5 | 4.5 |
| Zephyrhills Corr. Inst. | 0.5 | 0.1 | 2.5 | 7.4 | 4.3 | 12.4 |
| **Georgia** | | | | | | |
| Autry State Prison | 0.0% | 0.0% | 2.8% | 6.1% | 3.3% | 11.1% |
| Burruss Corr. Training Ctr. | 0.0 | 0.0 | 1.9 | 0.6 | 0.1 | 2.6 |
| D. Ray James Prison[g] | 0.0 | 0.0 | 1.9 | 0.5 | 0.1 | 2.7 |
| Lee Arrendale State Prison[e] | 3.5 | 1.7 | 6.8 | 2.4 | 1.1 | 5.3 |
| Macon State Prison | 0.0 | 0.0 | 1.8 | 5.8 | 3.5 | 9.5 |
| Rogers State Prison | 0.0 | 0.0 | 1.6 | 2.2 | 1.0 | 4.8 |
| Valdosta State Prison | 4.0 | 1.9 | 8.4 | 6.5 | 3.4 | 12.0 |
| Ware State Prison | 0.0 | 0.0 | 1.7 | 4.6 | 2.7 | 7.8 |
| Washington State Prison | 0.0 | 0.0 | 1.7 | 2.1 | 1.0 | 4.7 |
| **Hawaii** | | | | | | |
| Waiawa Corr. Fac. | 2.1% | 1.1% | 4.0% | 4.0% | 2.5% | 6.3% |
| **Idaho** | | | | | | |
| Idaho Max. Security Inst. | 6.9% | 2.6% | 17.1% | 7.0% | 2.5% | 18.0% |
| St. Anthony Work Camp | 2.3 | 0.5 | 9.4 | 0.0 | 0.0 | 5.1 |
| **Illinois** | | | | | | |
| Danville Corr. Ctr. | 0.5% | 0.2% | 1.8% | 0.0% | 0.0% | 1.8% |
| Decatur Corr. Ctr.[e] | 1.1 | 0.3 | 3.3 | 0.0 | 0.0 | 2.4 |
| Dwight Corr. Ctr.[e] | 4.0 | 2.1 | 7.4 | 6.7 | 3.9 | 11.0 |
| Hill Corr. Ctr. | 1.9 | 0.8 | 4.5 | 3.0 | 1.4 | 6.5 |
| Menard Corr. Ctr. | 1.0 | 0.3 | 3.5 | 1.6 | 0.5 | 4.6 |
| Pittsfield Work Camp | 0.0 | 0.0 | 4.6 | 0.0 | 0.0 | 4.6 |
| Stateville Corr. Ctr. | 0.3 | 0.1 | 1.5 | 0.8 | 0.2 | 2.7 |
| Western Illinois Corr. Ctr. | 0.0 | 0.0 | 2.4 | 3.7 | 1.6 | 8.1 |
| **Indiana** | | | | | | |
| Miami Corr. Fac. | 0.0% | 0.0% | 1.9% | 3.2% | 1.5% | 7.0% |
| Reception-Diagnostic Ctr. | 1.2 | 0.3 | 3.9 | 1.3 | 0.4 | 3.6 |
| Rockville Corr. Fac.[e] | 4.1 | 2.0 | 8.3 | 3.5 | 1.5 | 8.1 |
| Wabash Valley Corr. Fac. | 0.8 | 0.1 | 4.0 | 2.4 | 0.9 | 6.7 |
| **Iowa** | | | | | | |
| Anamosa State Penitentiary | 2.1% | 0.7% | 5.5% | 2.5% | 1.0% | 5.9% |
| **Kansas** | | | | | | |
| Lansing Corr. Fac. | 2.1% | 0.8% | 5.2% | 4.5% | 2.4% | 8.4% |
| Norton Corr. Fac. | 2.2 | 0.8 | 5.8 | 2.9 | 1.2 | 7.1 |

**APPENDIX TABLE 4 (continued)**
**Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **Kentucky** | | | | | | |
| Eastern Kentucky Corr. Complex | 1.0% | 0.3% | 3.4% | 5.4% | 2.9% | 9.7% |
| Kentucky State Reformatory | 2.0 | 0.7 | 5.6 | 4.4 | 2.2 | 8.8 |
| Otter Creek Corr. Complex[g] | 1.3 | 0.4 | 4.2 | 5.7 | 2.9 | 10.9 |
| **Louisiana** | | | | | | |
| B.B. Rayburn Corr. Ctr. | 1.0% | 0.3% | 3.1% | 3.2% | 1.4% | 6.9% |
| Elayn Hunt Corr. Ctr. | 2.5 | 0.9 | 6.3 | 4.0 | 2.1 | 7.6 |
| Louisiana State Penitentiary | 1.1 | 0.3 | 3.7 | 7.4 | 4.7 | 11.5 |
| **Maine** | | | | | | |
| Maine Corr. Ctr.[f] | 2.6% | 1.3% | 5.4% | 3.5% | 1.6% | 7.2% |
| **Maryland** | | | | | | |
| Maryland Corr. Inst. - Hagerstown | 0.0% | 0.0% | 2.1% | 3.1% | 1.5% | 6.4% |
| Maryland Corr. Inst. for Women[e] | 5.8 | 3.1 | 10.6 | 6.9 | 4.1 | 11.4 |
| Maryland Corr. Training Ctr. | 1.5 | 0.5 | 4.1 | 2.0 | 0.8 | 4.8 |
| Metropolitan Transition Ctr. | 0.0 | 0.0 | 3.5 | 3.2 | 1.4 | 7.6 |
| **Massachusetts** | | | | | | |
| Old Colony Corr. Ctr. | 3.2% | 1.6% | 6.4% | 2.4% | 1.1% | 5.1% |
| **Michigan** | | | | | | |
| Bellamy Creek Corr. Fac. | 0.7% | 0.1% | 3.4% | 3.7% | 1.7% | 7.7% |
| Central Michigan Corr. Fac. | 0.0 | 0.0 | 1.7 | 2.7 | 1.2 | 6.0 |
| Lakeland Corr. Fac. | 0.8 | 0.2 | 2.7 | 4.8 | 2.7 | 8.4 |
| Saginaw Corr. Fac. | 0.8 | 0.2 | 3.1 | 2.1 | 0.9 | 4.9 |
| Thumb Corr. Fac. | 1.5 | 0.5 | 4.9 | 1.7 | 0.5 | 5.4 |
| **Minnesota** | | | | | | |
| MCF - Moose Lake | 2.5% | 1.2% | 5.4% | 1.9% | 0.8% | 4.5% |
| MCF - Shakopee[e] | 7.6 | 4.5 | 12.6 | 5.4 | 2.5 | 11.4 |
| **Mississippi** | | | | | | |
| Pike Co. Community Work Ctr. | 0.0% | 0.0% | 11.7% | 0.0% | 0.0% | 11.7% |
| Walnut Grove Youth Corr. Fac.[g] | 1.2 | 0.5 | 3.1 | 8.7 | 6.1 | 12.2 |
| Wilkinson Co. Corr. Fac.[g] | 1.8 | 0.7 | 4.6 | 5.7 | 3.3 | 9.7 |
| **Missouri** | | | | | | |
| Algoa Corr. Ctr. | 0.0% | 0.0% | 2.5% | 0.0% | 0.0% | 2.5% |
| Farmington Corr. Fac. | 3.0 | 1.5 | 5.7 | 4.9 | 2.9 | 8.3 |
| South Central Corr. Fac. | 2.0 | 0.7 | 5.7 | 5.1 | 2.7 | 9.5 |
| Tipton Corr. Ctr. | 0.6 | 0.1 | 2.8 | 0.8 | 0.2 | 3.9 |
| Western Missouri Corr. Ctr. | 0.7 | 0.1 | 3.7 | 2.7 | 1.3 | 5.8 |
| Western Reception, Diagnostic and Corr. Ctr. | 0.0 | 0.0 | 2.0 | 1.5 | 0.5 | 4.1 |
| Women's Eastern Reception, Diagnostic and Corr. Ctr.[e] | 6.0 | 3.4 | 10.5 | 2.6 | 1.1 | 6.4 |
| **Montana** | | | | | | |
| Montana State Prison | 5.6% | 3.2% | 9.6% | 8.3% | 4.1% | 16.1% |
| **Nebraska** | | | | | | |
| Lincoln Corr. Ctr. | 1.3% | 0.5% | 3.5% | 3.2% | 1.5% | 6.6% |
| **Nevada** | | | | | | |
| Florence McClure Women's Corr. Ctr.[e] | 10.9% | 6.3% | 18.3% | 5.4% | 2.9% | 9.6% |
| High Desert State Prison | 0.5 | 0.1 | 2.5 | 2.1 | 0.7 | 5.9 |
| Lovelock Corr. Ctr. | 1.6 | 0.6 | 4.7 | 2.1 | 0.8 | 5.4 |
| **New Hampshire** | | | | | | |
| New Hampshire State Prison for Men | 1.7% | 0.6% | 4.7% | 3.8% | 1.7% | 8.4% |
| New Hampshire State Prison for Women[e] | 4.3 | 2.4 | 7.6 | 3.9 | 2.2 | 6.7 |
| **New Jersey** | | | | | | |
| Bayside State Prison | 0.0% | 0.0% | 3.1% | 3.4% | 1.3% | 8.6% |
| Mountainview Youth Corr. Fac. | 0.6 | 0.1 | 3.2 | 2.4 | 1.0 | 5.9 |
| South Woods State Prison | 1.3 | 0.2 | 6.6 | 4.0 | 1.6 | 9.3 |

**APPENDIX TABLE 4 (continued)**
**Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **New Mexico** | | | | | | |
| Lea Co. Corr. Fac.[g] | 0.9% | 0.2% | 4.4% | 3.7% | 1.6% | 8.0% |
| New Mexico Women's Corr. Fac.[e,g] | 5.2 | 2.9 | 9.2 | 9.1 | 5.8 | 14.0 |
| **New York** | | | | | | |
| Auburn Corr. Fac. | 4.0% | 2.1% | 7.6% | 5.8% | 3.2% | 10.0% |
| Cayuga Corr. Fac. | 0.5 | 0.1 | 2.6 | 2.1 | 0.9 | 5.0 |
| Gowanda Corr. Fac. | 0.2 | 0.0 | 1.2 | 3.1 | 1.7 | 5.9 |
| Lakeview Shock Incarceration Corr. Fac.[f] | 0.0 | 0.0 | 1.8 | 1.9 | 0.8 | 4.3 |
| Otisville Corr. Fac. | 0.6 | 0.1 | 2.4 | 7.7 | 4.4 | 13.2 |
| Washington Corr. Fac. | 0.6 | 0.1 | 2.7 | 3.3 | 1.6 | 6.5 |
| Wyoming Corr. Fac. | 1.3 | 0.5 | 3.5 | 1.8 | 0.7 | 4.3 |
| **North Carolina** | | | | | | |
| Harnett Corr. Inst. | 0.9% | 0.3% | 3.1% | 2.7% | 1.2% | 5.9% |
| Lanesboro Corr. Inst. | 0.0 | 0.0 | 2.3 | 3.3 | 1.5 | 7.1 |
| Mary Frances Ctr.[e,g] | 0.0 | 0.0 | 5.3 | 0.0 | 0.0 | 5.3 |
| Maury Corr. Inst. | 2.1 | 0.8 | 5.4 | 3.5 | 1.3 | 9.2 |
| North Carolina Corr. Inst. for Women[e] | 4.9 | 2.4 | 9.6 | 8.0 | 4.5 | 14.1 |
| Odom Corr. Inst. | 0.0 | 0.0 | 2.9 | 3.3 | 1.5 | 7.4 |
| Western Youth Inst. | 0.0 | 0.0 | 2.3 | 1.1 | 0.4 | 3.2 |
| **North Dakota** | | | | | | |
| North Dakota State Penitentiary | 1.6% | 0.6% | 4.1% | 3.6% | 1.7% | 7.5% |
| **Ohio** | | | | | | |
| Allen Corr. Inst. | 1.5% | 0.3% | 7.7% | 1.7% | 0.5% | 5.7% |
| Belmont Corr. Inst. | 0.5 | 0.1 | 2.5 | 1.9 | 0.7 | 5.3 |
| Chillicothe Corr. Inst. | 2.6 | 1.2 | 5.7 | 2.5 | 1.0 | 5.8 |
| Franklin Medical Ctr.[f] | 0.0 | 0.0 | 2.9 | 0.0 | 0.0 | 2.9 |
| Madison Corr. Inst. | 0.0 | 0.0 | 2.7 | 7.2 | 3.5 | 14.3 |
| Noble Corr. Inst. | 0.5 | 0.2 | 1.9 | 3.9 | 2.0 | 7.6 |
| Northeast Pre-Release Ctr.[e] | 4.7 | 2.7 | 8.3 | 2.8 | 1.1 | 7.3 |
| Pickaway Corr. Fac. | 2.9 | 1.2 | 6.5 | 2.5 | 1.1 | 5.5 |
| **Oklahoma** | | | | | | |
| Dr. Eddie Warrior Corr. Ctr.[e] | 5.4% | 3.2% | 9.1% | 4.0% | 2.1% | 7.3% |
| Jackie Brannon Corr. Ctr. | 0.0 | 0.0 | 2.1 | 0.5 | 0.1 | 2.3 |
| Mabel Bassett Corr. Ctr.[e] | 8.5 | 5.6 | 12.8 | 8.9 | 5.8 | 13.4 |
| North Fork Corr. Fac.[g] | 0.0 | 0.0 | 7.7 | 1.6 | 0.3 | 8.7 |
| **Oregon** | | | | | | |
| Coffee Creek Corr. Fac.[e] | 6.5% | 4.1% | 10.2% | 4.3% | 2.4% | 7.6% |
| Deer Ridge Corr. Inst. | 0.9 | 0.3 | 2.9 | 2.3 | 1.0 | 5.6 |
| Oregon State Penitentiary | 0.0 | 0.0 | 1.9 | 2.9 | 1.4 | 6.1 |
| **Pennsylvania** | | | | | | |
| Cambridge Springs State Corr. Inst.[e] | 2.0% | 0.9% | 4.2% | 2.2% | 0.9% | 5.1% |
| Chester State Corr. Inst. | 1.2 | 0.3 | 3.8 | 0.4 | 0.1 | 1.8 |
| Houtzdale State Corr. Inst. | 0.8 | 0.2 | 4.2 | 1.0 | 0.3 | 3.8 |
| Mahanoy State Corr. Inst. | 0.5 | 0.1 | 2.4 | 0.5 | 0.1 | 2.5 |
| Muncy State Corr. Inst.[e] | 5.7 | 3.5 | 9.2 | 5.7 | 3.5 | 9.1 |
| Pine Grove State Corr. Inst. | 1.7 | 0.7 | 4.5 | 5.4 | 2.7 | 10.4 |
| Somerset State Corr. Inst. | 1.4 | 0.4 | 5.2 | 3.1 | 1.3 | 7.1 |
| Waymart State Corr. Inst. | 0.4 | 0.1 | 2.1 | 1.0 | 0.2 | 5.0 |
| **Rhode Island** | | | | | | |
| Donald Price Med. Security Fac. | 1.2% | 0.5% | 3.0% | 1.4% | 0.7% | 3.0% |

**APPENDIX TABLE 4 (continued)**
**Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **South Carolina** | | | | | | |
| Camille Griffin Graham Corr. Inst.[e] | 4.4% | 2.1% | 9.1% | 4.3% | 2.2% | 8.4% |
| Kershaw Corr. Inst. | 1.3 | 0.5 | 3.6 | 4.3 | 2.2 | 8.2 |
| Kirkland Reception and Evaluation Ctr. | 0.4 | 0.1 | 2.2 | 2.4 | 1.1 | 5.2 |
| Turbeville Corr. Inst. | 0.9 | 0.3 | 2.8 | 2.3 | 1.0 | 5.2 |
| Tyger River Corr. Inst. | 0.3 | 0.1 | 1.3 | 1.6 | 0.6 | 4.5 |
| **South Dakota** | | | | | | |
| South Dakota Women's Prison[e] | 8.6% | 5.6% | 13.1% | 4.6% | 2.7% | 7.7% |
| **Tennessee** | | | | | | |
| Riverbend Max. Security Inst. | 0.8% | 0.2% | 3.9% | 0.4% | 0.1% | 2.0% |
| **Texas** | | | | | | |
| Byrd Unit | 1.0% | 0.3% | 3.3% | 0.8% | 0.3% | 2.7% |
| Carole Young Medical Fac. Complex[e] | 1.3 | 0.5 | 3.1 | 0.4 | 0.1 | 1.5 |
| Clemens Unit | 1.5 | 0.5 | 4.6 | 4.9 | 2.1 | 11.2 |
| Clemens Unit | 2.4 | 1.0 | 6.1 | 9.4 | 5.7 | 15.2 |
| Coffield Unit | 2.7 | 1.2 | 6.0 | 5.2 | 3.0 | 9.1 |
| Dawson State Jail[f,g] | 1.2 | 0.4 | 3.2 | 1.3 | 0.4 | 3.7 |
| Eastham Unit | 0.7 | 0.2 | 2.5 | 4.0 | 2.1 | 7.4 |
| Gist State Jail | 0.6 | 0.1 | 2.9 | 0.9 | 0.2 | 3.1 |
| Gurney Transfer Fac. | 0.4 | 0.1 | 2.1 | 1.1 | 0.3 | 3.7 |
| Henley State Jail[e] | 1.7 | 0.6 | 4.9 | 0.8 | 0.2 | 3.2 |
| Hodge Unit | 0.5 | 0.1 | 2.6 | 1.6 | 0.5 | 4.7 |
| Holliday Transfer Fac. | 1.0 | 0.3 | 3.7 | 1.8 | 0.5 | 6.1 |
| Huntsville Unit | 0.0 | 0.0 | 2.2 | 0.9 | 0.2 | 2.9 |
| McConnell Unit | 2.2 | 0.9 | 4.9 | 3.2 | 1.3 | 7.7 |
| Michael Unit | 3.2 | 1.5 | 6.8 | 2.7 | 1.2 | 6.1 |
| Montford Psychiatric Fac. | 3.4 | 1.7 | 6.8 | 6.8 | 4.0 | 11.3 |
| Murray Unit[e] | 7.0 | 4.0 | 11.9 | 8.3 | 5.0 | 13.4 |
| Plane State Jail[e] | 3.5 | 1.5 | 7.8 | 1.0 | 0.3 | 3.3 |
| Powledge Unit | 1.8 | 0.5 | 6.5 | 1.1 | 0.2 | 5.2 |
| Stiles Unit | 5.8 | 2.8 | 11.8 | 6.1 | 3.4 | 11.0 |
| Willacy Co. State Jail[g] | 0.0 | 0.0 | 2.5 | 1.1 | 0.3 | 3.8 |
| Woodman State Jail[e] | 1.3 | 0.4 | 4.3 | 0.0 | 0.0 | 2.7 |
| **Utah** | | | | | | |
| Central Utah Corr. Fac. | 1.8% | 0.7% | 4.3% | 3.7% | 1.9% | 7.1% |
| Utah State Prison[f] | 2.8 | 1.3 | 5.8 | 3.6 | 1.8 | 7.2 |
| **Vermont** | | | | | | |
| Southeast State Corr. Fac. | 0.0% | 0.0% | 6.2% | 5.1% | 2.3% | 10.9% |
| Southern State Corr. Fac. | 3.2 | 1.1 | 9.4 | 6.7 | 3.5 | 12.4 |
| **Virginia** | | | | | | |
| Brunswick Women's Reception and Pre-Release Ctr.[e] | 0.0% | 0.0% | 3.9% | 0.0% | 0.0% | 3.9% |
| Dillwyn Corr. Ctr. | 1.5 | 0.5 | 5.0 | 3.0 | 1.3 | 7.0 |
| Sussex II State Prison | 1.3 | 0.4 | 4.3 | 4.1 | 2.1 | 7.8 |
| **Washington** | | | | | | |
| Clallam Bay Corr. Ctr. | 2.3% | 0.9% | 6.1% | 2.8% | 1.2% | 6.5% |
| Monroe Corr. Complex | 1.9 | 0.6 | 6.0 | 1.0 | 0.3 | 3.5 |
| Washington State Penitentiary | 1.7 | 0.5 | 6.2 | 3.5 | 1.2 | 9.9 |
| **West Virginia** | | | | | | |
| Huttonsville Corr. Ctr. | 2.2% | 0.8% | 6.1% | 5.9% | 2.8% | 12.1% |
| **Wisconsin** | | | | | | |
| Green Bay Corr. Inst. | 1.8% | 0.8% | 4.2% | 2.9% | 1.5% | 5.6% |
| Oshkosh Corr. Ctr. | 1.7 | 0.7 | 4.0 | 3.1 | 1.5 | 6.1 |

**APPENDIX TABLE 4 (continued)**
**Percent of prison inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **Wyoming** | | | | | | |
| Wyoming Honor Farm | 0.0% | 0.0% | 3.8% | 2.9% | 1.5% | 5.5% |
| **Federal facilities (Bureau of Prisons)** | | | | | | |
| CI Eden[g] | 0.0% | 0.0% | 2.0% | 0.0% | 0.0% | 2.0% |
| CI Reeves I and II[g] | 0.0 | 0.0 | 2.1 | 0.0 | 0.0 | 2.1 |
| CI Reeves III[g] | 0.4 | 0.1 | 2.0 | 0.0 | 0.0 | 2.0 |
| CI Rivers[g] | 0.0 | 0.0 | 2.4 | 0.9 | 0.2 | 4.7 |
| FCI Allenwood Low | 0.5 | 0.1 | 2.8 | 1.4 | 0.4 | 4.5 |
| FCI Big Spring Camp | 0.0 | 0.0 | 5.2 | 1.2 | 0.3 | 5.0 |
| FCI Butner Med. I Camp | 0.0 | 0.0 | 3.7 | 0.0 | 0.0 | 3.7 |
| FCI Butner Med. II | 1.4 | 0.3 | 7.0 | 0.8 | 0.2 | 2.7 |
| FCI Forrest City Med. | 0.0 | 0.0 | 2.5 | 0.6 | 0.1 | 2.9 |
| FCI Greenville Camp[e] | 3.3 | 1.5 | 7.0 | 0.8 | 0.2 | 3.2 |
| FCI Jesup | 0.0 | 0.0 | 2.8 | 0.0 | 0.0 | 2.8 |
| FCI Lompoc | 0.0 | 0.0 | 2.3 | 0.6 | 0.1 | 2.8 |
| FCI Manchester Camp | 0.9 | 0.2 | 4.1 | 0.0 | 0.0 | 3.4 |
| FCI Marianna Camp[e] | 0.6 | 0.2 | 2.1 | 0.0 | 0.0 | 2.2 |
| FCI Milan | 1.0 | 0.3 | 3.2 | 1.5 | 0.4 | 4.9 |
| FCI Seagoville | 0.0 | 0.0 | 1.9 | 1.1 | 0.4 | 3.1 |
| FCI Tallahassee[e] | 1.7 | 0.6 | 4.5 | 4.1 | 2.0 | 8.3 |
| FCI Terre Haute | 0.0 | 0.0 | 4.0 | 2.1 | 0.5 | 8.2 |
| FDC Philadelphia[f] | 0.6 | 0.1 | 3.0 | 1.2 | 0.4 | 4.0 |
| FMC Carswell[e] | 2.3 | 1.1 | 5.1 | 1.8 | 0.8 | 4.4 |
| FMC Devens | 1.3 | 0.4 | 4.1 | 1.4 | 0.5 | 3.8 |
| FMC Lexington Camp[e] | 0.8 | 0.2 | 2.7 | 0.0 | 0.0 | 2.5 |
| FPC Alderson[e] | 2.2 | 0.9 | 5.3 | 0.5 | 0.1 | 2.4 |
| Limestone Co. Det. Ctr.[g] | 0.0 | 0.0 | 2.4 | 0.6 | 0.1 | 3.1 |
| MCFP Springfield | 1.8 | 0.6 | 5.2 | 0.0 | 0.0 | 4.6 |
| USP Hazelton - Female[e] | 2.0 | 0.6 | 6.2 | 3.2 | 1.4 | 7.3 |
| USP Lee | 0.0 | 0.0 | 3.7 | 1.7 | 0.5 | 5.7 |
| USP Tucson | 2.6 | 0.9 | 7.8 | 4.7 | 2.2 | 9.8 |

Note: Detail may not sum to total due to rounding.

[a]Includes all inmates who reported unwanted contacts with another inmate or unwilling contacts with staff that involved oral sex, anal sex, vaginal sex, hand jobs, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Includes all inmates who reported unwanted contacts with another inmate or unwilling contacts with staff that involved touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way occurring in the past 12 months or since admission to the facility, if shorter.

[c]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[d]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, sentence length, and time served. (See *Methodology*.)

[e]Female facility.

[f]Facility housed both males and females; both were sampled at this facility.

[g]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 5**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | | 95%-confidence interval[b] | |
| | | | | Percent[f] | Lower bound | Upper bound |
| Total | 279,129 | 54,118 | 60.6% | 3.2% | 2.9% | 3.5% |
| **Alabama** | | | | | | |
| Barbour Co. Jail | 95 | 47 | 65.9% | 2.4% | 0.7% | 7.5% |
| Dallas Co. Jail | 197 | 114 | 72.6 | 1.5 | 0.7 | 3.5 |
| Lee Co. W.S. Buck Jones Det. Ctr. | 384 | 165 | 79.9 | 2.9 | 1.6 | 5.2 |
| Marshall Co. Jail | 206 | 122 | 70.8 | 5.0 | 3.1 | 8.0 |
| Tuscaloosa Co. Jail | 626 | 216 | 77.1 | 3.5 | 2.0 | 5.9 |
| **Arizona** | | | | | | |
| Maricopa Co. Estrella Jail[g] | 925 | 205 | 63.5% | 3.7% | 2.0% | 6.8% |
| Maricopa Co. Fourth Avenue Jail | 1,927 | 193 | 52.0 | 1.5 | 0.5 | 4.3 |
| Maricopa Co. Towers Jail | 167 | 85 | 63.9 | 5.4 | 3.0 | 9.5 |
| Mariopa Co. Lower Buckeye Jail | 1,989 | 234 | 52.8 | 4.3 | 2.4 | 7.7 |
| Santa Cruz Co. Jail | 228 | 52 | 34.7 | 0.0 | 0.0 | 6.9 |
| Yuma Co. Det. Ctr. | 620 | 162 | 57.5 | 2.1 | 0.8 | 5.1 |
| **Arkansas** | | | | | | |
| Crittenden Co. Jail | 268 | 114 | 73.6% | 6.3% | 4.0% | 9.9% |
| Mississippi Co. Det. Ctr. | 177 | 86 | 67.1 | 0.9 | 0.3 | 2.8 |
| Pope Co. Det. Ctr. | 179 | 48 | 36.6 | 5.9 | 2.4 | 14.0 |
| Pulaski Co. Regional Det. Ctr. | 1,235 | 198 | 63.3 | 6.0 | 3.1 | 11.4 |
| Sebastian Co. Adult Det. Ctr. | 394 | 153 | 54.3 | 1.1 | 0.4 | 2.8 |
| **California** | | | | | | |
| Alameda Co. Santa Rita Jail | 3,506 | 281 | 60.9% | 3.0% | 1.6% | 5.5% |
| Contra Costa Co. Martinez Det. Fac. | 766 | 143 | 42.5 | 7.0 | 4.1 | 11.7 |
| Fresno Co. Downtown Det. Fac. - Main, North and South | 1,883 | 190 | 51.9 | 3.5 | 1.8 | 6.7 |
| Imperial Co. Jail | 708 | 202 | 63.5 | 1.0 | 0.4 | 2.8 |
| Kern Co. Lerdo Pre-Trial Fac. | 1,287 | 163 | 46.7 | 3.8 | 1.8 | 8.0 |
| Los Angeles Co. - Twin Towers Corr. Fac. | 3,406 | 199 | 44.1 | 8.0 | 4.8 | 13.0 |
| Los Angeles Co. Men's Central Jail | 5,246 | 188 | 42.0 | 6.9 | 4.1 | 11.2 |
| Los Angeles Co. North County Corr. Fac. | 3,980 | 190 | 47.5 | 2.8 | 1.2 | 6.4 |
| Napa Co. Jail | 325 | 112 | 46.5 | 3.8 | 2.0 | 7.3 |
| Orange Co. Central Jail Complex | 2,525 | 169 | 53.6 | 1.4 | 0.4 | 4.7 |
| Orange Co. Theo Lacy Fac. | 2,999 | 241 | 58.4 | 4.7 | 2.5 | 8.7 |
| Riverside Co. Indio Jail | 387 | 133 | 56.3 | 2.8 | 1.3 | 5.8 |
| Riverside Co. Larry D. Smith Corr. Ctr. | 1,454 | 204 | 57.5 | 5.1 | 2.9 | 8.8 |
| Riverside Co. Southwest Det. Ctr.[h] | 888 | 149 | 46.8 | 0.6 | 0.1 | 3.0 |
| Sacramento Co. Rio Cosumnes Corr. Ctr. | 2,049 | 258 | 73.3 | 4.9 | 3.0 | 8.0 |
| San Diego Co. East Mesa Med. Fac. | 350 | 138 | 58.4 | 2.4 | 1.0 | 5.6 |
| San Diego Co. George F. Bailey Det. Fac. | 1,742 | 175 | 49.5 | 5.2 | 2.7 | 9.8 |
| San Diego Co. Vista Det. Fac. | 876 | 153 | 47.8 | 3.8 | 2.1 | 7.0 |
| San Francisco Co. Jail Number 3 | 363 | 73 | 34.3 | 4.0 | 1.5 | 9.9 |
| Santa Clara Co. Elmwood Fac. - Min. and Med. | 1,920 | 219 | 54.4 | 2.4 | 1.1 | 5.4 |
| Santa Clara Co. Main Jail | 1,356 | 130 | 37.4 | 9.2 | 5.2 | 15.8 |
| Santa Clara Co. Women's Corr. Ctr.[g] | 518 | 141 | 50.3 | 2.1 | 0.9 | 5.2 |
| Solano Co. Justice Ctr. Det. Fac. | 660 | 195 | 71.6 | 5.2 | 3.1 | 8.4 |
| Tulare Co. Jail | 1,487 | 187 | 51.6 | 1.0 | 0.3 | 3.8 |
| Ventura Co. Jail | 722 | 199 | 65.0 | 2.8 | 1.4 | 5.3 |
| Yolo Co. Leinberger Ctr. | 77 | 44 | 73.1 | 2.1 | 0.7 | 6.0 |
| Yuba Co. Jail | 375 | 138 | 62.4 | 2.0 | 0.9 | 4.5 |
| **Colorado** | | | | | | |
| Chaffee Co. Jail | 70 | 33 | 61.5% | 0.0% | 0.0% | 10.4% |
| Denver Co. Jail | 751 | 205 | 68.8 | 3.7 | 2.1 | 6.3 |
| Denver Co. Van Cise-Simonet Det. Ctr. | 1,211 | 158 | 44.0 | 2.1 | 0.8 | 5.6 |
| Douglas Co. Jail | 352 | 128 | 61.7 | 2.8 | 1.4 | 5.8 |
| Fremont Co. Jail | 205 | 105 | 63.8 | 3.0 | 1.6 | 5.7 |
| Jefferson Co. Jail | 1,165 | 205 | 62.0 | 0.0 | 0.0 | 1.8 |
| Park Co. Jail | 95 | 56 | 67.4 | 0.0 | 0.0 | 6.4 |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] Percent[f] | 95%-confidence interval[b] Lower bound | Upper bound |
|---|---|---|---|---|---|---|
| **Florida** | | | | | | |
| Collier Co. Jail | 939 | 154 | 45.9% | 5.1% | 2.6% | 9.5% |
| Dixie Co. Jail | 72 | 39 | 73.0 | 8.2 | 4.1 | 15.5 |
| Escambia Co. Jail | 1,562 | 222 | 54.3 | 2.5 | 1.2 | 5.2 |
| Jacksonville City Montgomery Corr. Ctr. | 488 | 179 | 68.8 | 2.4 | 1.1 | 4.9 |
| Lake Co. Jail | 920 | 172 | 54.8 | 2.8 | 0.8 | 9.4 |
| Lee Co. Community Programs Unit | 266 | 134 | 65.4 | 3.1 | 1.6 | 5.8 |
| Leon Co. Det. Fac. | 1,049 | 252 | 67.6 | 4.9 | 3.0 | 8.0 |
| Manatee Co. Jail | 1,141 | 226 | 64.5 | 5.2 | 3.1 | 8.5 |
| Martin Co. Jail | 569 | 165 | 60.2 | 3.1 | 1.5 | 6.3 |
| Miami-Dade Co. Boot Camp | 65 | 56 | 98.4 | 0.0 | 0.0 | 7.4 |
| Miami-Dade Co. Metro West Det. Ctr. | 2,091 | 218 | 58.4 | 2.6 | 1.3 | 5.1 |
| Miami-Dade Co. Training and Treatment Ctr. | 1,117 | 174 | 53.4 | 1.0 | 0.3 | 3.2 |
| Miami-Dade Co. Turner Guilford Knight Corr. Ctr. | 885 | 208 | 58.8 | 1.0 | 0.3 | 3.0 |
| Okeechobee Co. Jail | 232 | 105 | 57.7 | 1.1 | 0.3 | 3.9 |
| Orange Co. 33rd Street Corr. Ctr. | 2,896 | 278 | 66.2 | 3.5 | 1.7 | 6.9 |
| Orange Co. Booking and Release Ctr. | 711 | 43 | 42.7 | 2.9 | 1.2 | 6.8 |
| Osceola Co. Jail | 1,032 | 238 | 71.0 | 0.9 | 0.3 | 3.1 |
| Palm Beach Co. Stockade | 824 | 155 | 54.8 | 2.4 | 1.0 | 5.6 |
| Pinellas Co. Central Division Fac. | 938 | 155 | 48.4 | 2.4 | 0.9 | 6.4 |
| Pinellas Co. South Division | 1,294 | 181 | 48.3 | 3.2 | 1.5 | 7.0 |
| Polk Co. - South Co. Jail | 1,268 | 216 | 62.0 | 5.1 | 3.0 | 8.5 |
| Sarasota North Co. Jail | 952 | 207 | 65.0 | 0.0 | 0.0 | 1.9 |
| Suwanee Co. Jail | 155 | 83 | 64.7 | 0.9 | 0.3 | 3.0 |
| Taylor Co. Jail | 78 | 25 | 40.8 | 0.0 | 0.0 | 13.3 |
| **Georgia** | | | | | | |
| Candler Co. Jail | 40 | 27 | 84.2% | 0.0% | 0.0% | 12.5% |
| Carroll Co. Prison | 203 | 150 | 82.7 | 2.7 | 1.6 | 4.3 |
| Clayton Co. Jail | 1,924 | 265 | 67.8 | 4.7 | 2.8 | 7.7 |
| Dekalb Co. Jail | 3,825 | 300 | 61.6 | 3.2 | 1.7 | 5.9 |
| Douglas Co. Jail | 908 | 272 | 66.1 | 2.8 | 1.5 | 5.1 |
| Floyd Co. Jail | 724 | 234 | 80.0 | 3.6 | 2.1 | 6.0 |
| Floyd Co. Prison | 351 | 180 | 75.7 | 2.8 | 1.5 | 5.0 |
| Fulton Co. Jail | 3,288 | 169 | 41.6 | 4.9 | 2.5 | 9.3 |
| Gwinnett Co. Det. Ctr. | 2,811 | 267 | 50.8 | 0.8 | 0.2 | 2.6 |
| Hall Co. Det. Ctr. | 1,350 | 193 | 57.3 | 3.0 | 1.5 | 6.0 |
| Houston Co. Jail | 524 | 176 | 71.2 | 7.1 | 4.6 | 10.8 |
| Irwin Co. Jail | 876 | 189 | 62.6 | 1.1 | 0.4 | 2.9 |
| Murray County Jail | 148 | 83 | 75.4 | 3.3 | 1.7 | 6.2 |
| Newton Co. Jail | 679 | 199 | 65.5 | 3.7 | 2.0 | 6.6 |
| Screven Co. Jail | 114 | 64 | 82.1 | 3.9 | 2.2 | 6.6 |
| South Fulton Municipal Regional Jail | 151 | 43 | 37.5 | 4.7 | 1.6 | 12.8 |
| Spalding Co. Jail | 507 | 138 | 50.6 | 5.1 | 2.7 | 9.2 |
| Troup Co. Jail | 440 | 174 | 68.7 | 2.2 | 1.0 | 4.4 |
| Upson Co. Jail | 160 | 108 | 82.3 | 2.6 | 1.5 | 4.6 |
| Ware Co. Jail | 429 | 201 | 84.3 | 2.2 | 1.2 | 3.9 |
| Wilkinson Co. Jail | 35 | 19 | 57.1 | 6.5 | 1.9 | 20.0 |
| **Idaho** | | | | | | |
| Bannock Co. Jail | 298 | 114 | 55.8% | 3.0% | 1.3% | 6.8% |
| **Illinois** | | | | | | |
| Champaign Co. Satellite Jail[h] | 313 | 58 | 42.5% | 2.0% | 0.5% | 8.4% |
| Cook Co. - Division 1 | 1,206 | 284 | 82.5 | 4.3 | 2.7 | 6.9 |
| Cook Co. - Division 11 | 1,552 | 289 | 75.6 | 7.7 | 5.3 | 11.0 |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | | 95%-confidence interval[b] | |
| | | | | Percent[f] | Lower bound | Upper bound |
| Cook Co. - Division 2 | 1,579 | 213 | 52.7% | 5.8% | 3.5% | 9.4% |
| Cook Co. - Division 5 | 1,177 | 247 | 72.9 | 3.5 | 2.0 | 6.2 |
| Cook Co. - Division 6 | 995 | 273 | 83.3 | 2.2 | 1.2 | 4.2 |
| Kane Co. Adult Justice Ctr. | 590 | 167 | 58.6 | 2.9 | 1.4 | 6.0 |
| Kankakee Co. Jerome Combs Det. Ctr. | 510 | 206 | 75.7 | 3.4 | 1.9 | 5.9 |
| Kendall Co. Jail | 111 | 61 | 68.4 | 5.1 | 2.8 | 9.2 |
| McHenry Co. Jail | 558 | 150 | 60.2 | 1.1 | 0.4 | 3.3 |
| Sangamon Co. Jail | 342 | 174 | 74.1 | 3.9 | 2.5 | 6.0 |
| **Indiana** | | | | | | |
| Bartholomew Co. Jail | 183 | 120 | 79.9% | 3.2% | 1.9% | 5.2% |
| Clinton Co. Jail | 169 | 97 | 73.9 | 2.4 | 1.1 | 5.2 |
| Dearborn Co. Jail | 235 | 125 | 64.4 | 1.8 | 0.8 | 4.3 |
| Delaware Co. Justice Ctr. | 292 | 100 | 47.1 | 1.8 | 0.7 | 4.6 |
| Elkhart Co. Corr. Ctr. | 941 | 275 | 79.2 | 3.6 | 2.1 | 6.1 |
| Hamilton Co. Jail | 301 | 137 | 67.4 | 1.5 | 0.6 | 3.8 |
| Jackson Co. Jail | 169 | 91 | 63.5 | 1.0 | 0.3 | 3.4 |
| Marion Co. Jail II[i] | 1,223 | 197 | 58.8 | 3.4 | 1.4 | 8.1 |
| Marion Co. Jail Intake Fac. | 225 | 62 | 43.3 | 7.7 | 3.4 | 16.3 |
| Noble Co. Jail | 156 | 105 | 82.3 | 0.9 | 0.3 | 2.3 |
| Ripley Co. Jail | 84 | 52 | 89.2 | 7.9 | 5.1 | 11.9 |
| Tippecanoe Co. Jail | 271 | 119 | 55.7 | 2.5 | 1.1 | 5.7 |
| **Iowa** | | | | | | |
| Des Moines Co. Jail | 75 | 30 | 58.9% | 2.1% | 0.6% | 7.1% |
| Scott Co. Jail and Annex | 301 | 141 | 66.7 | 3.2 | 1.6 | 6.1 |
| **Kansas** | | | | | | |
| Finney Co. Jail | 124 | 73 | 78.4% | 4.0% | 2.3% | 6.9% |
| Wilson Co. Jail | 85 | 36 | 73.8 | 5.6 | 1.7 | 16.5 |
| **Kentucky** | | | | | | |
| Big Sandy Regional Det. Ctr. | 262 | 144 | 74.3% | 1.3% | 0.6% | 3.2% |
| Boyle Co. Det. Ctr. | 308 | 150 | 84.5 | 1.9 | 0.6 | 5.7 |
| Daviess Co. Det. Ctr. | 628 | 202 | 69.3 | 3.6 | 2.1 | 6.2 |
| Grayson Co. Det. Ctr. | 497 | 213 | 76.8 | 2.2 | 1.2 | 4.1 |
| Kenton Co. Det. Ctr. | 524 | 137 | 53.9 | 1.1 | 0.4 | 3.0 |
| Lexington-Fayette Co. Jail Det. Division | 1,113 | 191 | 53.5 | 4.3 | 2.2 | 7.9 |
| Madison Co. Det. Ctr. | 263 | 139 | 67.2 | 3.8 | 2.3 | 6.2 |
| McCracken Co. Jail | 448 | 183 | 79.4 | 3.1 | 1.8 | 5.4 |
| Meade Co. Jail | 137 | 83 | 80.5 | 1.3 | 0.5 | 3.6 |
| Pulaski Co. Det. Ctr. | 269 | 97 | 57.2 | 1.6 | 0.6 | 4.2 |
| Woodford Co. Det. Ctr. | 100 | 34 | 50.7 | 0.1 | 0.0 | 0.6 |
| **Louisiana** | | | | | | |
| Assumption Parish Det. Ctr. | 91 | 65 | 82.8% | 4.6%[f] | 2.7% | 7.9% |
| Bossier Parish Max. Security Fac. | 349 | 177 | 74.8 | 0.9 | 0.4 | 2.3 |
| Bossier Parish Med. Security Fac. | 441 | 190 | 73.5 | 2.3 | 1.2 | 4.4 |
| Caddo Parish Corr. Ctr. | 1,285 | 273 | 80.5 | 2.0 | 0.9 | 4.2 |
| East Baton Rouge Parish Prison | 1,779 | 220 | 60.4 | 2.3 | 1.0 | 5.1 |
| Iberia Parish Jail | 546 | 198 | 67.5 | 3.9 | 2.3 | 6.6 |
| Lafayette Parish Jail | 972 | 213 | 63.6 | 3.2 | 1.7 | 6.0 |
| Livingston Parish Det. Ctr. | 560 | 219 | 78.7 | 1.4 | 0.6 | 3.2 |
| Rapides Parish Det. Ctr. III | 414 | 207 | 85.7 | 1.9 | 1.0 | 3.6 |
| St. Landry Parish Jail | 273 | 114 | 59.7 | 0.7 | 0.2 | 2.5 |
| St. Martin Parish Corr. Ctr. 1 | 179 | 78 | 60.1 | 3.8 | 1.8 | 8.1 |
| Webster Parish Bayou Dorcheat Corr. Fac. | 464 | 192 | 78.1 | 3.3 | 1.9 | 5.8 |
| **Maine** | | | | | | |
| Penobscot Co. Jail | 178 | 61 | 51.0% | 4.3% | 1.6% | 11.4% |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | | 95%-confidence interval[b] | |
| | | | | Percent[f] | Lower bound | Upper bound |
| **Maryland** | | | | | | |
| Allegany Co. Det. Ctr. | 170 | 46 | 36.1% | 2.3% | 0.5% | 9.6% |
| Anne Arundel Co. Jennifer Road Det. Ctr. | 553 | 106 | 38.0 | 0.9 | 0.2 | 4.4 |
| Baltimore City Det. Ctr. | 2,574 | 268 | 65.9 | 6.7 | 4.3 | 10.2 |
| Montgomery Co. Corr. Fac. | 649 | 186 | 62.8 | 2.7 | 1.3 | 5.5 |
| Wicomico Co. Det. Ctr. | 325 | 147 | 73.5 | 0.6 | 0.2 | 2.1 |
| **Massachusetts** | | | | | | |
| Hampden Co. Corr. Ctr. | 1,095 | 236 | 68.9% | 1.9% | 0.7% | 5.0% |
| Middlesex Co. Jail and House of Corr. | 1,204 | 232 | 70.1 | 2.1 | 0.9 | 4.7 |
| Plymouth Co. Corr. Fac. | 1,365 | 182 | 49.8 | 2.0 | 0.8 | 4.7 |
| Suffolk Co. House of Corr. | 1,510 | 228 | 65.5 | 6.2 | 3.8 | 9.9 |
| Suffolk Co. Nashua Street Jail | 775 | 150 | 48.7 | 1.9 | 0.7 | 4.9 |
| Worcester Co. Jail and House of Corr. | 1,172 | 266 | 77.0 | 4.4 | 2.7 | 7.3 |
| **Michigan** | | | | | | |
| Berrien Co. Jail | 503 | 213 | 79.7% | 4.3% | 2.9% | 6.5% |
| Calhoun Co. Jail | 547 | 167 | 46.8 | 5.1 | 2.7 | 9.6 |
| Huron Co. Jail | 52 | 29 | 70.2 | 0.0 | 0.0 | 12.1 |
| Kalamazoo Co. Jail | 355 | 164 | 71.9 | 5.7 | 3.7 | 8.7 |
| Macomb Co. Jail | 1,154 | 157 | 40.6 | 1.9 | 0.8 | 4.5 |
| Oakland Co. East Annex | 443 | 177 | 71.9 | 2.5 | 1.3 | 5.0 |
| Oakland Co. Law Enforcement Complex | 779 | 151 | 48.7 | 7.3 | 4.1 | 12.6 |
| Ottawa Co. Jail | 344 | 120 | 53.3 | 0.6 | 0.2 | 2.5 |
| Wayne Co. Andrew C. Baird Det. Fac. | 1,354 | 127 | 32.4 | 4.1 | 2.0 | 8.3 |
| Wayne Co. William Dickerson Det. - Division III | 996 | 175 | 54.2 | 0.4 | 0.1 | 2.1 |
| **Minnesota** | | | | | | |
| Anoka Co. Jail | 220 | 95 | 58.7% | 2.0% | 0.9% | 4.5% |
| Hennepin Co. Adult Det. Ctr. | 793 | 156 | 51.7 | 1.5 | 0.6 | 3.8 |
| Mille Lacs Co. Jail | 70 | 35 | 64.9 | 1.8 | 0.6 | 5.5 |
| Ramsey Co. Corr. Fac. | 383 | 167 | 71.6 | 0.9 | 0.3 | 2.2 |
| **Mississippi** | | | | | | |
| Covington Co. Jail | 35 | 11 | 44.4% | 0.0% | 0.0% | 25.9% |
| Harrison Co. Adult Det. Ctr. | 909 | 258 | 73.7 | 5.1 | 3.0 | 8.7 |
| Hinds Co. Jackson Det. Ctr. | 161 | 92 | 79.5 | 3.0 | 1.6 | 5.6 |
| Hinds Co. Raymond Det. Ctr. | 684 | 209 | 69.8 | 5.2 | 3.1 | 8.6 |
| Holmes-Humphreys Co. Regional Corr. Fac. | 359 | 147 | 64.6 | 2.5 | 1.1 | 5.6 |
| Madison Co. Jail | 325 | 146 | 65.7 | 3.2 | 1.7 | 5.9 |
| Marshall Co. Jail | 87 | 47 | 64.2 | 0.0 | 0.0 | 7.6 |
| Pike Co. Jail | 144 | 92 | 75.2 | 0.0 | 0.0 | 4.1 |
| **Missouri** | | | | | | |
| Boone Co. Jail | 219 | 71 | 47.1% | 4.0% | 1.6% | 9.9% |
| LaClede Co. Jail | 133 | 90 | 90.3 | 7.6 | 5.2 | 10.8 |
| St. Charles Co. Jail | 448 | 150 | 60.1 | 6.0 | 3.5 | 10.1 |
| St. Louis Co. Jail | 1,424 | 212 | 61.8 | 3.5 | 1.7 | 7.0 |
| St. Louis Med. Security Inst. | 837 | 224 | 57.6 | 6.7 | 4.2 | 10.4 |
| Washington Co. Jail | 41 | 20 | 59.0 | 3.3 | 0.9 | 11.3 |
| **Montana** | | | | | | |
| Cascade Co. Regional Jail | 377 | 167 | 62.8% | 5.2% | 3.3% | 8.3% |
| Hill Co. Jail | 53 | 27 | 60.9 | 0.0 | 0.0 | 12.5 |
| Missoula Co. Jail | 350 | 155 | 67.7 | 2.5 | 1.3 | 4.9 |
| **Nebraska** | | | | | | |
| Douglas Co. Dept. of Corr. | 1,517 | 207 | 55.5% | 4.0% | 1.9% | 8.3% |
| Saline Co. Jail | 93 | 63 | 73.0 | 4.0 | 1.9 | 8.1 |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] Percent[f] | 95%-confidence interval[b] Lower bound | Upper bound |
|---|---|---|---|---|---|---|
| **Nevada** | | | | | | |
| Clark Co. Det. Ctr. | 3,967 | 240 | 55.6% | 1.0% | 0.3% | 2.8% |
| Nye Co. Jail - Pahrump | 44 | 14 | 43.9 | 0.0 | 0.0 | 21.5 |
| Washoe Co. Det. Ctr. | 1,100 | 210 | 62.1 | 3.2 | 1.6 | 6.4 |
| **New Hampshire** | | | | | | |
| Coos Co. Jail | 36 | 19 | 63.9% | 4.4% | 1.2% | 14.3% |
| Hillsborough Co. House of Corr. | 618 | 132 | 38.3 | 6.0 | 3.3 | 10.6 |
| **New Jersey** | | | | | | |
| Bergen Co. Jail | 785 | 238 | 79.1% | 2.7% | 1.5% | 4.8% |
| Burlington Co. Min. Security Jail/Corr. and Work Release Ctr. | 203 | 61 | 48.6 | 0.0 | 0.0 | 5.9 |
| Essex Co. Corr. Fac. | 2,620 | 174 | 34.1 | 2.2 | 0.9 | 4.9 |
| Hudson Co. Corr. Fac. | 2,068 | 279 | 57.4 | 2.0 | 0.9 | 4.1 |
| Mercer Co. Corr. Ctr. | 910 | 145 | 55.6 | 7.3 | 4.3 | 12.0 |
| Middlesex Co. Adult Corr. Ctr. | 1,111 | 256 | 75.5 | 1.3 | 0.5 | 2.9 |
| Ocean Co. Justice Complex | 643 | 149 | 67.5 | 2.0 | 0.8 | 5.1 |
| Passaic Co. Jail | 1,020 | 197 | 61.1 | 2.6 | 1.3 | 5.0 |
| Salem Co. Corr. Fac. | 359 | 115 | 51.4 | 2.5 | 1.0 | 5.7 |
| **New Mexico** | | | | | | |
| Dona Ana Co. Det. Ctr. | 849 | 212 | 66.4% | 4.8% | 2.9% | 7.9% |
| San Juan Co. Adult Det. Ctr. | 693 | 140 | 45.1 | 3.0 | 1.3 | 6.9 |
| Santa Fe Co. Adult Det. Fac.[i] | 496 | 136 | 47.0 | 3.5 | 1.6 | 7.5 |
| **New York** | | | | | | |
| Albany Co. Corr. Fac. | 702 | 193 | 60.6% | 4.2% | 2.4% | 7.2% |
| Allegany Co. Jail | 138 | 69 | 56.8 | 4.6 | 2.1 | 9.6 |
| Broome Co. Jail | 536 | 167 | 54.7 | 5.3 | 2.8 | 9.7 |
| Dutchess Co. Jail | 305 | 129 | 60.3 | 1.5 | 0.5 | 3.8 |
| Erie Co. Corr. Fac. | 892 | 205 | 61.3 | 4.3 | 2.3 | 7.7 |
| Erie Co. Holding Fac. | 850 | 71 | 38.5 | 4.5 | 0.9 | 19.6 |
| Jefferson Co. Jail | 186 | 78 | 52.9 | 5.2 | 2.5 | 10.5 |
| New York City Anna M. Kross Ctr. | 2,739 | 161 | 42.1 | 5.6 | 3.1 | 10.0 |
| New York City George Motchan Det. Ctr. | 1,424 | 220 | 57.0 | 5.3 | 3.2 | 8.8 |
| New York City Otis Bantum Corr. Ctr. | 1,780 | 175 | 43.6 | 6.2 | 3.3 | 11.1 |
| New York City Robert N Davoren Complex | 2,166 | 273 | 50.2 | 3.4 | 1.8 | 6.3 |
| New York City Rose M. Singer Ctr.[g] | 1,004 | 215 | 63.4 | 8.6 | 5.8 | 12.6 |
| Niagara Co. Jail | 490 | 170 | 61.2 | 1.8 | 0.7 | 4.1 |
| Oneida Co. Corr. Fac. | 510 | 158 | 59.6 | 3.1 | 1.4 | 6.5 |
| Orange Co. Corr. Fac. | 611 | 199 | 62.6 | 1.9 | 0.9 | 4.2 |
| Putnam Co. Corr. Fac. | 129 | 68 | 63.4 | 1.1 | 0.3 | 3.7 |
| Rockland Co. Corr. Ctr. | 253 | 146 | 68.0 | 4.1 | 2.1 | 7.9 |
| Schenectady Co. Jail | 353 | 173 | 67.6 | 4.8 | 3.1 | 7.6 |
| Seneca Co. Law Enforcement Ctr. | 79 | 56 | 81.3 | 4.9 | 2.8 | 8.5 |
| Ulster Co. Law Enforcement Ctr. | 332 | 159 | 67.9 | 6.9 | 4.3 | 11.0 |
| Washington Co. Corr. Fac. | 102 | 63 | 72.9 | 0.0 | 0.0 | 5.8 |
| Westchester Co. Jail | 938 | 150 | 43.0 | 2.9 | 1.3 | 6.4 |
| Westchester Co. Penitentiary - Dept. of Corr. | 569 | 167 | 59.9 | 2.2 | 1.0 | 4.4 |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] Percent[f] | 95%-confidence interval[b] Lower bound | 95%-confidence interval[b] Upper bound |
|---|---|---|---|---|---|---|
| **North Carolina** | | | | | | |
| Buncombe Co. Det. Fac. | 433 | 154 | 63.6% | 1.9% | 0.8% | 4.3% |
| Cherokee Co. Jail | 81 | 45 | 65.8 | 2.5 | 0.8 | 7.8 |
| Durham Co. Jail | 538 | 180 | 76.4 | 2.3 | 1.1 | 4.8 |
| Edgecombe Co. Det. Ctr. | 249 | 138 | 67.2 | 6.3 | 4.2 | 9.5 |
| Forsyth Co. Adult Det. Ctr. | 705 | 153 | 40.5 | 3.2 | 1.5 | 6.8 |
| Granville Co. Det. Ctr. | 83 | 35 | 52.1 | 6.5 | 2.3 | 17.1 |
| Guilford Co. High Point Det. Fac. | 329 | 162 | 57.8 | 1.1 | 0.4 | 2.7 |
| Guilford Co. Prison Farm | 60 | 36 | 66.1 | 0.0 | 0.0 | 9.6 |
| Mecklenburg Co. Jail North | 510 | 146 | 45.5 | 2.0 | 0.8 | 4.9 |
| New Hanover Det. Fac. | 415 | 155 | 60.1 | 1.9 | 0.8 | 4.3 |
| Robeson Co. Jail | 488 | 147 | 52.4 | 7.5 | 4.8 | 11.5 |
| Scotland Co. Jail | 187 | 93 | 58.2 | 5.4 | 3.1 | 9.3 |
| Wake Co. John H. Baker, Jr. Public Safety Ctr. | 1,380 | 200 | 57.1 | 4.2 | 1.9 | 8.8 |
| **North Dakota** | | | | | | |
| Burleigh Co. Det. Ctr. | 151 | 82 | 75.2% | 3.5% | 1.9% | 6.5% |
| **Ohio** | | | | | | |
| Bedford Heights City Jail | 143 | 35 | 34.7% | 0.0% | 0.0% | 9.9% |
| Cuyahoga Co. Corr. Ctr. | 2,321 | 315 | 72.3 | 2.4 | 1.3 | 4.4 |
| Delaware Co. Jail | 214 | 108 | 61.1 | 0.0 | 0.0 | 3.4 |
| Franklin Co. Jail | 628 | 155 | 53.4 | 4.1 | 2.1 | 7.9 |
| Hamilton Co. Justice Ctr. | 1,245 | 219 | 64.9 | 1.8 | 0.8 | 4.3 |
| Hamilton Co. Reading Road Fac. | 183 | 105 | 70.7 | 2.4 | 1.3 | 4.3 |
| Lorain Co. Jail | 432 | 174 | 66.4 | 2.2 | 1.1 | 4.3 |
| Miami Co. Jail | 125 | 68 | 73.8 | 0.0 | 0.0 | 5.3 |
| Montgomery Co. Jail | 942 | 202 | 59.2 | 1.3 | 0.5 | 3.3 |
| Richland Co. Jail | 226 | 130 | 75.8 | 2.9 | 1.7 | 4.7 |
| **Oklahoma** | | | | | | |
| Dewey Co. Jail | 14 | 13 | 100.0% | 0.0% | 0.0% | 22.8% |
| Kay Co. Jail | 182 | 110 | 75.6 | 2.6 | 1.4 | 4.9 |
| Nowata Co. Jail | 53 | 24 | 63.8 | 2.4 | 0.7 | 8.3 |
| **Oregon** | | | | | | |
| Lane Co. Jail | 489 | 171 | 72.9% | 0.8% | 0.3% | 2.1% |
| Marion Co. Corr. Fac. | 597 | 212 | 77.3 | 1.9 | 0.9 | 3.8 |
| Washington Co. Jail | 604 | 153 | 49.4 | 0.5 | 0.1 | 2.4 |
| Yamhill Co. Corr. Fac. | 235 | 127 | 77.8 | 4.7 | 2.8 | 7.7 |
| **Pennsylvania** | | | | | | |
| Allegheny Co. Jail | 2,792 | 233 | 50.1% | 3.0% | 1.6% | 5.6% |
| Blair Co. Prison | 335 | 100 | 45.3 | 5.3 | 2.3 | 11.5 |
| Fayette Co. Prison | 310 | 97 | 39.3 | 4.9 | 2.6 | 9.1 |
| Indiana Co. Jail | 229 | 70 | 44.8 | 3.9 | 1.5 | 9.4 |
| Luzerne Co. Corr. Fac. | 727 | 181 | 52.2 | 3.0 | 1.6 | 5.7 |
| Montgomery Co. Prison Corr. Fac. | 1,838 | 236 | 66.4 | 3.7 | 2.0 | 6.6 |
| Philadelphia City Alternative and Special Det. Fac. | 768 | 173 | 55.0 | 0.8 | 0.3 | 2.5 |
| Philadelphia City Curran/Fromhold Corr. Fac. | 3,217 | 221 | 54.8 | 4.5 | 2.5 | 7.9 |
| Philadelphia City Industrial Corr. Ctr. | 1,052 | 241 | 68.7 | 9.5 | 6.4 | 13.7 |
| Philadelphia City Riverside Corr. Fac.[g] | 801 | 195 | 58.4 | 8.6 | 5.7 | 12.9 |
| Schuylkill Co. Prison | 292 | 136 | 74.3 | 2.7 | 1.4 | 5.0 |
| Westmoreland Co. Prison | 566 | 145 | 51.3 | 3.3 | 1.5 | 7.0 |
| York Co. Prison | 2,559 | 237 | 59.6 | 5.4 | 3.1 | 9.1 |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] | | |
|---|---|---|---|---|---|---|
| | | | | | 95%-confidence interval[b] | |
| | | | | Percent[f] | Lower bound | Upper bound |
| **South Carolina** | | | | | | |
| Charleston Co. Det. Ctr. | 1,450 | 213 | 55.7% | 1.9% | 0.9% | 4.3% |
| Florence Co. Det. Ctr. | 389 | 165 | 74.9 | 1.2 | 0.5 | 3.1 |
| Lexington Co. Jail | 781 | 193 | 59.9 | 1.6 | 0.6 | 4.0 |
| Spartanburg Co. Det. Fac. | 908 | 212 | 66.7 | 1.1 | 0.4 | 3.5 |
| Sumter-Lee Regional Det. Ctr. | 364 | 149 | 67.3 | 5.1 | 3.0 | 8.4 |
| York Co. Det. Ctr. | 397 | 133 | 48.7 | 2.1 | 0.8 | 5.3 |
| **South Dakota** | | | | | | |
| Pennington Co. Jail | 399 | 154 | 68.0% | 2.5% | 1.2% | 5.1% |
| **Tennessee** | | | | | | |
| Lincoln Co. Jail | 117 | 78 | 80.0% | 3.0% | 1.4% | 6.1% |
| Madison Co. Jail | 404 | 186 | 80.7 | 5.3 | 2.8 | 10.0 |
| McMinn Co. Jail | 248 | 161 | 78.4 | 3.4 | 2.2 | 5.2 |
| Montgomery Co. Jail | 542 | 122 | 45.8 | 0.7 | 0.2 | 3.3 |
| Obion Co. Jail | 154 | 98 | 75.0 | 0.0 | 0.0 | 3.8 |
| Robertson Co. Det. Ctr. | 398 | 171 | 71.7 | 2.8 | 1.5 | 5.3 |
| Shelby Co. Corr. Ctr. | 2,564 | 276 | 76.1 | 3.4 | 1.9 | 5.9 |
| Shelby Co. Jail | 2,715 | 286 | 72.6 | 1.8 | 0.8 | 3.7 |
| Sumner Co. Jail | 730 | 220 | 73.0 | 6.1 | 3.9 | 9.4 |
| Tipton Co. Jail | 137 | 74 | 64.6 | 1.5 | 0.5 | 5.0 |
| Van Buren Co. Jail | 30 | 15 | 77.8 | 0.0 | 0.0 | 20.4 |
| Washington Co. Det. Ctr. | 592 | 243 | 77.9 | 2.9 | 1.6 | 5.0 |
| **Texas** | | | | | | |
| Bexar Co. Adult Det. Ctr. | 3,557 | 201 | 42.3% | 5.1% | 2.6% | 9.5% |
| Bowie Co. Corr. Ctr. | 643 | 174 | 55.9 | 2.5 | 1.2 | 5.5 |
| Brazoria Co. Jail and Det. Ctr. | 761 | 222 | 69.6 | 0.9 | 0.3 | 2.6 |
| Brown Co. Jail | 147 | 78 | 70.3 | 0.0 | 0.0 | 4.7 |
| Cameron Co. Carrizales-Rucker Det. Ctr. | 1,518 | 286 | 72.1 | 0.3 | 0.1 | 1.6 |
| Dallas Co. Kays Det. Fac. | 2,120 | 212 | 57.0 | 2.1 | 0.9 | 4.6 |
| Denton Co. Det. Ctr. | 1,176 | 274 | 76.1 | 2.4 | 1.2 | 4.8 |
| Eastland Co. Jail | 58 | 36 | 90.2 | 0.0 | 0.0 | 9.9 |
| El Paso Co. Det. Fac. Annex | 1,354 | 195 | 52.0 | 2.9 | 1.4 | 5.9 |
| El Paso Co. Downtown Det. Fac. | 1,014 | 173 | 55.4 | 3.0 | 1.2 | 7.6 |
| Ellis Co. Wayne McCollum Det. Ctr. | 428 | 186 | 75.3 | 3.6 | 2.2 | 5.9 |
| Gregg Co. Jail | 679 | 238 | 80.9 | 1.5 | 0.7 | 3.2 |
| Harris Co. Jail - 1200 Baker Street Jail | 4,602 | 276 | 58.3 | 7.6 | 4.5 | 12.5 |
| Harris Co. Jail - 1307 Baker Street Jail | 454 | 194 | 65.5 | 1.4 | 0.6 | 3.1 |
| Harris Co. Jail - 701 North San Jacinto Street Jail[h] | 4,441 | 296 | 61.7 | 3.2 | 1.7 | 6.0 |
| Harris Co. Jail - 711 North San Jacinto Jail | 127 | 64 | 58.8 | 1.5 | 0.4 | 4.9 |
| Hays Co. Jail | 318 | 93 | 43.5 | 3.9 | 1.6 | 9.4 |
| Jefferson Co. Corr. Fac. | 1,026 | 241 | 70.3 | 2.1 | 1.1 | 4.2 |
| Johnson Co. Jail | 361 | 178 | 83.5 | 5.2 | 3.4 | 7.9 |
| Tarrant Co. Corr. Ctr. | 1,933 | 182 | 60.6 | 2.9 | 1.3 | 6.3 |
| Taylor Co. Jail | 513 | 169 | 63.9 | 3.0 | 1.5 | 5.9 |
| Titus Co. Jail | 162 | 64 | 52.7 | 0.0 | 0.0 | 5.7 |
| Travis Co. Corr. Fac. | 2,346 | 121 | 22.8 | 2.7 | 0.9 | 7.6 |
| Travis Co. Jail | 345 | 25 | 19.0 | 0.0 | 0.0 | 13.3 |
| Uvalde Co. Jail | 50 | 17 | 42.6 | 3.6 | 0.9 | 14.1 |
| Victoria Co. Jail | 473 | 41 | 43.8 | 1.6 | 0.4 | 6.6 |
| Washington Co. Jail | 109 | 77 | 84.3 | 2.7 | 1.4 | 5.1 |
| Webb Co. Jail | 475 | 110 | 38.8 | 0.6 | 0.1 | 2.7 |
| **Utah** | | | | | | |
| Box Elder Co. Jail | 51 | 40 | 87.8% | 0.0% | 0.0% | 8.8% |
| Davis Co. Jail | 652 | 170 | 54.4 | 4.8 | 2.7 | 8.4 |
| Weber Co. Corr. Fac. | 830 | 193 | 60.3 | 3.7 | 1.9 | 6.9 |

**APPENDIX TABLE 5 (continued)**
**Characteristics of jails and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Facility name | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] Percent[f] | 95%-confidence interval[b] Lower bound | Upper bound |
|---|---|---|---|---|---|---|
| **Virginia** | | | | | | |
| Alexandria Det. Ctr. | 470 | 119 | 47.8% | 0.6% | 0.1% | 2.6% |
| Arlington Co. Det. Fac. | 472 | 161 | 65.3 | 0.8 | 0.2 | 3.2 |
| Bristol City Jail | 157 | 101 | 79.2 | 0.8 | 0.3 | 2.3 |
| Hampton Corr. Fac. | 423 | 189 | 76.3 | 1.0 | 0.4 | 2.7 |
| Henrico Co. Regional Jail West | 593 | 177 | 64.1 | 2.7 | 1.4 | 5.2 |
| Mecklenburg Co. Jail | 123 | 67 | 77.2 | 0.0 | 0.0 | 5.4 |
| Montgomery Co. Jail | 108 | 60 | 84.6 | 0.0 | 0.0 | 6.0 |
| Newport News City Jail | 525 | 197 | 73.7 | 3.5 | 2.0 | 6.0 |
| Piedmont Regional Jail | 611 | 188 | 64.9 | 2.3 | 1.1 | 4.7 |
| Rappahannock Regional Jail | 1,878 | 266 | 75.6 | 4.5 | 2.7 | 7.3 |
| Richmond City Jail | 1,429 | 230 | 68.8 | 3.4 | 1.9 | 6.3 |
| Riverside Regional Jail | 1,391 | 256 | 75.2 | 4.9 | 3.0 | 8.0 |
| Virginia Beach Municipal Corr. Ctr. | 1,518 | 268 | 73.6 | 2.4 | 1.3 | 4.6 |
| **Washington** | | | | | | |
| Benton Co. Jail | 820 | 153 | 54.7% | 2.3% | 0.9% | 6.0% |
| Cowlitz Co. Jail | 359 | 173 | 79.3 | 1.7 | 0.8 | 3.6 |
| King Co. Regional Justice Ctr. | 791 | 179 | 53.7 | 1.3 | 0.5 | 3.5 |
| Snohomish Co. Jail | 1,385 | 230 | 64.3 | 1.0 | 0.3 | 3.1 |
| Sunnyside City Jail | 55 | 17 | 51.4 | 0.0 | 0.0 | 18.4 |
| Whatcom Co. Jail | 364 | 154 | 65.1 | 2.9 | 1.5 | 5.6 |
| Yakima City Jail | 76 | 39 | 65.2 | 1.8 | 0.5 | 5.9 |
| **West Virginia** | | | | | | |
| Eastern Regional Jail | 470 | 130 | 50.7% | 6.5% | 3.7% | 11.2% |
| South Central Regional Jail | 622 | 102 | 37.8 | 5.9 | 3.0 | 11.2 |
| Western Regional Jail | 658 | 215 | 68.0 | 4.8 | 3.0 | 7.7 |
| **Wisconsin** | | | | | | |
| Brown Co. Jail | 470 | 167 | 62.4% | 4.1% | 2.2% | 7.8% |
| Columbia Co. Jail | 101 | 40 | 50.0 | 4.1 | 1.6 | 10.4 |
| Milwaukee Co. Corr. Fac. South | 1,701 | 207 | 55.8 | 4.2 | 2.3 | 7.5 |
| Oconto Co. Jail | 50 | 18 | 45.0 | 0.0 | 0.0 | 18.4 |
| Rock Co. Jail | 661 | 164 | 60.9 | 3.3 | 1.7 | 6.4 |
| Walworth Co. Jail | 188 | 100 | 73.3 | 2.5 | 1.3 | 5.0 |
| Washington Co. Jail | 110 | 67 | 68.3 | 4.5 | 2.4 | 8.6 |
| Wood Co. Jail | 69 | 26 | 69.0 | 0.0 | 0.0 | 12.9 |
| **Wyoming** | | | | | | |
| Lincoln Co. Jail | 23 | 11 | 81.3% | 0.0% | 0.0% | 25.9% |

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[c]Number of inmates in the facility on the day of the roster plus any new inmates admitted prior to the first day of data collection.

[d]Number of respondents consenting to the sexual victimization survey on NIS. (See *Methodology*.)

[e]Response rate is equal to the number of respondents divided by the number of eligible inmates sampled times 100 percent.

[f]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, sentence length, and time served. (See *Methodology*.)

[g]Female facility.

[h]Facility housed both males and females; only males were sampled at this facility.

[i]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 6**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| Total | 1.6% | 1.4% | 1.9% | 1.8% | 1.7% | 2.0% |
| **Alabama** | | | | | | |
| Barbour Co. Jail | 2.3% | 0.7% | 7.5% | 0.0% | 0.0% | 7.6% |
| Dallas Co. Jail | 1.5 | 0.7 | 3.5 | 0.0 | 0.0 | 3.3 |
| Lee Co. W.S. Buck Jones Det. Ctr. | 2.4 | 1.3 | 4.6 | 1.0 | 0.4 | 2.5 |
| Marshall Co. Jail | 2.5 | 1.3 | 4.9 | 3.4 | 1.9 | 6.0 |
| Tuscaloosa Co. Jail | 0.8 | 0.3 | 2.3 | 2.7 | 1.4 | 4.9 |
| **Arizona** | | | | | | |
| Maricopa Co. Estrella Jail[d] | 3.7% | 2.0% | 6.8% | 0.3% | 0.1% | 1.5% |
| Maricopa Co. Fourth Avenue Jail | 0.6 | 0.1 | 3.2 | 0.9 | 0.3 | 3.2 |
| Maricopa Co. Towers Jail | 1.1 | 0.3 | 3.7 | 4.3 | 2.2 | 8.1 |
| Mariopa Co. Lower Buckeye Jail | 2.4 | 1.1 | 4.9 | 2.8 | 1.3 | 5.9 |
| Santa Cruz Co. Jail | 0.0 | 0.0 | 6.9 | 0.0 | 0.0 | 6.9 |
| Yuma Co. Det. Ctr. | 0.6 | 0.1 | 2.9 | 1.4 | 0.5 | 4.2 |
| **Arkansas** | | | | | | |
| Crittenden Co. Jail | 3.5% | 1.9% | 6.4% | 2.8% | 1.4% | 5.7% |
| Mississippi Co. Det. Ctr. | 0.0 | 0.0 | 4.3 | 0.8 | 0.3 | 2.8 |
| Pope Co. Det. Ctr. | 3.6 | 1.2 | 10.3 | 2.3 | 0.5 | 9.6 |
| Pulaski Co. Regional Det. Ctr. | 3.5 | 1.3 | 9.1 | 2.5 | 1.1 | 5.4 |
| Sebastian Co. Adult Det. Ctr. | 0.5 | 0.1 | 2.0 | 0.6 | 0.1 | 2.0 |
| **California** | | | | | | |
| Alameda Co. Santa Rita Jail | 1.2% | 0.5% | 3.0% | 2.0% | 1.0% | 4.3% |
| Contra Costa Co. Martinez Det. Fac. | 2.0 | 0.8 | 5.1 | 5.9 | 3.2 | 10.4 |
| Fresno Co. Downtown Det. Fac. - North and South | 1.6 | 0.7 | 4.0 | 1.9 | 0.8 | 4.6 |
| Imperial Co. Jail | 0.4 | 0.1 | 1.2 | 0.6 | 0.1 | 2.6 |
| Kern Co. Lerdo Pre-Trial Fac. | 2.5 | 1.0 | 6.1 | 1.7 | 0.6 | 5.1 |
| Los Angeles Co. - Twin Towers Corr. Fac. | 4.9 | 2.6 | 9.1 | 4.4 | 2.3 | 8.5 |
| Los Angeles Co. Men's Central Jail | 4.2 | 2.1 | 8.0 | 3.3 | 1.6 | 6.6 |
| Los Angeles Co. North County Corr. Fac. | 1.8 | 0.6 | 5.2 | 2.4 | 0.9 | 6.0 |
| Napa Co. Jail | 2.3 | 1.0 | 5.4 | 2.5 | 1.1 | 5.7 |
| Orange Co. Central Jail Complex | 1.4 | 0.4 | 4.7 | 0.7 | 0.1 | 3.8 |
| Orange Co. Theo Lacy Fac. | 3.2 | 1.4 | 6.8 | 1.5 | 0.5 | 4.4 |
| Riverside Co. Indio Jail | 2.8 | 1.3 | 5.8 | 0.6 | 0.2 | 2.5 |
| Riverside Co. Larry D. Smith Corr. Ctr. | 4.0 | 2.1 | 7.5 | 2.0 | 0.8 | 4.8 |
| Riverside Co. Southwest Det. Ctr.[e] | 0.0 | 0.0 | 2.5 | 0.6 | 0.1 | 3.0 |
| Sacramento Co. Rio Cosumnes Corr. Ctr. | 2.6 | 1.3 | 5.1 | 2.6 | 1.3 | 5.1 |
| San Diego Co. East Mesa Med. Fac. | 1.2 | 0.3 | 4.7 | 1.1 | 0.4 | 3.1 |
| San Diego Co. George F. Bailey Det. Fac. | 4.1 | 1.9 | 8.4 | 1.7 | 0.6 | 4.6 |
| San Diego Co. Vista Det. Fac. | 1.6 | 0.6 | 4.3 | 2.6 | 1.3 | 5.2 |
| San Francisco Co. Jail Number 3 | 2.4 | 0.8 | 7.3 | 1.6 | 0.3 | 7.0 |
| Santa Clara Co. Elmwood Fac. - Min. and Med. | 1.3 | 0.5 | 3.6 | 1.1 | 0.3 | 3.7 |
| Santa Clara Co. Main Jail | 3.5 | 1.5 | 7.9 | 6.2 | 3.0 | 12.5 |
| Santa Clara Co. Women's Corr. Ctr.[d] | 1.4 | 0.5 | 4.2 | 0.7 | 0.2 | 3.1 |
| Solano Co. Justice Ctr. Det. Fac. | 2.4 | 1.2 | 4.9 | 3.7 | 2.1 | 6.7 |
| Tulare Co. Jail | 0.0 | 0.0 | 2.0 | 1.0 | 0.3 | 3.8 |
| Ventura Co. Jail | 0.9 | 0.3 | 2.7 | 1.9 | 0.8 | 4.2 |
| Yolo Co. Leinberger Ctr. | 2.1 | 0.7 | 6.0 | 0.0 | 0.0 | 8.0 |
| Yuba Co. Jail | 1.5 | 0.5 | 3.9 | 1.2 | 0.4 | 3.2 |
| **Colorado** | | | | | | |
| Chaffee Co. Jail | 0.0% | 0.0% | 10.4% | 0.0% | 0.0% | 10.4% |
| Denver Co. Jail | 2.9 | 1.6 | 5.4 | 1.1 | 0.5 | 2.8 |
| Denver Co. Van Cise-Simonet Det. Ctr. | 0.5 | 0.1 | 2.5 | 1.6 | 0.5 | 5.1 |
| Douglas Co. Jail | 0.0 | 0.0 | 2.9 | 2.8 | 1.4 | 5.8 |
| Fremont Co. Jail | 3.0 | 1.6 | 5.7 | 0.8 | 0.2 | 2.5 |
| Jefferson Co. Jail | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 1.8 |
| Park Co. Jail | 0.0 | 0.0 | 6.4 | 0.0 | 0.0 | 6.4 |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Florida** | | | | | | |
| Collier Co. Jail | 2.4% | 1.1% | 5.5% | 2.6% | 1.0% | 6.8% |
| Dixie Co. Jail | 4.9 | 2.1 | 10.8 | 5.7 | 2.5 | 12.6 |
| Escambia Co. Jail | 2.0 | 0.9 | 4.5 | 0.5 | 0.1 | 2.3 |
| Jacksonville City Montgomery Corr. Ctr. | 1.3 | 0.4 | 3.6 | 1.6 | 0.7 | 3.6 |
| Lake Co. Jail | 0.3 | 0.1 | 1.7 | 2.5 | 0.6 | 9.4 |
| Lee Co. Community Programs Unit | 2.4 | 1.1 | 5.0 | 1.6 | 0.7 | 4.1 |
| Leon Co. Det. Fac. | 2.0 | 1.0 | 4.3 | 3.7 | 2.0 | 6.5 |
| Manatee Co. Jail | 3.4 | 1.8 | 6.4 | 2.3 | 1.1 | 4.8 |
| Martin Co. Jail | 1.1 | 0.4 | 3.4 | 2.6 | 1.2 | 5.8 |
| Miami-Dade Co. Boot Camp | 0.0 | 0.0 | 7.4 | 0.0 | 0.0 | 7.4 |
| Miami-Dade Co. Metro West Det. Ctr. | 1.0 | 0.3 | 3.4 | 1.6 | 0.7 | 3.5 |
| Miami-Dade Co. Training and Treatment Ctr. | 0.0 | 0.0 | 2.2 | 1.0 | 0.3 | 3.2 |
| Miami-Dade Co. Turner Guilford Knight Corr. Ctr. | 1.0 | 0.3 | 3.0 | 0.0 | 0.0 | 2.3 |
| Okeechobee Co. Jail | 0.0 | 0.0 | 3.7 | 1.1 | 0.3 | 3.9 |
| Orange Co. 33rd Street Corr. Ctr. | 1.3 | 0.4 | 3.7 | 2.2 | 0.9 | 5.3 |
| Orange Co. Booking and Release Ctr. | 1.0 | 0.2 | 3.9 | 2.9 | 1.2 | 6.8 |
| Osceola Co. Jail | 0.9 | 0.3 | 3.1 | 0.7 | 0.1 | 3.0 |
| Palm Beach Co. Stockade | 1.3 | 0.4 | 4.3 | 1.6 | 0.6 | 4.2 |
| Pinellas Co. Central Division Fac. | 2.4 | 0.9 | 6.4 | 1.0 | 0.2 | 4.8 |
| Pinellas Co. South Division | 2.0 | 0.7 | 5.4 | 1.3 | 0.4 | 4.1 |
| Polk Co. - South Co. Jail | 2.3 | 1.1 | 5.0 | 3.7 | 2.0 | 6.8 |
| Sarasota North Co. Jail | 0.0 | 0.0 | 1.9 | 0.0 | 0.0 | 1.9 |
| Suwanee Co. Jail | 0.9 | 0.3 | 3.0 | 0.0 | 0.0 | 4.5 |
| Taylor Co. Jail | 0.0 | 0.0 | 13.3 | 0.0 | 0.0 | 13.3 |
| **Georgia** | | | | | | |
| Candler Co. Jail | 0.0% | 0.0% | 12.5% | 0.0% | 0.0% | 12.5% |
| Carroll Co. Prison | 0.0 | 0.0 | 2.5 | 2.7 | 1.6 | 4.3 |
| Clayton Co. Jail | 2.3 | 1.1 | 4.7 | 3.3 | 1.7 | 6.1 |
| Dekalb Co. Jail | 2.0 | 0.9 | 4.5 | 1.9 | 0.9 | 4.0 |
| Douglas Co. Jail | 2.3 | 1.2 | 4.3 | 0.5 | 0.1 | 2.2 |
| Floyd Co. Jail | 2.4 | 1.3 | 4.6 | 1.2 | 0.5 | 2.8 |
| Floyd Co. Prison | 0.6 | 0.2 | 2.0 | 2.2 | 1.2 | 4.3 |
| Fulton Co. Jail | 3.3 | 1.5 | 7.4 | 1.6 | 0.5 | 4.5 |
| Gwinnett Co. Det. Ctr. | 0.8 | 0.2 | 2.6 | 0.0 | 0.0 | 1.5 |
| Hall Co. Det. Ctr. | 3.0 | 1.5 | 6.0 | 0.0 | 0.0 | 2.0 |
| Houston Co. Jail | 2.2 | 1.1 | 4.7 | 6.0 | 3.7 | 9.6 |
| Irwin Co. Jail | 0.0 | 0.0 | 2.0 | 1.1 | 0.4 | 2.9 |
| Murray County Jail | 2.4 | 1.1 | 5.3 | 0.8 | 0.3 | 2.5 |
| Newton Co. Jail | 2.2 | 1.1 | 4.4 | 1.5 | 0.6 | 4.0 |
| Screven Co. Jail | 1.4 | 0.6 | 3.5 | 2.4 | 1.3 | 4.7 |
| South Fulton Municipal Regional Jail | 0.0 | 0.0 | 8.2 | 4.7 | 1.6 | 12.8 |
| Spalding Co. Jail | 1.8 | 0.7 | 4.5 | 3.3 | 1.4 | 7.2 |
| Troup Co. Jail | 2.2 | 1.0 | 4.4 | 0.0 | 0.0 | 2.2 |
| Upson Co. Jail | 1.7 | 0.8 | 3.4 | 1.9 | 0.9 | 3.7 |
| Ware Co. Jail | 1.7 | 0.9 | 3.4 | 0.8 | 0.3 | 2.0 |
| Wilkinson Co. Jail | 6.5 | 1.9 | 20.0 | 0.0 | 0.0 | 16.8 |
| **Idaho** | | | | | | |
| Bannock Co. Jail | 0.0% | 0.0% | 3.3% | 3.0% | 1.3% | 6.8% |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Illinois** | | | | | | |
| Champaign Co. Satellite Jail[e] | 0.0% | 0.0% | 6.4% | 2.0% | 0.5% | 8.4% |
| Cook Co. - Division 1 | 0.7 | 0.2 | 2.1 | 4.0 | 2.4 | 6.5 |
| Cook Co. - Division 11 | 5.5 | 3.5 | 8.4 | 3.3 | 1.8 | 5.7 |
| Cook Co. - Division 2 | 2.5 | 1.1 | 5.4 | 4.2 | 2.3 | 7.5 |
| Cook Co. - Division 5 | 0.9 | 0.3 | 2.7 | 2.6 | 1.3 | 5.1 |
| Cook Co. - Division 6 | 1.1 | 0.4 | 2.7 | 1.5 | 0.7 | 3.3 |
| Kane Co. Adult Justice Ctr. | 1.5 | 0.6 | 3.8 | 2.1 | 0.8 | 5.1 |
| Kankakee Co. Jerome Combs Det. Ctr. | 1.6 | 0.7 | 3.8 | 2.6 | 1.5 | 4.7 |
| Kendall Co. Jail | 2.6 | 1.1 | 5.9 | 2.5 | 1.1 | 5.8 |
| McHenry Co. Jail | 0.5 | 0.1 | 2.2 | 0.6 | 0.1 | 2.6 |
| Sangamon Co. Jail | 2.4 | 1.3 | 4.2 | 2.0 | 1.1 | 3.5 |
| **Indiana** | | | | | | |
| Bartholomew Co. Jail | 3.2% | 1.9% | 5.2% | 0.8% | 0.3% | 2.0% |
| Clinton Co. Jail | 1.6 | 0.5 | 4.4 | 0.8 | 0.3 | 2.4 |
| Dearborn Co. Jail | 0.7 | 0.2 | 2.4 | 1.1 | 0.3 | 3.5 |
| Delaware Co. Justice Ctr. | 0.2 | 0.0 | 0.7 | 1.7 | 0.6 | 4.5 |
| Elkhart Co. Corr. Ctr. | 1.7 | 0.7 | 3.8 | 1.9 | 1.0 | 3.7 |
| Hamilton Co. Jail | 1.5 | 0.6 | 3.8 | 0.9 | 0.3 | 3.3 |
| Jackson Co. Jail | 1.0 | 0.3 | 3.4 | 0.0 | 0.0 | 4.1 |
| Marion Co. Jail II[f] | 0.5 | 0.1 | 2.5 | 2.9 | 1.0 | 7.7 |
| Marion Co. Jail Intake Fac. | 0.0 | 0.0 | 5.8 | 7.7 | 3.4 | 16.3 |
| Noble Co. Jail | 0.0 | 0.0 | 3.5 | 0.9 | 0.3 | 2.3 |
| Ripley Co. Jail | 7.9 | 5.1 | 11.9 | 2.0 | 0.8 | 4.5 |
| Tippecanoe Co. Jail | 2.5 | 1.1 | 5.7 | 0.0 | 0.0 | 3.2 |
| **Iowa** | | | | | | |
| Des Moines Co. Jail | 0.0% | 0.0% | 11.4% | 2.1% | 0.6% | 7.1% |
| Scott Co. Jail and Annex | 0.0 | 0.0 | 2.7 | 3.2 | 1.6 | 6.1 |
| **Kansas** | | | | | | |
| Finney Co. Jail | 1.0% | 0.3% | 2.9% | 3.0% | 1.6% | 5.7% |
| Wilson Co. Jail | 0.0 | 0.0 | 9.6 | 5.6 | 1.7 | 16.5 |
| **Kentucky** | | | | | | |
| Big Sandy Regional Det. Ctr. | 1.3% | 0.6% | 3.2% | 0.0% | 0.0% | 2.6% |
| Boyle Co. Det. Ctr. | 1.9 | 0.6 | 5.7 | 0.0 | 0.0 | 2.5 |
| Daviess Co. Det. Ctr. | 2.1 | 1.1 | 4.2 | 1.9 | 0.9 | 4.1 |
| Grayson Co. Det. Ctr. | 0.9 | 0.3 | 2.4 | 1.3 | 0.6 | 2.9 |
| Kenton Co. Det. Ctr. | 1.1 | 0.4 | 3.0 | 0.1 | 0.0 | 0.6 |
| Lexington-Fayette Co. Jail Det. Division | 3.1 | 1.4 | 6.6 | 3.3 | 1.6 | 6.7 |
| Madison Co. Det. Ctr. | 2.1 | 1.1 | 4.2 | 1.7 | 0.8 | 3.5 |
| McCracken Co. Jail | 1.5 | 0.7 | 3.2 | 1.6 | 0.8 | 3.5 |
| Meade Co. Jail | 1.3 | 0.5 | 3.6 | 1.3 | 0.5 | 3.6 |
| Pulaski Co. Det. Ctr. | 1.6 | 0.6 | 4.2 | 0.8 | 0.2 | 2.9 |
| Woodford Co. Det. Ctr. | 0.1 | 0.0 | 0.6 | 0.0 | 0.0 | 10.2 |
| **Louisiana** | | | | | | |
| Assumption Parish Det. Ctr. | 3.1% | 1.6% | 6.0% | 1.5% | 0.6% | 3.9% |
| Bossier Parish Max. Security Fac. | 0.9 | 0.4 | 2.3 | 0.0 | 0.0 | 2.2 |
| Bossier Parish Med. Security Fac. | 1.4 | 0.6 | 3.1 | 1.5 | 0.7 | 3.4 |
| Caddo Parish Corr. Ctr. | 1.1 | 0.4 | 3.0 | 1.1 | 0.4 | 3.0 |
| East Baton Rouge Parish Prison | 2.3 | 1.0 | 5.1 | 0.6 | 0.1 | 3.1 |
| Iberia Parish Jail | 2.4 | 1.2 | 4.7 | 2.5 | 1.3 | 4.9 |
| Lafayette Parish Jail | 1.8 | 0.8 | 4.1 | 2.4 | 1.1 | 4.9 |
| Livingston Parish Det. Ctr. | 1.0 | 0.4 | 2.7 | 0.4 | 0.1 | 1.5 |
| Rapides Parish Det. Ctr. III | 1.4 | 0.7 | 3.0 | 0.5 | 0.1 | 1.6 |
| St. Landry Parish Jail | 0.7 | 0.2 | 2.5 | 0.7 | 0.2 | 2.5 |
| St. Martin Parish Corr. Ctr. 1 | 1.3 | 0.4 | 4.6 | 2.6 | 1.0 | 6.4 |
| Webster Parish Bayou Dorcheat Corr. Fac. | 1.8 | 0.9 | 3.6 | 2.1 | 1.0 | 4.5 |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Maine** | | | | | | |
| Penobscot Co. Jail | 0.0% | 0.0% | 5.9% | 4.3% | 1.6% | 11.4% |
| **Maryland** | | | | | | |
| Allegany Co. Det. Ctr. | 2.3% | 0.5% | 9.6% | 0.0% | 0.0% | 7.7% |
| Anne Arundel Co. Jennifer Road Det. Ctr. | 0.0 | 0.0 | 3.6 | 0.9 | 0.2 | 4.4 |
| Baltimore City Det. Ctr. | 0.7 | 0.2 | 2.4 | 6.7 | 4.3 | 10.2 |
| Montgomery Co. Corr. Fac. | 1.8 | 0.7 | 4.5 | 1.6 | 0.6 | 4.1 |
| Wicomico Co. Det. Ctr. | 0.6 | 0.2 | 2.1 | 0.0 | 0.0 | 2.5 |
| **Massachusetts** | | | | | | |
| Hampden Co. Corr. Ctr. | 0.0% | 0.0% | 1.7% | 1.9% | 0.7% | 5.0% |
| Middlesex Co. Jail and House of Corr. | 1.5 | 0.5 | 4.0 | 0.6 | 0.2 | 2.1 |
| Plymouth Co. Corr. Fac. | 0.6 | 0.1 | 2.9 | 2.0 | 0.8 | 4.7 |
| Suffolk Co. House of Corr. | 4.1 | 2.2 | 7.6 | 3.5 | 1.9 | 6.6 |
| Suffolk Co. Nashua Street Jail | 0.6 | 0.1 | 2.7 | 1.3 | 0.4 | 4.2 |
| Worcester Co. Jail and House of Corr. | 1.9 | 0.9 | 4.0 | 2.9 | 1.5 | 5.5 |
| **Michigan** | | | | | | |
| Berrien Co. Jail | 0.9% | 0.4% | 2.3% | 3.4% | 2.1% | 5.3% |
| Calhoun Co. Jail | 2.7 | 1.1 | 6.5 | 3.5 | 1.7 | 7.3 |
| Huron Co. Jail | 0.0 | 0.0 | 12.1 | 0.0 | 0.0 | 12.1 |
| Kalamazoo Co. Jail | 3.6 | 2.0 | 6.5 | 3.5 | 2.0 | 5.8 |
| Macomb Co. Jail | 1.1 | 0.3 | 3.6 | 1.2 | 0.4 | 3.3 |
| Oakland Co. East Annex | 1.9 | 0.9 | 4.2 | 1.2 | 0.5 | 3.2 |
| Oakland Co. Law Enforcement Complex | 3.0 | 1.4 | 6.5 | 5.9 | 3.0 | 11.1 |
| Ottawa Co. Jail | 0.0 | 0.0 | 3.1 | 0.6 | 0.2 | 2.5 |
| Wayne Co. Andrew C. Baird Det. Fac. | 4.1 | 2.0 | 8.3 | 0.5 | 0.1 | 2.5 |
| Wayne Co. William Dickerson Det. - Division III | 0.0 | 0.0 | 2.2 | 0.4 | 0.1 | 2.1 |
| **Minnesota** | | | | | | |
| Anoka Co. Jail | 1.5% | 0.6% | 3.9% | 1.1% | 0.4% | 2.8% |
| Hennepin Co. Adult Det. Ctr. | 0.9 | 0.3 | 2.8 | 0.6 | 0.1 | 2.7 |
| Mille Lacs Co. Jail | 0.0 | 0.0 | 9.9 | 1.8 | 0.6 | 5.5 |
| Ramsey Co. Corr. Fac. | 0.0 | 0.0 | 2.2 | 0.9 | 0.3 | 2.2 |
| **Mississippi** | | | | | | |
| Covington Co. Jail | 0.0% | 0.0% | 25.9% | 0.0% | 0.0% | 25.9% |
| Harrison Co. Adult Det. Ctr. | 0.7 | 0.2 | 1.9 | 4.4 | 2.4 | 8.0 |
| Hinds Co. Jackson Det. Ctr. | 0.5 | 0.2 | 1.5 | 2.4 | 1.2 | 5.0 |
| Hinds Co. Raymond Det. Ctr. | 2.5 | 1.1 | 5.5 | 3.6 | 1.9 | 6.8 |
| Holmes-Humphreys Co. Regional Corr. Fac. | 1.0 | 0.2 | 3.6 | 1.5 | 0.6 | 4.1 |
| Madison Co. Jail | 0.0 | 0.0 | 2.7 | 3.2 | 1.7 | 5.9 |
| Marshall Co. Jail | 0.0 | 0.0 | 7.6 | 0.0 | 0.0 | 7.6 |
| Pike Co. Jail | 0.0 | 0.0 | 4.1 | 0.0 | 0.0 | 4.1 |
| **Missouri** | | | | | | |
| Boone Co. Jail | 3.1% | 1.0% | 9.2% | 0.9% | 0.2% | 3.5% |
| LaClede Co. Jail | 3.1 | 1.8 | 5.3 | 4.5 | 2.7 | 7.3 |
| St. Charles Co. Jail | 2.0 | 0.8 | 4.7 | 4.5 | 2.4 | 8.3 |
| St. Louis Co. Jail | 1.2 | 0.4 | 3.2 | 2.4 | 0.9 | 5.7 |
| St. Louis Med. Security Inst. | 0.8 | 0.3 | 2.3 | 6.3 | 3.9 | 10.0 |
| Washington Co. Jail | 3.3 | 0.9 | 11.3 | 0.0 | 0.0 | 16.1 |
| **Montana** | | | | | | |
| Cascade Co. Regional Jail | 3.3% | 1.9% | 5.8% | 3.6% | 2.0% | 6.3% |
| Hill Co. Jail | 0.0 | 0.0 | 12.5 | 0.0 | 0.0 | 12.5 |
| Missoula Co. Jail | 1.8 | 0.8 | 4.0 | 1.4 | 0.5 | 3.5 |
| **Nebraska** | | | | | | |
| Douglas Co. Dept. of Corr. | 0.7% | 0.1% | 3.6% | 3.3% | 1.4% | 7.4% |
| Saline Co. Jail | 1.6 | 0.6 | 4.5 | 2.3 | 0.9 | 6.2 |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Nevada** | | | | | | |
| Clark Co. Det. Ctr. | 0.6% | 0.2% | 1.9% | 0.4% | 0.1% | 2.2% |
| Nye Co. Jail - Pahrump | 0.0 | 0.0 | 21.5 | 0.0 | 0.0 | 21.5 |
| Washoe Co. Det. Ctr. | 1.1 | 0.3 | 3.5 | 2.1 | 0.9 | 4.9 |
| **New Hampshire** | | | | | | |
| Coos Co. Jail | 0.0% | 0.0% | 16.8% | 4.4% | 1.2% | 14.3% |
| Hillsborough Co. House of Corr. | 4.1 | 1.9 | 8.5 | 3.3 | 1.6 | 6.6 |
| **New Jersey** | | | | | | |
| Bergen Co. Jail | 1.6% | 0.7% | 3.3% | 1.5% | 0.7% | 3.2% |
| Burlington Co. Min. Security Jail/Corr. and Work Release Ctr. | 0.0 | 0.0 | 5.9 | 0.0 | 0.0 | 5.9 |
| Essex Co. Corr. Fac. | 0.8 | 0.2 | 2.8 | 1.7 | 0.7 | 4.2 |
| Hudson Co. Corr. Fac. | 1.0 | 0.4 | 2.7 | 1.7 | 0.8 | 3.8 |
| Mercer Co. Corr. Ctr. | 4.1 | 2.0 | 8.2 | 5.1 | 2.8 | 9.2 |
| Middlesex Co. Adult Corr. Ctr. | 1.0 | 0.4 | 2.5 | 0.7 | 0.2 | 2.2 |
| Ocean Co. Justice Complex | 1.2 | 0.4 | 3.7 | 0.8 | 0.2 | 3.6 |
| Passaic Co. Jail | 1.6 | 0.7 | 3.8 | 2.6 | 1.3 | 5.0 |
| Salem Co. Corr. Fac. | 0.7 | 0.2 | 3.0 | 1.7 | 0.6 | 4.8 |
| **New Mexico** | | | | | | |
| Dona Ana Co. Det. Ctr. | 3.0% | 1.7% | 5.4% | 2.5% | 1.2% | 5.3% |
| San Juan Co. Adult Det. Ctr. | 3.0 | 1.3 | 6.9 | 1.8 | 0.6 | 5.5 |
| Santa Fe Co. Adult Det. Fac.[f] | 2.3 | 1.0 | 5.3 | 1.8 | 0.6 | 5.5 |
| **New York** | | | | | | |
| Albany Co. Corr. Fac. | 2.7% | 1.4% | 5.2% | 2.4% | 1.2% | 5.0% |
| Allegany Co. Jail | 3.0 | 1.2 | 7.5 | 1.5 | 0.4 | 5.3 |
| Broome Co. Jail | 2.9 | 1.3 | 6.5 | 3.4 | 1.5 | 7.6 |
| Dutchess Co. Jail | 0.7 | 0.2 | 2.7 | 1.4 | 0.5 | 3.8 |
| Erie Co. Corr. Fac. | 0.4 | 0.1 | 2.0 | 3.9 | 2.0 | 7.2 |
| Erie Co. Holding Fac. | 0.0 | 0.0 | 5.3 | 4.5 | 0.9 | 19.6 |
| Jefferson Co. Jail | 1.0 | 0.3 | 3.9 | 4.2 | 1.8 | 9.4 |
| New York City Anna M. Kross Ctr. | 2.4 | 1.0 | 6.0 | 3.7 | 1.8 | 7.4 |
| New York City George Motchan Det. Ctr. | 1.4 | 0.5 | 3.6 | 4.0 | 2.2 | 7.1 |
| New York City Otis Bantum Corr. Ctr. | 0.6 | 0.1 | 3.0 | 5.6 | 2.9 | 10.5 |
| New York City Robert N Davoren Complex | 0.3 | 0.1 | 1.8 | 3.1 | 1.6 | 5.8 |
| New York City Rose M. Singer Ctr.[d] | 5.0 | 2.9 | 8.4 | 5.9 | 3.7 | 9.4 |
| Niagara Co. Jail | 0.7 | 0.2 | 2.8 | 1.1 | 0.4 | 3.0 |
| Oneida Co. Corr. Fac. | 0.0 | 0.0 | 2.5 | 3.0 | 1.4 | 6.5 |
| Orange Co. Corr. Fac. | 1.4 | 0.6 | 3.5 | 1.4 | 0.6 | 3.4 |
| Putnam Co. Corr. Fac. | 0.0 | 0.0 | 5.4 | 1.1 | 0.3 | 3.7 |
| Rockland Co. Corr. Ctr. | 2.1 | 0.7 | 6.5 | 2.0 | 1.1 | 3.6 |
| Schenectady Co. Jail | 4.4 | 2.7 | 7.0 | 2.9 | 1.7 | 5.0 |
| Seneca Co. Law Enforcement Ctr. | 3.6 | 1.8 | 7.0 | 3.3 | 1.6 | 6.6 |
| Ulster Co. Law Enforcement Ctr. | 1.5 | 0.7 | 3.5 | 6.1 | 3.6 | 10.2 |
| Washington Co. Corr. Fac. | 0.0 | 0.0 | 5.8 | 0.0 | 0.0 | 5.8 |
| Westchester Co. Jail | 0.5 | 0.1 | 2.3 | 2.5 | 1.0 | 5.9 |
| Westchester Co. Penitentiary - Dept. of Corr. | 0.9 | 0.3 | 2.5 | 1.3 | 0.5 | 3.3 |
| **North Carolina** | | | | | | |
| Buncombe Co. Det. Fac. | 0.7% | 0.2% | 2.5% | 1.3% | 0.5% | 3.4% |
| Cherokee Co. Jail | 0.0 | 0.0 | 7.9 | 2.5 | 0.8 | 7.8 |
| Durham Co. Jail | 0.7 | 0.2 | 2.7 | 1.6 | 0.7 | 3.7 |
| Edgecombe Co. Det. Ctr. | 2.6 | 1.4 | 4.8 | 3.8 | 2.2 | 6.5 |
| Forsyth Co. Adult Det. Ctr. | 1.2 | 0.3 | 3.8 | 2.9 | 1.2 | 6.5 |
| Granville Co. Det. Ctr. | 0.4 | 0.1 | 1.7 | 6.0 | 2.0 | 16.9 |
| Guilford Co. High Point Det. Fac. | 0.0 | 0.0 | 2.4 | 1.1 | 0.4 | 2.7 |
| Guilford Co. Prison Farm | 0.0 | 0.0 | 9.6 | 0.0 | 0.0 | 9.6 |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| Mecklenburg Co. Jail North | 0.6% | 0.1% | 2.4% | 2.0% | 0.8% | 4.9% |
| New Hanover Det. Fac. | 0.6 | 0.2 | 2.6 | 1.2 | 0.4 | 3.4 |
| Robeson Co. Jail | 2.4 | 1.1 | 5.0 | 5.2 | 3.0 | 8.7 |
| Scotland Co. Jail | 1.0 | 0.3 | 3.5 | 4.4 | 2.4 | 8.1 |
| Wake Co. John H. Baker, Jr. Public Safety Ctr. | 3.4 | 1.4 | 8.1 | 1.4 | 0.5 | 3.7 |
| **North Dakota** | | | | | | |
| Burleigh Co. Det. Ctr. | 0.0% | 0.0% | 4.5% | 3.5% | 1.9% | 6.5% |
| **Ohio** | | | | | | |
| Bedford Heights City Jail | 0.0% | 0.0% | 9.9% | 0.0% | 0.0% | 9.9% |
| Cuyahoga Co. Corr. Ctr. | 1.2 | 0.5 | 2.8 | 1.2 | 0.5 | 2.9 |
| Delaware Co. Jail | 0.0 | 0.0 | 3.4 | 0.0 | 0.0 | 3.4 |
| Franklin Co. Jail | 3.1 | 1.5 | 6.4 | 1.0 | 0.2 | 4.3 |
| Hamilton Co. Justice Ctr. | 0.0 | 0.0 | 1.8 | 1.8 | 0.8 | 4.3 |
| Hamilton Co. Reading Road Fac. | 2.1 | 1.1 | 4.0 | 0.3 | 0.1 | 0.9 |
| Lorain Co. Jail | 1.1 | 0.4 | 2.9 | 1.1 | 0.4 | 2.8 |
| Miami Co. Jail | 0.0 | 0.0 | 5.3 | 0.0 | 0.0 | 5.3 |
| Montgomery Co. Jail | 0.4 | 0.1 | 2.0 | 0.9 | 0.3 | 2.7 |
| Richland Co. Jail | 1.4 | 0.7 | 2.9 | 1.4 | 0.7 | 2.9 |
| **Oklahoma** | | | | | | |
| Dewey Co. Jail | 0.0% | 0.0% | 22.8% | 0.0% | 0.0% | 22.8% |
| Kay Co. Jail | 1.7 | 0.8 | 3.7 | 0.9 | 0.3 | 2.5 |
| Nowata Co. Jail | 0.0 | 0.0 | 13.8 | 2.4 | 0.7 | 8.3 |
| **Oregon** | | | | | | |
| Lane Co. Jail | 0.5% | 0.1% | 1.9% | 0.8% | 0.3% | 2.1% |
| Marion Co. Corr. Fac. | 0.5 | 0.1 | 1.8 | 1.4 | 0.6 | 3.2 |
| Washington Co. Jail | 0.0 | 0.0 | 2.5 | 0.5 | 0.1 | 2.4 |
| Yamhill Co. Corr. Fac. | 4.3 | 2.5 | 7.4 | 0.4 | 0.1 | 1.0 |
| **Pennsylvania** | | | | | | |
| Allegheny Co. Jail | 2.0% | 0.9% | 4.3% | 1.5% | 0.6% | 3.7% |
| Blair Co. Prison | 3.5 | 1.2 | 10.1 | 1.7 | 0.6 | 4.9 |
| Fayette Co. Prison | 2.6 | 1.0 | 6.1 | 3.9 | 1.9 | 7.7 |
| Indiana Co. Jail | 3.9 | 1.5 | 9.4 | 0.0 | 0.0 | 5.2 |
| Luzerne Co. Corr. Fac. | 2.4 | 1.2 | 4.9 | 0.6 | 0.1 | 2.5 |
| Montgomery Co. Prison Corr. Fac. | 1.4 | 0.6 | 3.4 | 2.6 | 1.3 | 5.3 |
| Philadelphia City Alternative and Special Det. Fac. | 0.0 | 0.0 | 2.2 | 0.8 | 0.3 | 2.5 |
| Philadelphia City Curran/Fromhold Corr. Fac. | 1.2 | 0.4 | 3.9 | 3.4 | 1.8 | 6.5 |
| Philadelphia City Industrial Corr. Ctr. | 3.5 | 1.8 | 6.6 | 6.3 | 3.9 | 10.0 |
| Philadelphia City Riverside Corr. Fac.[d] | 6.7 | 4.2 | 10.7 | 3.7 | 2.0 | 6.8 |
| Schuykill Co. Prison | 1.0 | 0.3 | 3.2 | 2.7 | 1.4 | 5.0 |
| Westmoreland Co. Prison | 2.1 | 0.8 | 5.1 | 2.2 | 0.8 | 6.1 |
| York Co. Prison | 3.5 | 1.8 | 6.8 | 1.8 | 0.8 | 4.4 |
| **South Carolina** | | | | | | |
| Charleston Co. Det. Ctr. | 0.7% | 0.2% | 2.3% | 1.7% | 0.7% | 4.0% |
| Florence Co. Det. Ctr. | 0.0 | 0.0 | 2.3 | 1.2 | 0.5 | 3.1 |
| Lexington Co. Jail | 1.1 | 0.3 | 3.2 | 0.6 | 0.1 | 2.5 |
| Spartanburg Co. Det. Fac. | 0.0 | 0.0 | 1.8 | 1.1 | 0.4 | 3.5 |
| Sumter-Lee Regional Det. Ctr. | 0.4 | 0.1 | 1.5 | 4.7 | 2.7 | 8.0 |
| York Co. Det. Ctr. | 0.0 | 0.0 | 2.9 | 2.1 | 0.8 | 5.3 |
| **South Dakota** | | | | | | |
| Pennington Co. Jail | 2.0% | 0.9% | 4.6% | 0.9% | 0.3% | 2.4% |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Tennessee** | | | | | | |
| Lincoln Co. Jail | 3.0% | 1.4% | 6.1% | 1.3% | 0.5% | 3.6% |
| Madison Co. Jail | 1.5 | 0.7 | 3.3 | 4.4 | 2.1 | 9.3 |
| McMinn Co. Jail | 2.8 | 1.8 | 4.5 | 1.0 | 0.5 | 2.1 |
| Montgomery Co. Jail | 0.0 | 0.0 | 3.1 | 0.7 | 0.2 | 3.3 |
| Obion Co. Jail | 0.0 | 0.0 | 3.8 | 0.0 | 0.0 | 3.8 |
| Robertson Co. Det. Ctr. | 1.1 | 0.4 | 2.9 | 1.7 | 0.8 | 3.9 |
| Shelby Co. Corr. Ctr. | 1.1 | 0.4 | 3.1 | 3.1 | 1.7 | 5.5 |
| Shelby Co. Jail | 0.6 | 0.2 | 2.2 | 1.1 | 0.5 | 2.8 |
| Sumner Co. Jail | 4.2 | 2.5 | 7.1 | 3.0 | 1.5 | 5.6 |
| Tipton Co. Jail | 1.5 | 0.5 | 5.0 | 0.0 | 0.0 | 4.9 |
| Van Buren Co. Jail | 0.0 | 0.0 | 20.4 | 0.0 | 0.0 | 20.4 |
| Washington Co. Det. Ctr. | 2.8 | 1.5 | 4.9 | 0.7 | 0.2 | 2.1 |
| **Texas** | | | | | | |
| Bexar Co. Adult Det. Ctr. | 1.6% | 0.6% | 4.0% | 4.3% | 2.1% | 8.6% |
| Bowie Co. Corr. Ctr. | 0.6 | 0.1 | 2.7 | 1.9 | 0.8 | 4.7 |
| Brazoria Co. Jail and Det. Ctr. | 0.4 | 0.1 | 2.0 | 0.4 | 0.1 | 2.0 |
| Brown Co. Jail | 0.0 | 0.0 | 4.7 | 0.0 | 0.0 | 4.7 |
| Cameron Co. Carrizales-Rucker Det. Ctr. | 0.3 | 0.1 | 1.6 | 0.0 | 0.0 | 1.4 |
| Dallas Co. Kays Det. Fac. | 0.4 | 0.1 | 2.2 | 2.1 | 0.9 | 4.6 |
| Denton Co. Det. Ctr. | 0.7 | 0.2 | 2.1 | 1.7 | 0.8 | 3.9 |
| Eastland Co. Jail | 0.0 | 0.0 | 9.9 | 0.0 | 0.0 | 9.9 |
| El Paso Co. Det. Fac. Annex | 2.2 | 1.0 | 4.9 | 1.0 | 0.3 | 3.3 |
| El Paso Co. Downtown Det. Fac. | 1.0 | 0.3 | 3.4 | 2.7 | 1.0 | 7.4 |
| Ellis Co. Wayne McCollum Det. Ctr. | 1.8 | 0.9 | 3.6 | 1.8 | 0.9 | 3.5 |
| Gregg Co. Jail | 0.3 | 0.1 | 1.4 | 1.2 | 0.5 | 2.8 |
| Harris Co. Jail - 1200 Baker Street Jail | 6.3 | 3.4 | 11.2 | 1.5 | 0.7 | 3.2 |
| Harris Co. Jail - 1307 Baker Street Jail | 1.0 | 0.4 | 2.5 | 0.5 | 0.1 | 1.7 |
| Harris Co. Jail - 701 North San Jacinto Street Jail[e] | 0.9 | 0.3 | 2.5 | 2.9 | 1.5 | 5.6 |
| Harris Co. Jail - 711 North San Jacinto Jail | 0.0 | 0.0 | 5.7 | 1.5 | 0.4 | 4.9 |
| Hays Co. Jail | 0.8 | 0.2 | 3.3 | 3.1 | 1.1 | 8.7 |
| Jefferson Co. Corr. Fac. | 1.0 | 0.4 | 2.5 | 1.8 | 0.8 | 3.7 |
| Johnson Co. Jail | 2.7 | 1.5 | 4.8 | 3.0 | 1.7 | 5.3 |
| Tarrant Co. Corr. Ctr. | 1.0 | 0.3 | 3.4 | 2.3 | 0.9 | 5.5 |
| Taylor Co. Jail | 1.7 | 0.7 | 4.2 | 1.3 | 0.4 | 3.6 |
| Titus Co. Jail | 0.0 | 0.0 | 5.7 | 0.0 | 0.0 | 5.7 |
| Travis Co. Corr. Fac. | 1.7 | 0.5 | 5.9 | 1.0 | 0.2 | 5.3 |
| Travis Co. Jail | 0.0 | 0.0 | 13.3 | 0.0 | 0.0 | 13.3 |
| Uvalde Co. Jail | 0.0 | 0.0 | 18.4 | 3.6 | 0.9 | 14.1 |
| Victoria Co. Jail | 1.6 | 0.4 | 6.6 | 0.0 | 0.0 | 8.6 |
| Washington Co. Jail | 2.6 | 1.4 | 5.1 | 0.0 | 0.0 | 4.8 |
| Webb Co. Jail | 0.0 | 0.0 | 3.4 | 0.6 | 0.1 | 2.7 |
| **Utah** | | | | | | |
| Box Elder Co. Jail | 0.0% | 0.0% | 8.8% | 0.0% | 0.0% | 8.8% |
| Davis Co. Jail | 4.0 | 2.1 | 7.6 | 0.8 | 0.3 | 2.4 |
| Weber Co. Corr. Fac. | 2.4 | 1.1 | 5.1 | 1.8 | 0.7 | 4.4 |

**APPENDIX TABLE 6 (continued)**
**Percent of jail inmates reporting victimization, by type of incident and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[c] | 95%-confidence interval[b] | | Percent victimized[c] | 95%-confidence interval[b] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Virginia** | | | | | | |
| Alexandria Det. Ctr. | 0.6% | 0.1% | 2.6% | 0.6% | 0.1% | 2.6% |
| Arlington Co. Det. Fac. | 0.0 | 0.0 | 2.3 | 0.8 | 0.2 | 3.2 |
| Bristol City Jail | 0.8 | 0.3 | 2.3 | 0.0 | 0.0 | 3.7 |
| Hampton Corr. Fac. | 0.5 | 0.1 | 1.8 | 0.5 | 0.1 | 2.0 |
| Henrico Co. Regional Jail West | 0.7 | 0.2 | 2.0 | 2.0 | 0.9 | 4.4 |
| Mecklenburg Co. Jail | 0.0 | 0.0 | 5.4 | 0.0 | 0.0 | 5.4 |
| Montgomery Co. Jail | 0.0 | 0.0 | 6.0 | 0.0 | 0.0 | 6.0 |
| Newport News City Jail | 1.0 | 0.3 | 2.8 | 2.5 | 1.3 | 4.8 |
| Piedmont Regional Jail | 1.4 | 0.5 | 3.5 | 0.9 | 0.3 | 2.7 |
| Rappahannock Regional Jail | 1.2 | 0.4 | 3.2 | 3.3 | 1.8 | 5.8 |
| Richmond City Jail | 2.1 | 1.0 | 4.5 | 1.8 | 0.8 | 4.2 |
| Riverside Regional Jail | 1.6 | 0.7 | 3.7 | 3.7 | 2.1 | 6.5 |
| Virginia Beach Municipal Corr. Ctr. | 1.0 | 0.4 | 2.6 | 1.4 | 0.6 | 3.4 |
| **Washington** | | | | | | |
| Benton Co. Jail | 1.2% | 0.3% | 5.0% | 1.1% | 0.4% | 3.6% |
| Cowlitz Co. Jail | 0.7 | 0.2 | 2.3 | 1.0 | 0.4 | 2.5 |
| King Co. Regional Justice Ctr. | 0.0 | 0.0 | 2.2 | 1.3 | 0.5 | 3.5 |
| Snohomish Co. Jail | 0.5 | 0.1 | 2.3 | 0.5 | 0.1 | 2.3 |
| Sunnyside City Jail | 0.0 | 0.0 | 18.4 | 0.0 | 0.0 | 18.4 |
| Whatcom Co. Jail | 2.9 | 1.5 | 5.6 | 0.3 | 0.1 | 1.0 |
| Yakima City Jail | 0.0 | 0.0 | 9.0 | 1.8 | 0.5 | 5.9 |
| **West Virginia** | | | | | | |
| Eastern Regional Jail | 6.0% | 3.3% | 10.6% | 1.5% | 0.6% | 3.6% |
| South Central Regional Jail | 3.6 | 1.6 | 8.1 | 2.3 | 0.8 | 6.4 |
| Western Regional Jail | 4.8 | 3.0 | 7.7 | 1.6 | 0.6 | 3.8 |
| **Wisconsin** | | | | | | |
| Brown Co. Jail | 1.7% | 0.7% | 4.4% | 3.9% | 2.0% | 7.6% |
| Columbia Co. Jail | 2.1 | 0.6 | 7.5 | 2.1 | 0.6 | 7.5 |
| Milwaukee Co. Corr. Fac. South | 1.3 | 0.5 | 3.7 | 2.9 | 1.4 | 5.9 |
| Oconto Co. Jail | 0.0 | 0.0 | 18.4 | 0.0 | 0.0 | 18.4 |
| Rock Co. Jail | 2.6 | 1.2 | 5.5 | 2.0 | 0.9 | 4.7 |
| Walworth Co. Jail | 0.8 | 0.3 | 2.6 | 2.5 | 1.3 | 5.0 |
| Washington Co. Jail | 3.1 | 1.4 | 6.9 | 3.0 | 1.3 | 6.5 |
| Wood Co. Jail | 0.0 | 0.0 | 12.9 | 0.0 | 0.0 | 12.9 |
| **Wyoming** | | | | | | |
| Lincoln Co. Jail | 0.0% | 0.0% | 25.9% | 0.0% | 0.0% | 25.9% |

Note: Detail may sum to more than total victimization rate because victims may have reported both inmate-on-inmate and staff-on-inmate sexual victimization.

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[c]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, sentence length, and time served. (See *Methodology*.)

[d]Female facility.

[e]Facility housed both males and females; only males were sampled at this facility.

[f]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 7**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| --- | --- | --- | --- | --- | --- |
| **Total** | 1.2% | 1.1% | 0.8% | 1.2% | 0.9% |
| **Alabama** | | | | | |
| Barbour Co. Jail | 2.3% | 0.0% | 0.0% | 0.0% | 0.0% |
| Dallas Co. Jail | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Lee Co. W.S. Buck Jones Det. Ctr. | 2.4 | 0.0 | 0.0 | 0.5 | 0.5 |
| Marshall Co. Jail | 2.5 | 0.0 | 1.7 | 3.4 | 0.0 |
| Tuscaloosa Co. Jail | 0.8 | 0.0 | 1.0 | 0.8 | 1.9 |
| **Arizona** | | | | | |
| Maricopa Co. Estrella Jail[e] | 2.3% | 2.1% | 0.3% | 0.3% | 0.3% |
| Maricopa Co. Fourth Avenue Jail | 0.6 | 0.0 | 0.9 | 0.9 | 0.9 |
| Maricopa Co. Towers Jail | 1.1 | 0.0 | 1.8 | 1.8 | 2.5 |
| Mariopa Co. Lower Buckeye Jail | 0.7 | 2.0 | 1.1 | 2.1 | 1.8 |
| Santa Cruz Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Yuma Co. Det. Ctr. | 0.0 | 0.6 | 0.6 | 0.6 | 1.4 |
| **Arkansas** | | | | | |
| Crittenden Co. Jail | 2.7% | 0.8% | 1.9% | 1.1% | 1.0% |
| Mississippi Co. Det. Ctr. | 0.0 | 0.0 | 0.8 | 0.0 | 0.0 |
| Pope Co. Det. Ctr. | 3.6 | 1.8 | 0.0 | 0.0 | 2.3 |
| Pulaski Co. Regional Det. Ctr. | 3.1 | 3.0 | 0.4 | 1.5 | 1.5 |
| Sebastian Co. Adult Det. Ctr. | 0.0 | 0.5 | 0.0 | 0.0 | 0.6 |
| **California** | | | | | |
| Alameda Co. Santa Rita Jail | 0.9% | 1.0% | 1.3% | 1.7% | 0.6% |
| Contra Costa Co. Martinez Det. Fac. | 1.4 | 2.0 | 3.2 | 5.2 | 3.7 |
| Fresno Co. Downtown Det. Fac. - Main, North and South | 1.2 | 0.5 | 1.5 | 1.4 | 0.4 |
| Imperial Co. Jail | 0.4 | 0.2 | 0.6 | 0.6 | 0.6 |
| Kern Co. Lerdo Pre-Trial Fac. | 2.5 | 1.5 | 0.4 | 1.4 | 1.3 |
| Los Angeles Co. - Twin Towers Corr. Fac. | 4.9 | 2.0 | 2.9 | 2.6 | 0.3 |
| Los Angeles Co. Men's Central Jail | 1.5 | 3.6 | 2.1 | 2.9 | 2.1 |
| Los Angeles Co. North County Corr. Fac. | 1.4 | 1.8 | 1.8 | 2.4 | 1.8 |
| Napa Co. Jail | 1.6 | 1.3 | 1.8 | 2.5 | 1.8 |
| Orange Co. Central Jail Complex | 0.0 | 1.4 | 0.7 | 0.7 | 0.0 |
| Orange Co. Theo Lacy Fac. | 1.7 | 1.9 | 1.1 | 1.1 | 0.5 |
| Riverside Co. Indio Jail | 2.8 | 2.1 | 0.6 | 0.6 | 0.0 |
| Riverside Co. Larry D. Smith Corr. Ctr. | 4.0 | 2.7 | 1.5 | 2.0 | 0.6 |
| Riverside Co. Southwest Det. Ctr.[f] | 0.0 | 0.0 | 0.6 | 0.6 | 0.6 |
| Sacramento Co. Rio Cosumnes Corr. Ctr. | 1.4 | 1.7 | 0.6 | 1.7 | 1.2 |
| San Diego Co. East Mesa Med. Fac. | 1.2 | 0.0 | 1.1 | 1.1 | 0.0 |
| San Diego Co. George F. Bailey Det. Fac. | 3.1 | 3.5 | 1.1 | 1.7 | 0.0 |
| San Diego Co. Vista Det. Fac. | 0.7 | 1.2 | 1.2 | 2.1 | 1.6 |
| San Francisco Co. Jail Number 3 | 1.0 | 2.4 | 0.0 | 1.6 | 0.0 |
| Santa Clara Co. Elmwood Fac. - Min. and Med. | 1.3 | 0.9 | 0.4 | 1.1 | 0.0 |
| Santa Clara Co. Main Jail | 2.1 | 2.5 | 4.8 | 3.6 | 1.6 |
| Santa Clara Co. Women's Corr. Ctr.[e] | 0.7 | 1.4 | 0.7 | 0.7 | 0.0 |
| Solano Co. Justice Ctr. Det. Fac. | 1.5 | 2.4 | 2.6 | 2.6 | 2.3 |
| Tulare Co. Jail | 0.0 | 0.0 | 0.0 | 0.8 | 0.3 |
| Ventura Co. Jail | 0.4 | 0.9 | 0.9 | 1.9 | 0.0 |
| Yolo Co. Leinberger Ctr. | 2.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Yuba Co. Jail | 0.7 | 1.5 | 0.5 | 0.7 | 0.0 |
| **Colorado** | | | | | |
| Chaffee Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Denver Co. Jail | 2.9 | 0.8 | 0.7 | 0.3 | 0.8 |
| Denver Co. Van Cise-Simonet Det. Ctr. | 0.0 | 0.5 | 0.8 | 0.0 | 0.8 |
| Douglas Co. Jail | 0.0 | 0.0 | 1.7 | 2.8 | 1.2 |
| Fremont Co. Jail | 3.0 | 1.4 | 0.8 | 0.8 | 0.0 |
| Jefferson Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Park Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| **Florida** | | | | | |
| Collier Co. Jail | 1.6% | 1.2% | 2.6% | 2.2% | 0.4% |
| Dixie Co. Jail | 2.4 | 4.9 | 0.0 | 2.4 | 3.3 |
| Escambia Co. Jail | 1.6 | 1.5 | 0.5 | 0.5 | 0.0 |
| Jacksonville City Montgomery Corr. Ctr. | 1.3 | 0.5 | 1.1 | 1.1 | 0.9 |
| Lake Co. Jail | 0.3 | 0.3 | 0.0 | 2.1 | 0.4 |
| Lee Co. Community Programs Unit | 2.4 | 2.4 | 1.6 | 1.6 | 0.9 |
| Leon Co. Det. Fac. | 1.7 | 1.1 | 0.8 | 1.4 | 2.3 |
| Manatee Co. Jail | 2.4 | 2.0 | 2.3 | 1.9 | 1.4 |
| Martin Co. Jail | 0.7 | 1.1 | 2.6 | 2.2 | 1.4 |
| Miami-Dade Co. Boot Camp | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Miami-Dade Co. Metro West Det. Ctr. | 0.5 | 0.5 | 0.6 | 1.2 | 0.6 |
| Miami-Dade Co. Training and Treatment Ctr. | 0.0 | 0.0 | 0.5 | 0.5 | 0.5 |
| Miami-Dade Co. Turner Guilford Knight Corr. Ctr. | 0.5 | 0.5 | 0.0 | 0.0 | 0.0 |
| Okeechobee Co. Jail | 0.0 | 0.0 | 0.0 | 1.1 | 0.0 |
| Orange Co. 33rd Street Corr. Ctr. | 0.7 | 1.3 | 0.6 | 1.9 | 0.3 |
| Orange Co. Booking and Release Ctr. | 1.0 | 0.0 | 1.0 | 1.0 | 1.9 |
| Osceola Co. Jail | 0.9 | 0.9 | 0.0 | 0.0 | 0.7 |
| Palm Beach Co. Stockade | 1.3 | 1.3 | 1.1 | 1.6 | 0.0 |
| Pinellas Co. Central Division Fac. | 2.4 | 1.6 | 0.0 | 1.0 | 0.0 |
| Pinellas Co. South Division | 2.0 | 2.0 | 1.3 | 1.3 | 1.3 |
| Polk Co. - South Co. Jail | 2.3 | 1.8 | 0.9 | 2.0 | 2.3 |
| Sarasota North Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Suwanee Co. Jail | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 |
| Taylor Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Georgia** | | | | | |
| Candler Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Carroll Co. Prison | 0.0 | 0.0 | 1.3 | 2.0 | 2.0 |
| Clayton Co. Jail | 1.8 | 1.4 | 2.6 | 1.4 | 1.2 |
| Dekalb Co. Jail | 2.0 | 1.4 | 0.3 | 1.2 | 1.3 |
| Douglas Co. Jail | 1.1 | 1.9 | 0.5 | 0.5 | 0.0 |
| Floyd Co. Jail | 2.4 | 0.4 | 0.4 | 0.8 | 0.4 |
| Floyd Co. Prison | 0.6 | 0.6 | 1.1 | 1.7 | 1.1 |
| Fulton Co. Jail | 2.5 | 2.0 | 0.6 | 0.6 | 1.0 |
| Gwinnett Co. Det. Ctr. | 0.4 | 0.4 | 0.0 | 0.0 | 0.0 |
| Hall Co. Det. Ctr. | 2.6 | 2.0 | 0.0 | 0.0 | 0.0 |
| Houston Co. Jail | 2.2 | 1.0 | 1.1 | 3.1 | 5.4 |
| Irwin Co. Jail | 0.0 | 0.0 | 0.8 | 0.8 | 0.7 |
| Murray County Jail | 1.1 | 1.3 | 0.0 | 0.8 | 0.0 |
| Newton Co. Jail | 1.7 | 1.8 | 0.3 | 1.5 | 0.9 |
| Screven Co. Jail | 1.4 | 1.4 | 2.4 | 2.4 | 1.2 |
| South Fulton Municipal Regional Jail | 0.0 | 0.0 | 2.3 | 4.7 | 4.7 |
| Spalding Co. Jail | 0.6 | 1.2 | 1.5 | 1.0 | 1.8 |
| Troup Co. Jail | 0.9 | 2.2 | 0.0 | 0.0 | 0.0 |
| Upson Co. Jail | 0.7 | 1.7 | 0.0 | 1.0 | 0.9 |
| Ware Co. Jail | 1.0 | 1.7 | 0.0 | 0.8 | 0.0 |
| Wilkinson Co. Jail | 0.0 | 6.5 | 0.0 | 0.0 | 0.0 |
| **Idaho** | | | | | |
| Bannock Co. Jail | 0.0% | 0.0% | 1.8% | 1.2% | 0.0% |
| **Illinois** | | | | | |
| Champaign Co. Satellite Jail[f] | 0.0% | 0.0% | 0.0% | 2.0% | 2.0% |
| Cook Co. - Division 1 | 0.7 | 0.7 | 1.5 | 2.2 | 2.5 |
| Cook Co. - Division 11 | 4.0 | 3.3 | 2.6 | 2.9 | 1.4 |
| Cook Co. - Division 2 | 2.5 | 2.0 | 1.8 | 2.9 | 2.3 |
| Cook Co. - Division 5 | 0.4 | 0.5 | 1.4 | 1.6 | 1.8 |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| Cook Co. - Division 6 | 1.1% | 1.1% | 0.7% | 1.1% | 1.1% |
| Kane Co. Adult Justice Ctr. | 1.1 | 1.0 | 1.3 | 2.1 | 0.6 |
| Kankakee Co. Jerome Combs Det. Ctr. | 0.9 | 1.2 | 1.3 | 1.4 | 0.8 |
| Kendall Co. Jail | 1.7 | 2.6 | 0.9 | 0.9 | 1.7 |
| McHenry Co. Jail | 0.0 | 0.5 | 0.0 | 0.6 | 0.0 |
| Sangamon Co. Jail | 1.9 | 2.4 | 0.5 | 1.6 | 0.9 |
| **Indiana** | | | | | |
| Bartholomew Co. Jail | 1.4% | 2.4% | 0.8% | 0.8% | 0.8% |
| Clinton Co. Jail | 1.6 | 1.6 | 0.0 | 0.0 | 0.8 |
| Dearborn Co. Jail | 0.7 | 0.7 | 1.1 | 1.1 | 0.0 |
| Delaware Co. Justice Ctr. | 0.2 | 0.2 | 0.0 | 0.5 | 1.2 |
| Elkhart Co. Corr. Ctr. | 1.3 | 1.0 | 1.3 | 1.6 | 0.7 |
| Hamilton Co. Jail | 1.5 | 1.5 | 0.0 | 0.0 | 0.9 |
| Jackson Co. Jail | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Marion Co. Jail II[g] | 0.5 | 0.5 | 2.1 | 1.3 | 1.7 |
| Marion Co. Jail Intake Fac. | 0.0 | 0.0 | 3.7 | 4.9 | 2.7 |
| Noble Co. Jail | 0.0 | 0.0 | 0.0 | 0.9 | 0.0 |
| Ripley Co. Jail | 5.9 | 7.9 | 2.0 | 2.0 | 2.0 |
| Tippecanoe Co. Jail | 2.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Iowa** | | | | | |
| Des Moines Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 2.1% |
| Scott Co. Jail and Annex | 0.0 | 0.0 | 0.6 | 1.3 | 1.9 |
| **Kansas** | | | | | |
| Finney Co. Jail | 0.0% | 1.0% | 3.0% | 2.0% | 0.0% |
| Wilson Co. Jail | 0.0 | 0.0 | 5.6 | 0.0 | 0.0 |
| **Kentucky** | | | | | |
| Big Sandy Regional Det. Ctr. | 1.3% | 0.9% | 0.0% | 0.0% | 0.0% |
| Boyle Co. Det. Ctr. | 1.9 | 1.9 | 0.0 | 0.0 | 0.0 |
| Daviess Co. Det. Ctr. | 1.3 | 2.1 | 0.9 | 1.5 | 0.9 |
| Grayson Co. Det. Ctr. | 0.4 | 0.5 | 0.5 | 1.3 | 0.0 |
| Kenton Co. Det. Ctr. | 1.0 | 0.5 | 0.0 | 0.0 | 0.1 |
| Lexington-Fayette Co. Jail Det. Division | 2.1 | 2.4 | 1.7 | 2.7 | 1.3 |
| Madison Co. Det. Ctr. | 2.1 | 0.7 | 0.7 | 0.9 | 1.0 |
| McCracken Co. Jail | 1.0 | 0.9 | 1.1 | 1.1 | 0.6 |
| Meade Co. Jail | 1.3 | 1.3 | 0.0 | 1.3 | 0.0 |
| Pulaski Co. Det. Ctr. | 1.6 | 0.0 | 0.8 | 0.8 | 0.0 |
| Woodford Co. Det. Ctr. | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Louisiana** | | | | | |
| Assumption Parish Det. Ctr. | 3.1% | 0.0% | 0.0% | 0.0% | 1.5% |
| Bossier Parish Max. Security Fac. | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 |
| Bossier Parish Med. Security Fac. | 1.0 | 0.8 | 1.0 | 1.0 | 0.5 |
| Caddo Parish Corr. Ctr. | 1.1 | 1.1 | 0.0 | 0.8 | 0.4 |
| East Baton Rouge Parish Prison | 1.4 | 1.3 | 0.0 | 0.0 | 0.6 |
| Iberia Parish Jail | 2.0 | 0.9 | 1.0 | 1.5 | 1.5 |
| Lafayette Parish Jail | 1.0 | 1.8 | 0.0 | 0.5 | 1.9 |
| Livingston Parish Det. Ctr. | 0.5 | 1.0 | 0.0 | 0.0 | 0.4 |
| Rapides Parish Det. Ctr. III | 1.4 | 0.5 | 0.5 | 0.5 | 0.0 |
| St. Landry Parish Jail | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| St. Martin Parish Corr. Ctr. 1 | 1.3 | 0.0 | 1.3 | 1.3 | 2.6 |
| Webster Parish Bayou Dorcheat Corr. Fac. | 1.8 | 1.4 | 0.6 | 0.6 | 1.5 |
| **Maine** | | | | | |
| Penobscot Co. Jail | 0.0% | 0.0% | 0.0% | 1.8% | 2.6% |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| **Maryland** | | | | | |
| Allegany Co. Det. Ctr. | 2.3% | 2.3% | 0.0% | 0.0% | 0.0% |
| Anne Arundel Co. Jennifer Road Det. Ctr. | 0.0 | 0.0 | 0.0 | 0.0 | 0.9 |
| Baltimore City Det. Ctr. | 0.4 | 0.7 | 2.8 | 3.1 | 5.2 |
| Montgomery Co. Corr. Fac. | 1.8 | 0.6 | 0.5 | 1.2 | 0.4 |
| Wicomico Co. Det. Ctr. | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Massachusetts** | | | | | |
| Hampden Co. Corr. Ctr. | 0.0% | 0.0% | 0.0% | 0.5% | 1.4% |
| Middlesex Co. Jail and House of Corr. | 1.5 | 0.7 | 0.4 | 0.4 | 0.6 |
| Plymouth Co. Corr. Fac. | 0.6 | 0.0 | 0.5 | 1.5 | 0.5 |
| Suffolk Co. House of Corr. | 1.8 | 3.8 | 1.9 | 2.0 | 2.3 |
| Suffolk Co. Nashua Street Jail | 0.6 | 0.0 | 0.0 | 0.6 | 1.3 |
| Worcester Co. Jail and House of Corr. | 1.2 | 1.2 | 0.4 | 2.3 | 1.2 |
| **Michigan** | | | | | |
| Berrien Co. Jail | 0.9% | 0.9% | 1.3% | 3.0% | 0.9% |
| Calhoun Co. Jail | 1.3 | 2.7 | 3.1 | 3.5 | 0.7 |
| Huron Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Kalamazoo Co. Jail | 3.6 | 3.1 | 3.5 | 1.5 | 1.0 |
| Macomb Co. Jail | 1.1 | 1.1 | 0.9 | 0.0 | 0.3 |
| Oakland Co. East Annex | 1.3 | 1.9 | 1.2 | 1.2 | 0.0 |
| Oakland Co. Law Enforcement Complex | 3.0 | 1.9 | 5.2 | 2.9 | 2.2 |
| Ottawa Co. Jail | 0.0 | 0.0 | 0.0 | 0.6 | 0.0 |
| Wayne Co. Andrew C. Baird Det. Fac. | 4.1 | 0.8 | 0.0 | 0.0 | 0.5 |
| Wayne Co. William Dickerson Det. - Division III | 0.0 | 0.0 | 0.4 | 0.4 | 0.0 |
| **Minnesota** | | | | | |
| Anoka Co. Jail | 1.5% | 0.5% | 1.1% | 0.5% | 0.6% |
| Hennepin Co. Adult Det. Ctr. | 0.9 | 0.4 | 0.0 | 0.6 | 0.6 |
| Mille Lacs Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 |
| Ramsey Co. Corr. Fac. | 0.0 | 0.0 | 0.0 | 0.4 | 0.5 |
| **Mississippi** | | | | | |
| Covington Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Harrison Co. Adult Det. Ctr. | 0.7 | 0.7 | 0.9 | 3.4 | 0.7 |
| Hinds Co. Jackson Det. Ctr. | 0.5 | 0.0 | 0.0 | 1.3 | 1.1 |
| Hinds Co. Raymond Det. Ctr. | 1.9 | 2.2 | 0.5 | 1.5 | 2.6 |
| Holmes-Humphreys Co. Regional Corr. Fac. | 1.0 | 0.0 | 0.8 | 0.8 | 0.8 |
| Madison Co. Jail | 0.0 | 0.0 | 1.2 | 1.8 | 1.4 |
| Marshall Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Pike Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Missouri** | | | | | |
| Boone Co. Jail | 0.0% | 3.1% | 0.0% | 0.9% | 0.0% |
| LaClede Co. Jail | 1.8 | 1.3 | 3.0 | 4.5 | 0.0 |
| St. Charles Co. Jail | 2.0 | 0.5 | 3.0 | 4.0 | 1.4 |
| St. Louis Co. Jail | 0.9 | 0.3 | 0.3 | 1.9 | 0.8 |
| St. Louis Med. Security Inst. | 0.4 | 0.8 | 3.6 | 4.0 | 4.1 |
| Washington Co. Jail | 0.0 | 3.3 | 0.0 | 0.0 | 0.0 |
| **Montana** | | | | | |
| Cascade Co. Regional Jail | 2.2% | 2.2% | 1.9% | 3.6% | 2.4% |
| Hill Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Missoula Co. Jail | 1.2 | 1.8 | 0.7 | 0.7 | 0.7 |
| **Nebraska** | | | | | |
| Douglas Co. Dept. of Corr. | 0.7% | 0.7% | 1.4% | 2.8% | 1.9% |
| Saline Co. Jail | 0.0 | 1.6 | 0.0 | 0.0 | 2.3 |
| **Nevada** | | | | | |
| Clark Co. Det. Ctr. | 0.6% | 0.3% | 0.4% | 0.4% | 0.4% |
| Nye Co. Jail - Pahrump | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Washoe Co. Det. Ctr. | 1.1 | 1.1 | 1.5 | 1.7 | 0.0 |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| **New Hampshire** | | | | | |
| Coos Co. Jail | 0.0% | 0.0% | 0.0% | 4.4% | 0.0% |
| Hillsborough Co. House of Corr. | 3.2 | 2.3 | 3.3 | 2.0 | 1.0 |
| **New Jersey** | | | | | |
| Bergen Co. Jail | 1.6% | 1.1% | 1.2% | 1.5% | 0.0% |
| Burlington Co. Min. Security Jail/Corr. and Work Release Ctr. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Essex Co. Corr. Fac. | 0.8 | 0.4 | 1.2 | 1.2 | 0.8 |
| Hudson Co. Corr. Fac. | 1.0 | 0.7 | 1.0 | 1.3 | 0.8 |
| Mercer Co. Corr. Ctr. | 4.1 | 1.3 | 2.0 | 3.1 | 3.7 |
| Middlesex Co. Adult Corr. Ctr. | 1.0 | 0.7 | 0.4 | 0.4 | 0.3 |
| Ocean Co. Justice Complex | 0.0 | 1.2 | 0.0 | 0.8 | 0.0 |
| Passaic Co. Jail | 1.2 | 1.3 | 2.6 | 2.3 | 1.2 |
| Salem Co. Corr. Fac. | 0.0 | 0.7 | 0.0 | 1.7 | 0.0 |
| **New Mexico** | | | | | |
| Dona Ana Co. Det. Ctr. | 1.6% | 2.5% | 1.4% | 1.9% | 0.8% |
| San Juan Co. Adult Det. Ctr. | 3.0 | 2.5 | 0.7 | 0.7 | 1.8 |
| Santa Fe Co. Adult Det. Fac.[g] | 1.2 | 2.3 | 0.0 | 0.6 | 1.2 |
| **New York** | | | | | |
| Albany Co. Corr. Fac. | 2.7% | 1.3% | 1.2% | 1.2% | 2.0% |
| Allegany Co. Jail | 3.0 | 3.0 | 1.5 | 1.5 | 0.0 |
| Broome Co. Jail | 1.4 | 2.9 | 1.5 | 2.8 | 1.9 |
| Dutchess Co. Jail | 0.7 | 0.7 | 0.7 | 1.4 | 0.0 |
| Erie Co. Corr. Fac. | 0.4 | 0.4 | 2.8 | 2.8 | 2.7 |
| Erie Co. Holding Fac. | 0.0 | 0.0 | 4.5 | 4.5 | 0.0 |
| Jefferson Co. Jail | 1.0 | 1.0 | 4.2 | 1.0 | 1.6 |
| New York City Anna M. Kross Ctr. | 2.4 | 0.5 | 1.2 | 2.1 | 1.5 |
| New York City George Motchan Det. Ctr. | 0.9 | 0.8 | 0.4 | 1.8 | 2.1 |
| New York City Otis Bantum Corr. Ctr. | 0.0 | 0.6 | 2.7 | 3.1 | 4.6 |
| New York City Robert N Davoren Complex | 0.3 | 0.3 | 0.6 | 1.3 | 2.3 |
| New York City Rose M. Singer Ctr.[e] | 4.1 | 2.3 | 2.3 | 5.6 | 2.9 |
| Niagara Co. Jail | 0.7 | 0.7 | 0.0 | 1.1 | 0.0 |
| Oneida Co. Corr. Fac. | 0.0 | 0.0 | 2.1 | 3.0 | 1.6 |
| Orange Co. Corr. Fac. | 0.4 | 1.0 | 0.0 | 0.9 | 0.9 |
| Putnam Co. Corr. Fac. | 0.0 | 0.0 | 1.1 | 1.1 | 1.1 |
| Rockland Co. Corr. Ctr. | 0.0 | 2.1 | 1.6 | 1.6 | 0.9 |
| Schenectady Co. Jail | 2.2 | 3.1 | 0.5 | 2.5 | 1.4 |
| Seneca Co. Law Enforcement Ctr. | 3.6 | 0.0 | 1.3 | 1.3 | 2.0 |
| Ulster Co. Law Enforcement Ctr. | 0.7 | 1.5 | 3.8 | 3.5 | 3.0 |
| Washington Co. Corr. Fac. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Westchester Co. Jail | 0.0 | 0.5 | 1.0 | 1.6 | 0.9 |
| Westchester Co. Penitentiary - Dept. of Corr. | 0.4 | 0.9 | 0.5 | 1.3 | 0.3 |
| **North Carolina** | | | | | |
| Buncombe Co. Det. Fac. | 0.7% | 0.0% | 0.6% | 1.3% | 0.0% |
| Cherokee Co. Jail | 0.0 | 0.0 | 2.5 | 2.5 | 2.5 |
| Durham Co. Jail | 0.7 | 0.7 | 0.0 | 0.5 | 1.1 |
| Edgecombe Co. Det. Ctr. | 1.1 | 1.5 | 0.9 | 1.7 | 2.9 |
| Forsyth Co. Adult Det. Ctr. | 0.8 | 0.4 | 2.2 | 1.4 | 2.0 |
| Granville Co. Det. Ctr. | 0.4 | 0.4 | 1.2 | 1.2 | 4.8 |
| Guilford Co. High Point Det. Fac. | 0.0 | 0.0 | 0.0 | 0.0 | 1.1 |
| Guilford Co. Prison Farm | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Mecklenburg Co. Jail North | 0.6 | 0.6 | 0.0 | 1.3 | 1.4 |
| New Hanover Det. Fac. | 0.6 | 0.6 | 0.7 | 1.2 | 0.0 |
| Robeson Co. Jail | 2.4 | 1.3 | 1.2 | 3.3 | 2.6 |
| Scotland Co. Jail | 0.0 | 1.0 | 1.9 | 3.0 | 2.5 |
| Wake Co. John H. Baker, Jr. Public Safety Ctr. | 2.9 | 2.2 | 0.4 | 0.9 | 0.4 |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| **North Dakota** | | | | | |
| Burleigh Co. Det. Ctr. | 0.0% | 0.0% | 2.5% | 3.5% | 0.0% |
| **Ohio** | | | | | |
| Bedford Heights City Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Cuyahoga Co. Corr. Ctr. | 0.9 | 1.2 | 0.7 | 0.7 | 1.2 |
| Delaware Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Franklin Co. Jail | 2.6 | 1.2 | 0.0 | 1.0 | 0.0 |
| Hamilton Co. Justice Ctr. | 0.0 | 0.0 | 1.1 | 1.8 | 0.0 |
| Hamilton Co. Reading Road Fac. | 0.8 | 1.3 | 0.0 | 0.0 | 0.3 |
| Lorain Co. Jail | 0.6 | 1.1 | 1.1 | 1.1 | 0.0 |
| Miami Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Montgomery Co. Jail | 0.4 | 0.0 | 0.9 | 0.9 | 0.0 |
| Richland Co. Jail | 1.4 | 1.4 | 0.0 | 0.7 | 0.7 |
| **Oklahoma** | | | | | |
| Dewey Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Kay Co. Jail | 1.7 | 0.9 | 0.0 | 0.0 | 0.9 |
| Nowata Co. Jail | 0.0 | 0.0 | 0.0 | 2.4 | 0.0 |
| **Oregon** | | | | | |
| Lane Co. Jail | 0.5% | 0.5% | 0.5% | 0.8% | 0.0% |
| Marion Co. Corr. Fac. | 0.5 | 0.5 | 0.9 | 0.5 | 0.9 |
| Washington Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| Yamhill Co. Corr. Fac. | 3.2 | 4.3 | 0.0 | 0.4 | 0.4 |
| **Pennsylvania** | | | | | |
| Allegheny Co. Jail | 1.5% | 1.0% | 0.2% | 1.0% | 1.0% |
| Blair Co. Prison | 0.0 | 3.5 | 0.0 | 1.7 | 0.0 |
| Fayette Co. Prison | 1.6 | 2.6 | 2.1 | 2.9 | 2.3 |
| Indiana Co. Jail | 1.7 | 2.1 | 0.0 | 0.0 | 0.0 |
| Luzerne Co. Corr. Fac. | 1.5 | 2.4 | 0.0 | 0.6 | 0.0 |
| Montgomery Co. Prison Corr. Fac. | 0.7 | 1.4 | 1.0 | 2.2 | 0.5 |
| Philadelphia City Alternative and Special Det. Fac. | 0.0 | 0.0 | 0.4 | 0.8 | 0.0 |
| Philadelphia City Curran/Fromhold Corr. Fac. | 1.2 | 0.5 | 1.3 | 2.0 | 1.7 |
| Philadelphia City Industrial Corr. Ctr. | 3.5 | 1.9 | 2.3 | 3.4 | 3.4 |
| Philadelphia City Riverside Corr. Fac.[e] | 6.7 | 4.5 | 3.1 | 3.2 | 0.0 |
| Schuylkill Co. Prison | 1.0 | 1.0 | 1.0 | 1.6 | 1.1 |
| Westmoreland Co. Prison | 0.7 | 1.8 | 1.0 | 2.2 | 0.0 |
| York Co. Prison | 2.4 | 2.2 | 0.0 | 1.8 | 0.0 |
| **South Carolina** | | | | | |
| Charleston Co. Det. Ctr. | 0.4% | 0.7% | 0.9% | 0.8% | 0.4% |
| Florence Co. Det. Ctr. | 0.0 | 0.0 | 0.5 | 0.0 | 0.7 |
| Lexington Co. Jail | 1.1 | 0.6 | 0.6 | 0.6 | 0.0 |
| Spartanburg Co. Det. Fac. | 0.0 | 0.0 | 0.0 | 1.1 | 0.5 |
| Sumter-Lee Regional Det. Ctr. | 0.0 | 0.4 | 2.4 | 3.2 | 3.0 |
| York Co. Det. Ctr. | 0.0 | 0.0 | 1.8 | 2.1 | 0.0 |
| **South Dakota** | | | | | |
| Pennington Co. Jail | 2.0% | 0.7% | 0.4% | 0.9% | 0.0% |
| **Tennessee** | | | | | |
| Lincoln Co. Jail | 3.0% | 3.0% | 1.3% | 1.3% | 0.0% |
| Madison Co. Jail | 1.0 | 0.5 | 1.7 | 3.0 | 1.0 |
| McMinn Co. Jail | 1.9 | 2.8 | 0.6 | 0.6 | 1.0 |
| Montgomery Co. Jail | 0.0 | 0.0 | 0.7 | 0.7 | 0.7 |
| Obion Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Robertson Co. Det. Ctr. | 0.6 | 0.5 | 0.0 | 1.2 | 0.6 |
| Shelby Co. Corr. Ctr. | 1.1 | 0.4 | 1.1 | 1.1 | 2.8 |
| Shelby Co. Jail | 0.6 | 0.3 | 0.6 | 1.1 | 0.8 |
| Sumner Co. Jail | 3.4 | 1.9 | 1.7 | 2.0 | 1.0 |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| --- | --- | --- | --- | --- | --- |
| Tipton Co. Jail | 0.0% | 1.5% | 0.0% | 0.0% | 0.0% |
| Van Buren Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Washington Co. Det. Ctr. | 1.9 | 2.2 | 0.5 | 0.7 | 0.0 |
| **Texas** | | | | | |
| Bexar Co. Adult Det. Ctr. | 0.8% | 1.1% | 1.8% | 3.1% | 1.2% |
| Bowie Co. Corr. Ctr. | 0.6 | 0.6 | 0.5 | 1.1 | 1.3 |
| Brazoria Co. Jail and Det. Ctr. | 0.0 | 0.4 | 0.0 | 0.4 | 0.0 |
| Brown Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Cameron Co. Carrizales-Rucker Det. Ctr. | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 |
| Dallas Co. Kays Det. Fac. | 0.0 | 0.4 | 0.4 | 0.9 | 1.2 |
| Denton Co. Det. Ctr. | 0.0 | 0.7 | 0.4 | 1.4 | 1.3 |
| Eastland Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| El Paso Co. Det. Fac. Annex | 2.2 | 1.5 | 0.3 | 0.3 | 0.6 |
| El Paso Co. Downtown Det. Fac. | 1.0 | 1.0 | 1.4 | 1.4 | 1.3 |
| Ellis Co. Wayne McCollum Det. Ctr. | 1.8 | 0.9 | 0.5 | 1.8 | 0.4 |
| Gregg Co. Jail | 0.3 | 0.3 | 0.0 | 0.3 | 0.8 |
| Harris Co. Jail - 1200 Baker Street Jail | 5.0 | 2.6 | 0.4 | 1.1 | 0.2 |
| Harris Co. Jail - 1307 Baker Street Jail | 1.0 | 0.5 | 0.0 | 0.5 | 0.0 |
| Harris Co. Jail - 701 North San Jacinto Street Jail[f] | 0.6 | 0.6 | 0.3 | 1.4 | 1.4 |
| Harris Co. Jail - 711 North San Jacinto Jail | 0.0 | 0.0 | 0.0 | 0.0 | 1.5 |
| Hays Co. Jail | 0.8 | 0.8 | 1.8 | 3.1 | 1.8 |
| Jefferson Co. Corr. Fac. | 1.0 | 0.2 | 1.0 | 1.4 | 0.7 |
| Johnson Co. Jail | 2.3 | 1.6 | 0.5 | 2.5 | 1.1 |
| Tarrant Co. Corr. Ctr. | 0.6 | 1.0 | 0.0 | 1.0 | 1.2 |
| Taylor Co. Jail | 1.0 | 1.1 | 0.0 | 1.3 | 0.7 |
| Titus Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Travis Co. Corr. Fac. | 1.0 | 0.8 | 0.0 | 0.0 | 1.0 |
| Travis Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Uvalde Co. Jail | 0.0 | 0.0 | 0.0 | 3.6 | 0.0 |
| Victoria Co. Jail | 0.0 | 1.6 | 0.0 | 0.0 | 0.0 |
| Washington Co. Jail | 2.6 | 2.6 | 0.0 | 0.0 | 0.0 |
| Webb Co. Jail | 0.0 | 0.0 | 0.0 | 0.6 | 0.0 |
| **Utah** | | | | | |
| Box Elder Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Davis Co. Jail | 2.2 | 2.8 | 0.0 | 0.8 | 0.5 |
| Weber Co. Corr. Fac. | 1.2 | 1.6 | 0.7 | 1.8 | 0.5 |
| **Virginia** | | | | | |
| Alexandria Det. Ctr. | 0.0% | 0.6% | 0.0% | 0.6% | 0.0% |
| Arlington Co. Det. Fac. | 0.0 | 0.0 | 0.8 | 0.8 | 0.0 |
| Bristol City Jail | 0.0 | 0.8 | 0.0 | 0.0 | 0.0 |
| Hampton Corr. Fac. | 0.5 | 0.0 | 0.5 | 0.5 | 0.0 |
| Henrico Co. Regional Jail West | 0.4 | 0.3 | 0.9 | 1.5 | 0.6 |
| Mecklenburg Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Montgomery Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Newport News City Jail | 0.4 | 0.6 | 1.9 | 2.5 | 1.5 |
| Piedmont Regional Jail | 0.0 | 1.4 | 0.5 | 0.9 | 0.5 |
| Rappahannock Regional Jail | 1.2 | 0.0 | 2.3 | 1.9 | 0.6 |
| Richmond City Jail | 1.7 | 0.8 | 0.4 | 0.8 | 1.0 |
| Riverside Regional Jail | 0.8 | 1.6 | 1.4 | 3.2 | 0.9 |
| Virginia Beach Municipal Corr. Ctr. | 1.0 | 0.4 | 1.1 | 0.7 | 0.7 |

**APPENDIX TABLE 7 (continued)**
**Percent of jail inmates reporting sexual victimization, by level of coercion and facility, National Inmate Survey, 2011–12**

| Facility name | Inmate-on-inmate[a] | | Staff sexual misconduct[a] | | |
|---|---|---|---|---|---|
| | Physically forced[b] | Pressured[c] | Physically forced[b] | Pressured[c] | Without force or pressure[d] |
| **Washington** | | | | | |
| Benton Co. Jail | 0.1% | 1.1% | 0.0% | 1.1% | 1.1% |
| Cowlitz Co. Jail | 0.7 | 0.0 | 0.6 | 1.0 | 0.0 |
| King Co. Regional Justice Ctr. | 0.0 | 0.0 | 0.9 | 0.6 | 0.8 |
| Snohomish Co. Jail | 0.5 | 0.0 | 0.5 | 0.5 | 0.0 |
| Sunnyside City Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Whatcom Co. Jail | 2.7 | 2.9 | 0.0 | 0.0 | 0.3 |
| Yakima City Jail | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 |
| **West Virginia** | | | | | |
| Eastern Regional Jail | 4.7% | 4.0% | 0.9% | 1.5% | 0.4% |
| South Central Regional Jail | 2.9 | 3.0 | 1.7 | 1.1 | 0.5 |
| Western Regional Jail | 4.4 | 3.6 | 0.9 | 1.6 | 0.4 |
| **Wisconsin** | | | | | |
| Brown Co. Jail | 1.7% | 0.5% | 2.1% | 2.1% | 1.4% |
| Columbia Co. Jail | 0.0 | 2.1 | 2.1 | 2.1 | 0.0 |
| Milwaukee Co. Corr. Fac. South | 1.3 | 1.3 | 1.4 | 2.4 | 1.0 |
| Oconto Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Rock Co. Jail | 1.3 | 2.1 | 0.8 | 1.3 | 0.7 |
| Walworth Co. Jail | 0.8 | 0.8 | 1.7 | 1.7 | 2.5 |
| Washington Co. Jail | 3.1 | 3.1 | 1.4 | 3.0 | 3.0 |
| Wood Co. Jail | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Wyoming** | | | | | |
| Lincoln Co. Jail | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Physical force or threat of physical force reported.

[c]Includes incidents in which the perpetrator, without using force, pressured the inmate or made the inmate feel that they had to participate.  (See *Methodology*.)

[d]Includes incidents in which the staff offered favors or privileges in exchange for sex or sexual contact and incidents in which the inmate reported that they willingly had sex or sexual contact with staff.

[e]Female facility.

[f]Facility housed both males and females; only males were sampled at this facility.

[g]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 8**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011−12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Total** | 1.2% | 1.0% | 1.4% | 1.9% | 1.7% | 2.2% |
| **Alabama** | | | | | | |
| Barbour Co. Jail | 2.3% | 0.7% | 7.5% | 0.0% | 0.0% | 7.6% |
| Dallas Co. Jail | 0.7 | 0.2 | 2.1 | 0.9 | 0.3 | 2.7 |
| Lee Co. W.S. Buck Jones Det. Ctr. | 1.4 | 0.5 | 3.3 | 1.6 | 0.8 | 3.3 |
| Marshall Co. Jail | 1.7 | 0.7 | 3.8 | 3.4 | 1.9 | 6.0 |
| Tuscaloosa Co. Jail | 1.7 | 0.8 | 3.6 | 1.8 | 0.8 | 3.8 |
| **Arizona** | | | | | | |
| Maricopa Co. Estrella Jail[e] | 2.9% | 1.4% | 5.8% | 0.8% | 0.3% | 2.6% |
| Maricopa Co. Fourth Avenue Jail | 0.6 | 0.1 | 3.2 | 0.9 | 0.3 | 3.2 |
| Maricopa Co. Towers Jail | 2.0 | 0.8 | 4.9 | 3.4 | 1.6 | 7.1 |
| Mariopa Co. Lower Buckeye Jail | 0.9 | 0.3 | 2.9 | 3.4 | 1.8 | 6.6 |
| Santa Cruz Co. Jail | 0.0 | 0.0 | 6.9 | 0.0 | 0.0 | 6.9 |
| Yuma Co. Det. Ctr. | 0.0 | 0.0 | 2.4 | 2.1 | 0.8 | 5.1 |
| **Arkansas** | | | | | | |
| Crittenden Co. Jail | 4.5% | 2.6% | 7.6% | 1.9% | 0.8% | 4.4% |
| Mississippi Co. Det. Ctr. | 0.0 | 0.0 | 4.3 | 0.8 | 0.3 | 2.8 |
| Pope Co. Det. Ctr. | 4.1 | 1.4 | 11.7 | 1.8 | 0.4 | 7.7 |
| Pulaski Co. Regional Det. Ctr. | 5.0 | 2.4 | 10.5 | 1.0 | 0.3 | 3.2 |
| Sebastian Co. Adult Det. Ctr. | 0.0 | 0.0 | 2.5 | 1.1 | 0.4 | 2.8 |
| **California** | | | | | | |
| Alameda Co. Santa Rita Jail | 0.3% | 0.0% | 1.3% | 2.7% | 1.4% | 5.2% |
| Contra Costa Co. Martinez Det. Fac. | 0.6 | 0.1 | 2.8 | 6.4 | 3.7 | 11.0 |
| Fresno Co. Downtown Det. Fac. - Main, North and South | 2.7 | 1.3 | 5.7 | 0.8 | 0.2 | 2.7 |
| Imperial Co. Jail | 0.2 | 0.0 | 0.8 | 0.8 | 0.3 | 2.7 |
| Kern Co. Lerdo Pre-Trial Fac. | 1.0 | 0.2 | 4.9 | 2.8 | 1.2 | 6.3 |
| Los Angeles Co. - Twin Towers Corr. Fac. | 3.3 | 1.5 | 7.2 | 4.6 | 2.4 | 8.9 |
| Los Angeles Co. Men's Central Jail | 1.3 | 0.5 | 3.8 | 5.6 | 3.1 | 9.7 |
| Los Angeles Co. North County Corr. Fac. | 0.8 | 0.2 | 2.9 | 1.9 | 0.7 | 5.5 |
| Napa Co. Jail | 0.0 | 0.0 | 3.3 | 3.8 | 2.0 | 7.3 |
| Orange Co. Central Jail Complex | 0.6 | 0.1 | 3.4 | 0.7 | 0.1 | 3.8 |
| Orange Co. Theo Lacy Fac. | 1.7 | 0.6 | 4.8 | 3.0 | 1.4 | 6.4 |
| Riverside Co. Indio Jail | 2.1 | 0.9 | 5.0 | 0.7 | 0.2 | 2.6 |
| Riverside Co. Larry D. Smith Corr. Ctr. | 2.3 | 1.1 | 5.0 | 2.7 | 1.2 | 6.0 |
| Riverside Co. Southwest Det. Ctr.[f] | 0.0 | 0.0 | 2.5 | 0.6 | 0.1 | 3.0 |
| Sacramento Co. Rio Cosumnes Corr. Ctr. | 1.8 | 0.8 | 3.9 | 3.1 | 1.6 | 5.8 |
| San Diego Co. East Mesa Med. Fac. | 0.0 | 0.0 | 2.7 | 2.4 | 1.0 | 5.6 |
| San Diego Co. George F. Bailey Det. Fac. | 3.1 | 1.4 | 7.0 | 2.1 | 0.7 | 5.8 |
| San Diego Co. Vista Det. Fac. | 0.4 | 0.1 | 1.7 | 3.5 | 1.8 | 6.6 |
| San Francisco Co. Jail Number 3 | 0.0 | 0.0 | 5.0 | 4.0 | 1.5 | 9.9 |
| Santa Clara Co. Elmwood Fac. - Min. and Med. | 1.3 | 0.5 | 3.6 | 1.1 | 0.3 | 3.7 |
| Santa Clara Co. Main Jail | 6.0 | 2.8 | 12.4 | 3.2 | 1.4 | 7.2 |
| Santa Clara Co. Women's Corr. Ctr.[e] | 1.4 | 0.5 | 4.2 | 0.7 | 0.2 | 3.1 |
| Solano Co. Justice Ctr. Det. Fac. | 1.5 | 0.6 | 3.5 | 3.7 | 2.0 | 6.6 |
| Tulare Co. Jail | 0.8 | 0.1 | 3.8 | 0.3 | 0.1 | 1.4 |
| Ventura Co. Jail | 1.9 | 0.8 | 4.2 | 0.9 | 0.3 | 2.7 |
| Yolo Co. Leinberger Ctr. | 2.1 | 0.7 | 6.0 | 0.0 | 0.0 | 8.0 |
| Yuba Co. Jail | 0.8 | 0.2 | 2.9 | 1.2 | 0.4 | 3.2 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011−12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **Colorado** | | | | | | |
| Chaffee Co. Jail | 0.0% | 0.0% | 10.4% | 0.0% | 0.0% | 10.4% |
| Denver Co. Jail | 2.1 | 1.0 | 4.4 | 1.5 | 0.7 | 3.4 |
| Denver Co. Van Cise-Simonet Det. Ctr. | 1.3 | 0.4 | 4.4 | 0.8 | 0.1 | 3.8 |
| Douglas Co. Jail | 0.7 | 0.2 | 2.6 | 2.2 | 0.9 | 5.0 |
| Fremont Co. Jail | 2.3 | 1.1 | 4.7 | 0.8 | 0.2 | 2.5 |
| Jefferson Co. Jail | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 1.8 |
| Park Co. Jail | 0.0 | 0.0 | 6.4 | 0.0 | 0.0 | 6.4 |
| **Florida** | | | | | | |
| Collier Co. Jail | 2.0% | 0.9% | 4.2% | 3.1% | 1.2% | 7.6% |
| Dixie Co. Jail | 2.4 | 0.8 | 7.4 | 5.7 | 2.5 | 12.6 |
| Escambia Co. Jail | 1.4 | 0.6 | 3.4 | 1.1 | 0.3 | 3.6 |
| Jacksonville City Montgomery Corr. Ctr. | 0.8 | 0.2 | 3.1 | 1.6 | 0.7 | 3.6 |
| Lake Co. Jail | 0.3 | 0.1 | 1.7 | 2.5 | 0.6 | 9.4 |
| Lee Co. Community Programs Unit | 0.7 | 0.2 | 2.4 | 2.4 | 1.1 | 5.0 |
| Leon Co. Det. Fac. | 2.3 | 1.1 | 4.8 | 2.6 | 1.3 | 5.1 |
| Manatee Co. Jail | 2.0 | 0.8 | 4.6 | 3.2 | 1.7 | 5.9 |
| Martin Co. Jail | 1.3 | 0.4 | 3.8 | 1.9 | 0.7 | 4.6 |
| Miami-Dade Co. Boot Camp | 0.0 | 0.0 | 7.4 | 0.0 | 0.0 | 7.4 |
| Miami-Dade Co. Metro West Det. Ctr. | 0.5 | 0.1 | 2.6 | 2.1 | 1.0 | 4.4 |
| Miami-Dade Co. Training and Treatment Ctr. | 0.0 | 0.0 | 2.2 | 1.0 | 0.3 | 3.2 |
| Miami-Dade Co. Turner Guilford Knight Corr. Ctr. | 0.5 | 0.1 | 2.4 | 0.5 | 0.1 | 2.2 |
| Okeechobee Co. Jail | 1.1 | 0.3 | 3.9 | 0.0 | 0.0 | 3.7 |
| Orange Co. 33rd Street Corr. Ctr. | 0.5 | 0.1 | 2.6 | 3.0 | 1.4 | 6.3 |
| Orange Co. Booking and Release Ctr. | 1.0 | 0.2 | 3.9 | 1.9 | 0.7 | 5.4 |
| Osceola Co. Jail | 0.3 | 0.1 | 1.2 | 0.7 | 0.1 | 3.0 |
| Palm Beach Co. Stockade | 0.5 | 0.1 | 2.3 | 1.9 | 0.7 | 5.0 |
| Pinellas Co. Central Division Fac. | 0.0 | 0.0 | 2.4 | 2.4 | 0.9 | 6.4 |
| Pinellas Co. South Division | 0.8 | 0.2 | 3.9 | 2.4 | 1.0 | 5.8 |
| Polk Co. - South Co. Jail | 1.2 | 0.4 | 3.2 | 3.9 | 2.1 | 7.1 |
| Sarasota North Co. Jail | 0.0 | 0.0 | 1.9 | 0.0 | 0.0 | 1.9 |
| Suwanee Co. Jail | 0.9 | 0.3 | 3.0 | 0.0 | 0.0 | 4.5 |
| Taylor Co. Jail | 0.0 | 0.0 | 13.3 | 0.0 | 0.0 | 13.3 |
| **Georgia** | | | | | | |
| Candler Co. Jail | 0.0% | 0.0% | 12.5% | 0.0% | 0.0% | 12.5% |
| Carroll Co. Prison | 0.7 | 0.3 | 1.7 | 2.0 | 1.1 | 3.5 |
| Clayton Co. Jail | 2.1 | 1.0 | 4.4 | 2.5 | 1.2 | 5.1 |
| Dekalb Co. Jail | 0.9 | 0.3 | 2.4 | 2.4 | 1.1 | 4.8 |
| Douglas Co. Jail | 2.2 | 1.1 | 4.3 | 0.7 | 0.2 | 1.9 |
| Floyd Co. Jail | 2.1 | 1.0 | 4.2 | 1.5 | 0.7 | 3.2 |
| Floyd Co. Prison | 0.0 | 0.0 | 2.1 | 2.8 | 1.5 | 5.0 |
| Fulton Co. Jail | 2.9 | 1.2 | 6.5 | 2.0 | 0.7 | 5.6 |
| Gwinnett Co. Det. Ctr. | 0.8 | 0.2 | 2.6 | 0.0 | 0.0 | 1.5 |
| Hall Co. Det. Ctr. | 1.4 | 0.5 | 3.8 | 1.6 | 0.6 | 4.2 |
| Houston Co. Jail | 2.2 | 1.0 | 4.6 | 4.9 | 2.8 | 8.3 |
| Irwin Co. Jail | 0.0 | 0.0 | 2.0 | 1.1 | 0.4 | 2.9 |
| Murray County Jail | 1.1 | 0.4 | 3.3 | 2.2 | 1.0 | 4.7 |
| Newton Co. Jail | 1.7 | 0.8 | 3.7 | 2.0 | 0.9 | 4.6 |
| Screven Co. Jail | 2.7 | 1.4 | 5.1 | 1.2 | 0.5 | 3.0 |
| South Fulton Municipal Regional Jail | 2.3 | 0.5 | 9.5 | 2.3 | 0.5 | 9.5 |
| Spalding Co. Jail | 1.1 | 0.4 | 3.3 | 4.0 | 1.9 | 8.0 |
| Troup Co. Jail | 1.1 | 0.4 | 2.9 | 1.1 | 0.4 | 2.9 |
| Upson Co. Jail | 0.0 | 0.0 | 3.4 | 2.6 | 1.5 | 4.6 |
| Ware Co. Jail | 0.8 | 0.3 | 2.1 | 1.4 | 0.6 | 2.9 |
| Wilkinson Co. Jail | 6.5 | 1.9 | 20.0 | 0.0 | 0.0 | 16.8 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Idaho** | | | | | | |
| Bannock Co. Jail | 0.0% | 0.0% | 3.3% | 3.0% | 1.3% | 6.8% |
| **Illinois** | | | | | | |
| Champaign Co. Satellite Jail[f] | 2.0% | 0.5% | 8.4% | 0.0% | 0.0% | 6.4% |
| Cook Co. - Division 1 | 1.1 | 0.4 | 2.7 | 3.3 | 1.9 | 5.6 |
| Cook Co. - Division 11 | 3.3 | 1.9 | 5.8 | 4.4 | 2.7 | 7.1 |
| Cook Co. - Division 2 | 0.6 | 0.1 | 3.0 | 5.1 | 3.0 | 8.6 |
| Cook Co. - Division 5 | 1.2 | 0.5 | 3.1 | 2.3 | 1.1 | 4.7 |
| Cook Co. - Division 6 | 0.4 | 0.1 | 1.6 | 1.9 | 0.9 | 3.7 |
| Kane Co. Adult Justice Ctr. | 0.8 | 0.3 | 2.6 | 2.1 | 0.8 | 5.1 |
| Kankakee Co. Jerome Combs Det. Ctr. | 1.7 | 0.7 | 3.9 | 1.7 | 0.8 | 3.4 |
| Kendall Co. Jail | 3.4 | 1.7 | 6.8 | 1.7 | 0.5 | 5.1 |
| McHenry Co. Jail | 0.6 | 0.1 | 2.6 | 0.5 | 0.1 | 2.2 |
| Sangamon Co. Jail | 1.6 | 0.8 | 3.0 | 2.3 | 1.3 | 4.1 |
| **Indiana** | | | | | | |
| Bartholomew Co. Jail | 0.5% | 0.2% | 1.3% | 2.6% | 1.5% | 4.7% |
| Clinton Co. Jail | 1.6 | 0.5 | 4.4 | 0.8 | 0.3 | 2.4 |
| Dearborn Co. Jail | 0.0 | 0.0 | 3.0 | 1.8 | 0.8 | 4.3 |
| Delaware Co. Justice Ctr. | 1.6 | 0.6 | 4.4 | 0.2 | 0.1 | 0.9 |
| Elkhart Co. Corr. Ctr. | 1.2 | 0.5 | 3.2 | 2.4 | 1.3 | 4.4 |
| Hamilton Co. Jail | 0.5 | 0.2 | 1.9 | 0.9 | 0.3 | 3.3 |
| Jackson Co. Jail | 1.0 | 0.3 | 3.4 | 0.0 | 0.0 | 4.1 |
| Marion Co. Jail II[g] | 1.2 | 0.4 | 3.3 | 2.2 | 0.6 | 7.3 |
| Marion Co. Jail Intake Fac. | 2.7 | 0.7 | 10.7 | 4.9 | 1.9 | 12.2 |
| Noble Co. Jail | 0.0 | 0.0 | 3.5 | 0.9 | 0.3 | 2.3 |
| Ripley Co. Jail | 0.0 | 0.0 | 7.0 | 7.9 | 5.1 | 11.9 |
| Tippecanoe Co. Jail | 2.5 | 1.1 | 5.7 | 0.0 | 0.0 | 3.2 |
| **Iowa** | | | | | | |
| Des Moines Co. Jail | 0.0% | 0.0% | 11.4% | 2.1% | 0.6% | 7.1% |
| Scott Co. Jail and Annex | 2.4 | 1.1 | 5.1 | 0.8 | 0.2 | 2.8 |
| **Kansas** | | | | | | |
| Finney Co. Jail | 3.0% | 1.6% | 5.6% | 1.0% | 0.3% | 2.9% |
| Wilson Co. Jail | 0.0 | 0.0 | 9.6 | 5.6 | 1.7 | 16.5 |
| **Kentucky** | | | | | | |
| Big Sandy Regional Det. Ctr. | 0.0% | 0.0% | 2.6% | 1.3% | 0.6% | 3.2% |
| Boyle Co. Det. Ctr. | 0.0 | 0.0 | 2.5 | 1.9 | 0.6 | 5.7 |
| Daviess Co. Det. Ctr. | 0.7 | 0.3 | 2.1 | 2.9 | 1.5 | 5.4 |
| Grayson Co. Det. Ctr. | 0.8 | 0.3 | 2.2 | 1.4 | 0.6 | 3.1 |
| Kenton Co. Det. Ctr. | 0.4 | 0.1 | 1.8 | 0.7 | 0.2 | 2.5 |
| Lexington-Fayette Co. Jail Det. Division | 0.6 | 0.2 | 2.0 | 3.6 | 1.8 | 7.3 |
| Madison Co. Det. Ctr. | 2.1 | 1.1 | 4.2 | 1.7 | 0.8 | 3.4 |
| McCracken Co. Jail | 1.1 | 0.4 | 2.8 | 2.0 | 1.0 | 3.9 |
| Meade Co. Jail | 0.0 | 0.0 | 4.4 | 1.3 | 0.5 | 3.6 |
| Pulaski Co. Det. Ctr. | 0.9 | 0.2 | 3.1 | 0.8 | 0.2 | 2.9 |
| Woodford Co. Det. Ctr. | 0.1 | 0.0 | 0.6 | 0.0 | 0.0 | 10.2 |
| **Louisiana** | | | | | | |
| Assumption Parish Det. Ctr. | 1.5% | 0.6% | 3.9% | 3.1% | 1.6% | 6.0% |
| Bossier Parish Max. Security Fac. | 0.9 | 0.4 | 2.3 | 0.0 | 0.0 | 2.2 |
| Bossier Parish Med. Security Fac. | 0.4 | 0.1 | 1.5 | 2.0 | 1.0 | 4.0 |
| Caddo Parish Corr. Ctr. | 0.4 | 0.1 | 1.8 | 1.6 | 0.7 | 3.7 |
| East Baton Rouge Parish Prison | 1.4 | 0.5 | 3.8 | 0.9 | 0.3 | 3.2 |
| Iberia Parish Jail | 1.4 | 0.6 | 3.2 | 2.5 | 1.3 | 4.9 |
| Lafayette Parish Jail | 0.5 | 0.1 | 2.2 | 2.8 | 1.4 | 5.4 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| Livingston Parish Det. Ctr. | 0.0% | 0.0% | 1.7% | 1.4% | 0.6% | 3.2% |
| Rapides Parish Det. Ctr. III | 1.4 | 0.7 | 3.0 | 0.5 | 0.1 | 1.6 |
| St. Landry Parish Jail | 0.0 | 0.0 | 3.3 | 0.7 | 0.2 | 2.5 |
| St. Martin Parish Corr. Ctr. 1 | 2.6 | 1.0 | 6.4 | 1.3 | 0.4 | 4.6 |
| Webster Parish Bayou Dorcheat Corr. Fac. | 1.2 | 0.6 | 2.6 | 2.1 | 1.0 | 4.5 |
| **Maine** | | | | | | |
| Penobscot Co. Jail | 1.8% | 0.4% | 6.7% | 2.6% | 0.7% | 9.6% |
| **Maryland** | | | | | | |
| Allegany Co. Det. Ctr. | 2.3% | 0.5% | 9.6% | 0.0% | 0.0% | 7.7% |
| Anne Arundel Co. Jennifer Road Det. Ctr. | 0.0 | 0.0 | 3.6 | 0.9 | 0.2 | 4.4 |
| Baltimore City Det. Ctr. | 1.2 | 0.4 | 3.3 | 5.5 | 3.4 | 8.8 |
| Montgomery Co. Corr. Fac. | 1.6 | 0.6 | 3.9 | 1.1 | 0.4 | 3.5 |
| Wicomico Co. Det. Ctr. | 0.6 | 0.2 | 2.1 | 0.0 | 0.0 | 2.5 |
| **Massachusetts** | | | | | | |
| Hampden Co. Corr. Ctr. | 0.0% | 0.0% | 1.7% | 1.9% | 0.7% | 5.0% |
| Middlesex Co. Jail and House of Corr. | 0.7 | 0.2 | 3.5 | 1.4 | 0.6 | 3.2 |
| Plymouth Co. Corr. Fac. | 0.0 | 0.0 | 2.1 | 2.0 | 0.8 | 4.7 |
| Suffolk Co. House of Corr. | 1.5 | 0.6 | 3.5 | 4.7 | 2.6 | 8.3 |
| Suffolk Co. Nashua Street Jail | 0.0 | 0.0 | 2.5 | 1.9 | 0.7 | 4.9 |
| Worcester Co. Jail and House of Corr. | 0.7 | 0.2 | 2.2 | 3.7 | 2.1 | 6.5 |
| **Michigan** | | | | | | |
| Berrien Co. Jail | 0.8% | 0.3% | 1.9% | 3.5% | 2.2% | 5.6% |
| Calhoun Co. Jail | 0.3 | 0.1 | 1.2 | 4.8 | 2.4 | 9.4 |
| Huron Co. Jail | 0.0 | 0.0 | 12.1 | 0.0 | 0.0 | 12.1 |
| Kalamazoo Co. Jail | 1.6 | 0.8 | 3.2 | 4.1 | 2.4 | 7.0 |
| Macomb Co. Jail | 0.0 | 0.0 | 2.5 | 1.9 | 0.8 | 4.5 |
| Oakland Co. East Annex | 1.2 | 0.5 | 3.2 | 1.3 | 0.5 | 3.5 |
| Oakland Co. Law Enforcement Complex | 3.7 | 1.8 | 7.5 | 3.6 | 1.5 | 8.5 |
| Ottawa Co. Jail | 0.0 | 0.0 | 3.1 | 0.6 | 0.2 | 2.5 |
| Wayne Co. Andrew C. Baird Det. Fac. | 2.8 | 1.2 | 6.4 | 1.3 | 0.4 | 4.6 |
| Wayne Co. William Dickerson Det. - Division III | 0.0 | 0.0 | 2.2 | 0.4 | 0.1 | 2.1 |
| **Minnesota** | | | | | | |
| Anoka Co. Jail | 0.9% | 0.3% | 3.3% | 1.1% | 0.4% | 2.8% |
| Hennepin Co. Adult Det. Ctr. | 0.6 | 0.1 | 2.7 | 0.9 | 0.3 | 2.8 |
| Mille Lacs Co. Jail | 0.0 | 0.0 | 9.9 | 1.8 | 0.6 | 5.5 |
| Ramsey Co. Corr. Fac. | 0.0 | 0.0 | 2.2 | 0.9 | 0.3 | 2.2 |
| **Mississippi** | | | | | | |
| Covington Co. Jail | 0.0% | 0.0% | 25.9% | 0.0% | 0.0% | 25.9% |
| Harrison Co. Adult Det. Ctr. | 1.0 | 0.4 | 2.5 | 4.1 | 2.2 | 7.6 |
| Hinds Co. Jackson Det. Ctr. | 1.8 | 0.8 | 4.0 | 1.1 | 0.4 | 3.1 |
| Hinds Co. Raymond Det. Ctr. | 1.6 | 0.7 | 3.9 | 3.5 | 1.8 | 6.6 |
| Holmes-Humphreys Co. Regional Corr. Fac. | 1.7 | 0.6 | 4.6 | 0.8 | 0.2 | 3.0 |
| Madison Co. Jail | 1.8 | 0.8 | 3.9 | 1.4 | 0.5 | 3.6 |
| Marshall Co. Jail | 0.0 | 0.0 | 7.6 | 0.0 | 0.0 | 7.6 |
| Pike Co. Jail | 0.0 | 0.0 | 4.1 | 0.0 | 0.0 | 4.1 |
| **Missouri** | | | | | | |
| Boone Co. Jail | 1.7% | 0.6% | 4.6% | 2.3% | 0.6% | 8.8% |
| LaClede Co. Jail | 3.1 | 1.8 | 5.3 | 4.5 | 2.7 | 7.3 |
| St. Charles Co. Jail | 2.4 | 1.0 | 5.6 | 3.6 | 1.8 | 7.0 |
| St. Louis Co. Jail | 1.8 | 0.7 | 4.8 | 1.7 | 0.6 | 4.4 |
| St. Louis Med. Security Inst. | 3.5 | 1.7 | 6.8 | 3.2 | 1.7 | 5.9 |
| Washington Co. Jail | 3.3 | 0.9 | 11.3 | 0.0 | 0.0 | 16.1 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011–12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **Montana** | | | | | | |
| Cascade Co. Regional Jail | 1.7% | 0.7% | 3.7% | 3.6% | 2.0% | 6.3% |
| Hill Co. Jail | 0.0 | 0.0 | 12.5 | 0.0 | 0.0 | 12.5 |
| Missoula Co. Jail | 1.2 | 0.4 | 3.0 | 1.4 | 0.5 | 3.5 |
| **Nebraska** | | | | | | |
| Douglas Co. Dept. of Corr. | 1.4% | 0.4% | 4.9% | 2.6% | 1.1% | 6.4% |
| Saline Co. Jail | 2.3 | 0.9 | 6.2 | 1.6 | 0.6 | 4.5 |
| **Nevada** | | | | | | |
| Clark Co. Det. Ctr. | 0.6% | 0.2% | 1.9% | 0.4% | 0.1% | 2.2% |
| Nye Co. Jail - Pahrump | 0.0 | 0.0 | 21.5 | 0.0 | 0.0 | 21.5 |
| Washoe Co. Det. Ctr. | 2.8 | 1.3 | 5.9 | 0.4 | 0.1 | 2.1 |
| **New Hampshire** | | | | | | |
| Coos Co. Jail | 0.0% | 0.0% | 16.8% | 4.4% | 1.2% | 14.3% |
| Hillsborough Co. House of Corr. | 2.9 | 1.2 | 6.8 | 3.1 | 1.4 | 6.7 |
| **New Jersey** | | | | | | |
| Bergen Co. Jail | 0.8% | 0.3% | 2.3% | 1.9% | 0.9% | 3.7% |
| Burlington Co. Min. Security Jail/Corr. and Work Release Ctr. | 0.0 | 0.0 | 5.9 | 0.0 | 0.0 | 5.9 |
| Essex Co. Corr. Fac. | 0.5 | 0.1 | 2.4 | 1.7 | 0.7 | 4.2 |
| Hudson Co. Corr. Fac. | 1.3 | 0.5 | 3.1 | 0.7 | 0.2 | 2.4 |
| Mercer Co. Corr. Ctr. | 2.8 | 1.2 | 6.5 | 4.4 | 2.3 | 8.4 |
| Middlesex Co. Adult Corr. Ctr. | 0.3 | 0.1 | 1.4 | 1.0 | 0.4 | 2.5 |
| Ocean Co. Justice Complex | 2.0 | 0.8 | 5.1 | 1.0 | 0.4 | 2.5 |
| Passaic Co. Jail | 0.7 | 0.2 | 2.1 | 1.9 | 0.9 | 4.2 |
| Salem Co. Corr. Fac. | 1.8 | 0.6 | 4.9 | 0.7 | 0.2 | 2.8 |
| **New Mexico** | | | | | | |
| Dona Ana Co. Det. Ctr. | 2.3% | 1.2% | 4.4% | 2.5% | 1.2% | 5.3% |
| San Juan Co. Adult Det. Ctr. | 1.7 | 0.5 | 5.3 | 1.4 | 0.4 | 4.1 |
| Santa Fe Co. Adult Det. Fac.[g] | 3.5 | 1.6 | 7.5 | 0.0 | 0.0 | 2.7 |
| **New York** | | | | | | |
| Albany Co. Corr. Fac. | 1.8% | 0.8% | 4.1% | 2.4% | 1.1% | 4.9% |
| Allegany Co. Jail | 1.5 | 0.4 | 5.3 | 3.0 | 1.2 | 7.5 |
| Broome Co. Jail | 0.9 | 0.3 | 2.7 | 4.3 | 2.1 | 8.8 |
| Dutchess Co. Jail | 0.0 | 0.0 | 3.0 | 1.4 | 0.5 | 3.8 |
| Erie Co. Corr. Fac. | 0.0 | 0.0 | 2.1 | 4.3 | 2.3 | 7.7 |
| Erie Co. Holding Fac. | 0.0 | 0.0 | 5.3 | 4.5 | 0.9 | 19.6 |
| Jefferson Co. Jail | 1.6 | 0.4 | 6.0 | 3.6 | 1.6 | 8.2 |
| New York City Anna M. Kross Ctr. | 1.9 | 0.7 | 5.4 | 3.7 | 1.8 | 7.4 |
| New York City George Motchan Det. Ctr. | 1.8 | 0.7 | 4.1 | 3.6 | 1.9 | 6.6 |
| New York City Otis Bantum Corr. Ctr. | 0.0 | 0.0 | 2.2 | 6.2 | 3.3 | 11.1 |
| New York City Robert N Davoren Complex | 0.4 | 0.1 | 1.9 | 3.0 | 1.6 | 5.8 |
| New York City Rose M. Singer Ctr.[e] | 2.4 | 1.1 | 5.1 | 6.2 | 3.9 | 9.7 |
| Niagara Co. Jail | 0.0 | 0.0 | 2.3 | 1.8 | 0.7 | 4.1 |
| Oneida Co. Corr. Fac. | 0.9 | 0.2 | 3.8 | 2.1 | 0.9 | 5.1 |
| Orange Co. Corr. Fac. | 0.5 | 0.1 | 2.3 | 1.4 | 0.6 | 3.4 |
| Putnam Co. Corr. Fac. | 0.0 | 0.0 | 5.4 | 1.1 | 0.3 | 3.7 |
| Rockland Co. Corr. Ctr. | 0.6 | 0.2 | 1.8 | 3.5 | 1.7 | 7.4 |
| Schenectady Co. Jail | 1.9 | 0.9 | 4.1 | 2.9 | 1.7 | 5.0 |
| Seneca Co. Law Enforcement Ctr. | 1.6 | 0.6 | 4.0 | 3.3 | 1.6 | 6.6 |
| Ulster Co. Law Enforcement Ctr. | 0.9 | 0.3 | 2.2 | 6.1 | 3.6 | 10.1 |
| Washington Co. Corr. Fac. | 0.0 | 0.0 | 5.8 | 0.0 | 0.0 | 5.8 |
| Westchester Co. Jail | 0.9 | 0.3 | 2.8 | 2.1 | 0.8 | 5.5 |
| Westchester Co. Penitentiary - Dept. of Corr. | 0.4 | 0.1 | 1.9 | 1.7 | 0.8 | 3.8 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011−12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **North Carolina** | | | | | | |
| Buncombe Co. Det. Fac. | 0.7% | 0.2% | 2.5% | 1.3% | 0.5% | 3.4% |
| Cherokee Co. Jail | 0.0 | 0.0 | 7.9 | 2.5 | 0.8 | 7.8 |
| Durham Co. Jail | 0.7 | 0.2 | 2.7 | 1.6 | 0.7 | 3.7 |
| Edgecombe Co. Det. Ctr. | 3.1 | 1.8 | 5.4 | 3.2 | 1.7 | 5.9 |
| Forsyth Co. Adult Det. Ctr. | 1.2 | 0.4 | 4.0 | 2.0 | 0.8 | 5.1 |
| Granville Co. Det. Ctr. | 5.3 | 1.5 | 16.5 | 1.2 | 0.3 | 4.4 |
| Guilford Co. High Point Det. Fac. | 0.0 | 0.0 | 2.4 | 1.1 | 0.4 | 2.7 |
| Guilford Co. Prison Farm | 0.0 | 0.0 | 9.6 | 0.0 | 0.0 | 9.6 |
| Mecklenburg Co. Jail North | 0.0 | 0.0 | 3.1 | 2.0 | 0.8 | 4.9 |
| New Hanover Det. Fac. | 0.0 | 0.0 | 2.4 | 1.9 | 0.8 | 4.3 |
| Robeson Co. Jail | 2.4 | 1.1 | 5.1 | 5.1 | 3.0 | 8.6 |
| Scotland Co. Jail | 4.0 | 2.0 | 7.7 | 1.4 | 0.5 | 3.6 |
| Wake Co. John H. Baker, Jr. Public Safety Ctr. | 2.3 | 0.7 | 7.3 | 1.8 | 0.8 | 4.3 |
| **North Dakota** | | | | | | |
| Burleigh Co. Det. Ctr. | 0.0% | 0.0% | 4.5% | 3.5% | 1.9% | 6.5% |
| **Ohio** | | | | | | |
| Bedford Heights City Jail | 0.0% | 0.0% | 9.9% | 0.0% | 0.0% | 9.9% |
| Cuyahoga Co. Corr. Ctr. | 0.7 | 0.3 | 2.0 | 1.6 | 0.7 | 3.6 |
| Delaware Co. Jail | 0.0 | 0.0 | 3.4 | 0.0 | 0.0 | 3.4 |
| Franklin Co. Jail | 2.6 | 1.2 | 5.8 | 1.5 | 0.5 | 4.6 |
| Hamilton Co. Justice Ctr. | 0.0 | 0.0 | 1.8 | 1.8 | 0.8 | 4.3 |
| Hamilton Co. Reading Road Fac. | 0.9 | 0.4 | 2.1 | 1.6 | 0.7 | 3.3 |
| Lorain Co. Jail | 0.6 | 0.1 | 2.1 | 1.6 | 0.7 | 3.6 |
| Miami Co. Jail | 0.0 | 0.0 | 5.3 | 0.0 | 0.0 | 5.3 |
| Montgomery Co. Jail | 0.9 | 0.3 | 2.7 | 0.4 | 0.1 | 2.0 |
| Richland Co. Jail | 1.4 | 0.7 | 2.9 | 1.4 | 0.7 | 2.9 |
| **Oklahoma** | | | | | | |
| Dewey Co. Jail | 0.0% | 0.0% | 22.8% | 0.0% | 0.0% | 22.8% |
| Kay Co. Jail | 0.8 | 0.3 | 2.4 | 1.8 | 0.8 | 3.8 |
| Nowata Co. Jail | 0.0 | 0.0 | 13.8 | 2.4 | 0.7 | 8.3 |
| **Oregon** | | | | | | |
| Lane Co. Jail | 0.0% | 0.0% | 2.2% | 0.8% | 0.3% | 2.1% |
| Marion Co. Corr. Fac. | 0.0 | 0.0 | 1.8 | 1.8 | 0.9 | 3.8 |
| Washington Co. Jail | 0.0 | 0.0 | 2.5 | 0.5 | 0.1 | 2.4 |
| Yamhill Co. Corr. Fac. | 2.8 | 1.4 | 5.8 | 1.8 | 0.9 | 3.5 |
| **Pennsylvania** | | | | | | |
| Allegheny Co. Jail | 0.5% | 0.1% | 1.7% | 2.5% | 1.2% | 5.1% |
| Blair Co. Prison | 3.5 | 1.2 | 10.1 | 1.7 | 0.6 | 4.9 |
| Fayette Co. Prison | 1.0 | 0.2 | 4.1 | 3.9 | 1.9 | 7.7 |
| Indiana Co. Jail | 1.7 | 0.6 | 4.8 | 2.1 | 0.5 | 8.2 |
| Luzerne Co. Corr. Fac. | 2.4 | 1.2 | 4.9 | 0.6 | 0.1 | 2.7 |
| Montgomery Co. Prison Corr. Fac. | 1.9 | 0.8 | 4.1 | 1.8 | 0.8 | 4.3 |
| Philadelphia City Alternative and Special Det. Fac. | 0.0 | 0.0 | 2.2 | 0.8 | 0.3 | 2.5 |
| Philadelphia City Curran/Fromhold Corr. Fac. | 1.5 | 0.5 | 4.3 | 3.0 | 1.5 | 5.9 |
| Philadelphia City Industrial Corr. Ctr. | 2.7 | 1.2 | 5.6 | 6.8 | 4.3 | 10.6 |
| Philadelphia City Riverside Corr. Fac.[e] | 4.1 | 2.3 | 7.3 | 4.5 | 2.5 | 8.1 |
| Schuykill Co. Prison | 0.0 | 0.0 | 2.7 | 2.7 | 1.4 | 5.0 |
| Westmoreland Co. Prison | 2.1 | 0.8 | 5.2 | 1.2 | 0.3 | 4.4 |
| York Co. Prison | 1.5 | 0.6 | 4.2 | 3.8 | 2.0 | 7.1 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011−12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | Percent victimized[d] | 95%-confidence interval[c] | | Percent victimized[d] | 95%-confidence interval[c] | |
| | | Lower bound | Upper bound | | Lower bound | Upper bound |
| **South Carolina** | | | | | | |
| Charleston Co. Det. Ctr. | 0.3% | 0.1% | 1.3% | 1.7% | 0.7% | 4.0% |
| Florence Co. Det. Ctr. | 0.0 | 0.0 | 2.3 | 1.2 | 0.5 | 3.1 |
| Lexington Co. Jail | 1.1 | 0.3 | 3.2 | 0.6 | 0.1 | 2.5 |
| Spartanburg Co. Det. Fac. | 0.0 | 0.0 | 1.8 | 1.1 | 0.4 | 3.5 |
| Sumter-Lee Regional Det. Ctr. | 1.0 | 0.4 | 2.7 | 4.1 | 2.2 | 7.3 |
| York Co. Det. Ctr. | 0.7 | 0.2 | 2.7 | 1.4 | 0.4 | 4.6 |
| **South Dakota** | | | | | | |
| Pennington Co. Jail | 1.6% | 0.6% | 4.2% | 0.9% | 0.3% | 2.4% |
| **Tennessee** | | | | | | |
| Lincoln Co. Jail | 3.0% | 1.4% | 6.1% | 0.0% | 0.0% | 4.7% |
| Madison Co. Jail | 0.4 | 0.1 | 1.4 | 4.9 | 2.4 | 9.7 |
| McMinn Co. Jail | 1.0 | 0.5 | 2.0 | 2.4 | 1.4 | 4.1 |
| Montgomery Co. Jail | 0.0 | 0.0 | 3.1 | 0.7 | 0.2 | 3.3 |
| Obion Co. Jail | 0.0 | 0.0 | 3.8 | 0.0 | 0.0 | 3.8 |
| Robertson Co. Det. Ctr. | 1.1 | 0.4 | 2.9 | 1.7 | 0.8 | 3.9 |
| Shelby Co. Corr. Ctr. | 0.3 | 0.1 | 1.6 | 3.1 | 1.7 | 5.5 |
| Shelby Co. Jail | 0.2 | 0.0 | 0.9 | 1.6 | 0.7 | 3.5 |
| Sumner Co. Jail | 3.1 | 1.7 | 5.7 | 2.9 | 1.5 | 5.6 |
| Tipton Co. Jail | 0.0 | 0.0 | 4.9 | 1.5 | 0.5 | 5.0 |
| Van Buren Co. Jail | 0.0 | 0.0 | 20.4 | 0.0 | 0.0 | 20.4 |
| Washington Co. Det. Ctr. | 1.5 | 0.7 | 3.4 | 1.4 | 0.6 | 2.9 |
| **Texas** | | | | | | |
| Bexar Co. Adult Det. Ctr. | 4.6% | 2.3% | 9.0% | 0.4% | 0.1% | 2.4% |
| Bowie Co. Corr. Ctr. | 1.2 | 0.4 | 3.6 | 1.3 | 0.4 | 3.8 |
| Brazoria Co. Jail and Det. Ctr. | 0.0 | 0.0 | 1.7 | 0.9 | 0.3 | 2.6 |
| Brown Co. Jail | 0.0 | 0.0 | 4.7 | 0.0 | 0.0 | 4.7 |
| Cameron Co. Carrizales-Rucker Det. Ctr. | 0.0 | 0.0 | 1.4 | 0.3 | 0.1 | 1.6 |
| Dallas Co. Kays Det. Fac. | 0.7 | 0.2 | 2.6 | 1.3 | 0.5 | 3.7 |
| Denton Co. Det. Ctr. | 1.3 | 0.5 | 3.3 | 1.1 | 0.4 | 2.9 |
| Eastland Co. Jail | 0.0 | 0.0 | 9.9 | 0.0 | 0.0 | 9.9 |
| El Paso Co. Det. Fac. Annex | 1.4 | 0.5 | 3.9 | 1.5 | 0.5 | 4.0 |
| El Paso Co. Downtown Det. Fac. | 0.0 | 0.0 | 2.2 | 3.0 | 1.2 | 7.6 |
| Ellis Co. Wayne McCollum Det. Ctr. | 1.3 | 0.6 | 2.9 | 2.3 | 1.2 | 4.3 |
| Gregg Co. Jail | 1.0 | 0.4 | 2.4 | 0.5 | 0.1 | 2.0 |
| Harris Co. Jail - 1200 Baker Street Jail | 5.1 | 2.6 | 9.8 | 2.5 | 1.2 | 5.2 |
| Harris Co. Jail - 1307 Baker Street Jail | 0.4 | 0.1 | 1.7 | 1.0 | 0.4 | 2.5 |
| Harris Co. Jail - 701 North San Jacinto Street Jail[f] | 0.3 | 0.1 | 1.5 | 2.9 | 1.5 | 5.6 |
| Harris Co. Jail - 711 North San Jacinto Jail | 1.5 | 0.4 | 4.9 | 0.0 | 0.0 | 5.7 |
| Hays Co. Jail | 0.8 | 0.2 | 3.3 | 3.1 | 1.1 | 8.7 |
| Jefferson Co. Corr. Fac. | 0.3 | 0.1 | 1.6 | 1.8 | 0.8 | 3.7 |
| Johnson Co. Jail | 2.4 | 1.2 | 4.5 | 2.8 | 1.6 | 5.0 |
| Tarrant Co. Corr. Ctr. | 0.9 | 0.3 | 3.1 | 1.9 | 0.7 | 5.2 |
| Taylor Co. Jail | 0.6 | 0.1 | 2.7 | 2.4 | 1.1 | 5.1 |
| Titus Co. Jail | 0.0 | 0.0 | 5.7 | 0.0 | 0.0 | 5.7 |
| Travis Co. Corr. Fac. | 2.7 | 0.9 | 7.6 | 0.0 | 0.0 | 3.5 |
| Travis Co. Jail | 0.0 | 0.0 | 13.3 | 0.0 | 0.0 | 13.3 |
| Uvalde Co. Jail | 0.0 | 0.0 | 18.4 | 3.6 | 0.9 | 14.1 |
| Victoria Co. Jail | 1.6 | 0.4 | 6.6 | 0.0 | 0.0 | 8.6 |
| Washington Co. Jail | 1.3 | 0.5 | 3.2 | 1.4 | 0.5 | 3.5 |
| Webb Co. Jail | 0.0 | 0.0 | 3.4 | 0.6 | 0.1 | 2.7 |

**APPENDIX TABLE 8 (continued)**
**Percent of jail inmates reporting nonconsensual sexual acts and abusive sexual contacts, by facility, National Inmate Survey, 2011−12**

| Facility name | Nonconsensual sexual acts[a] | | | Abusive sexual contacts only[b] | | |
|---|---|---|---|---|---|---|
| | | 95%-confidence interval[c] | | | 95%-confidence interval[c] | |
| | Percent victimized[d] | Lower bound | Upper bound | Percent victimized[d] | Lower bound | Upper bound |
| **Utah** | | | | | | |
| Box Elder Co. Jail | 0.0% | 0.0% | 8.8% | 0.0% | 0.0% | 8.8% |
| Davis Co. Jail | 3.2 | 1.5 | 6.7 | 1.6 | 0.7 | 3.6 |
| Weber Co. Corr. Fac. | 1.2 | 0.5 | 3.1 | 2.5 | 1.1 | 5.5 |
| **Virginia** | | | | | | |
| Alexandria Det. Ctr. | 0.0% | 0.0% | 3.1% | 0.6% | 0.1% | 2.6% |
| Arlington Co. Det. Fac. | 0.0 | 0.0 | 2.3 | 0.8 | 0.2 | 3.2 |
| Bristol City Jail | 0.0 | 0.0 | 3.7 | 0.8 | 0.3 | 2.3 |
| Hampton Corr. Fac. | 0.5 | 0.1 | 2.0 | 0.5 | 0.1 | 1.8 |
| Henrico Co. Regional Jail West | 1.8 | 0.8 | 3.9 | 0.9 | 0.3 | 2.8 |
| Mecklenburg Co. Jail | 0.0 | 0.0 | 5.4 | 0.0 | 0.0 | 5.4 |
| Montgomery Co. Jail | 0.0 | 0.0 | 6.0 | 0.0 | 0.0 | 6.0 |
| Newport News City Jail | 2.0 | 0.9 | 4.2 | 1.5 | 0.6 | 3.4 |
| Piedmont Regional Jail | 0.0 | 0.0 | 2.0 | 2.3 | 1.1 | 4.7 |
| Rappahannock Regional Jail | 2.4 | 1.2 | 4.8 | 2.1 | 1.0 | 4.2 |
| Richmond City Jail | 0.9 | 0.3 | 2.8 | 2.6 | 1.3 | 5.2 |
| Riverside Regional Jail | 1.8 | 0.8 | 4.3 | 3.1 | 1.7 | 5.6 |
| Virginia Beach Municipal Corr. Ctr. | 1.0 | 0.4 | 2.6 | 1.4 | 0.6 | 3.3 |
| **Washington** | | | | | | |
| Benton Co. Jail | 0.1% | 0.0% | 0.4% | 2.3% | 0.8% | 6.0% |
| Cowlitz Co. Jail | 1.1 | 0.5 | 2.8 | 0.6 | 0.2 | 2.0 |
| King Co. Regional Justice Ctr. | 0.6 | 0.1 | 2.7 | 0.8 | 0.2 | 2.4 |
| Snohomish Co. Jail | 1.0 | 0.3 | 3.1 | 0.0 | 0.0 | 1.6 |
| Sunnyside City Jail | 0.0 | 0.0 | 18.4 | 0.0 | 0.0 | 18.4 |
| Whatcom Co. Jail | 0.5 | 0.1 | 1.8 | 2.5 | 1.2 | 5.1 |
| Yakima City Jail | 0.0 | 0.0 | 9.0 | 1.8 | 0.5 | 5.9 |
| **West Virginia** | | | | | | |
| Eastern Regional Jail | 3.3% | 1.4% | 7.5% | 3.2% | 1.6% | 6.6% |
| South Central Regional Jail | 1.8 | 0.6 | 4.8 | 4.2 | 1.8 | 9.2 |
| Western Regional Jail | 2.9 | 1.6 | 5.3 | 1.9 | 0.9 | 4.2 |
| **Wisconsin** | | | | | | |
| Brown Co. Jail | 1.2% | 0.4% | 3.9% | 2.9% | 1.4% | 6.1% |
| Columbia Co. Jail | 2.1 | 0.6 | 7.5 | 2.1 | 0.6 | 7.5 |
| Milwaukee Co. Corr. Fac. South | 1.0 | 0.3 | 3.2 | 3.2 | 1.6 | 6.3 |
| Oconto Co. Jail | 0.0 | 0.0 | 18.4 | 0.0 | 0.0 | 18.4 |
| Rock Co. Jail | 0.8 | 0.2 | 3.0 | 2.5 | 1.2 | 5.3 |
| Walworth Co. Jail | 0.0 | 0.0 | 3.7 | 2.5 | 1.3 | 5.0 |
| Washington Co. Jail | 0.0 | 0.0 | 5.4 | 4.5 | 2.4 | 8.6 |
| Wood Co. Jail | 0.0 | 0.0 | 12.9 | 0.0 | 0.0 | 12.9 |
| **Wyoming** | | | | | | |
| Lincoln Co. Jail | 0.0% | 0.0% | 25.9% | 0.0% | 0.0% | 25.9% |

[a]Includes all inmates who reported unwanted contacts with another inmate or any contacts with staff that involved oral, anal, or vaginal penetration, hand jobs, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Includes all inmates who reported unwanted contacts with another inmate or any contacts with staff that involved touching of the inmate's buttocks, thigh, penis, breasts, or vagina in a sexual way occurring in the past 12 months or since admission to the facility, if shorter.

[c]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[d]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, sentence length, and time served. (See *Methodology*.)

[e]Female facility.

[f]Facility housed both males and females; only males were sampled at this facility.

[g]Privately operated facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 9**
**Characteristics of special correctional facilities and prevalence of sexual victimization, by facility, National Inmate Survey, 2011–12**

| Special correctional facilities | Number of inmates in custody[c] | Respondents to sexual victimization survey[d] | Response rate[e] | Inmates reporting sexual victimization[a] Percent[f] | 95%-confidence interval[b] Lower bound | Upper bound |
|---|---|---|---|---|---|---|
| **Immigration and Customs Enforcement facilities** | | | | | | |
| El Centro SPC (CA) | 386 | 115 | 47.8% | 0.8% | 0.2% | 3.4% |
| Jena/LaSalle Det. Fac. (LA)[g] | 767 | 97 | 39.6 | 1.1 | 0.2 | 5.4 |
| Krome North SPC (FL) | 584 | 60 | 22.9 | 3.8 | 1.2 | 11.9 |
| Otero Co. Processing Ctr. (NM) | 618 | 140 | 59.0 | 1.7 | 0.6 | 4.4 |
| Port Isabel Processing Ctr. (TX) | 1173 | 161 | 39.3 | 2.3 | 1.0 | 5.6 |
| **Military facilities** | | | | | | |
| Midwest Joint Regional Corr. Fac., Fort Leavenworth (KS) | 188 | 82 | 56.2% | 3.9% | 1.9% | 7.9% |
| Naval Consolidated Brig, Charleston (SC) | 138 | 94 | 80.7 | 4.4 | 2.6 | 7.4 |
| Naval Consolidated Brig, Miramar (CA)[h] | 312 | 121 | 64.1 | 6.6 | 3.8 | 11.2 |
| Northwest Joint Regional Corr. Fac. (WA) | 140 | 85 | 71.0 | 6.6 | 2.9 | 14.1 |
| United States Disciplinary Barracks, Fort Leavenworth (KS) | 464 | 157 | 69.5 | 2.6 | 1.2 | 5.6 |
| **Indian country jails** | | | | | | |
| Hualapai Adult Det. Ctr. (AZ)[g] | 15 | 7 | 60.0% | : | : | : |
| Laguna Det. Ctr. (NM)[g] | 38 | 26 | 73.7 | 0.0% | 0.0% | 12.9% |
| Oglala Sioux Tribal Offenders Fac. (SD)[g] | 115 | 56 | 51.8 | 10.8 | 6.2 | 17.9 |
| San Carlos Dept. of Corr. and Rehabilitation - Adult and Juvenile Det. (AZ)[g] | 133 | 79 | 83.8 | 1.6 | 0.6 | 4.2 |
| Standing Rock Law Enforcement and Adult Det. Ctr. (ND)[g] | 35 | 7 | 72.7 | : | : | : |

: Not calculated.

[a]Includes all types of sexual victimization, including oral, anal, or vaginal penetration, hand jobs, touching of the inmate's butt, thighs, penis, breasts, or vagina in a sexual way, and other sexual acts occurring in the past 12 months or since admission to the facility, if shorter.

[b]Indicates that different samples in the same facility would yield prevalence rates falling between the lower and upper bound estimates 95 out of 100 times.

[c]Number of inmates in custody on day when the facility provided the sample roster.

[d]Number of respondents completing to the sexual victimization survey. (See *Methodology*.)

[e]Response rate is equal to the number of respondents divided by the number of eligible inmates sampled times 100 percent.

[f]Weights were applied so that inmates who responded accurately reflected the entire population of each facility on select characteristics, including age, sex, race, time served, and sentence length. (See *Methodology*.)

[g]Facility housed both males and females; both were sampled at this facility.

[h]Facility housed both males and females; only males were sampled at this facility.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 10**
**Standard errors for table 2: Prevalence of sexual victimization across inmate surveys, by type of incident, National Inmate Survey, 2007, 2008–09, and 2011–12**

| Type of incident[c] | Percent of prison inmates NIS-1 2007 | NIS-2 2008–09 | NIS-3 2011–12 | Percent of jail inmates NIS-1 2007 | NIS-2 2008–09 | NIS-3 2011–12 |
|---|---|---|---|---|---|---|
| **Total** | 0.3% | 0.3% | 0.2% | 0.1% | 0.1% | 0.2% |
| **Inmate-on-inmate** | 0.1% | 0.2% | 0.1% | 0.1% | 0.1% | 0.1% |
| Nonconsensual sexual acts | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Abusive sexual contacts only | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Staff sexual misconduct** | 0.2% | 0.2% | 0.2% | 0.1% | 0.1% | 0.1% |
| Unwilling activity | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 |
| Excluding touching | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Touching only | 0.1 | 0.1 | 0.1 | -- | -- | -- |
| Willing activity | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Excluding touching | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Touching only | -- | -- | -- | -- | -- | -- |

--Less than 0.05%.

Source: Bureau of Justice Statistics, National Inmate Survey, 2007, 2008–09, and 2011–12.

**APPENDIX TABLE 11**

**Standard errors for table 7: Prevalence of sexual victimization, by type of incident and inmate characteristics, National Inmate Survey, 2011−12**

| Characteristic | Prison inmates reporting sexual victimization | | | Jail inmates reporting sexual victimization | | |
|---|---|---|---|---|---|---|
| | Number of inmates | Inmate-on-inmate | Staff sexual misconduct | Number of inmates | Inmate-on-inmate | Staff sexual misconduct |
| **Sex** | | | | | | |
| Male | 85,500 | 0.1% | 0.2% | 31,500 | 0.1% | 0.1% |
| Female | 8,900 | 0.7 | 0.3 | 6,800 | 0.3 | 0.2 |
| **Race/Hispanic origin** | | | | | | |
| White | 29,400 | 0.3% | 0.2% | 11,700 | 0.2% | 0.1% |
| Black | 38,500 | 0.1 | 0.2 | 16,400 | 0.1 | 0.2 |
| Hispanic | 30,900 | 0.2 | 0.4 | 13,500 | 0.3 | 0.1 |
| Other | 3,500 | 0.4 | 0.7 | 1,800 | 0.3 | 0.4 |
| Two or more races | 8,500 | 0.5 | 0.6 | 2,800 | 0.4 | 0.4 |
| **Age** | | | | | | |
| 18–19 | 2,300 | 0.7% | 0.6% | 1,900 | 0.3% | 0.4% |
| 20–24 | 12,100 | 0.3 | 0.4 | 7,300 | 0.2 | 0.2 |
| 25–34 | 26,800 | 0.2 | 0.3 | 11,900 | 0.2 | 0.2 |
| 35–44 | 27,900 | 0.2 | 0.4 | 7,800 | 0.2 | 0.1 |
| 45–54 | 18,900 | 0.3 | 0.2 | 6,500 | 0.2 | 0.1 |
| 55 or older | 9,900 | 0.2 | 0.2 | 2,000 | 0.4 | 0.1 |
| **Education** | | | | | | |
| Less than high school | 48,900 | 0.2% | 0.2% | 17,900 | 0.2% | 0.1% |
| High school graduate | 19,700 | 0.3 | 0.4 | 8,600 | 0.1 | 0.2 |
| Some college | 15,900 | 0.3 | 0.2 | 7,100 | 0.2 | 0.2 |
| College degree or more | 6,000 | 0.4 | 0.4 | 3,200 | 0.4 | 0.4 |
| **Marital status** | | | | | | |
| Married | 16,100 | 0.2% | 0.3% | 7,900 | 0.1% | 0.2% |
| Widowed, divorced, or separated | 23,700 | 0.2 | 0.2 | 8,600 | 0.3 | 0.2 |
| Never married | 47,400 | 0.2 | 0.2 | 19,500 | 0.2 | 0.1 |
| **Body Mass Index** | | | | | | |
| Underweight | 1,200 | 1.1% | 1.3% | 600 | 0.9% | 0.5% |
| Normal | 21,600 | 0.2 | 0.2 | 12,400 | 0.1 | 0.1 |
| Overweight | 37,500 | 0.1 | 0.2 | 14,300 | 0.1 | 0.1 |
| Obese | 22,700 | 0.2 | 0.2 | 6,900 | 0.3 | 0.2 |
| Morbidly Obese | 2,700 | 0.6 | 0.9 | 900 | 0.6 | 0.7 |

--Less than 0.05%.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 12**
**Standard errors for table 8: Prevalence of sexual victimization, by type of incident and inmate sexual characteristics, National Inmate Survey, 2011−12**

| Sexual characteristic | Prison inmates reporting sexual victimization | | | Jail inmates reporting sexual victimization | | |
|---|---|---|---|---|---|---|
| | Number of inmates | Inmate-on-inmate | Staff sexual misconduct | Number of inmates | Inmate-on-inmate | Staff sexual misconduct |
| **Sexual orientation** | | | | | | |
| Heterosexual | 78,900 | 0.1% | 0.2% | 31,700 | 0.1% | 0.1% |
| Non-heterosexual | 7,400 | 0.8 | 0.7 | 3,300 | 0.9 | 0.5 |
| **Number of sexual partners** | | | | | | |
| 0–1 | 17,000 | 0.2% | 0.2% | 6,300 | 0.3% | 0.2% |
| 2–4 | 9,700 | 0.3 | 0.3 | 5,400 | 0.2 | 0.2 |
| 5–10 | 15,300 | 0.2 | 0.2 | 5,800 | 0.2 | 0.1 |
| 11–20 | 12,500 | 0.3 | 0.4 | 6,000 | 0.3 | 0.2 |
| 21 or more | 29,600 | 0.2 | 0.3 | 12,100 | 0.2 | 0.2 |
| **Prior sexual victimization** | | | | | | |
| Yes | 12,900 | 0.7% | 0.5% | 5,700 | 0.8% | 0.4% |
| No | 75,600 | 0.1 | 0.2 | 30,300 | -- | 0.1 |

--Less than 0.05%.
Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 13**
**Standard errors for table 9: Prevalence of sexual victimization, by type of incident and inmate criminal justice status and history, National Inmate Survey, 2011−12**

| Criminal justice status and history | Prison inmates reporting sexual victimization | | | Jail inmates reporting sexual victimization | | |
|---|---|---|---|---|---|---|
| | Number of prison inmates | Inmate-on-inmate | Staff sexual misconduct | Number of jail inmates | Inmate-on-inmate | Staff sexual misconduct |
| **Most serious offense** | | | | | | |
| Violent sexual offense | 25,500 | 0.4% | 0.3% | 1,900 | 0.6% | 0.4% |
| Other violent | 34,200 | 0.2 | 0.2 | 7,500 | 0.3 | 0.3 |
| Property | 16,000 | 0.3 | 0.3 | 8,300 | 0.2 | 0.2 |
| Drug | 22,000 | 0.1 | 0.2 | 7,400 | 0.1 | 0.1 |
| Other | 11,600 | 0.4 | 0.5 | 10,500 | 0.1 | 0.2 |
| **Sentence length** | | | | | | |
| Less than 1 year | 6,100 | 0.4% | 0.4% | : | : | : |
| 1–4 years | 23,400 | 0.2 | 0.1 | : | : | : |
| 5–9 years | 16,500 | 0.2 | 0.3 | : | : | : |
| 10–19 years | 23,700 | 0.2 | 0.2 | : | : | : |
| 20 years or more | 30,000 | 0.4 | 0.4 | : | : | : |
| Life/death | 14,300 | 0.4 | 0.4 | : | : | : |
| **Time in a correctional facility prior to current facility** | | | | | | |
| Less than 1 month | 17,300 | 0.2% | 0.2% | 10,500 | 0.2% | 0.1% |
| 1–5 months | 9,700 | 0.3 | 0.4 | 6,300 | 0.2 | 0.1 |
| 6–11 months | 6,900 | 0.2 | 0.3 | 3,400 | 0.2 | 0.3 |
| 1–4 years | 22,700 | 0.2 | 0.2 | 7,800 | 0.1 | 0.2 |
| 5 years or more | 30,100 | 0.2 | 0.2 | 8,300 | 0.3 | 0.3 |
| **Number of times arrested** | | | | | | |
| 1 time | 13,800 | 0.3% | 0.2% | 4,700 | 0.4% | 0.2% |
| 2–3 times | 28,500 | 0.2 | 0.2 | 9,800 | 0.2 | 0.2 |
| 4–10 times | 34,700 | 0.2 | 0.2 | 13,600 | 0.1 | 0.1 |
| 11 or more times | 13,400 | 0.2 | 0.3 | 8,300 | 0.2 | 0.2 |
| **Time since admission** | | | | | | |
| Less than 1 month | 6,500 | 0.4% | 0.2% | 12,300 | 0.1% | 0.1% |
| 1–5 months | 22,100 | 0.2 | 0.2 | 16,100 | 0.1 | 0.1 |
| 6–11 months | 21,100 | 0.2 | 0.3 | 5,300 | 0.5 | 0.3 |
| 1–4 years | 35,300 | 0.2 | 0.2 | 4,800 | 0.3 | 0.4 |
| 5 years or more | 24,400 | 0.5 | 0.4 | 200 | 1.3 | 1.6 |

: Not calculated.
Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 14**
**Standard errors for table 10: Juvenile inmates reporting sexual victimization, by type of incident, National Inmate Survey, 2011–12**

| Type of incident | Standard errors | | |
|---|---|---|---|
| | All facilities | Prisons | Jails |
| **Total** | 0.7% | 1.2% | 0.9% |
| Inmate-on-inmate | 0.5% | 0.8% | 0.6% |
| Nonconsensual sexual acts | 0.2 | 0.8 | 0.1 |
| Abusive sexual contacts only | 0.4 | 0.2 | 0.5 |
| **Staff sexual misconduct** | 0.6% | 1.0% | 0.7% |
| Unwilling activity | 0.4 | 0.3 | 0.5 |
| Excluding touching | 0.4 | 0.3 | 0.5 |
| Touching only | 0.1 | 0.0 | 0.2 |
| Willing activity | 0.5 | 1.0 | 0.6 |
| Excluding touching | 0.5 | 1.0 | 0.6 |
| Touching only | 0.0 | 0.0 | 0.0 |
| **Number of inmates** | : | : | : |

: Not calculated.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 15**
**Standard errors for table 11: Prevalence of sexual victimization, by type of incident and age of inmate, National Inmate Survey, 2011–12**

| Age | Prison inmates | | | Jail inmates | | |
|---|---|---|---|---|---|---|
| | Number | Inmate-on-inmate | Staff sexual misconduct | Number | Inmate-on-inmate | Staff sexual misconduct |
| 16–17 | 360 | 0.8% | 1.0% | 950 | 0.6% | 0.7% |
| 18–19 | 2,280 | 0.7 | 0.6 | 6,080 | 0.3 | 0.4 |
| 20–24 | 12,070 | 0.3 | 0.4 | 22,240 | 0.2 | 0.2 |
| 25–34 | 26,820 | 0.2 | 0.3 | 38,050 | 0.2 | 0.2 |
| 35–44 | 27,890 | 0.2 | 0.4 | 23,090 | 0.2 | 0.1 |
| 45–54 | 18,890 | 0.3 | 0.2 | 16,170 | 0.2 | 0.1 |
| 55 or older | 9,910 | 0.2 | 0.2 | 4,750 | 0.4 | 0.1 |

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 16**

**Standard errors for table 12: Prevalence of sexual victimization among juveniles ages 16–17 and inmates ages 18–19 and 20–24, by type of incident and inmate characteristics, National Inmate Survey, 2011–12**

| | Prison and jail inmates reporting sexual victimization | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of inmates | | | Inmate-on-inmate | | | Staff sexual misconduct | | |
| Characteristic | Ages 16–17 | 18–19 | 20–24 | Ages 16–17 | 18–19 | 20–24 | Ages 16–17 | 18–19 | 20–24 |
| All inmates | 790 | 5,020 | 25,500 | 0.5% | 0.3% | 0.2% | 0.6% | 0.3% | 0.2% |
| **Sex** | | | | | | | | | |
| Male | 740 | 4,750 | 23,760 | 0.5% | 0.3% | 0.2% | 0.6% | 0.3% | 0.3% |
| Female | 110 | 510 | 2,790 | 1.7 | 1.5 | 0.8 | 0.6 | 0.5 | 0.4 |
| **Race/Hispanic origin** | | | | | | | | | |
| White | 150 | 1,210 | 6,410 | 3.2% | 1.1% | 0.4% | 1.8% | 0.7% | 0.3% |
| Black | 450 | 2,410 | 10,650 | 0.5 | 0.3 | 0.2 | 0.8 | 0.5 | 0.3 |
| Hispanic | 350 | 1,560 | 8,030 | 0.4 | 0.5 | 0.3 | 1.5 | 0.6 | 0.7 |
| Other | 20 | 230 | 1,120 | 0.0 | 1.5 | 0.5 | 0.0 | 1.3 | 1.9 |
| Two or more races | 110 | 610 | 2,650 | 0.8 | 0.8 | 0.9 | 0.8 | 1.1 | 0.8 |
| **Body Mass Index** | | | | | | | | | |
| Underweight | 80 | 190 | 470 | 5.7% | 1.7% | 1.1% | 5.7% | 1.0% | 1.9% |
| Normal | 470 | 3,070 | 11,840 | 0.3 | 0.4 | 0.2 | 0.7 | 0.5 | 0.2 |
| Overweight | 180 | 1,570 | 9,500 | 1.0 | 0.5 | 0.3 | 0.7 | 0.6 | 0.5 |
| Obese | 100 | 480 | 3,360 | 3.8 | 0.9 | 0.6 | 2.8 | 0.5 | 0.7 |
| Morbidly obese | 30 | 80 | 480 | 0.0 | 3.4 | 1.8 | 0.0 | 4.3 | 1.9 |
| **Sexual orientation** | | | | | | | | | |
| Heterosexual | 740 | 4,680 | 23,100 | 0.5% | 0.2% | 0.1% | 0.6% | 0.3% | 0.2% |
| Non-heterosexual | 50 | 410 | 2,300 | 3.1 | 4.1 | 1.4 | 0.8 | 1.5 | 2.0 |
| **Most serious offense** | | | | | | | | | |
| Violent sexual | 30 | 320 | 2,480 | 4.3% | 5.0% | 1.4% | 4.7% | 1.5% | 0.6% |
| Other violent | 360 | 1,790 | 8,710 | 0.5 | 0.4 | 0.3 | 1.2 | 0.7 | 0.5 |
| Property | 280 | 1,870 | 6,100 | 0.5 | 0.4 | 0.4 | 0.6 | 0.6 | 0.3 |
| Drug | 110 | 770 | 4,830 | 4.2 | 0.6 | 0.3 | 2.9 | 0.6 | 0.3 |
| Other | 120 | 820 | 4,410 | 2.2 | 0.7 | 0.2 | 1.0 | 0.5 | 0.4 |

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 17**

**Standard errors for table 13: Circumstances surrounding incidents among juveniles ages 16–17 and inmates ages 18–19 and 20–24, by type of victimization, National Inmate Survey, 2011–12**

| | Victims in prisons and jails | | | | | |
|---|---|---|---|---|---|---|
| | Inmate-on-inmate | | | Staff sexual misconduct | | |
| Circumstance | Ages 16–17 | 18–19 | 20–24 | Ages 16–17 | 18–19 | 20–24 |
| Number of victims | 40 | 190 | 710 | 50 | 220 | 1,110 |
| **Number of incidents** | | | | | | |
| 1 | 17.6% | 9.4% | 5.4% | 8.0% | 4.4% | 5.4% |
| 2 or more | 17.6 | 9.4 | 5.4 | 8.0 | 4.4 | 5.4 |
| **Type of coercion or force** | | | | | | |
| Without pressure or force | ~ | ~ | ~ | 7.7% | 5.9% | 3.9% |
| Pressured | 11.7% | 7.8% | 3.0% | 9.8 | 6.4 | 4.9 |
| Force/threat of force | 9.4 | 9.1 | 3.7 | 9.9 | 5.5 | 4.0 |
| Ever injured | 12.8% | 7.4% | 2.2% | 4.2% | 3.8% | 3.5% |
| Ever report an incident | 6.8% | 6.9% | 2.5% | 3.4% | 3.6% | 3.5% |

~Not applicable.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 18**

**Standard errors for table 14: Prevalence of victimization by current mental health status and history of mental health problems among inmates, by type of facility, National Inmate Survey, 2011–12**

| | Adult prison inmates | | | | Adult jail inmates | | | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Inmate-on-inmate | Staff sexual misconduct | Number | Percent | Inmate-on-inmate | Staff sexual misconduct |
| **Current mental health status** | | | | | | | | |
| No mental illness | 57,200 | 0.8% | 0.1% | 0.1% | 17,000 | 0.6% | 0.1% | 0.1% |
| Anxiety-mood disorder | 13,600 | 0.4 | 0.3 | 0.4 | 7,700 | 0.3 | 0.2 | 0.1 |
| Serious psychological distress | 12,400 | 0.5 | 0.6 | 0.4 | 10,400 | 0.5 | 0.3 | 0.2 |
| **History of mental health problems** | | | | | | | | |
| Ever told by mental health professional had disorder | | | | | | | | |
|   Yes | 27,600 | 1.2% | 0.3% | 0.2% | 16,300 | 0.8% | 0.3% | 0.2% |
|   No | 57,900 | 1.2 | 0.1 | 0.1 | 19,100 | 0.8 | 0.1 | 0.1 |
| Had overnight stay in hospital in year before current admission | | | | | | | | |
|   Yes | 8,000 | 0.4% | 0.6% | 0.6% | 5,900 | 0.4% | 0.5% | 0.3% |
|   No | 74,100 | 0.4 | 0.1 | 0.1 | 28,700 | 0.4 | 0.1 | 0.1 |
| Used prescription medications at time of current offense | | | | | | | | |
|   Yes | 11,600 | 0.8% | 0.4% | 0.3% | 8,600 | 0.6% | 0.3% | 0.2% |
|   No | 72,900 | 0.8 | 0.1 | 0.1 | 26,200 | 0.6 | 0.1 | 0.1 |
| Ever received professional mental health therapy | | | | | | | | |
|   Yes | 27,600 | 1.0% | 0.3% | 0.3% | 14,100 | 0.6% | 0.3% | 0.2% |
|   No | 55,900 | 1.0 | 0.1 | 0.1 | 20,800 | 0.6 | 0.1 | 0.1 |

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 19**

**Standard errors for table 15: Prevalence of serious psychological distress among adults in prisons, jails, and the U.S. civilian noninstitutional population, 2011–12**

| | Percent with serious psychological distress | | |
|---|---|---|---|
| | | Inmates age 18 or older | |
| Demographic characteristic | U.S. noninstitutional adult population | Prison | Jail |
| **Total** | 0.2% | 0.5% | 0.5% |
| **Sex** | | | |
| Male | 0.2% | 0.5% | 0.5% |
| Female | 0.2 | 1.1 | 0.9 |
| **Race/Hispanic origin** | | | |
| White | 0.2% | 0.6% | 0.7% |
| Black | 0.3 | 0.6 | 0.8 |
| Hispanic | 0.4 | 0.8 | 0.8 |
| **Age** | | | |
| 18–44 | 0.2% | 0.6% | 0.5% |
| 45–64 | 0.3 | 0.8 | 0.8 |
| 65 or older | 0.3 | 1.4 | 3.5 |

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12; and Centers for Disease Control and Prevention, National Health Interview Survey, 2012.

**APPENDIX TABLE 20**

**Standard errors for table 16: Prevalence of inmate-on-inmate victimization, by current mental health status and inmate characteristics, National Inmate Survey, 2011–12**

| Characteristic | Prison inmates reporting sexual victimization | | | Jail inmates reporting sexual victimization | | |
|---|---|---|---|---|---|---|
| | No mental illness | Anxiety-mood disorder | Serious psychological distress | No mental illness | Anxiety-mood disorder | Serious psychological distress |
| **Sex** | | | | | | |
| Male | 0.1% | 0.3% | 0.6% | 0.1% | 0.2% | 0.4% |
| Female | 0.4 | 1.1 | 1.3 | 0.4 | 0.4 | 0.7 |
| **Race/Hispanic origin** | | | | | | |
| White | 0.2% | 0.6% | 0.8% | 0.2% | 0.3% | 0.4% |
| Black | 0.1 | 0.3 | 0.9 | 0.1 | 0.2 | 0.4 |
| Hispanic | 0.1 | 0.5 | 1.1 | 0.2 | 0.3 | 0.7 |
| **Age** | | | | | | |
| 18–24 | 0.1% | 0.8% | 1.1% | 0.1% | 0.4% | 0.4% |
| 25–34 | 0.1 | 0.5 | 0.7 | 0.2 | 0.2 | 0.4 |
| 35–44 | 0.1 | 0.4 | 1.0 | 0.1 | 0.2 | 0.7 |
| 45 or older | 0.2 | 0.5 | 0.9 | 0.2 | 0.3 | 0.8 |
| **Sexual orientation** | | | | | | |
| Heterosexual | -- | 0.2% | 0.4% | 0.1% | 0.1% | 0.2% |
| Non-heterosexual | 0.8% | 1.5 | 2.2 | 0.8 | 0.8 | 2.0 |
| **Most serious offense** | | | | | | |
| Violent sexual offense | 0.3% | 0.7% | 1.4% | 0.6% | 1.5% | 1.2% |
| Other violent | 0.2 | 0.4 | 0.9 | 0.4 | 0.5 | 0.5 |
| Property | 0.1 | 0.6 | 1.1 | 0.1 | 0.3 | 0.6 |
| Drug | 0.1 | 0.4 | 0.7 | 0.1 | 0.2 | 0.4 |
| Other | 0.2 | 0.5 | 0.9 | 0.1 | 0.2 | 0.4 |

--Less than 0.05%.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 21**

**Standard errors for table 17: Prevalence of staff sexual misconduct, by current mental health status and inmate characteristics, National Inmate Survey, 2011–12**

| Characteristic | Prison inmates reporting sexual victimization | | | Jail inmates reporting sexual victimization | | |
|---|---|---|---|---|---|---|
| | No mental illness | Anxiety-mood disorder | Serious psychological distress | No mental illness | Anxiety-mood disorder | Serious psychological distress |
| **Sex** | | | | | | |
| Male | 0.1% | 0.5% | 0.5% | 0.1% | 0.1% | 0.3% |
| Female | 0.2 | 0.4 | 0.7 | 0.2 | 0.3 | 0.3 |
| **Race/Hispanic origin** | | | | | | |
| White | 0.1% | 0.3% | 0.6% | 0.1% | 0.1% | 0.3% |
| Black | 0.2 | 1.2 | 0.8 | 0.1 | 0.3 | 0.5 |
| Hispanic | 0.2 | 0.4 | 1.5 | 0.1 | 0.2 | 0.5 |
| **Age** | | | | | | |
| 18–24 | 0.3% | 0.7% | 1.5% | 0.1% | 0.3% | 0.5% |
| 25–34 | 0.2 | 0.5 | 0.8 | 0.2 | 0.2 | 0.4 |
| 35–44 | 0.2 | 1.1 | 0.8 | 0.1 | 0.2 | 0.4 |
| 45 or older | 0.1 | 0.4 | 0.7 | 0.1 | 0.3 | 0.3 |
| **Sexual orientation** | | | | | | |
| Heterosexual | 0.1% | 0.5% | 0.4% | 0.1% | 0.1% | 0.2% |
| Non-heterosexual | 0.6 | 0.9 | 2.0 | 0.7 | 0.6 | 0.8 |
| **Most serious offense** | | | | | | |
| Violent sexual offense | 0.3% | 0.7% | 0.8% | 0.5% | 0.4% | 1.1% |
| Other violent | 0.2 | 0.6 | 0.9 | 0.3 | 0.4 | 0.6 |
| Property | 0.2 | 0.6 | 1.2 | 0.1 | 0.3 | 0.4 |
| Drug | 0.1 | 1.3 | 0.6 | 0.1 | 0.2 | 0.4 |
| Other | 0.3 | 0.5 | 1.2 | 0.2 | 0.2 | 0.5 |

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 22**

**Standard errors for table 18: Circumstances surrounding incidents among adult inmates, by current mental health status and type of victimization, National Inmate Survey, 2011–12**

| | Victims in prisons and jails | | | | | |
| | Inmate-on-inmate | | | Staff sexual misconduct | | |
| Circumstance | No mental illness | Anxiety-mood disorder | Serious psychological distress | No mental illness | Anxiety-mood disorder | Serious psychological distress |
|---|---|---|---|---|---|---|
| Number of victims | 860 | 790 | 1,450 | 1,250 | 1,260 | 1,200 |
| **Number of incidents** | | | | | | |
| 1 | 4.5% | 6.0% | 2.5% | 2.6% | 2.7% | 2.3% |
| 2 or more | 4.5 | 6.0 | 2.5 | 2.6 | 2.7 | 2.3 |
| **Type of coercion or force** | | | | | | |
| Without pressure or force | ~ | ~ | ~ | 3.2% | 3.5% | 2.9% |
| Pressured | 3.4% | 2.5% | 2.5% | 3.0 | 4.4 | 2.7 |
| Force/threat of force | 3.4 | 3.5 | 2.2 | 2.7 | 4.7 | 2.9 |
| **Ever injured** | 2.0% | 2.3% | 2.2% | 1.4% | 1.6% | 2.4% |
| **Ever report an incident** | 3.0% | 2.4% | 2.3% | 2.2% | 2.8% | 2.6% |

~Not applicable.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 23**

**Standard errors for table 19: Prevalence of sexual victimization, by type of incident and inmate sexual orientation, National Inmate Survey, 2011–12**

| | Inmate-on-inmate | | Staff sexual misconduct | |
| Characteristic | Heterosexual | Non-heterosexual | Heterosexual | Non-heterosexual |
|---|---|---|---|---|
| **Sex** | | | | |
| Male | 0.1% | 0.9% | 0.2% | 0.7% |
| Female | 0.3 | 0.7 | 0.2 | 0.4 |
| **Race/Hispanic origin** | | | | |
| White | 0.1% | 1.1% | 0.1% | 0.5% |
| Black | 0.1 | 1.2 | 0.2 | 0.9 |
| Hispanic | 0.1 | 1.2 | 0.3 | 1.6 |
| **Age** | | | | |
| 18–24 | 0.1% | 1.5% | 0.2% | 1.8% |
| 25–44 | 0.1 | 0.8 | 0.2 | 0.5 |
| 45 or older | 0.1 | 1.1 | 0.1 | 0.7 |
| **Education** | | | | |
| Less than high school | 0.1% | 0.9% | 0.2% | 0.5% |
| High school graduate | 0.2 | 1.4 | 0.3 | 1.5 |
| Some college or more | 0.1 | 1.0 | 0.2 | 0.6 |
| **Mental health problems** | | | | |
| None | -- | 0.6% | 0.1% | 0.5% |
| Anxiety-mood disorder | 0.1% | 1.1 | 0.3 | 0.6 |
| Serious psychological distress | 0.2 | 1.5 | 0.2 | 1.3 |

--Less than 0.05%.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

**APPENDIX TABLE 24**

**Standard errors for table 20: Circumstances surrounding incidents of sexual victimization among heterosexual and non-heterosexual inmates, National Inmate Survey, 2011–12**

| | Victims in prisons and jails | | | |
|---|---|---|---|---|
| | Inmate-on-inmate | | Staff sexual misconduct | |
| Circumstance | Heterosexual | Non-heterosexual | Heterosexual | Non-heterosexual |
| Number of victims | 1,530 | 1,490 | 3,680 | 1,000 |
| **Number of incidents** | | | | |
| 1 | 3.5% | 3.2% | 1.8% | 2.5% |
| 2 or more | 3.5 | 3.2 | 1.8 | 2.5 |
| **Type of coercion or force** | | | | |
| Without pressure or force | ~ | ~ | 1.9% | 5.0% |
| Pressured | 2.4% | 1.9% | 1.7 | 6.7 |
| Force or threat of force | 2.5 | 2.3 | 1.9 | 5.0 |
| **Ever injured** | 2.0% | 2.2% | 1.4% | 3.3% |
| **Ever report an incident** | 2.2% | 2.2% | 1.7% | 4.3% |

~Not applicable.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.





N C J 2 4 1 3 9 9

**Office of Justice Programs**
**Innovation • Partnerships • Safer Neighborhoods**
**www.ojp.usdoj.gov**

# EXHIBIT H

8-5-2022                    ID# 07313-506

Dear Judge John F. Walter
The Honorable John F. Walter

Whom may this letter Concern:

    I Tasha Grayson is Derrick
Patterson, Grandmother. I have
Been in derrick life Since the
day he was born.

Derrick is mine oldest grandson
Derrick grew up in a good home.
With his mother Sister and brother.

Derrick mother Pass away in march
of 2016 from breast cancer. Derrick
was fifteen at that time.

Derrick move to California After
his mother passed away. Derrick
try to Survive own his on,

ID# 07313-506

Derrick couldn't cope of lost of his mother Derrick is a very understanding Person, Derrick Mother allways told Derrick to listen more, talk less, and don't interrupt while some one is talking and have respect, and never doubt family who love you.

I know Derrick is still dealing with lost of his mother. Derrick is a fun person to be with, his sister and brother miss him clearly.

I love mine grandson he check up on me every day to see how I am doing. Derrick is a loving person he wouldnt harm any one. Wants you get to know Derrick. he is a caring person.

This is Derrick first time leaving home. own his on. he was just trying

ID 07313-506

to make it Out in the world.
Derrick has learn his lesson.
Derrick and I Pray everynight
that everything will be Okay.

Dear Judge John F. Walter
I want to thank you for your
time reading my letter. I love
my grandson dearly.

Thank you for understanding my
grandson. for every thing he bees threw.

Sincerely,
MRS Tasha Grayon
T. Grayson
Aug 5, 2022.

# EXHIBIT I

**Dear judge Derrick**

Case 2:22-cr-00159 Document 41-1   Filed 10/03/22   Page 221 of 221   Page ID #:480

John F. Walter.                    Patterson
                                   #07313-506

The Honorable

John F. Walter

My plead to you

I can just remember when  my nephew  Derrick was a young boy he was happy, funny, loving, and caring always knew how to take time to think about others . Derrick is smart and always ready to learn, your honor I totally believe Derrick has grown up to be a responsible, accountable, upstanding, and most of all understanding  man.

When Derrick was just 17 years of age he experienced the loss of his mother something that no child will never want to experience. I believe Derrick never fully recovered instead of talking with friends or family To discuss his depression or his emotions Derrick was trying to deal with everything on his own which had to be very difficult for him as the oldest child. Derrick started to live on his own in Los Angeles California soon after the death of his mother in 2016 was a very dark time for Derrick to the point he was struggling living with friends even sometimes in his car, things had gotten very rough for Derrick at times. Derrick Made several attempts to look for employment due to the lack of education, luck was not on his side. Derrick manage to stay strong!Derrick may made some bad decisions in his past, please be kind and allow Derrick to state his truth and ask for forgiveness on his behalf.

Derrick Malik Patterson is my first nephew I love him very dearly he has two beautiful siblings one sister, brother, two-year-old nephew and grandmother who he love so much that are depending on him! Derrick is a awesome nephew he is very strong, intelligent. I strongly believe that he has learned his lesson and deserves a  lighter sentence plus a Second chance in today's society.  We're a loving family we love miss Derrick tremendously.

Thank you so much for taking your time to read my letter judge

*[signature]*

8/8/22